LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                   NORTHERN DIVISION

4

5     CASE NUMBER:   2:06cv459-MHT           ▢ COPY

6

7     GLORIA DUNIPHIN,

8          Plaintiff,

9     vs.

10    BENNY WHITEHEAD, INC., and

11    PeopLease CORPORATION,

12         Defendants.

13

14

15    BEFORE:

16         Cynthia M. Noakes, Commissioner

17         and Court Reporter

18

19

20      DEPOSITION TESTIMONY OF GLORIA DUNIPHIN

21

22

23         * * * * * * * * * * * * * * * * * * * * * * * * *

Page 26

1   A.    No.

2   Q.    All right.  So Mr. Browning.  Were y'all

3   divorced, or how did that --

4   A.    Yes.

5   Q.    And he is where?

6   A.    LaGrange.

7   Q.    Okay.  And then your next marriage?

8   A.    Was David Smith.

9   Q.    All right.  Is he deceased?

10  A.    Yes.

11  Q.    And when did he pass away?

12  A.    January 2, 2002.

13  Q.    And were y'all still married whenever he

14  passed away?

15  A.    Yes.

16  Q.    Okay.  And then, of course, there's Michael

17  Duniphin, correct?

18  A.    Yes.

19  Q.    And when did y'all get married?

20  A.    June 5, '04.

21  Q.    And I understand that he's passed away.

22  A.    Yes.

23  Q.    And when did he pass?

Page 35

1   hires team drivers? drivers as teams?

2   A.    I wasn't a team.

3   Q.    Right.  But were you aware that they hire

4   team drivers?

5   A.    Yes.

6   Q.    And I understand when you were hired, you

7   did not have another team member; is that right?

8   A.    That's right.

9   Q.    Tell me, what did the recruiter tell you

10  about your training?

11  A.    That I would go through a training period

12  with the trainer, and they would put me in a truck

13  with somebody.

14  Q.    All right.  And did they tell you that they

15  would always put you in a truck with somebody?

16  A.    We didn't go into that.

17  Q.    All right.  Tell me, so you talked to this

18  recruiter.  She says that she's going to put you

19  with a trainer; is that right?

20  A.    Yes.

21  Q.    When did you actually start driving with

22  Benny Whitehead?

23  A.    December 3rd, I believe it was, was the day

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 38

1    Fund; she told me that I'd have to go have the

2    physical and the drug test, and that she was

3    working on -- or that she had already contacted

4    Mike and that he was out with somebody else; he'd

5    be coming back in, and I would be going to work

6    when he got back.

7    Q.    All right.  Did she ask you anything about

8    your preferences of who you might want to ride

9    with, as a trainer?

10   A.    I told her I'd prefer to be put with

11   somebody white and somebody that smoked or didn't

12   mind smoking.

13   Q.    Right.  Because you smoke; is that right?

14   A.    Yes.

15   Q.    And I understand, you know, you go on long

16   drives whenever you're together, so sometimes

17   personality preferences come into play; is that

18   right?

19   A.    Yes.

20   Q.    Because you spend a lot of time together as

21   a team driver; is that right?

22   A.    Yes.

23   Q.    All right.  And so Mr. Duniphin was the

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 39

1   person that you were teamed with?

2   A.     Yes.

3   Q.     And what do you remember that she went over

4   in the employee handbook?

5   A.     She just flipped through the book and

6   pointed out things in it.  Nothing specific.

7   Q.     Okay.  Can you recall anything that she went

8   over with you that was in the employee handbook?

9   A.     No.

10   Q.     Okay.  And you, at some point, were made

11   aware of PeopLease; is that right?

12   A.     Yes.

13   Q.     What were you told about PeopLease's role in

14   your employment?

15   A.     We were employed through Benny but we were

16   leased to PeopLease, and they would be paying us,

17   or something.

18   Q.     Or was it something kind of like that?

19   A.     Basically.

20   Q.     And so were you given documents that day,

21   during the interview process, from PeopLease?

