**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **GLORIA DUNIPHIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   **Civil Action No.: 2:06cv459-MHT** |
| **BENNY WHITEHEAD, INC. and** | ) |
| **PEOPLEASE CORPORATION,** | ) |
| | ) |
| **Defendants.** | ) |

**<u>DEFENDANTS' BRIEF IN SUPPORT OF
THEIR JOINT MOTION FOR SUMMARY JUDGMENT</u>**

COME NOW the defendants in the above-styled action, Benny Whitehead, Inc. ("Whitehead") and PeopLease Corporation ("PeopLease"), (collectively, "Defendants"), and submit this brief in support of their Joint Motion for Summary Judgment on all claims asserted by plaintiff Gloria Duniphin. Defendants respectfully request that the court grant their motion for summary judgment in its entirety because Plaintiff has failed to produce any evidence that Defendants discriminated against her on the basis of her gender or age, or retaliated against her for taking leave pursuant to the Family Medical Leave Act of 1993 ("FMLA"), or interfered with her FMLA rights.

## I. <u>STATEMENT OF THE CASE</u>

**A.     The Present Action.**

### 1.     *Plaintiff's Complaint.*

Plaintiff filed this present action on May 22, 2006, against PeopLease, a professional employer company in the business of leasing employees to various businesses, and Whitehead, a trucking company located in Eufaula, Alabama. Plaintiff, a truck driver, claims she was

discriminated against after her completion of medical leave pursuant to the FMLA because Whitehead did not assign her any work after she provided a release from her doctor, which she claims amounts to a constructive discharge. (Complaint, ¶ 11).  Specifically, Plaintiff claims Defendants discriminated against her (a) on account of her gender in violation of the Title VII of the Civil Rights Act of 1964 as amended by the Civil Rights Act of 1991 (Complaint, Sec. III); and (b) on account of her age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and willfully violated the ADEA (Complaint, Sec. IV).  In addition, Plaintiff claims Defendants violated her rights secured by the FMLA, and/or in retaliation for her "making complaints of the violations of the company's failure to follow FMLA procedures" and for "opposing and complaining about the discriminatory treatment to which plaintiff and others seeking FMLA leave were subjected." (Complaint, ¶ 25- 26).

> ### 2.    *Defendants' Answer and Motion For Summary Judgment.*

Defendants filed an Answer in which they denied the material allegations in the complaint and asserted various affirmative defenses.  Defendants have expressly denied Plaintiff has been constructively discharged, that they discriminated against her in any way, and that they violated the FMLA in any way.  In addition, Defendants have asserted in their Answer and at all times pertinent hereto that work is available for Plaintiff if she can find a qualified driver who will agree to partner and team drive with her.  Defendants have expressly alleged that their actions were motivated by "legitimate, non-discriminatory reasons" that were not pretextual and that were "consistent with business necessity."   (Answer, Affirmative Defenses, p.6, ¶ 11). Finally, Defendants deny that Plaintiff is entitled to any of the relief requested in her complaint. (Answer, Prayer for Relief, p. 5).

Defendants filed their joint motion for summary judgment with this Court on January 30, 2007.  Defendants submit this brief in support of their motion.

**B.      Applicable Summary Judgment Principles.**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith" when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  Once the defendant establishes that it is entitled to a judgment as a matter of law, the burden shifts to the plaintiff to show that summary judgment is not appropriate.  Fed.R.Civ.P. 56(e).  The plaintiff may not rest upon the mere allegations in his complaint, but rather, must set forth "specific facts" showing a "genuine issue" for trial.  Id.  In order to create a "genuine issue" for Rule 56 purposes, a plaintiff must produce "'significant probative evidence'" showing an actual dispute as to a material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quoting First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 290 (1968)).  "Significant probative evidence" is evidence upon which "reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 252 (emphasis added).

In employment discrimination cases such as this one, the plaintiff, in order to avoid summary judgment, "must present specific nonconclusory facts that would support a jury verdict against the particular defendant on the issue of discriminatory intent."  Ratliff v. DeKalb County, Georgia, 62 F.3d 338, 341 (11th Cir. 1995).  The plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive."  Pace v. Southern Ry. Sys., 701 F.2d 1283, 1291 (11th Cir.), cert. denied, 464 U.S. 1018 (1983).  Instead, he "must come forward with sufficient evidence to establish a *prima facie* case and respond sufficiently to any rebuttal by the defendant

to create a genuine issue of material fact." <u>Id.</u>   <u>See, e.g.</u>, <u>Maniccia v. Brown</u>, 171 F.3d 1364 (11th Cir. 1999); <u>Standard v. A.B.E.L. Serv., Inc.</u>, 161 F.3d 1318 (11th Cir. 1998); <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192 (11th Cir. 1997); <u>Holifield v. Reno</u>, 115 F.3d 1555 (11th Cir. 1997).

The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The law is well settled that "'conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" <u>Young v. General Foods Corp.</u>, 840 F.2d 825, 830 (11th Cir. 1988), <u>cert. denied</u>, 488 U.S. 1004 (1989) (quoting <u>Grigsby v. Reynolds Metals Co.</u>, 821 F.2d 590, 597 (11th Cir. 1987)).  <u>See generally</u> <u>Clay v. Equifax, Inc.</u>, 762 F.2d 952, 959 (11th Cir. 1985) (a "broad, conclusory allegation . . . without more is not sufficient to withstand a motion for summary judgment").

