# Condensed Transcript

# Deposition of
# Benny Paul Whitehead

**taken on**
**February 20, 2007**

**Gloria Duniphin**
**v.**
**Benny Whitehead, Inc., and PeopLease Corporation, et al.**

**Case No. 2:06-cv-00459-WKW**



**Certified Court Reporters and Certified Legal Video Specialists**
**334.262.3332  1.888.253.DEPS**
**Email: depo@baker-baker.com**
**www.baker-baker.com**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


GLORIA DUNIPHIN,

     Plaintiff,

vs.           CASE NO. 2:06-cv-00459-WKW

BENNY WHITEHEAD, INC.,

and PEOPLEASE CORPORATION, et al.,

     Defendants.


*    *    *    *    *    *    *    *


The videotaped deposition of BENNY
PAUL WHITEHEAD was taken before Cornelia
J. Baker, Certified Court Reporter and
Certified Shorthand Reporter, as
Commissioner, on Tuesday, February 20,
2007, commencing at approximately
1:21 p.m., in the law offices of Williams,
Potthoff, Williams & Smith, L.L.C.,
125 Orange Avenue, Eufaula, Alabama,
pursuant to the stipulations set forth
herein.

Page 2

```
 1    *   *   *   *   *   *   *
 2              APPEARANCES
 3
 4    Representing the Plaintiff:
 5
 6         MR. JERRY D. ROBERSON
           Attorney at Law
 7         Roberson & Roberson
           Suite 150
 8         8 Office Park Circle
           Birmingham, Alabama 35223
 9
10         MR. ALBERT H. ADAMS, JR.
           Attorney at Law
11         Irby Law Firm
           Post Office Box 910
12         Eufaula, Alabama 36072
13    Representing the Defendants:
14         MS. COURTNEY POTTHOFF
           Attorney at Law
15         Williams, Potthoff, Williams &
              Smith, L.L.C.
16         125 Orange Avenue
           Eufaula, Alabama 36072
17
18         MR. JIM S. CALTON, JR.
           Attorney at Law
19         Calton & Calton
           226 East Broad Street
20         Eufaula, Alabama 36072
21
22    Also present:
23         Ms. Deborah Hiott
24
25
```

Page 4

```
 1    may be introduced at the trial of this
 2    case or used in any other manner by either
 3    party hereto provided for by the Statute,
 4    regardless of the waiving of the filing of
 5    same.
 6         It is further stipulated and agreed
 7    by and between counsel and the witness
 8    that the reading and signing of the
 9    deposition by the witness is hereby not
10    waived.
11
12    *   *   *   *   *   *   *   *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    *   *   *   *   *   *   *   *
 2
 3              STIPULATIONS
 4
 5         It is hereby stipulated and agreed by
 6    and between counsel representing the
 7    parties that the videotaped deposition of
 8    BENNY PAUL WHITEHEAD is taken pursuant to
 9    the Rules of Civil Procedure, and that
10    said deposition may be taken before
11    Cornelia J. Baker, Certified Court
12    Reporter, as Commissioner, without the
13    formality of a commission; that objections
14    to questions, other than objections as to
15    the form of the questions, need not be
16    made at this time, but may be reserved for
17    a ruling at such time as the deposition
18    may be offered into evidence, or used for
19    any other purpose by either party hereto,
20    provided by the Statute.
21         It is further stipulated and agreed
22    by and between counsel representing the
23    parties in this case, that the filing of
24    the deposition of BENNY PAUL WHITEHEAD is
25    hereby waived, and that said deposition
```

Page 5

```
 1    *   *   *   *   *   *   *   *
 2              INDEX
 3    EXAMINATION              PAGE
 4    BY MR. ROBERSON:            7
 5    EXHIBIT                   PAGE
 6    Plaintiff's Exhibit No. 1 .......... 30
         Initial Road Test
 7
      Plaintiff's Exhibit No. 2 .......... 54
 8       Defendant Benny Whitehead, Inc.'s,
         Responses to Plaintiff's First
 9       Interrogatories
10    Plaintiff's Exhibit No. 3 .......... 55
         Affidavit of Robert Kirkham
11
      Plaintiff's Exhibit No. 4 .......... 62
12       00649-00654, Trainee Weekly
         Evaluation Report
13
      Plaintiff's Exhibit No. 5 .......... 67
14       00703, 9/25/03 note
15    Plaintiff's Exhibit No. 6 .......... 73
         Photo
16
      Plaintiff's Exhibit No. 7 .......... 75
17       Photo
18    Plaintiff's Exhibit No. 8 .......... 76
         8/29/05 letter from Gloria Duniphin
19
      Plaintiff's Exhibit No. 9 .......... 81
20       Georgia Department of Labor, Claims
         Examiner's Determination
21
      Plaintiff's Exhibit No. 10 .......... 86
22       00280, 12/05/05 letter to Benny
         Whitehead from Gloria Duniphin
23
24
25
```

Page 6

```
1       MR. ROBERSON: On the Record. This
2       is -- we're at the offices of
3       Williams, Potthoff in Eufaula,
4       Alabama. Today is February
5       20th. It is 1:21 p.m.
6           We are taking the
7       videotaped deposition of the
8       Defendant, Benny Whitehead,
9       Inc., in the case of Gloria
10      Duniphin versus Benny
11      Whitehead, Inc., and PeopLease
12      Corporation. This case is
13      pending in the United States
14      District Court for the Middle
15      District of Alabama, Northern
16      Division. It's CV No. 206-459
17      pending before Judge Thompson.
18          My name is Jerry
19      Roberson. And I represent the
20      Plaintiff, Gloria Duniphin.
21          Would all counsel of
22      Record state their name and
23      party they represent?
24      MR. CALTON: Jim Calton for Benny
25          Whitehead, Inc.
```

Page 7

```
1       MRS. POTTHOFF: Courtney Potthoff
2           for PeopLease Corporation.
3       MR. ADAMS: Albert Adams, attorney
4           for Gloria Duniphin, Plaintiff.
5       MR. ROBERSON: Would you swear our
6           Witness, please, ma'am?
7           BENNY PAUL WHITEHEAD,
8       The Witness, having first been sworn or
9       affirmed to speak the truth, the whole
10      truth, and nothing but the truth,
11          testified as follows:
12      MR. ROBERSON: Do we have the usual
13          stipulations? And is he going
14          to read and sign, too?
15      MR. CALTON: I'm sure he'll want to,
16          yes.
17              EXAMINATION
18      BY MR. ROBERSON:
19      Q. Would you state your full name,
20      please, sir?
21      A. Benny Paul Whitehead.
22      Q. All right. Mr. Whitehead, my name
23      is Jerry Roberson. I represent Gloria
24      Duniphin. Have you ever given a deposition
25      before?
```

Page 8

```
1       A. Yes.
2       Q. What kind of case?
3       A. In a workmen's comp.
4       Q. Other than that, have you ever given
5       a deposition?
6       A. No, sir.
7       Q. Are you presently employed?
8       A. Yes, sir.
9       Q. In what capacity?
10      A. I run a trucking company.
11      Q. What's your job?
12      A. Sales. General, just . . .
13      Q. Do you have a job title?
14      A. They've got me listed as president.
15      Q. Of what entity?
16      A. Benny Whitehead, Incorporated.
17      Q. Is your father Benny Whitehead?
18      A. Yes, sir.
19      Q. Are you a Junior or . . .
20      A. No, sir.
21      Q. He's got a different middle name?
22      A. Yeah. He's a Harold.
23      Q. Okay. And what's your age, sir?
24      A. Thirty-nine.
25      Q. Did you graduate from college?
```

Page 9

```
1       A. No, sir.
2       Q. Did you attend college?
3       A. Some.
4       Q. Where?
5       A. Troy State.
6       Q. And what level did you obtain?
7       A. A couple of years. I come back and
8       went back to work.
9       Q. Do you know Gloria Duniphin?
10      A. Yes, sir.
11      Q. Did you ever supervise Mrs.
12      Duniphin?
13      A. In a limited capacity, yes.
14      Q. How so?
15      A. Worked in dispatch. She was up
16      under -- she was a driver up under some
17      dispatch.
18      Q. How long have you been president of
19      Benny Whitehead, Inc.?
20      A. We started rotating around between
21      me and my brother and sister. A year or so.
22      Q. Okay. Well, on June 13 of 2005,
23      were you the president of Benny Whitehead,
24      Inc.?
25      A. I can't recall.
```

Page 10

1    Q. Would there be any documents that
2 might tell me who was the president at that
3 time?
4    A. Somewhere probably, yes.
5    Q. Do y'all have corporate meetings?
6    A. Yes, sir.
7    Q. Where are they?
8    A. Where are the meetings at?
9    Q. Yeah.
10    A. Sometimes at my father's house,
11 sometimes at the office.
12    Q. Are there minutes kept?
13    A. Yes.
14    Q. Who is in charge of those minutes?
15    A. My sister.
16    Q. Who's that?
17    A. Amy Culpepper.
18    Q. Okay. Would those minutes reflect
19 who the corporate officers were?
20    A. Probably not. We don't really go
21 into that.
22    Q. Well, what corporate documents would
23 reflect who was the corporate officer in June
24 of 2005?
25    A. She would probably just have a

Page 11

1 change of status document, you know . . .
2    Q. Do you know Robert Mutin (phonetic)?
3    A. Yes, sir.
4    Q. Does he still work for your company?
5    A. Yes.
6    Q. Is he a dispatcher?
7    A. Yes.
8    Q. Was he a dispatcher in June of '05?
9    A. Yes.
10    Q. Do you know Eddie Whitehead?
11    A. Yes.
12    Q. Is he your brother?
13    A. Yes.
14    Q. Is he the director of safety and
15 maintenance?
16    A. At that particular time or now?
17    Q. Has he ever held that position?
18    A. He's held it, yes, sir.
19    Q. Is he now?
20    A. No, sir.
21    Q. Who did you replace as president?
22    A. Probably my father. I'd have to
23 make for sure, but that's fairly certain.
24    Q. Are you a shareholder?
25    A. Yes, sir.

Page 12

1    Q. How much stock do you own?
2    A. Like 16. It's 16 percent and some
3 change.
4    Q. Do you know who the other
5 shareholders are?
6    A. Yes, sir.
7    Q. Is it a closely-held corporation?
8    A. It's a family-owned business.
9    Q. Well, does that mean that
10 shareholders can't buy stock in Benny
11 Whitehead, Inc.?
12    A. That's right.
13    Q. Who are the other shareholders
14 besides yourself?
15    A. My brother and my sister each own
16 16 percent and some change. And then my dad
17 owns the other 52 percent.
18    Q. So he trusts you, but not enough; is
19 that right?
20        MR. CALTON: Object to the form.
21    Q. You can answer.
22    A. Yes, sir.
23    Q. And is that the way the company is
24 run, that is Benny Whitehead makes the
25 decisions, your dad?