22   A.     I don't remember getting any.  I don't know.

23   Q.     All right.  But, at some point, you would

Page 45

1  right?

2  A.    Yes.

3  Q.    And then his job was terminated as a result?

4  A.    Yes.

5  Q.    Did either you or Mr. Duniphin ever dispute

6  the findings of that drug screen?

7  A.    He did.

8  Q.    Did he ever get a second test or anything

9  like that?

10  A.    No.

11  Q.    And then dispute it, what did he do to

12  dispute it?  He just didn't agree with it?

13  A.    Well, he didn't smoke.  I mean, he ate some

14  brownies with it in there.

15  Q.    Okay.

16  A.    And asked Robert, the morning he told him,

17  could he go take it again.  Robert told him there

18  was nothing he could do.

19  Q.    All right.  He ate some brownies with

20  marijuana in them?

21  A.    Yes.

22  Q.    Where did that happen?

23  A.    At a Christmas party.

Page 57

1    received, was that just the retirement from his

2    military?

3    A.    That was it.

4    Q.    Y'all didn't have any other source of

5    income?

6    A.    No.

7    Q.    Okay.  You weren't doing anything since you

8    had been released from worker's comp up until the

9    time you drove with Mr. Bryant; is that right?

10   A.    No, I didn't do anything.

11   Q.    Did you ever cut hair on the side or

12   anything like that?

13   A.    No.

14   Q.    Okay.  So you make two trips with Mr. Bryant

15   to California; is that right?

16   A.    Yes.

17   Q.    Then what happened?

18   A.    I had to come out of the truck.  I went in

19   the hospital with congestive heart failure.

20   Q.    Right.  And that's when you went on FMLA; is

21   that right?

22   A.    Yes.

23   Q.    Tell me, what happened in particular for you

Page 75

1    sister.

2    Q.    Amy?

3    A.    Amy.  But it wasn't about my job.

4    Q.    Okay.  The information in the letter with

5    Amy, that was related to your claim from the

6    Drivers' Fund; is that right?

7    A.    Uh-huh.

8    Q.    That didn't have anything to do with the

9    claims that you're making in this case; is that

10   right?

11   A.    No.

12   Q.    And the only letter that you've written to

13   Benny Whitehead about your employment status was

14   the letter that you wrote to Eddie; is that right?

15   A.    I wrote two to Eddie.  One was asking for

16   anything, even the short hauls, that I needed some

17   work.  I was willing to do the short hauls to pick

18   up loads for them.

19   Q.    Okay.

20   A.    And one was after I was told that I had been

21   -- I had abandoned my job.  I wrote him one saying

22   if I didn't have a job anymore, I needed my

23   holdback money.  And he sent it to me.

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 79

1    Q.    And more than three times that you actually

2    spoke to Eddie?

3    A.    A lot of times I'd go in and ask Stacy, or

4    I'd stick my head in the door and say, "Eddie have

5    you found anybody?"  It wasn't a sit-down

6    conversation.

7    Q.    Okay.  Was his response to you always the

8    same, that he's looking for somebody?

9    A.    "We're checking.  I don't have anybody right

10   now."

11   Q.    Was he ever rude to you or anything like

12   that?

13   A.    No.

14   Q.    Okay.  And when did you find out that they

15   had actually found somebody for you to ride with,

16   after you had been released to return back to work

17   from your FMLA?

18   A.    Stacy called me once and told me that she

19   had somebody, wanted to know how soon I could be

20   ready.  I said, Give me a day or so to get my

21   stuff together.  Because it had been so long.  And

22   she said, All right.  I'll call you back and let

23   you know when you're leaving.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 80

1        And after about three days, I never heard

2    anything.  And I called her.  And she said, "Oh,

3    Robert didn't call you?  This guy said he wouldn't

4    ride with a married woman."

5        That's the only time I've been notified

6    about going back out at all.

7            MR. ROBERSON:  Courtney, do you want to

8    make a copy of this and let us keep the original,

9    if you don't mind?