## II.  <u>STATEMENT OF THE UNDISPUTED MATERIAL FACTS</u>

**A.    Defendants & Their Relationship**

1.      Defendant Whitehead is a trucking company with an office and terminal in Eufaula, Alabama (Affidavit of Benny Paul Whitehead, ¶ 2).  Whitehead's primary freight customers are grocery store chains that contract with Whitehead to transport dry goods from the Southeast via its terminal in Eufaula to the West Coast, and, instead of returning with empty trailers, to then transport fresh produce from the West Coast to locations in Georgia and Florida. (B.P. Whitehead Aff., ¶ 3).

2.      Whitehead employs two types of truck drivers:  (1) pickup and delivery drivers and (2) long haul team drivers, who drive in teams of two.  (B.P. Whitehead Aff., ¶ 4).  Pickup and delivery drivers make short solo runs from Eufaula to locations in the Southeast to pick up dry goods and return with them to the Eufaula terminal.  (B.P. Whitehead Aff., ¶ 5).  A pickup and delivery driver must have substantial experience, including at least two years of over-the-road driving experience and be able to back up the truck at loading docks.  (B.P. Whitehead Aff., ¶ 5).  The pickup and delivery jobs require more experience and skill than the team driver jobs, because the driver must drive and back up the trucks without a team driver partner to assist. (B.P. Whitehead Aff., ¶ 5).

3.      The long haul team drivers take the dry goods that are delivered to the Eufaula terminal by the pickup and delivery drivers and transport them to the West Coast, and then return with a load of fresh produce for delivery to points in Georgia and Florida. (B.P. Whitehead Aff., ¶ 6).  Whitehead's insurance carrier generally requires that drivers must have two years' experience, which Ms. Duniphin does not have. (B.P. Whitehead Aff., ¶7).  If they do not have sufficient experience, they may team drive with a driver trainer. (Id.)  Ms. Duniphin was not qualified to make a solo run because of her lack of experience, so she could only team drive. (Id.).  The West Coast runs are made almost exclusively by team drivers, although occasionally Whitehead will allow a solo driver with more than two years' over-the-road driving experience to make the trip alone. (Id.).

4.      On each such return trip from the West Coast to the Southeast, Whitehead requires its drivers to stop at its truck yard in Eufaula to have the truck serviced and washed before finishing the delivery to Georgia or Florida.  (Affidavit of Robert Kirkham, ¶ 5).  After

the truck is serviced and washed, the trucks are driven to either Florida or Georgia where the produce is off-loaded and the truck returns the same day. (Id.).

     5.     In general, Whitehead requires prospective drivers and existing team drivers who lose their partner to find their own team driving partner, and in fact, most of its team drivers are married couples. (B.P. Whitehead Aff., ¶ 8). It is difficult for Whitehead to partner females with anyone other than their husband because other married males have wives who will not allow them to ride with another female. (Id.). In addition, single males typically prefer to ride with a single female to avoid issues with the female's spouse. (Id.).

     6.     Whitehead generally does not assign drivers to partners, but has done so on limited occasions when a qualified driver is available and willing to partner with a prospective new driver or one who has lost his or her partner. (B.P. Whitehead Aff., ¶ 9). On those limited occasions when Whitehead helps drivers find partners, its practice is to find partners and match them up, but only if they each agree to drive with one another. (Id.). The driver teams spend extended amounts of time together within the confines of a truck cab on their trips to the West Coast, so it is important for the team drivers to be able to work well together and get along with each other. (B.P. Whitehead Aff., ¶ 10).

     7.     In order to find partners who are agreeable to partner with one another, Whitehead asks the driver to express what criteria he or she will agree to in a partner, such as smoking or non-smoking, married or non-married. (Id.). Whitehead does not force partners to drive together unless both partners are agreeable. (Id.). Whitehead pays the drivers on a percentage of the gross freight charge per load, and the team drivers generally split the payment on a 50/50 basis. (B.P. Whitehead Aff., ¶ 11).

8.      When drivers are initially hired, Whitehead "holds back" $50 from each paycheck until a balance of $500 is reached, which is referred to as a driver's "hold-back money."  (B.P. Whitehead Aff., ¶ 12).  The purpose of this is to provide security against loss in the event an employee abandons his or her job and Whitehead's equipment, or otherwise leaves Whitehead's employment while owing Whitehead money.  (Id.).

9.      Due to the nature of the labor market for truck drivers, Whitehead has a constant need for drivers and always has team driver positions available.  (B.P. Whitehead Aff., ¶ 11).  In fact, Whitehead has had open trucks constantly throughout 2005 to the present day.  (Id.).  Whitehead operates anywhere from 45 to 60 trucks at any given time.  (B.P. Whitehead Aff., ¶ 22).