Page 13

1    A. He's there in like a consultant-type
2 deal, more or less than anything else. We
3 consult him about what we do.
4    Q. He controls the company, doesn't he?
5    A. Not necessarily. We all do as a
6 group.
7    Q. He owns 52 percent, correct?
8    A. That's correct.
9    Q. So if he decides that you don't get
10 a paycheck, you don't, do you?
11    A. No. I sign the checks.
12    Q. Okay. Was Gloria Duniphin hired in
13 December of '03?
14    A. I'd have to check her application
15 for the date.
16    Q. Okay. What have you done to prepare
17 for this deposition, Mr. Whitehead?
18    A. Read most all the paperwork they
19 give me, the copy and everything, the
20 application and the other stuff. But I don't
21 remember the date.
22    Q. Okay. Well, do you know how she was
23 hired? That is, was she a graduate of
24 truckdriving school?
25    A. Yes.

Page 14

1    Q. How many -- what percentage of
2  people that you hire at Benny Whitehead,
3  Inc., that's their first job as a
4  truckdriver?
5    A. As in straight out of school?
6    Q. Yeah.
7    A. Less than 10 percent.
8    Q. Okay. And how many employees do you
9  have as truckdrivers?
10   A. As drivers? It varies. Right now
11 we're running about fifty-five trucks or
12 somewhere around a hundred to a hundred and
13 ten drivers, somewhere like that. We run all
14 teams.
15   Q. Okay. So about 10 percent would be
16 about ten --
17   A. Uh-huh (affirmative response).
18   Q. -- eleven, twelve?
19   A. Somewhere in that nature. I'd have
20 to look for exact figures, but somewhere --
21 that's close.
22   Q. Would you agree with me that all of
23 those people have less than two years of
24 experience as truckdrivers?
25   A. Yes.

Page 15

1    Q. How many people have you hired out
2  of truckdriving school since 2005?
3    A. Couldn't tell you.
4    Q. Did you know that I'd requested that
5  information?
6    A. I know that I couldn't tell you. I
7  don't know. You know, the ones out of
8  driving school -- you know, just straight out
9  of driving school, they become a trainee.
10 But I wouldn't know the exact amount.
11   Q. So you designate people that come
12 out of driving school as trainees; is that
13 correct?
14   A. Yes.
15   Q. Typically, do they come with a
16 partner?
17   A. Some do. Some don't. They --
18   Q. Name --
19   A. Okay. Go ahead.
20   Q. Name one person that came with a
21 partner.
22   A. Robert Kirkham's wife. Well,
23 Robert -- you know, Robert, he come first.
24 She come second. She's his partner.
25   Q. Okay. Robert Kirkham, did he come

Page 16

1  from driving school?
2    A. Yes.
3    Q. And at the time he came, did he have
4  a partner?
5    A. No.
6    Q. Who obtained the partner for him?
7    A. We had somebody there. We had -- we
8  did, Benny Whitehead, Inc.
9    Q. And how do you -- how do you assist
10 new hires with partners?
11   A. As in how do we try to match them
12 up?
13   Q. Yeah.
14   A. We ask them questions like -- you
15 know, like some of the older guys like, you
16 know, to listen to a different kind of music
17 than younger guys; whether or not they smoke;
18 Whether they have -- you know, some of my
19 guys have dogs in the trucks with them,
20 whether they do that and that sort of stuff.
21 Try to get somebody that sort of matches
22 together. They're living in 70 square foot
23 of truck. So, you know, it's close quarters.
24   Q. They need to be compatible, correct?
25   A. Yes, sir.

Page 17

1    Q. Well, do you know who -- is it fair
2  to say that a new hire must be paired with
3  somebody that has more than two years of
4  over-the-road experience?
5    A. That's correct.
6    Q. And is that a requirement of your
7  insurer?
8    A. Yes, sir.
9    Q. Who is your insurer?
10   A. I don't know at this time. I can
11 find out. I don't know. We change insurance
12 companies once a year -- or update insurance
13 once a year. Sometimes it changes, sometimes
14 it doesn't.
15   Q. Well, is it always a requirement of
16 your insurer?
17   A. In the last three or four times,
18 yes.
19   Q. Okay. Well, do you have some kind
20 of database that assists you in pairing these
21 truckdrivers?
22   A. No.
23   Q. How do you do it then?
24   A. I know them all.
25   Q. Oh. You do it personally?

Page 18

1    A. No. Me and my father and my
2  brother. We've got another guy hired now,
3  too, also, but . . .
4    Q. Who is that?
5    A. Phil Hatfield (phonetic). He's been
6  with us since Christmas.
7    Q. And because it is a family-owned
8  business, and because you know all of your
9  employees, you know who is likely to be
10 compatible with the other driver, correct?
11   A. Not necessarily. It's a crap shoot
12 at best. You know, sometimes you put
13 somebody with them, and sometimes they work
14 out and sometimes they don't.
15   Q. Okay. Well, if they don't work out,
16 do you reassign them or do you fire them?
17   A. No. We don't fire them. We try to
18 reassign them. And sometimes that's an
19 issue.
20   Q. So how many drivers do you think
21 you've placed that have less than two years
22 of experience with another driver who has
23 more than two years experience? Since June
24 of '05, how many people have you placed?
25   A. I couldn't tell you an exact number.

Page 19

1    Q. Well, do you think it would be
2  several dozen?
3    A. I couldn't tell you an exact number.
4    Q. Give me your best judgment. More
5  than ten?
6    A. Ten. Twelve, maybe, at the most.
7    Q. Is there any driver, other than
8  Gloria Duniphin, that you haven't placed with
9  a team driver?
10   A. Right now or in that time area?
11   Q. Since June of '05.
12   A. I couldn't tell you.
13   Q. You can't name one person that you
14 have been unable to find a team driver for?
15   A. Sometimes it takes longer than
16 others. I don't know. I couldn't tell you
17 an exact name.
18   Q. Well, why were you unable to place
19 Gloria Duniphin with anybody?
20   A. She had put certain restrictions on
21 us on what she would ride with or who she
22 would ride with.
23   Q. And what do you claim those
24 restrictions were?
25   A. Well, she wanted somebody that was a

Page 20

1  smoker. And, you know, that's an issue.
2  Wanted somebody -- she wanted somebody that
3  was white. And she didn't mind if they were
4  male or female, but she said she wanted a
5  white person to drive. And on our side, we
6  needed somebody that had two years
7  experience. So it's sort of . . .
8    Q. Right.
9    A. You know . . .
10   Q. Okay. And of your current employees
11 that you've had since June of '05, how many
12 smoke, are white, and have more than two
13 years experience?
14   A. I could not tell you an exact
15 number. I have a hundred employees. I
16 couldn't tell you how many that smoked
17 or . . .
18   Q. Sixty? Thirty?
19   A. I couldn't tell you.
20   Q. Could you tell me anybody that does?
21   A. Yeah, there is some.
22   Q. Does D.A. Bryant?
23   A. Yes.
24   Q. Did you ever ask him if he would be
25 paired with Gloria Duniphin?

Page 21

1    A. Yes.
2    Q. What did he say?
3    A. Didn't want her back.
4    Q. When did you ask him?
5    A. I don't know the exact date. It's
6  in his affidavit.
7    Q. Did you ask him in 2005?
8    A. I don't have the exact date.
9    Q. Did you make any document where you
10 had asked him?
11   A. No, sir.
12   Q. Did Mr. Bryant tell you why he no
13 longer wished to work with Mrs. Duniphin?
14   A. Yes.
15   Q. What did he say?
16   A. It's in the affidavit. Said that
17 she couldn't back up. She couldn't back the
18 truck up to a dock and that she wasn't
19 comfortable in traffic. California mainly.
20 And that's part of the DOT requirements.
21 They're required to be able to back up, and
22 they're also required to be able to handle
23 themself in traffic.
24   Q. Okay. Did he make any complaint to
25 you, any written complaint, during the period

Page 22

1  of time when he worked with Mrs. Duniphin?
2      A.  I don't think so.  I don't have any
3  recollection of it.
4      Q.  Oh.  Does Mr. Bryant still work for
5  you?
6      A.  Yes, sir.
7      Q.  And did he have a partner?
8      A.  Not at this time.  He's gotten a
9  little older.  He does single stuff now.  He
10 delivers loads for us here to Florida.
11     Q.  Did you ask D.A. Bryant to give you
12 an affidavit?
13     A.  I don't know if I asked him.  I
14 think the lawyer -- I think Jimmy did.
15     Q.  Okay.  Do you know when that was?
16     A.  Don't have a date.  It's been pretty
17 recently, I think.
18     Q.  Yeah.  Because his affidavit is
19 dated January 25th, 2007.
20     A.  Yeah.
21     Q.  Do you know if D.A. Bryant ever gave
22 any statement, written statement, before
23 January 25th, 2007, about Mrs. Duniphin?
24     A.  A written statement?
25     Q.  Yeah.

Page 23

1      A.  I don't know, sir.
2      Q.  Okay.  Now, has Benny Whitehead --
3  do they have any written policy or regulation
4  that says the driver is responsible for
5  finding a teammate?
6      A.  If it is, it's in the handbook.  I
7  don't know of any.
8      Q.  You don't know of any, and you're
9  the president of Benny Whitehead, Inc.,
10 correct?
11     A.  That's correct.
12     Q.  Well, is that your policy?
13     A.  We try to assist them in finding --
14 in finding partners for the single guys and
15 single ladies.  But sometimes we have issues
16 doing it.
17     Q.  Okay.  You just can't name anybody
18 besides Gloria Duniphin that you've ever had
19 an issue doing it; is that correct?
20     A.  There's been some, but I can't give
21 you an exact name.
22     Q.  Okay.  Well, and you've got over a
23 hundred employees, correct?
24     A.  Yes.
25     Q.  Is there anything to prevent you

Page 24

1  from just assigning an employee to work with
2  Gloria Duniphin?
3      A.  Yes.
4      Q.  What is that?
5      A.  You can't put two people in a truck
6  and -- as big as this desk and expect them to
7  get along.  I've got business to take care
8  of.  They have to be at a certain place at a
9  certain time.  If you put two people in there
10 that don't get along, they don't get what
11 they're supposed to do.
12     Q.  Well, how would you know if they
13 don't get along unless you assign them?
14     A.  They can sit down and talk.  You
15 know, we try -- we try to do the best we can
16 with that.
17     Q.  Have you ever provided Gloria
18 Duniphin with a list of employees that have
19 more than two years of experience?
20     A.  No.
21     Q.  Why not?
22     A.  It's confidential.  It's their
23 private information.  I can't give it to
24 them.
25     Q.  Do you -- do you contend that Gloria