10            MS. POTTHOFF:  Yeah.

11            MR. ROBERSON:  I mean, you can have a

12    copy, but we'd like to keep the original.

13            MS. POTTHOFF:  Yeah, okay.  I'm going

14    to get a copy real quick.

15            (A brief recess was taken.)

16    (BY MS. POTTHOFF)

17    Q.    Okay.  I'm going to go ahead and mark as

18    Defendants' Exhibit 1 the handwritten letter

19    that's just been provided to me.  It's dated

20    August 29, 2005.

21            (Defendants' Exhibit No. 1 was

22            marked for identification and a

23            copy of the same is attached

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 89

1    to drive the truck under their insurance

2    requirements by themselves?

3    A.    Do I know of any that's not?

4    Q.    Do you know of anybody that did that?

5    A.    Yes.

6    Q.    That did not have two years' over-the-road

7    driving experience?

8    A.    Yes.

9    Q.    Who?

10   A.    Robert Kirkham.

11   Q.    Can you spell his last name?

12   A.    K-I-R-K-A-M or -H-A-M.

13   Q.    So you're saying that he took a single load

14   by himself without two years' over-the-road

15   driving experience; is that right?

16   A.    Him and his wife together didn't have two

17   years.

18   Q.    Okay.  And what is his wife's name?

19   A.    Sally.  Debra.

20   Q.    Debra or Sally?

21   A.    Debra is how they've got her listed.

22   Q.    Okay.  And are you saying that she also

23   drove single loads by herself without two years'

Page 93

1    file the charge.

2           Other than you had seen other people take a

3    single load --

4    A.     Other men.

5    Q.     Other men.  I'm sorry.  You had seen other

6    men take a single load.  And the person that

7    you're talking about is Robert, and nobody else;

8    is that right?

9    A.     Yes.

10   Q.     Okay.  What else led you to file the EEOC

11   charge?

12   A.     I just felt like I know they had been hiring

13   people, but specifically I can't tell you if they

14   were hiring males, females, whatever.  But I just

15   felt like I was being discriminated, pushed aside.

16   Q.     Okay.  Did anybody at Benny Whitehead ever

17   say anything to you that you believe was

18   discriminatory?

19   A.     No.

20   Q.     Did anyone at Benny Whitehead tell you that

21   they weren't doing the best they could to try and

22   find you a partner?

23   A.     No.

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 101

1    Q.    Okay.  All right.  Did you have any other

2    conversations with anybody else, after that

3    conversation with Benny and Eddie, from Benny

4    Whitehead?

5    A.    Just the same thing:  calling or checking to

6    see if they had anybody.

7    Q.    Do you know of anybody that you think you

8    should have been assigned to or teamed with during

9    this time period?

10   A.    No.

11   Q.    Do you have any reason to dispute the fact

12   that there was not anybody available that met your

13   criteria?

14   A.    I have no idea who they've hired or what

15   they've, you know...  I just don't know.

16   Q.    All right.  You write the letter to Eddie,

17   the typed letter.  And that was after you had

18   filed the EEOC charge, right?

19   A.    I don't remember.

20   Q.    But when you typed the letter to Eddie, had

21   you already consulted a lawyer over your EEOC

22   charge?

23   A.    Yes.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 103

1   the letter to Eddie?

2   A.      Probably.

3   Q.      All right.  And so when would you have

4   called PeopLease?

5   A.      A couple of days before, somewhere around in

6   there.  Within a week before I wrote the letter.

7   Q.      Okay.  Did you type this letter?  Did you

8   type the December 5, 2005, letter to Eddie?

9               THE WITNESS:  Did I type it or did

10  Holly type it?

11  A.      I don't remember.

12  Q.      I don't want to get into conversations that

13  you've had with your lawyers or anything that's

14  attorney-client privilege.  But do you know did

15  you type this letter?

16  A.      I hand wrote it.  I don't think I typed it.

17  Q.      Okay.  What was the purpose of writing the

18  letter on December 5, 2005?