10.     PeopLease Corporation is a professional employer organization engaged in the business of leasing its employees to various businesses.  (Affidavit of Deb Hiott, ¶ 3).  Whitehead's employees are "leased" to them through a contractual agreement with PeopLease, a copy of which is attached as Exhibit 1 to the Affidavit of Deb Hiott.  (Hiott Aff., ¶ 3).

11.     PeopLease is a personnel leasing company based in South Carolina.  (Hiott Aff., ¶ 4).  PeopLease has clients throughout the United States.  (Id.) Client employees are "leased" through a contractual service agreement with PeopLease and the client companies.  (Id.) Client companies exercise almost complete control over all aspects of their employees' terms and conditions of employment, including most decisions regarding hiring, job assignments, discipline and discharge.  (Id.)  On occasion, client companies consult with PeopLease for advice on discretionary issues and on occasion, PeopLease will exercise its right to fire an employee or refuse to hire an applicant.  (Id.)  Primarily, PeopLease provides payroll administration and benefits services to the client companies.  (Id.)

**B.      Plaintiff's Hiring and Employment History with Whitehead**

12.      Plaintiff is a white female who represented to Whitehead she had a date of birth of August 7, 1954.  (B.P. Whitehead Aff., ¶ 13).  Defendants hired Plaintiff (who was then Gloria Smith) as a team driver on December 10, 2003.  (Id.).  Plaintiff's prior truck driving experience was limited to completion of truck driver school, and therefore she lacked two years' over-the-road truck driving experience necessary for a pickup and delivery driver job.  (Id.).  The only driver position for which she was qualified was as a team driver, and due to her inexperience, she was required to partner with a trainer driver who had more than two years' verifiable over-the-road experience. (Id.).  She did not have a partner when she applied, so Whitehead agreed to find a trainer driver willing to partner with her so she could become a team driver. (B.P. Whitehead Aff., ¶ 14).  Plaintiff was not, and to date is not, qualified for a position as a pickup and delivery driver.  (B.P. Whitehead Aff., ¶ 15).    In addition, Plaintiff is not qualified to make solo runs to the West Coast. (Id.).

13.      When hiring Plaintiff, Whitehead asked her about her preferences for a partner in order to match her with someone who would be mutually agreeable.  (Deposition of Plaintiff, p. 38, ln. 7-12).  Since she was a smoker, she wanted to be paired with someone who did not mind smoking.  (Pl. Dep., p. 38, ln. 10-12).  In addition, she required the person be white because of the close quarters involved.  (Pl. Dep., p. 182, ln. 4-7).  At the time she was hired, she was aware that Whitehead hires team drivers.  (Pl. Dep., p. 35, ln. 3-5).    She understood she would go through a training period with the trainer, and Whitehead would put her in a truck with somebody for that purpose.  (Pl. Dep., p. 35, ln. 11-13).  Whitehead never told her they would always be able to partner her with a driver.  (Pl. Dep., p. 35 ln. 14-16).  Plaintiff was aware Whitehead and PeopLease have written policies against discrimination on the basis of race,

color, religion, sex, age, marital status, sexual orientation, national origin, or any other classification protected. (Pl. Dep., p. 153, ln. 1-5).

14.    She was partnered with Mike Duniphin, a driver trainer. (Pl. Dep., p. 38, ln. 23; p. 39, ln. 1-2). They eventually married on June 5, 2004. (Pl. Dep., p. 26, ln. 20). On September 30, 2004, she was in an accident while team driving a Whitehead truck, injuring her left shoulder. (B.P. Whitehead Aff., ¶ 16). While she was on workers compensation leave, her husband/driving partner failed a random drug screen on December 21, 2004, in violation of company policy and was terminated. (B.P. Whitehead Aff., ¶ 17). According to Plaintiff, he tested positive for marijuana after eating marijuana brownies at a party. (Pl. Dep., p. 45, ln. 13-21).

15.    As a result of her husband's termination, Plaintiff no longer had a driver partner. (B.P. Whitehead Aff., ¶ 17). Whitehead found her a partner acceptable to her on February 14, 2005. (B.P. Whitehead Aff., ¶ 18). She was temporarily teamed up and put back to work with D.A. Bryant, a 56-year-old white male. (B.P. Whitehead Aff., ¶ 18; Affidavit of D.A. Bryant, ¶ 8). Plaintiff made two or three team runs to and from the West Coast with Mr. Bryant. (B.P. Whitehead Aff., ¶ 18; Bryant Aff., ¶ 8; Pl. Dep., p. 57, ln. 14-16). After returning from one of these trips, her physician diagnosed her with congestive heart failure and restricted her from driving. (B.P. Whitehead Aff., ¶ 18). She took FMLA leave for approximately 12 weeks. (Id.).