Page 25

1  Duniphin must find a team driver in order to
2  get back to work at Benny Whitehead, Inc.?
3      A.  Yes, sir.
4      Q.  But she's not entitled to know who's
5  working there, correct?
6      A.  She can know who's working there,
7  but I can't give her their personal
8  information.  My drivers that are driving
9  with me now have a team partner.  And I
10 wouldn't split -- I couldn't -- I couldn't
11 split them up and put them with her.
12     Q.  Well, certainly, you do -- you have
13 split up teams before, haven't you?
14     A.  At their request.
15     Q.  You haven't split up teams not at
16 their request?
17     A.  No, sir.
18     Q.  Well, who was Mike Duniphin paired
19 with before Gloria Smith was hired?
20     A.  I would have to pull the records up
21 and see.
22     Q.  Well, he was -- do you have people
23 that are assigned to work as trainers?
24     A.  Not really.
25     Q.  Not really, does that mean --

Page 26

1   A. No.
2   Q. -- yes?
3   A. It means no.
4   Q. Was Mike Duniphin a trainer?
5   A. At the particular time when he first
6  started here, no.
7   Q. Was he ever a trainer?
8   A. When he started taking -- when he
9  took Gloria with him, he was assigned as a
10 trainer then.
11  Q. Okay. A trainer. And you used the
12 term "trainee" for new hires, didn't you?
13  A. That's correct.
14  Q. So does a trainee have to be
15 assigned to a trainer?
16  A. Yes.
17  Q. And how many people are qualified to
18 work as trainers?
19     MRS. POTTHOFF: All right. Jerry,
20        you're starting to yell.
21     MR. ROBERSON: I'm not yelling.
22  A. I don't have a number.
23  Q. Well, do you have a designation that
24 you put on those people?
25  A. Most of my -- most of my drivers

Page 27

1  have over two years experience. And any of
2  the guys -- any of the guys or the ladies
3  with over two years experience that have, you
4  know, no incident history, as in accidents or
5  that sort of stuff, and have over two years
6  experience, with that kind of experience can
7  qualify as a trainer.
8   Q. Do you get more pay as a trainer?
9   A. Yes.
10  Q. How much more pay?
11  A. At the time that we're talking about
12 here, I think it was on a percentage. And it
13 was like 24 percent. And the trainer would
14 get like -- or 26 percent. And the trainer
15 would get 16, and the trainee would get 10.
16  Q. Oh.
17  A. And that varies depending on
18 experience as they come along. And let's
19 say, when they first get started, they start
20 at 10. And as they come along and learn how
21 to back up and learn how to do -- handle
22 themselves in traffic, able to take the truck
23 down -- you know, competent on -- you know,
24 competent to where they could release them on
25 a truck, then the pay would increase.

Page 28

1   Q. Well, are they tested on that?
2   A. We rely a lot on the trainer.
3   Q. So the trainer determines when they
4  get a raise?
5   A. No, sir.
6   Q. Who determines that?
7   A. We do.
8   Q. Based on what?
9   A. Whether or not they can drive.
10  Q. Well, how do you know?
11  A. We take them down the road and give
12 them a road test.
13  Q. Well, did you ever give Gloria
14 Duniphin a road test?
15  A. Not me personally.
16  Q. Did anybody at Benny Whitehead?
17  A. Probably three or four times.
18  Q. And are there records of those
19 tests?
20  A. There should be some in her -- there
21 should be some in her employment file.
22  Q. Is there ever any notation that she
23 could not perform satisfactorily as a driver?
24  A. Just the stuff from D.A.
25  Q. Oh. So every road test that she

Page 29

1  had, she performed satisfactorily, correct?
2   A. I couldn't tell you. I couldn't
3  answer. I didn't give her the test.
4   Q. You haven't looked at her file?
5   A. I looked at her file, but I couldn't
6  tell you. I don't have it in front of me.
7   Q. Well, let's take a break and go off
8  the Record and let you look at the file,
9  okay?
10  A. All right.
11     MR. ROBERSON: Going off the Record
12        at a quarter till two.
13        (A brief recess was taken.)
14        (Ms. Hiott exited the
15        deposition proceedings.)
16     MR. ROBERSON: We're back on the
17        Record at ten till two.
18 BY MR. ROBERSON:
19  Q. Mr. Whitehead, have you had an
20 opportunity to look for those documents?
21  A. Yeah. This is the initial road test
22 that my brother signed off on, so he
23 initially gave her the first road test.
24  Q. Let me mark that as Exhibit 1 to
25 your deposition.

Page 30

1        (Whereupon Plaintiff's Exhibit
2          No. 1 was marked for
3          identification and attached
4          hereto.)
5    A. It's on the left side.
6    Q. Okay. This is where your brother --
7  is it Eddie --
8    A. Yes.
9    Q. -- qualified her?
10    A. Yes.
11    Q. Did he note any deficiencies?
12    A. Well, she come straight out of
13  school. We wouldn't -- you know, we just
14  know when they come straight out of school
15  most of them are not as proficient as
16  somebody that's got ten years of experience.
17    Q. Did he note any proficiencies?
18    A. We never note any.
19    Q. Okay. So no, the answer to that is
20  no?
21    A. No.
22    Q. Okay, thank you. Who is McCork?
23    A. Trisha McCook.
24    Q. McCook?
25    A. She was secretary at that time.

Page 31

1    Q. Okay. How do you know your brother
2  did this document?
3    A. Because he signed his name on the
4  bottom of it.
5    Q. Where? Where did he sign?
6    A. (Witness indicated.)
7    Q. This?
8    A. Yes.
9    Q. Is his signature?
10    A. Uh-huh.
11    Q. I'm sorry. I didn't recognize that.
12    A. That's a card you get from the DOT.
13  You have to -- she has to keep a copy of
14  that, too.
15    Q. Okay. Well, is there any other
16  document that notes that Mrs. Duniphin was
17  given a driver's test?
18    A. I didn't see any in her file, no,
19  sir.
20    Q. Did she ever get a raise from the
21  initial 10 percent when she was a trainee?
22    A. She probably did. When she come as
23  original driver, she married the guy that she
24  went on the truck with to start off with.
25  And most of the time, that's when they're --

Page 32

1  when they're man-and-wife teams, they split
2  the money dead even down the middle, whether
3  or not she has experience or not. That's a
4  general rule.
5    Q. Did they? Did Mrs. Duniphin and her
6  soon-to-be husband split the money down the
7  middle?
8    A. I can look on her payroll sheets and
9  see.
10    Q. Would you mind looking?
11    A. No problem.
12        MRS. POTTHOFF: All right. Here's
13          going to be her first check.
14          Her first check is right up
15          here. And then you may want to
16          look and see when they get
17          married if something changes.
18      THE WITNESS: I'll have to get a
19          date on that.
20        MRS. POTTHOFF: I've got -- Jerry,
21          do you know the date of the
22          wedding, of the marriage?
23      MR. ROBERSON: Should I?
24        MRS. POTTHOFF: Yes.
25      MR. ROBERSON: I don't even know the

Page 33

1          date of mine, much less Gloria
2          Duniphin.
3      MR. CALTON: Y'all changed the
4          name from Smith to Duniphin on
5          the . . . that might be a date.
6      THE WITNESS: Yeah, I'm looking to
7          see.
8
9    A. She started out at 10 percent.
10  That's what she first started, which would be
11  a trainee pay.
12    Q. If you could try to determine --
13    A. And they change her here to
14  14 percent.
15    Q. When did that happen?
16    A. Hold on. They changed it to 12.
17  All right, this here date on this one here is
18  1/22, so she'd have one month's experience.
19  They changed her from ten, the next paycheck
20  she went to 12. The next one after that, she
21  went to 14, which is two after that.
22    Q. Is she still Gloria Smith during
23  that period of time?
24    A. Gloria Smith, yes.
25    Q. So she got two raises before she got

Page 34

1  married; is that correct?
2      A.  This was 2 of '06, two, yeah.
3  February 6, '04.  February 6 of '04.  I don't
4  know if -- I don't think we changed her name
5  to Duniphin.  I didn't see where we have.  We
6  never did change her name to Duniphin --
7  yeah, it is.  It's all the way back here.
8  Looks like they changed her name somewhere
9  around November 12th of '04.
10     Q.  Was she hired in '03?  Is that
11  correct?
12     A.  Yeah, December 1st.
13     Q.  And at that time, y'all had no
14  contractual agreement with PeopLease,
15  correct?
16     A.  I don't know the exact dates, but I
17  think that's correct.
18     Q.  Was she an employee only of Benny
19  Whitehead, Inc., initially?
20     MRS. POTTHOFF:  I just want to
21         clarify:  The way the
22         relationship started, in 2002,
23         was PeopLease.  The contract
24         was dated in 2005.  That's the
25         contract --

Page 35

1      A.  No.  She had PeopLease check all the
2  way through.
3      Q.  Well, so there is no document in the
4  possession of Benny Whitehead, Inc., that
5  lists any driving deficiency for Gloria
6  Duniphin, correct?
7      A.  That's correct.
8      Q.  You do have an affidavit dated
9  January of '05 where Mr. Bryant expresses his
10  opinion regarding --
11     MRS. POTTHOFF:  January 7th.
12     A.  '07.
13     Q.  '07?
14     A.  Yes.
15     Q.  That's the only document, correct?
16     A.  That's correct.
17     Q.  Okay.
18     A.  She didn't drive but with two
19  people, one being her husband and the other
20  one was D.A. Bryant.
21     Q.  And Benny Whitehead assigned Mike
22  Duniphin to work with her?
23     A.  That's correct.
24     Q.  As a trainer, correct?
25     A.  That's right.

Page 36

1      Q.  And she was a trainee, correct?
2      A.  That's right.
3      Q.  And then Mr. Bryant -- I'm sorry,
4  Mr. Duniphin -- well, first, Gloria was
5  involved in an accident on the job, correct?
6      A.  Yes, sir.  I don't know the dates.
7      Q.  Yeah.  In '04 she was involved in an
8  accident in Texas, correct?
9      A.  That's correct.
10     Q.  And then she was out of work, unable
11  to work as a driver, for a period of time --
12     A.  That's correct.
13     Q.  -- following that?
14     A.  That's correct.
15     Q.  And then when she was reinstated as
16  a driver, when she was medically able to
17  drive, she was assigned to work with D.A.
18  Bryant, correct?
19     A.  Yes.  There was a time period in the
20  middle of that that we couldn't find her a
21  partner also before we put her with D.A.  And
22  I think D.A. and his partner separated for
23  some reason.
24     Q.  Okay.  Well, she actually was
25  released, I think, in January, and she went

Page 37

1  to work in February?
2      A.  That's correct.
3      Q.  Correct?
4      A.  That's correct.
5      Q.  All right.  And so for the second
6  time, Benny Whitehead, Inc., found her a
7  partner, correct?
8      A.  Yes.
9      Q.  Then she worked, I think it's two
10  trips.  Is it -- does a trip take about a
11  week?
12     A.  Thereabout.  Five, six, seven days,
13  somewhere in that range.
14     Q.  Okay.  I think it's two trips, may
15  be more.  But she worked for about two weeks
16  with D.A. Bryant before she had to go on FMLA
17  leave, correct?
18     A.  Yes.
19     Q.  And she had to go on FMLA leave
20  because she had congestive heart failure,
21  correct?
22     A.  Yes.
23     Q.  Okay.  And you agree that's a
24  serious health condition, correct?
25     A.  Yes.