19  A.      Because if I didn't have a job, they had

20  $500 in holdback money that I needed.

21  Q.      Okay.  Did you get your holdback money?

22  A.      Yes.

23  Q.      Did you get it with a cover letter from

Page 111

1  partner that you could team with?

2  A.    I didn't have anybody to -- anywhere to find

3  a partner.

4  Q.    Okay.  But answer my question.  Did you ever

5  make an effort to find somebody?

6  A.    No.

7  Q.    Okay.  And he told you that at this time he

8  didn't have anybody that he could put you with, so

9  he enclosed your check for your holdback money; is

10  that right?

11  A.    Yes.

12  Q.    Okay.  Have you had any other conversations

13  with Eddie Whitehead that you haven't told me

14  about?

15  A.    No.

16  Q.    Have you had any other conversations with

17  Stacy that you haven't told me about?

18  A.    Nothing pertaining to my job.

19  Q.    Okay.  Have you had any conversations with

20  Benny Whitehead that you've not told me about?

21  A.    No.

22  Q.    Have you had any conversations with Benny

23  Paul?

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 116

1   Q.    And do you believe that if you -- you don't

2   have any reason to dispute the fact that work is

3   available for you at Benny Whitehead if you come

4   to them with a qualified partner?

5   A.    That's what they say.

6   Q.    Right.  But you don't have any reason to

7   dispute that, do you?

8   A.    No.

9   Q.    Okay.  And you don't know of anybody that's

10  been hired, from the time that you submitted your

11  return to work slip in June of '05 up until today,

12  that could have been your partner?

13  A.    I have no idea.

14  Q.    Okay.  And you don't know specifically of

15  anybody that was hired, that was hired as a single

16  driver without two years' over-the-road

17  experience, do you?

18  A.    I have no idea.

19  Q.    Tell me this:  The employees in general at

20  Benny Whitehead, do you know whether or not the

21  people out there are typically younger than you

22  are or older than you are, or about the same age?

23  A.    The ones I've seen, there's more younger.

Page 144

1    Q.    I'm going to show you what I've marked as

2    Defendants' Exhibit 5, which is a copy of your

3    EEOC charge.

4         Do you recognize that?

5    A.    Yes.

6    Q.    Okay.  Is that your signature on the first

7    page, down at the bottom?

8    A.    Yes.

9    Q.    And the information that's provided in the

10   attachment is information that you swore to and

11   provided your lawyers; is that right?

12   A.    Yes, ma'am.

13   Q.    All right.  And you understood at the time

14   that the information that's provided in the

15   Attachment A is sworn under oath; is that right?

16   A.    Yes.

17   Q.    Okay.

18              (Defendants' Exhibit No. 6 was

19              marked for identification and a

20              copy of the same is attached

21              hereto.)

22   Q.    I'm going to show you what I've marked as

23   Defendants' Exhibit 6, which is a letter dated

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 145

1    December 5, 2005.  There's some markings on the

2    bottom, which is my handwriting, "E-1."  That's

3    where we faxed it during the unemployment hearing.

4    I don't know if you remember that.

5         But other than that, this is your letter --

6    what I've marked as Defendants' Exhibit 6 -- that

7    you mailed to Eddie Whitehead; is that right?

8    A.    Yes.

9    Q.    And it's dated December 5, 2005; is that

10   correct?

11   A.    Yes.

12   Q.    And that's about when you would have mailed

13   it?

14   A.    Yes.

15   Q.    Okay.  We've already talked about parts of

16   that letter.  Okay.

17              (Defendants' Exhibit No. 7 was

18              marked for identification and a

19              copy of the same is attached

20              hereto.)

21   Q.    I've marked Defendants' Exhibit 7, which is

22   the Decision of the Administrative Hearing Officer

23   from the Georgia Department of Labor Appeals

Page 153

1  Q.    Do you see where it has a statement about

2  PeopLease does not discriminate on the basis of

3  race, color, religion, sex, age, marital status,

4  sexual orientation, national origin, or any other

5  classification protected?