16.    On June 16, 2005, she provided Whitehead a doctor's release clearing her to return to work. (B.P. Whitehead Aff., ¶ 19). However, she was unable to find a driver partner. (Id.). D.A. Bryant, with whom she was temporarily teamed before her FMLA leave, had found another team partner while she was on leave. (Bryant Aff., ¶ 10). He was not assigned a new partner by Whitehead, and Whitehead was unable to find a partner for him. (Id.). Instead, he

found a partner on his own named Randy Luker, who had previously been employed as a driver and wanted to return to work at Whitehead.  (Id.).  Mr. Luker contacted Mr. Bryant on his own, and they agreed to team drive together.  (Id.).  Eddie Whitehead contacted D.A. Bryant upon Ms. Duniphin's release to return to work about partnering with her again and he told Eddie he did not want to be her permanent partner because she could not back up the truck and she did not want to drive in California because she was uncomfortable, and this meant he had to do most of the work.  (Bryant Aff., ¶ 9; Affidavit of Eddie Whitehead, ¶ 3).  Mr. Bryant did not want to split the compensation from Whitehead equally because he was doing most of the work, and therefore had no desire to be her long-term partner driver.    (Bryant Aff., ¶9; E. Whitehead Aff., ¶ 3). Therefore, he would not agree to partner with her after her return from leave.

17.    On one occasion, Stacy Lawson, a recruiter at Whitehead, called and told Plaintiff she had somebody to partner with, and asked when she could be ready to depart.  (Pl. Dep., p. 79, ln. 18-20).  Plaintiff told her to give her a day or so to get ready to make the trip.  (Pl. Dep., p. 79, ln. 21-22).  Stacy told her she would call back and let her know when the load was leaving. (Pl. Dep., p. 79, ln. 22-23).  After about three days, Plaintiff called Stacy to inquire about the load, and Stacy told her the driver had decided he did not want to ride with a married woman, and that the driver was to have contacted Plaintiff and advised her of this.  (Pl. Dep., p. 80, ln. 1-4).

18.    Whitehead continued to try to identify a partner for Plaintiff who would agree to drive with her, and whom she would accept as a partner, but was unsuccessful.[1]  (E. Whitehead Aff., ¶ 4).  At all times pertinent, Plaintiff was, and still is, welcome to find her own qualified

---

[1] Although Plaintiff disputes it, Whitehead offered her a new partner during a meeting with Benny Whitehead and Eddie Whitehead, but she refused the load as a result of having made plans to attend a birthday party in Texas.  (E. Whitehead Aff., ¶ 5).

partner and return to work, but she has not done so.  (E. Whitehead Aff., ¶ 4; B.P. Whitehead Aff., ¶ 20).

19.    Therefore, since her medical release in June 2005, Plaintiff has not been able to work because she lacks a driver partner and two years of verifiable over-the-road driving experience necessary for her to drive without a partner.  (B.P. Whitehead Aff., ¶ 21; E. Whitehead Aff., ¶ 6.)  She is not qualified to drive as a pickup and delivery driver or to drive solo on a West Coast trip, as she lacks two years' experience. (B.P. Whitehead Aff., ¶ 21; E. Whitehead Aff., ¶ 6.)  Plaintiff's discriminatory refusal to drive with non-white partners has also limited her partner options.  (B.P. Whitehead Aff., ¶ 21; E. Whitehead Aff., ¶ 6.)   Whitehead has a number of African-American drivers, yet Plaintiff refused to ride with anyone, male or female, who was not white and who did not smoke.  (B.P. Whitehead Aff., ¶ 21; E. Whitehead Aff., ¶ 6).

20.    On December 5, 2005, Plaintiff wrote Eddie Whitehead requesting her hold-back money because she was having financial problems.  (Pl. Dep., pp. 144-145, Ex. 6.)  As the letter indicates, PeopLease informed her a week prior to December 5, 2005, that its records indicated she had abandoned her job.  Id.  As part of its routine practice, PeopLease makes inquiries about inactive employees.  (Hiott Aff., ¶ 6).  Prior to Plaintiff's call in December 2005, PeopLease had inquired about her status.  (Id.).  PeopLease believed she had abandoned her job because she refused a load in September and she had been unable to find a qualified partner since that time. (Id.).    When Plaintiff had her attorneys' secretary type the letter, she had already consulted a lawyer over the EEOC charge.  (Pl. Dep., p. 101, ln. 20-23; p. 103, ln. 7-16).  Out of sympathy for the Plaintiff's financial plight, and not as an indication she had been terminated, Eddie Whitehead returned her hold-back money, along with a cover letter on December 9, 2005,

explaining that she had not been fired but that Whitehead had been unable to find her a partner. (E. Whitehead Aff., ¶ 7; Pl. Dep., p. 75, ln. 22-23; Ex. 2). The letter explained that Whitehead had work for her if she could find a partner. (E. Whitehead Aff., ¶ 7; Pl. Dep., Ex. 2).

21.    Plaintiff admits she never made an effort to find a partner. (Pl. Dep., p. 111, ln. 4-5). Plaintiff has no reason to dispute the fact that work is available for her at Whitehead if she comes to them with a qualified partner. (Pl. Dep., p. 116, ln. 1-5). No one at Whitehead ever said anything to Plaintiff that she believed was discriminatory. (Pl. Dep., p. 93, ln. 16-18).

22.    Plaintiff contends Whitehead let men drive "single" loads that she should have been permitted to drive, but only identified Robert Kirkham as a male who drove a single load by himself without two years' over-the-road driving experience. (Pl. Dep., p. 89, ln. 10-15). Mr. Kirkham is a white male whose date of birth is April 15, 1943, making him 11 years older than Plaintiff. (Kirkham Aff., ¶ 2). He was employed by Whitehead as an over-the-road, long haul team truck driver for approximately three years, from April 2003 until May 2006. (Id.).