Page 38

1    Q. She's entitled -- y'all have more
2 than 50 employees, right?
3    A. Yes.
4    Q. So she's entitled to take FMLA
5 leave, correct?
6    A. Yes.
7    Q. She's worked for a year, more than a
8 thousand hours in a year, correct?
9    A. She hadn't been -- she didn't work
10 for more than a year. She had nine months
11 and some change.
12    Q. Okay.
13    A. She was off. You know, she wasn't
14 working. She was on -- I don't know if they
15 considered -- I reckon they consider
16 workmen's comp.
17    Q. She had been employed --
18    A. Employed.
19    Q. -- over a year?
20    A. Employed, yeah.
21    Q. Okay. She received approval to take
22 the FMLA leave, correct?
23    A. Yes.
24    Q. She got a medical clearance
25 authorization to return to work for Benny

Page 39

1 Whitehead as a truckdriver on June 13th,
2 2005, correct?
3    A. Benny Whitehead, Inc.
4    Q. Benny Whitehead, Inc.?
5    A. Yes, sir.
6    Q. And she returned that authorization
7 to Benny Whitehead, Inc., in June of 2005,
8 correct?
9    A. I don't know the answer to that. I
10 don't know when she returned it.
11    Q. Well --
12    A. She might have just called and said,
13 I've got my release, but I don't know what
14 date that she talked -- that she brought the
15 piece of paper back to us.
16    Q. Who would she normally report that
17 to?
18    A. She'd probably have called dispatch
19 and said, Hey, I'm released. Then, you know,
20 we'd probably patched her up to the personnel
21 department up front, which I think would have
22 been Stacey at that time; Trish had left.
23    Q. Yeah. And if she brought her form,
24 her release form, back to Stacey, would that
25 be the appropriate person at Benny Whitehead,

Page 40

1 Inc.?
2    A. Probably Eddie first, he was up
3 there. He was the managing part of it at
4 that time. She probably had to talk to him
5 first.
6    Q. Okay.
7    A. And then, it, you know . . .
8    Q. Well, is it noticed to Benny
9 Whitehead, Inc., if I give my return-to-work
10 slip to Stacey?
11    A. I couldn't tell you the answer to
12 that. You know, she'd have to talk the --
13 she'd have to talk to her supervisor, which
14 would have been, you know in that department,
15 which would have been my brother Eddie.
16    Q. What's Stacey's job?
17    A. Secretary.
18    Q. In June of '05, she was a secretary?
19    A. I'd have to check dates on her
20 employment. She worked as a dispatcher for a
21 while, and then we moved her to the secretary
22 department up there.
23    Q. Oh, for a time she was a dispatcher?
24    A. Yes.
25    Q. So when she was a dispatcher, she

Page 41

1 would have been the supervisor for
2 truckdrivers, correct?
3    A. Well, for a while, yes, sir.
4    Q. Okay. Well, do you know when Gloria
5 Duniphin provided her authorization to Benny
6 Whitehead, Inc.?
7    A. No, sir.
8    Q. Does anyone at Benny Whitehead,
9 Inc., know when they received that
10 authorization?
11    A. It's not in the paperwork. I
12 don't -- I don't know when. The date's not
13 on it, so . . .
14    Q. Let me show you what was marked as
15 Exhibit 2 to Deb Hiott's deposition and ask
16 you if you recognize that document?
17       (Witness reviewed document.)
18    A. I don't recognize it. I've never
19 seen it before except -- until we got in this
20 case.
21    Q. Well, did you know that Gloria
22 Duniphin was being treated for congestive
23 heart failure by Northside Cardiology and
24 Dr. Michael Balk?
25    A. I knew she was being treated. I

Page 42

1    didn't know where or who.
2        Q.  Okay.  Well, she has to provide
3    Benny Whitehead, Inc., as her employer with
4    written notification of her serious health
5    condition, correct?
6        A.  Yes.
7        Q.  She has to give them proof; some
8    doctor has to certify that she has a serious
9    health condition, correct?
10       A.  Yes.
11       Q.  And Benny Whitehead received that,
12   right?
13       A.  I don't have a copy of it.  I don't
14   know if he did or not.
15       Q.  Well, wouldn't you have to have it
16   before you granted her leave, FMLA leave?
17       A.  PeopLease granted her that, not me.
18       Q.  I see.  Well, when PeopLease grants
19   leave to employees of Benny Whitehead, Inc.,
20   FMLA leave, do they provide the document to
21   Benny Whitehead?
22       A.  Not necessarily.
23       Q.  Do you know when this document was
24   provided to PeopLease?
25       A.  Sometime around December, is what

Page 43

1    y'all said earlier.
2        Q.  Yeah.  Do you know who provided it?
3        A.  No, sir.  Stacey was secretary at
4    that time, so if it was in her office, that's
5    where it would have come out of.
6        Q.  Do you know why it would have been
7    provided in December of 2005?
8        A.  I don't have, no.
9        Q.  And it's dated June 8th, 2005?
10       A.  I don't have an answer for that.
11       Q.  That's a long time, isn't it --
12       A.  Uh-huh (affirmative response).
13       Q.  -- for a truckdriver to be out of
14   work; you agree with that?
15       A.  Yeah.  Yes.
16       Q.  How much money do your truckdrivers
17   make normally in a week, just a ballpark?
18       A.  As a trainee or as a trainer -- as a
19   trainee or a full driver?
20       Q.  Well, let's say you get -- how do
21   you pay your drivers, by the load?
22       A.  Yeah.  At that time she was paid a
23   percentage of the load.
24       Q.  Okay.  And at 14 percent, what would
25   a load weekly average be for weekly?

Page 44

1        A.  Six, 6500, $7,000 gross and she'd
2    get 14 percent of that as a full driver,
3    which would be split down the middle.
4        Q.  14 percent?
5        A.  It's a -- would be a full driver.
6    That would be somebody with two years'
7    experience and --
8        Q.  Well, somebody with less than two
9    years' experience?
10       A.  Ten percent.  I can show you if you
11   want me to.
12       Q.  Well, I thought you said she got
13   14 percent?
14       A.  She did after -- after, with the guy
15   that she married.
16       Q.  Okay.  Well, then that's what she
17   was making, wasn't it?
18       A.  At that time, yes, sir.
19       Q.  Okay.  And what was her paycheck
20   when she made 14 percent?
21       A.  Let me pull one up.  Let's see.
22   Here's one dated June 20th, 740 -- let's
23   see.  It says 742.  Yep, 626.10, that's after
24   taxes and everything.
25       Q.  Well, what's her gross?

Page 45

1            (Witness reviewed document.)
2        A.  Her gross would be 780 -- 792.87.
3        Q.  About $800 a week?
4        A.  There or -- there or better, yeah.
5        Q.  Okay.  And for six months, that's 26
6    weeks at $800 a week, what's that, about --
7        A.  Eighteen, $20,000.
8        Q.  Yeah, about $20,000.
9        A.  Uh-huh (affirmative response).
10       Q.  So do you know if Mrs. Duniphin had
11   any contact with Benny Whitehead, Inc., from
12   June when she was released to December of
13   '05?
14       A.  I think so.
15       Q.  How many times did she have contact
16   with them?
17       A.  I knew of a couple of phone calls,
18   and I think she had been by the office maybe
19   once or twice.
20       Q.  How would you be made aware of it?
21       A.  I'm in the office, and we have a --
22   we're a small trucking company.
23       Q.  Okay.  You have personal knowledge
24   of these two occasions when she came by?
25       A.  Yeah.

Page 46

1    Q. Was she seeking work?
2    A. Yes.
3    Q. Was she asking to be placed back on
4 a truck?
5    A. Yes.
6    Q. Was she, from June to December,
7 allowed to work as a truckdriver?
8    A. No, sir.
9    Q. Okay. And was she told that Benny
10 Whitehead, Inc., was looking for a partner
11 for her?
12    A. Yes.
13    Q. And was she told that they were
14 unable to provide her with a partner from
15 June until December of '05?
16    A. Yes.
17    Q. And has that been the case, even
18 until today, you've been unable to provide
19 her with a partner?
20    A. For some of the requirements that
21 she put on us, it's sort of tough to find her
22 a partner.
23    Q. Yeah. Those are onerous require-
24 ments, right?
25    A. They are.

Page 47

1    Q. You have to not object to someone
2 who smokes; you have to be a white person;
3 and you have to have more than two years'
4 experience, correct?
5    A. Yes.
6    Q. That's probably only about half your
7 workforce, isn't it?
8    A. I can't split up a perfectly good
9 team that's already working together just to
10 give her a job.
11    Q. Sure you can.
12    A. No, I can't. I can't force anybody
13 to go in a truck against their will.
14    Q. Sure you can.
15    A. No, I can't.
16    MR. CALTON: Object.
17    Q. Do you have the ability to assign
18 any person another partner to work with?
19    A. We don't -- when we assign -- when
20 we assign them, it has to be agreeable on
21 both parties.
22    Q. Have you assigned anyone to work
23 with Gloria Duniphin?
24    A. We tried to assign her one, I don't
25 know the exact date. But we tried to assign

Page 48

1 her one, and she couldn't go.
2    Q. Who? Who was she going to go with?
3    A. I don't have his name.
4    Q. Well, are you talking about in
5 September when she went to her grandmother's
6 hundredth birthday party?
7    A. I think that's the date.
8    Q. Yeah. Is there a writing about
9 that?
10    A. A what?
11    Q. A writing.
12    A. As a record of it?
13    Q. Yeah.
14    A. I don't think so.
15    Q. Oh. And you don't know who the
16 person was that she was going to team up
17 with?
18    A. That's correct.
19    Q. You know, that's almost like you
20 just made that up.
21    MR. CALTON: Object to the form.
22    MRS. POTTHOFF: Object to the form.
23    MR. CALTON: That's uncalled for,
24       Jerry.
25    Q. Well, is there any documentation

Page 49

1 about that?
2    A. Yeah. There's a letter or a note or
3 something.
4    Q. There's a letter in December of '05
5 that references that, correct?
6    A. I don't know the date, but I think
7 so.
8    Q. Is there anything else?
9    A. No.
10    Q. Well, why would you wait until
11 December of '05 to write a letter about that?
12    A. Because we were still trying to find
13 her a partner to go with her.
14    Q. Oh. Did you ever advise her in
15 writing that she needed to find a partner?
16    A. No, sir. Verbally, but never in
17 writing.
18    Q. Oh. You never gave her a list of
19 employees and their phone numbers, correct?
20    A. She never asked for one.
21    Q. Did you ever give her one?
22    A. No. She didn't ask for one.
23    Part of her -- part of the job, it's
24 her responsibility -- is to help find her a
25 partner especially with the kind of

Page 50

1   stipulations that she put upon us.
2       Q.  Well, how was she supposed to do
3   that, sir?
4       A.  Same way the other, you know, the
5   other drivers do.
6       Q.  How?
7       A.  Go back to the original school where
8   she come from and see if they know anybody
9   there that's had a couple years' experience
10  that doesn't have a job yet.  Go to a truck
11  stop, same way I do.
12      Q.  How can you have a couple years'
13  experience and not have a jo?
14      A.  Same way she had.  She hadn't worked
15  the last year.
16      Q.  Well, she, Mr. Whitehead --
17      A.  Yes, sir.
18      Q.  -- I want to believe you.  I'm
19  looking for a reason to believe you.  But you
20  don't have any documents that support your
21  position, do you?
22      A.  As in --
23          MRS. POTTHOFF:  Object to the form.
24      A.  As in which position are you talking
25  about?