6  A.    Yes.

7  Q.    Okay.  And then it also directs anybody who

8  encounters unacceptable conduct that violates this

9  policy should immediately bring it to the

10  attention of the Human Resources Department.

11      Do you see that?

12  A.    Yes.

13  Q.    And you never brought anything to their

14  attention, did you?

15      MR. ROBERSON:  Until your EEOC charge.

16  Q.    Prior to filing your EEOC charge, you never

17  brought any conduct to their attention, did you?

18  A.    No.

19  Q.    And you were never subject to any kind of

20  sexual harassment or anything like that, were you?

21  A.    No.

22  Q.    Okay.  Let's go to page 8.  Did you ever

23  read the section regarding FMLA?

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 182

1  Q.    So that needs to be part of the deal.  They

2  need to know going in, right?

3  A.    Right.

4  Q.    And you didn't care if you worked with a man

5  or a woman, did you?

6  A.    No.  I just asked that it be somebody white.

7  That's close quarters.

8  Q.    It is close quarters.  But, now, when you

9  work as a team driver, there's never any occasion

10  when both of you are sleeping in the truck, is

11  there? or is there?

12  A.    Yes.

13  Q.    There is?  Okay.  Well, I thought somebody

14  was driving all the time.

15  A.    No.  Sometimes you get laid over or you have

16  to wait on a load.

17  Q.    Okay.  Well, it's rare that you both would

18  be sleeping, isn't it?

19  A.    It don't happen often, but it does happen.

20  Q.    Okay.  Somebody's supposed to be driving,

21  unless you're waiting on a load?

22  A.    Right.

23  Q.    I mean, you're not making money unless

```
 1                C E R T I F I C A T E

 2   STATE OF ALABAMA      )

 3   COUNTY OF JEFFERSON )

 4

 5              I hereby certify that the

 6   above and foregoing proceeding was taken

 7   down by me by stenographic means, and that

 8   the content herein was produced in

 9   transcript form by computer aid under my

10   supervision, and that the foregoing

11   represents, to the best of my ability, a

12   true and correct transcript of the

13   proceedings occurring on said date at said

14   time.

15              I further certify that I am

16   neither of counsel nor of kin to the

17   parties to the action; nor am I in anywise

18   interested in the result of said case.

19

20

21   _____

22        Court Reporter and Commissioner

23
```

December 9, 2005

Gloria Duniphan
124 Blackmon Rd.
Eufaula, Al. 36027

      Re: returning to work

Dear Gloria:

      We have been trying to find someone you can ride with since you've been cleared to work since June. Due to your experience level our insurance company won't allow you to run in a solo position. We did call you on or about September 8th to go out and you were going out of town and wouldn't be back until the following week. You haven't been fired; we just haven't been able to meet your criteria as far as a partner you can run with. If you can find someone that is qualified to work here we will be more than happy to put you back to work. PeopleLease's policy is to terminate employees that haven't had a check in a certain amount of time. At this time I still don't have anyone that I can put you with so I have enclosed a check for your holdback, as soon as I come up with something I will give you a call.

Thanks,

Eddie Whitehead



DEFENDANT'S EXHIBIT

2- Duniphin

December 5, 2005

Eddie Whitehead
3265 S. Eufaula Ave.
Eufaula, Al. 36027

      Re:    Returning to Work

Dear Eddie:

      As you know, I was released by my doctor to return to work on June 16, 2005. I brought my FMLA paperwork to Stacy.

      Since that time I have written and called you asking when I could return to work. I have never been told to report back to work.

      Last week, I spoke with People's Lease to find out my status. I was told that I had abandoned my job. While I completely disagree with this, and still wish to return to work, if I have been fired then I want my $500.00 that was held back from my paycheck. At the present time, I can neither work and your company has $500.00 of my money.

      Please let me return to work. If you will not let me return, please give me my money. Thank you.

*Gloria Duniphin*

Gloria Duniphin

DEFENDANT'S
EXHIBIT

6- Duniphin

E-1
(912) 681-5228