23.    In October 2003, Whitehead hired Kirkham's wife, Debra Kirkham, and pursuant to their request she teamed with him and they drove together for approximately 2½ years. (Kirkham Aff., ¶ 3). His wife is a white female and her date of birth is November 19, 1954. (Id.). As team drivers, their primary run for Whitehead was the trip from the Southeast to the West Coast to deliver a load of dry goods to a customer there. (Kirkham Aff., ¶ 4). As with other team drivers, while on the West Coast, they would pick up a load of fresh produce for delivery on the return trip to a customer in either Florida or Georgia. (Id.). On rare occasions when completing such a trip from the West Coast, and simply for his and his wife's convenience, he dropped his wife off in Eufaula while there for servicing and washing, and finished the run to

either Florida or Georgia by himself.  (Kirkham Aff., ¶ 6). This last leg of the trip was not dispatched as a separate or single load or run, but was simply the final leg of a team run.  (Id.).

24.    While employed with Whitehead, Kirkham never made a "single run" by himself while he had less than two years' experience. (Kirkham Aff., ¶ 7).  A "single run," as opposed to a "team run," is a long haul trip by one driver to the West Coast to deliver a load and return with a load for delivery back to the Southeast.  (Id.)    On those rare occasions when he would drop off his wife in Eufaula, he was simply finishing the "team run" they had already been dispatched to complete. He was never dispatched to complete a "single run" as described.  (Id.).

25.    Plaintiff did not complain to anyone at either Defendant about any of the conduct she alleges in this action. (Pl. Dep., p. 153, ln. 16-18).

26.    The average age of all female employees at Whitehead is 50 years of age, and the average age of all female drivers is 54 years of age.  (E. Whitehead Aff., ¶ 8).

## III.

## ARGUMENT

A.    **The Court Should Grant Defendants' Joint Motion for Summary Judgment on Plaintiff's Title VII and ADEA Discrimination Claims Because Plaintiff Has Failed to Produce Any Evidence That She Was Discriminated Against Because of Her Gender or Age or that Defendants Willfully Violated the ADEA.**

*1.    Title VII Is Not A Vehicle For General Judicial Review of Business Decisions.*

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964, as amended, provides that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1) (emphasis added).  Title VII is not a vehicle for general judicial review of business decisions and "was not intended to diminish traditional management prerogatives." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981).  It is simply "not the

court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc).

> **2.    *Plaintiff Is Required to Present Substantial Evidence that Defendants Actually And Intentionally Discriminated Against Her On the Basis of Her Gender Or Age In Order to Avoid Summary Judgment.***

Plaintiff's proof burdens are the same for her claims under Title VII and the ADEA. See Walker v. Nations Bank of Florida, N.A., 53 F.3d 1548, 1556 (11th Cir. 1995) (Order and allocation of proof are the same under Title VII and the ADEA); see also Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 141-142, 120 S. Ct.2097, 2105, 149 L.Ed.2d 105 (2000) .

The plaintiff in a disparate treatment case such as this one must prove "intentional discrimination" in order to prevail. Burdine, 450 U.S. at 256; see also Reeves, 530 U.S. at 153 (the "ultimate question" in every disparate treatment case "is whether the plaintiff was the victim of intentional discrimination"). The Supreme Court has stated unequivocally that "[p]roof of discriminatory motive is critical" in a Title VII disparate treatment case. Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977). See also United States Postal Service v. Aikens, 460 U.S. 711, 715 (1983); Clark v. Huntsville City Bd. of Educ., 717 F.2d 525, 528-29 (11th Cir. 1983) ("discriminatory motive, purpose or animus"). The Supreme Court has also held that "discriminatory intent" in a Title VII case "means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive." Pullman-Standard v. Swint, 456 U.S. 273, 289-90 (1982).

A plaintiff bringing a claim under Title VII and the ADEA must initially establish a *prima facie* case of discrimination through one of three methods: by direct evidence of discriminatory intent, by circumstantial evidence of discrimination by satisfying the four-pronged analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36

L.Ed.2d 668 (1973) and  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 259 (1981), or by introducing statistical evidence of discrimination.  Walker, 53 F.3d at 1556; Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  Since Plaintiff in this case has presented neither statistical nor direct evidence in support of her claims of discrimination, she must prove her case by circumstantial evidence using the McDonnell Douglas burden shifting framework. Under this framework, she has the initial burden of showing by a preponderance of the evidence a *prima facie* case of the proscribed practice.  McDonnell Douglas Corp., 411 U.S. at 802; see also Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988).