Page 51

1       Q.  Well, let's take -- let's take them
2   in order.
3           Do you have a writing that says you
4   must provide -- as an employee of Benny
5   Whitehead, Inc., you must provide another
6   employee with more than two years' experience
7   to be your partner?
8       A.  No.
9       Q.  Okay.  Do you know when
10  Mrs. Duniphin gave you the authorization?
11      A.  I don't know that she ever did, to
12  be honest.  I mean, you know, I don't know
13  what day; whether it was in June or whether
14  it was in December when we got this letter.
15      Q.  Well, you know that you sent it to
16  PeopLease in December of '05, don't you?
17      A.  I know we had it by then.  But I
18  don't know if she give it to me in June or
19  September or December, either one of those.
20  I don't know when she give it to us.
21      Q.  Well, how many times did she come by
22  before September asking for work?
23      A.  I don't know between September.  I
24  know between January and December.
25      Q.  Okay.  Well, why would she be coming

Page 52

1   by if she hadn't been released and provided
2   you her release?
3       A.  Well, she -- I don't know.  Looking
4   for a job; she needed work.
5       Q.  Yeah.  So you got the release, you
6   sent it to PeopLease.  We just don't have any
7   information about when you got it, correct?
8       A.  That's correct.
9       Q.  Now, everybody in the history of
10  Benny Whitehead, Inc., has been able to get a
11  partner except for Gloria Duniphin?
12          MR. CALTON:  Object to the form.
13          MRS. POTTHOFF:  Object to the form.
14      Q.  Correct?
15      A.  No, it's not correct.
16      Q.  Well, name one person who wasn't
17  able to get a partner?
18      A.  We hire a hundred people a year,
19  thereabout, and like I said, I couldn't give
20  you -- I couldn't give you the name of one
21  particular person out of the hundred that we
22  hire a year that would have to wait on that.
23  There are some.
24          Like I said, she had to wait the
25  previous time because for two or three weeks

Page 53

1   for D.A. to have an opening where we could
2   put her with him when she come off of
3   workmen's comp.
4       Q.  Mr. Whitehead, I'm going to show you
5   Exhibit 11.  It's a list of employees from
6   June 1st, 2005 to December 1st, 2005.  Name
7   one person who has been unable to obtain a
8   partner that has less than two years'
9   experience, was unable to obtain a partner
10  other than Gloria Duniphin.
11          (Witness reviewed document.)
12      A.  I couldn't tell you which ones, to
13  be honest with you.  I'd have to go
14  back and -- it would be a hard task.  But I
15  reckon we could go back and pull everyone of
16  them in here and ask them and see.  But I'd
17  have to, you know -- I couldn't tell you an
18  exact name.
19          MR. ROBERSON:  Let's take a break
20          and go off the Record at 2:15.
21          (A brief recess was taken.)
22          MR. ROBERSON:  Back on the Record.
23          Deposition of Mr. -- Benny
24          Whitehead, Inc.
25

Page 54

1  BY MR. ROBERSON:
2      Q.  First of all, Mr. Whitehead, let me
3  show you what I've marked as Exhibit 2.  And
4  I'll represent to you those are
5  Interrogatories that were signed by your
6  brother.
7              (Whereupon Plaintiff's Exhibit
8              No. 2 was marked for
9              identification and attached
10             hereto.)
11     A.  Okay.
12     Q.  And those are -- Interrogatories are
13 just questions that one party to a lawsuit
14 asks another.
15     A.  Okay.
16     Q.  And is that signed by your brother,
17 Eddie Whitehead?
18     A.  Yep.
19     Q.  What does he say his position is?
20     A.  At that time, it was safety
21 director.  That was the 3rd of -- 3rd of
22 January, this year.
23     Q.  Okay.  Now, I'm also going to show
24 you what's been marked as Plaintiff's Exhibit
25 No. 3.  And that's the affidavit of Robert

Page 55

1  Kirkham.
2              (Whereupon Plaintiff's Exhibit
3              No. 3 was marked for
4              identification and attached
5              hereto.)
6      A.  Okay.
7      Q.  Have you seen that before today?
8      A.  Before today, yes.
9      Q.  And do you know Mr. Kirkham?
10     A.  Yes.
11     Q.  Was he a former driver for you?
12     A.  Former, and about to come back to
13 work, yes, sir.
14     Q.  He's about to come back to work?
15     A.  Yes, sir.
16     Q.  Where is he working now?
17     A.  I don't know where he's working now.
18 Somewhere local, I think, at home.  His wife
19 had a health issue and had to come off the
20 road.  And I think he was at home with her
21 for a while.
22     Q.  And is she going to be able to come
23 back to work, too?
24     A.  No, sir.
25     Q.  Did y'all hire Mr. Kirkham out of

Page 56

1  school, truckdriving school?
2      A.  I'd have to look back at his
3  application and see.  I don't know.  I could
4  look and see, but I don't know right off
5  hand.
6      Q.  Well, let me tell you that you did.
7  He had had no over-the-road truckdriving
8  experience, okay.  And when did you hire him?
9  What does that say in his affidavit?
10             (Witness reviewed document.)
11     A.  Looks like April of '03.
12     Q.  April of '03.  And when did his wife
13 begin working at Benny Whitehead, Inc.?
14     A.  Sometime around October of '03.
15     Q.  And when Mr. Kirkham first began
16 when he was just a trainee truckdriver, who
17 was his partner?
18     A.  I would have to look in his file and
19 see the driver's name.  I do remember that
20 part of it now.
21     Q.  Well, would he have been assigned a
22 driver by Benny Whitehead?
23     A.  Probably so, yes, sir.
24     Q.  A trainer, right?
25     A.  Yes, sir.

Page 57

1      Q.  Would his file reflect who that was?
2      A.  It should have some information.
3  Maybe it does.  I don't know.  It should have
4  some if it is in the sheets.
5      Q.  Okay.  Well, then when his wife
6  graduated from truckdriving school and went
7  to work at Benny Whitehead in October, were
8  they assigned to work together?
9      A.  Yes.
10     Q.  How could you do that when you only
11 had six months over-the-road experience?
12     A.  Our insurance company leaves us some
13 leeway.  We have a letter to that effect.
14 And in certain -- in certain cases where they
15 have no accidents, they deliver everything on
16 time, there's no problems, no log violations,
17 no speeding tickets, especially on the
18 accident.
19     Q.  So there's not a requirement, is
20 what you're telling me, about two years of
21 over-the-road experience?
22         MR. CALTON:  Object to the form.
23         MRS. POTTHOFF:  Object to the form.
24     A.  There is a requirement.
25     Q.  Well, this leeway, is it in writing

Page 58

1  anywhere?
2      A.  Yes.
3      Q.  Where is that in writing?
4      A.  I've got the paperwork.  Courtney
5  and Jimmy, they should have a sheet of paper
6  on it.
7          MR. ROBERSON:  Has that been
8      produced, Counsel?
9          MRS. POTTHOFF:  It's -- I think it's
10         a letter from the -- no, I
11         don't think that's the letter
12         from the insurance carrier, the
13         memo from the insurance
14         carrier.  I don't know that
15         that has been produced.
16  BY MR. ROBERSON:
17     Q.  So what you're telling me,
18  Mr. Whitehead, is that Robert Kirkham was
19  partnered with his wife when he had six
20  months of over-the-road driving experience
21  and she had none, correct?
22     A.  Correct.
23     Q.  And he worked with her in that
24  capacity for two years -- two-and-a-half
25  years according to his affidavit?

Page 59

1      A.  Yes.
2      Q.  Okay.  Now, Robert Kirkham is a
3  male, isn't he?
4      A.  Yes, sir.
5      Q.  How old is he?
6      A.  I don't know exactly how old he is.
7  His birth date is on here, '43.
8      Q.  He's forty-three?
9      A.  No, it's 1943.  April 15th, 1943.
10  So he's around the same age, fifty,
11  fifty-five.
12     Q.  Okay.
13         MR. CALTON:  Sixty-three.
14         THE WITNESS:  Huh?
15         MR. CALTON:  Sixty-three.
16         THE WITNESS:  Sixty-three?
17         MR. CALTON:  Wouldn't that be right?
18         THE WITNESS:  Could be.
19  BY MR. ROBERSON:
20     Q.  Other than Mr. Kirkham, is there
21  anybody else who's been teamed with someone
22  who neither of the team members had more than
23  two years driving experience?
24     A.  There's one or two.  I know of one.
25  I know of one name, is Greg Haire.  He's no

Page 60

1  longer employed with us, but he had like
2  seventeen, eighteen months experience.  And
3  they okayed him to do it also.  No tickets,
4  no accidents, no problems, no anything.
5      Q.  How do you spell his last name?
6      A.  Haire, H-A-I-R-E.  Greg Haire.
7      Q.  And he's not employed with you
8  anymore?
9      A.  No, sir.
10     Q.  Where was he from?
11     A.  Around Bainbridge.
12     Q.  And who was his partner?  Do you
13  know?
14     A.  His son.
15     Q.  His son?
16     A.  Yes, sir.
17     Q.  What was his name?
18     A.  Dusty.
19     Q.  Dusty Haire?
20     A.  Uh-huh (affirmative response).
21     Q.  H-A-I-R?
22     A.  I-R-E.
23     Q.  Okay.  And was Dusty a trainee; that
24  is, a new hire?
25     A.  Yeah, he come out of school.  But he