If the plaintiff succeeds in establishing a *prima facie* case, the defendant only has the burden of articulating or producing evidence, but not persuading, that the actions complained of were taken for a "legitimate, nondiscriminatory reason."  Reeves, 530 U.S. at 142; Burdine, 450 U.S. at 253.  Once the employee has established a *prima facie* case of discrimination, the employer must articulate legitimate nondiscriminatory reasons for its employment decision. Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997).  (Citing Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d. 207.)  The employer's burden is "exceedingly light."  Holifield,  115 F.3d at 1564.   The employer's burden at this stage is one of deduction and not persuasion; consequently, the employer need only produce evidence that could allow a rational fact finder to conclude that the challenged employment action was not made for a discriminatory reason.  See, e.g., Davis v. Qualico Miscellaneous, Inc., 161 F.Supp.2d. 1314, 1321 (M.D. Ala 2001).

Once the defendant articulates a "legitimate, nondiscriminatory reason" for its actions, any presumption of discrimination arising out of the *prima facie* case "simply drops out of the picture."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993); see also Burdine, 450 U.S. at 255 n.10 ("drops from the case").  This is true because once the defendant articulates a

legitimate nondiscriminatory reason for its actions, the "nondiscriminatory reasons just as readily explain the difference in treatment." Nix, 738 F.2d at 1186.

If the defendant succeeds in rebutting plaintiff's *prima facie* case, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Burdine, 450 U.S. at 253; see also Reeves, 530 U.S. at 143. In order to do so, the plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (emphasis added).

Under the McDonnell Douglas/Burdine method of proof scheme, the "ultimate question" is "whether the defendant intentionally discriminated against the plaintiff," United States Postal Service v. Aikens, 460 U.S. at 714-15, and "'[t]he ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" St. Mary's Honor Center v. Hicks, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253) (unless there is direct evidence of discrimination, which is not present in this case).

**3.    *Plaintiff Has Failed To Produce Any Evidence She Suffered an Adverse Employment Action Because Of Her Gender Or Age***

As will be demonstrated, Plaintiff has wholly failed to produce any evidence that Defendants actually and intentionally discharged or treated Plaintiff improperly "because of" her gender or age. See 42 U.S.C. § 2000e-2(a)(1). Plaintiff has failed to produce any evidence that Defendants acted with a "discriminatory motive, purpose, or animus." Clark, 717 F.2d at 528-29. Indeed, Plaintiff has failed to establish a *prima facie* case of discrimination. And even if it is assumed, for the purposes of argument only, that Plaintiff has established a *prima facie* case, which she has not, Plaintiff has failed to produce any evidence that Defendants' legitimate,

16

nondiscriminatory reasons for their actions was a mere pretext for gender or age discrimination. For these reasons, Defendants are entitled to summary judgment on Plaintiff's Title VII and ADEA claims as a matter of law.

> **a)    Plaintiff Has Failed To Establish A Prima Facie Case Of Gender Discrimination Under Title VII.**

A plaintiff may establish a *prima facie* case of gender discrimination by showing (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse-employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly situated individual outside her protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir.2003).

Plaintiff has failed to establish a *prima facie* case of gender discrimination for three separate and independent reasons.  First, plaintiff was not fired.  She cannot show that she suffered an adverse employment action.  The essence of her claim is that she was constructively discharged because Whitehead has failed to make work available to her since her medical release following FMLA leave.  However, Whitehead has had an open truck for her since her medical release in June 2005, but has been unable to find a partner that would meet her criteria who is willing to team drive with her.  (Facts, ¶ 9, 18).  Whitehead communicated this to her by letter dated December 9, 2005. (Facts, ¶ 20).  Whitehead is not aware of, and has been unable to locate, a qualified driver with which to partner her who would meet her criteria and who would agree to drive with her (Facts, ¶ 18).    To this date, Whitehead has an open truck for Plaintiff if she can find a qualified driver partner. (Facts, ¶ 9, 18). She was not discharged and has not suffered an adverse employment action, so she cannot satisfy the *prima facie* requirements.

Second, plaintiff has failed to establish a *prima facie* case because she has failed to produce any evidence that she "was replaced by one outside the protected class." Hawkins v.

Ceco Corp., 883 F.2d at 982.  Defendants do not dispute that Plaintiff is a member of the protected classes of females and persons over 40 years of age.  However, no one has replaced Plaintiff, and her position is still as described above. (Facts, ¶ 18).  Therefore, she is not able to establish a *prima facie* case. The Court should grant Defendants' motion for summary judgment on Plaintiff's Title VII claims for the initial reason that she "did not meet the fourth requirement of showing [s]he was replaced by a [male]."  Hawkins, 883 F.2d at 984.

Plaintiff has failed to establish a *prima facie* case for a third reason: her failure to produce any evidence that Defendants treated similarly situated employees differently than her. See Maynard,  342 F.3d at 1289, 1290; Jones v. Gerwens, 874 F.2d 1534, 1542 (11th Cir. 1989); Smith v. Monsanto Chemical Co., 770 F.2d 719, 724 (8th Cir. 1985), cert. denied, 475 U.S. 1050 (1986); Tate v. Weyerhaeuser Co., 723 F.2d 598, 605 (8th Cir. 1983), cert. denied, 469 U.S. 847 (1984).  The Eleventh Circuit has expressly held that the decisionmaker must have condoned transgressions by employees outside the plaintiff's class who were similarly situated to plaintiff in order to raise an inference of discrimination.  Jones v. Gerwens, 874 F. 2d at 1541-42 and n.14.  Where, as here, the plaintiff "has failed to adduce evidence of knowledge of [prior leniency to males] on the part of [the decisionmaker in plaintiff's case], [s]he failed to make out a *prima facie* case of disparate treatment."  Jones v. Gerwens, 874 F.2d at 1542.