Page 61

1  was with somebody else first, and then he
2  went with his dad.
3      Q.  He had less than two years
4  experience, too?
5      A.  When he first came on board, he went
6  with a guy that had a lot of experience.  And
7  then he went with his dad later on.
8      Q.  Okay.  Do you know why they left
9  your employment?
10     A.  Dusty is still with us.  Greg, I
11  think, went to J.B. Hunt, went to another
12  driver, another driver position.
13     Q.  Do you know why?
14     A.  No, sir.
15     Q.  That's part of the hardships of
16  running a trucking company, guys come and go,
17  don't they?
18     A.  Guys and ladies both.  That's my --
19  my biggest expense is driver recruitment.
20  And like I said, I have fifty-five trucks.
21  And like I said, I have every incentive to
22  keep every one of them rolling.  You know,
23  like I said, she made like 7 or $800, so that
24  same turnaround, my gross revenue would have
25  been 6 or $7,000, so -- and so I have

Page 62

1 payments to pay.
2      And you might -- Nicole Edwards
3 (phonetic) might be included on that list
4 with less than two years experience, too. I
5 think they okayed her. She's got fourteen,
6 fifteen, sixteen months experience, too. It
7 was about the same as what Greg was.
8      Q. Mr. Haire's son?
9      A. Dusty.
10     Q. Dusty, would he be under age forty?
11     A. Yeah. Dusty's probably thirty-
12 something. I don't have the exact age, but
13 that's about what he looks like to me.
14     Q. Okay. Well, is he on this list
15 anywhere? That gives the birthday.
16     A. Yeah. No, he's not on this one.
17 He's not on this list. His dad is, but he's
18 not.
19     Q. Okay. Mr. Whitehead, I'm going to
20 show you what I'll mark as Exhibit 4 to your
21 deposition. And this is out of Robert
22 Kirkham's personnel file that was produced to
23 me today.
24          (Whereupon Plaintiff's Exhibit
25          No. 4 was marked for

Page 63

1          identification and attached
2          hereto.)
3      MRS. POTTHOFF: What's the Bates
4          number?
5      MR. ROBERSON: It's 00649, 650
6          through 654. Okay?
7      MRS. POTTHOFF: Okay.
8 BY MR. ROBERSON:
9      Q. First of all, is that a Benny
10 Whitehead record?
11     A. Yes.
12     Q. Okay. And it's got over that,
13 weekly training record?
14     A. Yeah, trainee weekly evaluation
15 report.
16     Q. Now, does Gloria Duniphin have any
17 of those in her personnel file?
18     A. I don't think. I didn't see any in
19 her personnel file.
20     Q. Why doesn't she have any, because
21 her husband was her trainer?
22     A. Basically, yeah.
23     Q. Okay. Well, I was just asking.
24     A. Basically, a lot of the . . . yeah.
25     Q. Okay. Well, do you see there in

Page 64

1 that first document that I marked as
2 Exhibit 4 where it says that Robert Kirkham
3 has problems backing up?
4      A. Uh-huh, problems backing up and --
5 yeah.
6      Q. Huh? Well, did you show that to
7 your insurance carrier before you got him
8 exempted from that two-year requirement?
9      A. That's his first training report.
10 That's his first trip. If he didn't have
11 problems, it would be a miracle. Everybody
12 does.
13     Q. Oh, okay.
14     A. It's like walking for the first
15 time, you've got to get practice at it.
16     Q. You've got to learn, right?
17     A. Uh-huh (affirmative response).
18     Q. Okay.
19     A. The next one says he's continuing to
20 improve his shifting and backing. Safe while
21 operating equipment. Next one is continues
22 to improve. Need to consider moving Robert
23 up on his pay scale.
24     Q. Does that say who his trainer is?
25     A. George Franklin.

Page 65

1      Q. Okay. So he had more than two years
2 experience, right?
3      A. Yes.
4      Q. Okay.
5      A. Continues to improve on his --
6 that's backing and shifting. More
7 improvement is still needed. He's improving.
8 Has problems occasionally with transmission.
9 Improving with backing. Needs practice.
10 Same thing. And then at the bottom it says,
11 Will become an excellent driver. Hard
12 worker. Always ready to help.
13     Q. Now, is there an organizational
14 chart for Benny Whitehead?
15     A. As in . . .
16     Q. Shows who's where and what positions
17 they hold.
18     MRS. POTTHOFF: You mean like who
19          reports to who and --
20     MR. ROBERSON: Yeah.
21     MRS. POTTHOFF: A chain-of-command
22          kind of thing?
23     MR. ROBERSON: Yes, ma'am.
24     A. Not that I know of.
25     Q. Never seen one?

Page 66

1    A. I've never wrote one.
2    Q. Is it your position that
3 Mrs. Duniphin is still an employee of Benny
4 Whitehead?
5    A. Yes. If she could -- if she could
6 find a partner or if we could find her a
7 partner or if she could find her a partner to
8 come back on board.
9    Q. Are y'all still looking for one?
10    A. We look for drivers every day.
11    Q. No. Are you still looking for a
12 partner for her?
13    A. I look for partners for everybody
14 that doesn't have one.
15    Q. Is there any writing where you have
16 looked for her?
17    A. As a written record of where I just
18 specifically looked for her, no.
19    Q. Okay. Let me show you what I'm
20 going to mark as Exhibit -- is that 5?
21    A. That's 4 here.
22    MR. CALTON: I believe it's Bates
23    703.
24    Q. Let me ask you if you can identify
25 that document?

Page 67

1    (Whereupon Plaintiff's Exhibit
2    No. 5 was marked for
3    identification and attached
4    hereto.)
5    (Witness reviewed document.)
6    A. I can't identify it. But TM should
7 be Trisha McCook (phonetic). That was the
8 secretary at that time, I think.
9    Q. Did she type it?
10    A. She probably did. She put her
11 initials on it.
12    Q. Well, do you see where it says, Put
13 Robert and Debra together as a team? He has
14 five months experience and she has none. He
15 had been running with George Franklin and
16 been doing a good job. Team them up per
17 Mr. Benny. Would this be your dad?
18    A. That would be my dad.
19    Q. So Benny Whitehead told them to team
20 them up in September of '03, correct?
21    A. Yes, sir.
22    Q. I don't see anything from any
23 insurance carrier, do you?
24    A. As in what are you -- what are you
25 looking for?

Page 68

1    Q. Well, a letter or anything, any
2 consultation with the insurance carrier. It
3 says team them up per Benny.
4    A. Like I said, they give us some
5 leeway on what we can and can't do. And like
6 I said, if someone shows a lot of progress
7 and that doesn't have any accidents and that
8 does like they're supposed to, you can do
9 some of that with.
10    Q. Well, five months?
11    A. Every driver is different on their
12 skills and how fast they learn.
13    MR. ROBERSON: I see. Let's go off
14    the Record and change tapes.
15    (A brief recess was taken.)
16    MR. ROBERSON: We're back on the
17    Record.
18 BY MR. ROBERSON:
19    Q. Mr. Whitehead, do you live in
20 Eufaula?
21    A. Yes.
22    Q. Does your father live in Eufaula?
23    A. Yes.
24    Q. Does every member of your family
25 live in Eufaula?

Page 69

1    A. My brother and my sister actually.
2    Q. Okay. And where is Benny Whitehead,
3 Inc., located?
4    MRS. POTTHOFF: Are these pictures
5    of the terminal?
6    A. South of Eufaula. 3265 South
7 Eufaula Avenue.
8    Q. Is that in Alabama?
9    A. That terminal is. Now, we have an
10 office in Georgetown, too.
11    Q. Okay. Where your trucks are, do
12 y'all own the trucks?
13    A. Yes.
14    Q. How many trucks do y'all own?
15    A. Fifty-five right now. We're in the
16 middle of swapping over.
17    Q. Okay. What kind of trucks are they?
18    A. Freightliners.
19    Q. And do you own them; that is, do you
20 own them as opposed to lease them?
21    A. That's correct.
22    Q. So how much does a truck cost?
23    A. We've just got seventy new ones
24 coming in. They're 102,000 apiece.
25    Q. Whew. That's a lot of money, isn't

Page 70

1 it?
2     A. Yes. And I paid 84 for the last
3 ones I bought a year ago.
4     Q. And where are those trucks? Do you
5 have to get a tag?
6     A. Yes.
7     Q. Where are they licensed?
8     A. Georgia. The tag's out of Atlanta.
9     Q. And why is that?
10     A. Tax purposes. They give you a
11 little better incentive to be in Georgia than
12 they do in Alabama.
13     Q. Do you have to pay -- when you run a
14 trucking company, do you have to pay an
15 over-the-road tax?
16     A. Yes.
17     Q. And how much is that in Georgia?
18     A. It varies.
19     Q. Is it more expensive to get your tag
20 in Alabama?
21     A. Yes.
22     Q. So that's why you get your tags in
23 Georgia?
24     A. That's why we have an office -- our
25 main office is in Georgia, and the person

Page 71

1 working there. But it's for tax purposes.
2 They also offer you incentives, too. We're
3 getting ready to build a new terminal here in
4 the next three to five years, and they
5 offered us big incentives to go over there.
6     Q. Okay. Well, is Benny Whitehead,
7 Inc., is that an Alabama corporation?
8     A. Alabama corporation that's licensed
9 to operate in Georgia.
10     Q. It's licensed to do business in
11 Georgia?
12     A. Uh-huh (affirmative response).
13     Q. Is that yes?
14     A. Yes.
15     Q. It's qualified in Georgia to do
16 business?
17     A. Yes.
18     Q. When did they qualify?
19     A. I don't know the exact date.
20     Q. Well -- now, is it fair to say that
21 all your trucks are located -- that is, when
22 they're not being used, they're left at the
23 Eufaula location?
24     A. No, sir.
25     Q. Where are they left?

Page 72

1     A. Various driver's homes. A lot of
2 the driver's take them home.
3     Q. Oh, okay. But other -- do you have
4 a number of trucks that are parked at your
5 Eufaula location?
6     A. Sometimes for service, yes.
7     Q. Okay. And do you have a service
8 facility at the Eufaula location?
9     A. Yes.
10     Q. How many bays do you have?
11     A. Two.
12     Q. Where you do your in-house
13 maintenance?
14     A. Yes, sir.
15     Q. Now, y'all do light service work?
16     A. Anything. We can do anything. But
17 it's mostly service, air conditioning, oil
18 changes.
19     Q. Okay. Is there -- do y'all pay
20 anybody -- how many mechanics do y'all have?
21     A. Three full-time mechanics.
22     Q. Okay.
23     A. Well, two mechanics and the guy that
24 washes trucks full-time.
25     Q. All right. And tell me, do y'all

Page 73

1 have anybody that works in Georgia?
2     A. Yes.
3     Q. Who is that?
4     A. Alex Lawson (phonetic).
5     Q. What's his job?
6     A. Recruiting. He's another one of my
7 recruiting guys. Recruiting, answering
8 phones, filing.
9     Q. Where does he work?
10     A. It's -- I don't know the exact
11 address. Go through Georgetown. It's in the
12 curve on the right. We co-rent our office
13 with a fellow over there that does buildings.
14     Q. Okay.
15     MR. ROBERSON: Well, what number am
16     I on? This was 5. So this
17     would be 6, wouldn't it?
18     MR. CALTON: Yep.
19 BY MR. ROBERSON:
20     Q. Let me show you what I'll mark as
21 Exhibit 6, and ask you if that is your
22 Georgetown, Georgia, office?
23         (Whereupon Plaintiff's Exhibit
24         No. 6 was marked for
25         identification and attached

Page 74

1           hereto.)
2      A.  Yes, sir.
3      Q.  Is that a temporary office?
4      A.  No.  We've rented a couple of
5  different places.  We had one place that was
6  over in a strip mall and they -- the lease
7  come up.  And then we rented a place from
8  Judge Bennett (phonetic) over there for a
9  while.  And then this guy here wanted to do
10  some stuff.
11      Q.  Okay.  Well, is there also another
12  business that occupies that same office?
13      A.  Yeah.  The same people that do the
14  buildings.
15      Q.  Oh.  And so you're telling me that
16  your Georgia recruiter reports to work every
17  day at this facility?
18      A.  Four days, four-and-a-half, five
19  days a week, yes, sir.
20      Q.  And what are his hours?
21      A.  Sometimes around 7:30 or 7:45 to
22  about 4:30.
23      Q.  Do y'all have a phone?
24      A.  Yes, sir.
25      Q.  And what's the number?