Plaintiff has not shown that any similarly situated males were treated more favorably than her.  The Court should grant Defendants' motion for summary judgment on Plaintiff's Title VII claim because Plaintiff has failed to establish that Defendants treated similarly situated male employees more favorably than plaintiff under similar circumstances.

> **(b)** **Plaintiff Has Failed to Establish a Prima Facie Case of Age Discrimination in Violation of the ADEA.**

The ADEA prohibits employers from failing or refusing to hire any individual or otherwise discriminating against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's age; the protected class under the ADEA includes individuals over the age of forty.  See 29 U.S.C. Section 621 (a)(1).  The *prima facie* elements for an ADEA claim are slightly different, as Plaintiff must prove that she (1) was a member of the protected age group, (2) she was subjected to adverse employment action, (3) she was qualified for the position, and (4) she was replaced by or otherwise lost a position to a younger individual.  Chapman v. AI Transport, 229 F.3d 1012 (11th Cir.2000).

Applying the same facts and arguments set forth in subparagraph (a) above, Plaintiff's *prima facie* case of ADEA discrimination fails because (1) she was not terminated or subjected to adverse employment action; (2) she was not replaced by or otherwise lost a position to a younger individual; and (3) she has not produced any evidence that similarly situated younger employees were treated more favorably than her under similar circumstances.

      c)       **Even If Plaintiff Had Suffered Adverse Employment Action, Which She Has Not, Plaintiff Has Failed To Produce Any Evidence That Defendant's Would-Be Legitimate, Nondiscriminatory Reasons For Its Actions Were A Mere Pretext For Discrimination.**

Even if it is assumed for the purposes of argument only, that Plaintiff has established a *prima facie* case of discrimination in her alleged discharge from employment, which she has not, the Court should still grant Defendants' motion for summary judgment.   Work is available for Plaintiff if she can find a qualified driver partner, and has been since her FMLA medical release (Facts, ¶ 18).

If Plaintiff established a *prima facie* case, which she has not, Defendants' "solid evidence of a legitimate, nondiscriminatory reason for [their] action completely rebuts the inference of discrimination raised by plaintiff's initial showing."   Mauter v. Hardy Corp., 825 F.2d 1554,

1558 (11th Cir. 1987). Plaintiff has failed to offer any evidence that Defendants' legitimate, nondiscriminatory reasons for their actions are mere pretext for gender or age discrimination. Yet, the plaintiff in a Title VII disparate treatment case such as this one can recover "only when defendant's articulated reason is a pretext for accomplishing a racially discriminatory purpose [or discriminatory purpose based on age or gender]." Clark, 717 F.2d at 529. There is no such evidence here.

In the foregoing narrative statement of undisputed facts, Defendants explained that (1) Whitehead primarily uses team drivers (Facts, ¶ 2-3); (2) it is the drivers' responsibility to find a driving partner for team driving (Facts, ¶ 5); (3) Whitehead does not force drivers to partner together but rather places them together only if they are agreeable because it is necessary for them to get along on long trips in close quarters (Facts, ¶ 6-7); (4) Plaintiff lacks the requisite two years' experience to drive alone and therefore must have a qualified partner (Facts, ¶ 12); and (5) that as late as December 9, 2005, (after Plaintiff claims PeopLease told her its records indicated she had abandoned her job), Whitehead advised her in writing that Whitehead had been trying to find someone to partner her with and that she had a position if either she or Whitehead could find a qualified partner for her. (Facts, ¶ 18, 20).

The foregoing facts are legitimate, non-discriminatory reasons for why Plaintiff has not worked since her return from leave. Likewise, Whitehead cannot permit Plaintiff to drive alone because her inexperience renders her uninsurable under its policy, which is a legitimate non-discriminatory reason. Whitehead has acted in good faith by continuing to attempt to locate a driver partner for Plaintiff. (Facts, ¶ 18, 20). Plaintiff, by contrast, has made no effort to locate a driver partner for herself and has established criteria for a driver partner (white only, smoker)

that not only hinders Whitehead in its voluntary search to find her a partner but also leaves Plaintiff with unclean hands in this lawsuit.  (Facts, ¶ 13, 21).

Defendants have offered legitimate, non-discriminatory reasons for their actions, and there is no evidence such reasons are pretext.  Plaintiff, on the other hand, has conditioned her return to work on certain factors, including race. She should not be permitted to recover under any theory of unlawful discrimination or retaliation.

Summary judgment is due to be granted as to all of Plaintiff's Title VII and ADEA discrimination claims.