Page 75

1      A.  334-1100.
2      Q.  What's the area code?
3      A.  229.  But there's also an 800 number
4  there, too.  And it's -- I can't remember it.
5  It's like a recruiting, a specific recruiting
6  800 number.  It should be on one of those
7  sheets.
8      Q.  Does he have files there?
9      A.  Yeah.  He mails out applications and
10  gets in applications.
11      Q.  Let me show you Exhibit 7, and ask
12  you if this is your former Georgia office?
13          (Whereupon Plaintiff's Exhibit
14              No. 7 was marked for
15              identification and attached
16              hereto.)
17      A.  Yes.  We didn't stay there long.
18  There's one more before this one also.
19      Q.  Okay.  Where is -- where is the
20  trailer that's depicted in Exhibit 7?
21      A.  I think they took it out and moved
22  it.
23      Q.  No.  Where was it?
24      A.  When you go across there, the first
25  truck stop, on the first station right there

Page 76

1  on the right, sort of behind it.
2      Q.  Did this same recruiter work at that
3  location?
4      A.  Yes.
5      Q.  Well, is that his truck?
6      A.  No.
7      Q.  What kind of vehicle does he drive?
8      A.  He drives like a big dually.  Now,
9  he trades -- he's bad as my dad, he trades
10  trucks about three times a year.  But he's
11  driving a silver Chevrolet dually at this
12  moment.
13      Q.  Okay.
14      A.  The other office is on around in
15  front of the bank.
16      Q.  Now, let me show you what I've
17  marked as Exhibit 8 to your deposition, and
18  ask you if you have seen that document
19  before?
20          (Whereupon Plaintiff's Exhibit
21              No. 8 was marked for
22              identification and attached
23              hereto.)
24          (Witness reviewed document.)
25      A.  I've never seen it.  I knew that she

Page 77

1  had written a letter.
2      Q.  Okay.  And who's -- what's the date
3  of that letter?  Can you read that?
4      A.  August the 29th, '05.
5      Q.  Okay.  And who did she write a
6  letter to?
7      A.  My brother, Eddie.
8      Q.  Would he have been her supervisor
9  then?
10      A.  In the safety department, yeah.
11      Q.  Okay.  Would you read that letter?
12  Can you read it for me?
13      A.  Yeah.  As you know, I've been
14  released to return to work now for about
15  two-a-half months.  I'm in a bind financially
16  and need to work.  I am willing to run solo.
17      Q.  And it's signed by Gloria Duniphin?
18      A.  Thank you.  Gloria Duniphin.
19      Q.  And do you acknowledge that Benny
20  Whitehead, Inc., received that on or about
21  August of 2005?
22      A.  Yes, sir.
23      Q.  And do you recall one of the
24  occasions that you saw Gloria was when she
25  brought that letter to Eddie or . . .

Page 78

1    A.  I can't recall whether it was or
2  not.
3    Q.  Okay.  Well, did you know that your
4  brother Eddie had appeared at the Georgia
5  unemployment hearing for Gloria Duniphin?
6  Did you know that?
7    A.  Yes, yes.
8    Q.  Why was he selected to appear as a
9  witness on behalf of Benny Whitehead, Inc.?
10    A.  He, at that time, was in that part
11  of the company doing the paperwork and that
12  sort of stuff.
13    Q.  Oh, okay.
14    A.  I do a lot of sales, too.  So my
15  schedule is sort of screwed up sometimes.
16    Q.  And Gloria Duniphin filed for
17  unemployment?
18    A.  Yes, sir.
19    Q.  And this is what I'm having trouble
20  with:  Did Gloria Duniphin ever work in
21  Georgia?
22    A.  Worked out of Georgia.  That's where
23  our people are paid out of.
24    Q.  What do you mean where they're paid
25  out of?

Page 79

1    A.  That's where all of our billing and
2  everything goes, through Georgia.
3    Q.  Well, she gets a PeopLease check,
4  doesn't she?
5    A.  Out of South Carolina, yes.
6    Q.  Okay.  And the information about
7  what pay she's to receive comes from Eufaula,
8  doesn't it?
9    A.  No.
10    Q.  No?
11    A.  No.  It comes from South Carolina.
12  They mail it.  They mail it to Georgia.  We
13  go get it, and then they send it out,
14  so . . .
15    Q.  No.  The original information that's
16  about what each employee is to be paid, their
17  wages --
18    A.  Oh, okay, yeah.
19    Q.  -- comes from Eufaula, correct?
20    A.  Correct.  We have -- our payroll
21  clerk is in Eufaula.
22    Q.  Okay.  Who is your payroll clerk?
23    A.  Lindsey Head (phonetic).
24    Q.  Okay.  And she transmits the
25  information, I assume by fax, to PeopLease?

Page 80

1    A.  Fax or e-mail.  I don't know
2  exactly.
3    Q.  Okay, fax or e-mail.
4    Now, when Gloria Duniphin worked
5  there, when she drove a truck there, where
6  did she -- where was her run?  Where was her
7  assigned route?
8    A.  We don't have assigned routes.
9    Q.  Okay.  Well, didn't she go to
10  California?
11    A.  Yes.
12    Q.  Do you go through Georgia to go --
13  to get to California?
14    A.  Not going.  But you do coming back
15  going to Florida.  We go from -- our normal
16  runs are say from Alabama -- you know,
17  Georgia, Alabama, this area, southeast to
18  California or to Washington.  And then they
19  unload out there, load, come back, and go
20  back to either Georgia or Florida.
21    Q.  Well, Gloria Duniphin is deducted
22  state income taxes, correct?
23    A.  Correct.
24    Q.  What state?
25    A.  Georgia.

Page 81

1    Q.  Georgia?
2    A.  Uh-huh (affirmative response).
3    Q.  She pays taxes to Georgia?
4    A.  As far as I know, yes.
5    Q.  How can you, when you're an Alabama
6  citizen, file your state income taxes in
7  Georgia?  How can you do that?
8    A.  Same way you do if you're a driver
9  out of Florida.  They give rebates on it.
10  They have drivers out of Mississippi.  Had
11  drivers out of Texas.  Pay them there and you
12  get rebates on them.  Same way I do.  I live
13  in Alabama, but I pay Georgia taxes.  And I
14  get a Georgia tax refund at the end of the
15  year.
16    Q.  Okay.  Let me show you Plaintiffs'
17  Exhibit 9, which is from the Georgia
18  Department of Labor.
19        (Whereupon Plaintiff's Exhibit
20        No. 9 was marked for
21        identification and attached
22        hereto.)
23        (Witness reviewed document.)
24    A.  Okay.
25    Q.  And that's the result of

Page 82

1  Mrs. Duniphin's unemployment claim.  And it
2  says that she is not entitled to receive
3  unemployment, because she's still employed.
4  Do you see that?
5      A.  Yes, sir.
6      Q.  Is that what it says?
7      A.  Let me read it a little more . . .
8          (Witness reviewed document.)
9      A.  Yes.  That's what it says.
10     Q.  Is that your position?
11     A.  Yes.
12     Q.  Well, let me show you what was
13 marked as Exhibit 6 to Deb Hiott's deposition
14 where it says that Mrs. Duniphin has been
15 terminated, voluntarily quit, and it's signed
16 by Stacey Lawson, an employee of Benny
17 Whitehead, Inc.  Do you see that?
18         (Witness reviewed document.)
19     A.  Uh-huh (affirmative response).
20     Q.  Is that yes?
21     A.  Yes.
22     Q.  Well, isn't that document
23 inconsistent with the position that Gloria
24 Duniphin is still employed?
25     A.  Yes.

Page 83

1      Q.  Well, was Stacey Lawson in error
2  when she completed that document?
3      A.  I don't know.
4      Q.  Do you have any explanation for why
5  it would say that Gloria Duniphin voluntarily
6  quit?
7      A.  Just whatever she wrote on the
8  thing, that would be the only explanation.
9  Said she's unable to leave going out on a
10 load for personal reasons.  She was going out
11 of town.
12     Q.  Is Stacey Lawson able to make
13 judgments about people's employment status
14 without consulting officers of Benny
15 Whitehead, Inc.?
16     A.  No.  She would have to consult
17 somebody.
18     Q.  And who did she consult?
19     A.  I don't know for sure.  But it would
20 have either been -- my brother most likely.
21     Q.  Would she have to receive
22 permission to send that document?
23     A.  Yes.  Somebody would have given it.
24     Q.  Well, how could Eddie Whitehead come
25 to Gloria Duniphin's unemployment hearing and

Page 84

1  say that she was still employed when he had
2  authorized Stacey Lawson to send that
3  document?
4      A.  In his letter he sent to her in
5  December, he said he was still looking for
6  her a partner, just as I am to this day.
7  I've got -- today I've got two trucks empty.
8  I could use four people right today.
9      Q.  Well, he didn't tell unemployment
10 that she had voluntarily quit?
11     A.  I don't know what -- I wasn't in
12 that meeting.
13     Q.  And, of course, that document that
14 Stacey Lawson sent doesn't have a date on it,
15 does it?
16     A.  I'd have to look at it and see.  I
17 didn't notice the date.
18         (Witness reviewed document.)
19     A.  None that I can see.
20     Q.  Although it's got a place for date,
21 doesn't it?
22     A.  Yes.
23     Q.  And she had to send that document to
24 PeopLease, didn't she?
25     A.  Yes.