### 4.    *Plaintiff Cannot Prove a Willful Violation Under the ADEA and Is Not Entitled to Liquidated Damages*

Plaintiff alleges in her complaint a "willful" violation of the ADEA by Defendants. Under the ADEA, an employee is entitled to liquidated damages only for a willful violation of the statute.  Willfulness exists when the employer knew its conduct was prohibited or showed reckless disregard for whether its conduct was prohibited by the ADEA.  See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985).  There is no evidence that Defendants pursued discriminatory policies based on age, and in fact, the average age of all female employees at Whitehead is 50 and the average age of all female drivers is 54. (Facts ¶  26).  Plaintiff never complained about any kind of discrimination based on race, age, or retaliation to anyone at Whitehead or PeopLease despite a policy against discrimination of which she was aware.  (Facts ¶ 25).  There is absolutely no evidence that Defendants treated any younger employees more favorably than her.  She cannot show Defendants knew their conduct was prohibited or showed a reckless disregard for whether its conduct was prohibited by the ADEA.  Summary judgment is due on this claim as well.

**B.      Summary Judgment is Due to be Granted on Plaintiff's FMLA Claims.**

Courts have recognized two types of claims a plaintiff may bring pursuant to FMLA: interference and retaliation claims. See O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir.2000); Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206 (11th Cir.2001).  In an interference claim, a plaintiff must show only an entitlement to the benefit denied by the employer. Id.  In this case, as has been shown, Plaintiff was not denied any benefit, as Whitehead still has a position available to her.

Likewise, Plaintiff's FMLA retaliation claim fails because she has no evidence that she was terminated in retaliation for taking FMLA leave, and in fact her position remains available to her. The hurdle she faces is much higher here, because she has "the increased burden of showing that his employer's actions were motivated by an impermissible or retaliatory animus." Id. at 1206, 1207.

The Plaintiff has adduced no direct evidence of retaliation.  In the absence of direct evidence, courts in FMLA retaliation cases apply a variant of the McDonnell Douglas burden shifting framework for Title VII retaliation claims.  See Brungart v. Bellsouth Telecomm., Inc., 231 F.3d 791, 798 (11th Cir. 2000).  To state a claim of retaliation, a Plaintiff must prove that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the adverse employment decision was causally related to the protected activity. Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1207 (11th Cir. 2001)  (citing Parris v. Miami Herald Publ'g Co., 216 F.3d 1298, 1301 (11th Cir. 2000)).

As argued above, Plaintiff has not suffered an adverse employment action because her position is still available to her.  Likewise, there is no evidence that Whitehead's inability to find a driver partner for her is causally related to the fact that she took FMLA leave.  In fact, it is

undisputed that Whitehead has attempted to find a driver partner for Plaintiff, but has been unable to find a qualified driver who satisfies Plaintiff's criteria and would agree to drive with Plaintiff.

In addition, Plaintiff has failed to show that any employees who sought or took FMLA leave were treated more favorably.  Plaintiff has completely "failed to produce any evidence at all that [defendant's] policy was unevenly applied."  Conner v. Fort Gordon Bus. Co., 761 F.2d 1495, 1501 (11th Cir. 1985).

There has been no showing of an intention to retaliate.  In a retaliation claim, "an employee must demonstrate that his employer **intentionally** discriminated against him in the form of an adverse employment action for having exercised an FMLA right."  Strickland, 239 F.3d at 1207 (Emphasis added).  That is, a Plaintiff bears "the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus."  Id. at 1206-1207 (Citation in internal quotation marks omitted).  The Plaintiff cannot meet this increased burden because she has no evidence of intentional discrimination.

Finally, Plaintiff has adduced no evidence that she complained of FMLA violations or failure to follow FMLA procedures, or of any opposition to and complaints about alleged discriminatory treatment to which plaintiff and others seeking FMLA leave were subjected.

Summary judgment is due to be granted on all of Plaintiff's FMLA claims.

## IV.

## CONCLUSION

For the foregoing reasons, the court should grant defendants' joint motion for summary judgment on all plaintiff's claims asserted in this action and dismiss this action with prejudice and with costs taxed against the plaintiff.

/s/ Joel P. Smith, Jr.
Joel P. Smith, Jr. (ASB-0328-M46J)

/s/ Courtney R. Potthoff
Courtney R. Potthoff (ASB-4565-057C)

Attorneys for Defendants,
PeopLease Corporation and Benny
Whitehead, Inc.

**OF COUNSEL:**
WILLIAMS, POTTHOFF, WILLIAMS, & SMITH, L.L.C.
Post Office Box 880
Eufaula, Alabama 36072-0880
Telephone:    (334) 687-5834
Facsimile:    (334) 687-5722

/s/ Jim S. Calton, Jr.
Jim S. Calton, Jr., Esq. (ASB-0968-L66J)
Attorney for Benny Whitehead, Inc.

**OF COUNSEL:**
CALTON & CALTON
Post Office Box 895
Eufaula, Alabama  36072-0895
Telephone:    (334) 687-3563
Facsimile:    (334) 687-3564

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date served a copy of the foregoing upon the following counsel of record in this cause via electronic mail on this 30th day of January, 2007.

Jerry D. Roberson, Esq.
Roberson & Roberson
Post Office Box 380487
3765 Kenross Drive
Birmingham, Alabama  35238-0487

Albert H. Adams, Jr.
Irby Law Firm, LLC
Post Office Box 910
Eufaula, Alabama  36072-0910

/s/  Joel P. Smith, Jr._____
OF COUNSEL