Page 85

1      Q.  Wouldn't she normally send that by
2  fax?
3      A.  Yes.
4      Q.  Why isn't there a fax header on that
5  document?
6      A.  I don't have the slightest idea.
7      Q.  That's strange, isn't it?
8          MR. CALTON:  Object to the form.
9          MRS. POTTHOFF:  Object to form.
10     Q.  Isn't it?
11     A.  Not to me.
12     Q.  Do y'all have a scanner out there?
13     A.  Like document scanner?
14     Q.  Yeah.
15     A.  We used to.  I don't know if we do
16 anymore or not.
17     Q.  Well, you told me sometimes you
18 transmit documents by e-mail, right?
19     A.  Yeah.  Some, yeah.
20     Q.  Well, do you have the ability to
21 scan a document and send it by e-mail?
22     A.  We used to.  I don't think we -- I
23 don't think we do anymore.  Not that I'm
24 aware of anyway.
25         MR. ROBERSON:  Okay.  All right.

Page 86

1  We're going to go off the
2  Record here. We're about to
3  conclude. We'll go off the
4  Record at 3:19.
5  (Whereupon a brief recess was
6  taken.)
7  MR. ROBERSON: All right. We're
8  back on the Record. The
9  deposition of Benny Whitehead,
10  Inc.
11 BY MR. ROBERSON:
12  Q. Mr. Whitehead, let me show you what
13 I've marked as Plaintiff's Exhibit 10. Do
14 you recognize that document?
15  (Whereupon Plaintiff's Exhibit
16  No. 10 was marked for
17  identification and attached
18  hereto.)
19  (Witness reviewed document.)
20  A. I've never seen it before.
21  Q. Well, did Benny Whitehead, Inc.,
22 receive that?
23  (Witness reviewed document.)
24  A. We probably did. I heard about it,
25 but I haven't seen it.

Page 87

1  Q. Okay. You've been told about it,
2  correct?
3  A. Yes.
4  Q. And on December 5th, 2005, Gloria
5  Duniphin wrote Eddie Whitehead again,
6  correct? Correct?
7  A. Correct.
8  Q. And it's a typed letter this time.
9  It says I brought my paperwork to Stacey.
10 Since that time, I have written and called
11 you asking when I could return to work. I
12 have never been told to report back to work.
13 Last week I spoke with PeopLease to find out
14 my status. I was told that I had abandoned
15 my job. While I completely disagree with
16 this and still wish to return to work, if I
17 have been fired, then I want my $500 that was
18 held back from my paycheck. At the present
19 time, I can neither work and your company has
20 $500 of my money. It says please let me
21 return to work. If you will not let me
22 return, please give me my money. And that's
23 what prompted Eddie Whitehead's letter of
24 December 9th, correct?
25  A. Correct.

Page 88

1  Q. And he returned her money, correct?
2  A. Correct.
3  Q. Does that indicate that he wasn't
4  going to let her go back to work?
5  A. No, sir.
6  Q. Oh. Other than Gloria Duniphin, has
7  any employee of Benny Whitehead, Inc., ever
8  received their holdback money and continued
9  to work there?
10  A. Yes, sir.
11  Q. Who?
12  A. Every -- well, I need to make sure,
13 but this previous weekend, over the holiday
14 weekend, just about every driver. Because
15 PeopLease didn't get their checks to them on
16 time. So I think Amy wrote checks to about
17 three-quarters of them.
18  Q. Okay.
19  A. And then Willie Nixon (phonetic), I
20 know he bought a car one time. I give it
21 back to him. A couple of guys out of
22 Florida, same deal; got a divorce, needed
23 some money, I gave it back to him. They
24 continued working. We just started over.
25 During Christmas sometimes when they need a

Page 89

1  little extra money or whatever, vacation.
2  Q. So you took it back out?
3  A. After they got back. It's for
4  like -- it's like for if they quit us and
5  leave the truck somewhere. Or if they have a
6  ticket they don't pay, we're responsible for
7  it if they don't pay a ticket and it's in our
8  truck, that sort of deal. That's what it's
9  for. We do that instead of holding back a
10 week on the paycheck.
11  Q. Or if they damage the equipment or
12 something?
13  A. Yeah. Most of the time we try to
14 work that out with them before.
15  Q. Okay. All right. Well --
16  A. If she was in a tight for her money,
17 that's why he sent it back to her.
18  Q. Well, she had been in a tight for
19 six months, though, hadn't she?
20  A. Yes, sir. That's what the letter
21 said.
22  Q. And she had asked for money to
23 return to work during that six months, hadn't
24 she?
25  A. Yes.

Page 90

```
 1     Q.  And nobody lifted a finger to help
 2  her, did they?
 3         MR. CALTON:  Object to the form.
 4         MRS. POTTHOFF:  Object to form.
 5     Q.  You can answer.
 6     A.  That's completely wrong.
 7     Q.  Is there any document anywhere that
 8  you can point me to that shows that anybody
 9  did anything for Gloria Duniphin?
10     A.  That one right there, to start it
11  off with.  I got enough paychecks for five
12  people doing recruiting.  I recruit.  I
13  recruit twenty-four, seven.  I got a lady
14  that recruits five, six days a week on the
15  road on the car.  Puts out 5,000 pens during
16  the week.  We put out 42,000 of them things
17  right there last year.  And like I said,
18  I've got -- like I said, I've got two trucks
19  empty right now I'm needing drivers for.  And
20  they don't make a dime if they're parked on
21  the yard.
22     Q.  Well, you told me you had leeway
23  about this two-year requirement, right?
24     A.  Yes, sir.
25     Q.  Did you give Gloria Duniphin any
```

Page 91

```
 1  leeway?
 2     A.  She had an accident.  The leeway
 3  says no tickets, no accidents, no problems.
 4  She had a wreck.  She caused it.
 5     Q.  Is that in writing somewhere?
 6     A.  Yeah.  It's in the paper.  You
 7  should have a copy of it.  We can give you a
 8  copy of the memo.
 9     Q.  The accident that Gloria Duniphin
10  was involved in --
11     A.  Yes, sir.
12     Q.  -- was it her fault?
13     A.  As far as I know, yes, sir.
14     Q.  I see.  Well, did she sue the other
15  driver?
16     A.  I don't know about that.  We didn't.
17     Q.  Did she collect?
18     A.  I don't know about that either.
19     Q.  Well, wouldn't that indicate whether
20  she was at fault or not?
21     A.  No, sir.
22     Q.  Oh.
23     A.  Most of the time, a state trooper
24  will not -- would try not to designate fault.
25     Q.  So just to make certain:  In order
```

Page 92

```
 1  to get the leeway, you can't have any
 2  accidents, correct?
 3     A.  That's correct.
 4     Q.  You can't have any tickets?
 5     A.  Speeding tickets, log violations,
 6  that sort of stuff.  DOT violations,
 7  basically.
 8     Q.  Okay.  And didn't you say something
 9  else?
10     A.  No problems.  On-time deliveries,
11  you know, showing up when they're supposed
12  to.  That sort of stuff.  You know, just
13  basically top grade.
14     Q.  Got to have a clean record,
15  basically?
16     A.  Straight across the board.
17         MR. ROBERSON:  Okay.  I believe I'm
18             through in record time.
19         MRS. POTTHOFF:  All right.  Great.
20         MR. ROBERSON:  Have you got some
21             questions of this Witness?
22         MRS. POTTHOFF:  We can -- let me
23             confer with my counsel here.
24         MR. ROBERSON:  Okay.  Do you want me
25             to go off the Record?
```

Page 93

```
 1         MR. ADAMS:  Y'all want a private
 2             co-counsel time?
 3         MR. ROBERSON:  We'll go off the
 4             Record then at 3:27.
 5             (A brief recess was taken.)
 6  BY MR. ROBERSON:
 7     Q.  We're back on the Record,
 8  Mr. Whitehead.  Did you -- did you ever find
 9  a partner, Benny Whitehead, Inc., for anyone
10  under age forty since June of '05?
11     A.  I couldn't tell you for sure.  You
12  know, we don't track -- we don't track
13  under -- you know, that sort of deal on the
14  partners.  We just try to . . .
15     Q.  Have you found a partner for any
16  male since June of '05?
17     A.  I would have to look back and see.
18  You know, it's a year, so . . .
19     Q.  Well, do you hire truckdrivers under
20  age forty?
21     A.  Yes.
22     Q.  Some of them from -- straight from
23  high school?
24     A.  No, sir.  They've got to be twenty-
25  three years old.
```

Page 94

1    Q. I'm sorry. Straight from
2  truckdriving school?
3    A. Yes, sir.
4    Q. And so those people wouldn't have
5  two-years experience, correct?
6    A. That's right.
7    Q. If any of them were under age forty,
8  then you had to assign them a trainer,
9  correct?
10    A. Yes.
11    Q. And if any of them were under --
12  were male, you had to assign them a trainer,
13  correct?
14    A. Yes.
15    Q. And have you done that since June of
16  '05?
17    A. Most likely. I would have to go
18  back and do some research. Dusty Haire would
19  be the only one I would even -- that comes to
20  mind. But I've got a lot of drivers,
21  so . . .
22    MR. ROBERSON: Thank you,
23      Mr. Whitehead. I don't have
24      anything further.
25        And I understand y'all

Page 95

1      don't have any questions,
2      right?
3  MRS. POTTHOFF: Right.
4    (The videotaped deposition of
5      BENNY PAUL WHITEHEAD
6      concluded at approximately
7      3:37 p.m.)
8
9  * * * * * * * * * *
10    FURTHER DEPONENT SAITH NOT
11  * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1  * * * * * * * * * *
2      REPORTER'S CERTIFICATE
3  * * * * * * * * * *
4
5  STATE OF ALABAMA)
6  COUNTY OF MONTGOMERY)
7
8    I, Cornelia J. Baker, Certified Court
9  Reporter, Certified Shorthand Reporter,
10  and Notary Public in and for the State of
11  Alabama at Large, do hereby certify that
12  on Tuesday, February 20, 2007, pursuant to
13  notice and stipulation on behalf of the
14  Plaintiff, I reported the deposition of
15  BENNY PAUL WHITEHEAD, who was first duly
16  sworn by me to speak the truth, the whole
17  truth, and nothing but the truth, in the
18  matter of GLORIA DUNIPHIN, Plaintiff,
19  versus BENNY WHITEHEAD, INC. and PEOPLEASE
20  CORPORATION, et al., Defendants, Case
21  Number 2:06-CV-00459-WKW, now pending in
22  the United States District Court for the
23  Middle District of Alabama, Northern
24  Division; that the foregoing pages contain
25  a true and accurate transcription of the

Page 97

1  examination of said witness by counsel for
2  the parties set out herein; that the
3  reading and signing of said deposition was
4  not waived by witness and counsel for the
5  parties.
6    I further certify that I am neither of
7  kin nor of counsel to the parties to said
8  cause, nor in any manner interested in the
9  results thereof.
10    This the 22nd day of February, 2007.
11
12
13
14      Cornelia J. Baker
        Certified Shorthand Reporter,
        Certified Court Reporter and
15      Notary Public for the
        State of Alabama
16
17      My Commission expires 6/9/08.
18
19
20
21
22
23
24
25