# Condensed Transcript

# Deposition of Deborah Hiott

**taken on February 20, 2007**

**Gloria Duniphin**
**v.**
**Benny Whitehead, Inc., and PeopLease Corporation, et al.**

**Case No. 2:06-cv-00459-WKW**

**Certified Court Reporters and Certified Legal Video Specialists**
**334.262.3332 1.888.253.DEPS**
**Email: depo@baker-baker.com**
**www.baker-baker.com**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


GLORIA DUNIPHIN,

    Plaintiff,

vs.              CASE NO. 2:06-cv-00459-WKW

BENNY WHITEHEAD, INC.,

AND PEOPLEASE CORPORATION, et al.,

    Defendants.


    *    *    *    *    *    *    *    *


    The deposition of DEBORAH HIOTT was taken before Cornelia J. Baker, Certified Court Reporter and Certified Shorthand Reporter, as Commissioner, on Tuesday, February 20, 2007, commencing at approximately 9:07 a.m., in the law offices of Williams, Potthoff, Williams & Smith, L.L.C., 125 South Orange Street, Eufaula, Alabama, pursuant to the stipulations set forth herein.

* * * * * * *

APPEARANCES

Representing the Plaintiff:

MR. JERRY D. ROBERSON
Attorney at Law
Roberson & Roberson
Suite 150
8 Office Park Circle
Birmingham, Alabama 35223

MR. ALBERT H. ADAMS, JR.
Attorney at Law
Irby Law Firm
Post Office Box 910
Eufaula, Alabama 36072

Representing the Defendants:

MS. COURTNEY POTTER
Attorney at Law
Williams, Potthoff, Williams & Smith, L.L.C.
125 South Orange Avenue
Eufaula, Alabama 36072

MR. JIM S. CALTON, JR.
Attorney at Law
Calton & Calton
226 East Broad Street
Eufaula, Alabama 36072

Also present:

Mr. Benny Paul Whitehead

* * * * * * * *

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of DEBORAH HIOTT is taken pursuant to the Rules of Civil Procedure, and that said deposition may be taken before Cornelia J. Baker, Certified Court Reporter, as Commissioner, without the formality of a commission; that objections to questions, other than objections as to the form of the questions, need not be made at this time, but may be reserved for a ruling at such time as the deposition may be offered into evidence, or used for any other purpose by either party hereto, provided by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case, that the filing of the deposition of DEBORAH HIOTT is hereby waived, and that said deposition may be

introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute, regardless of the waiving of the filing of same.

It is further stipulated and agreed by and between counsel and the witness that the reading and signing of the deposition by the witness is hereby NOT WAIVED.

* * * * * * * *

* * * * * * * * *

INDEX

| EXAMINATION | PAGE |
|---|---|
| BY MR. ROBERSON: | 9 |
| BY MRS. POTTHOFF: | 145 |
| BY MR. ROBERSON: | 148 |

| EXHIBIT | PAGE |
|---|---|
| Plaintiff's Exhibit No. 1 .......... 000107, 6/06/05 Employer Response to Employee Request for Family and Medical Leave | 25 |
| Plaintiff's Exhibit No. 2 .......... 000106, 6/08/05 document from Northside Cardiology | 30 |
| Plaintiff's Exhibit No. 3 .......... 000117, Record Notes Report | 32 |
| Plaintiff's Exhibit No. 4 .......... 000001-000014, Service Agreement between PeopLease Corporation and Benny Whitehead, Inc. | 74 |
| Plaintiff's Exhibit No. 5 .......... Affidavit of Deb Hiott | 87 |
| Plaintiff's Exhibit No. 6 .......... 000033-000034, Personnel Status Change | 97 |
| Plaintiff's Exhibit No. 7 .......... 000066, 8/20/04 payroll check to Gloria W. Smith | 107 |
| Plaintiff's Exhibit No. 8 .......... 000004, 12/19/03 payroll check to Gloria W. Smith | 108 |

Plaintiff's Exhibit No. 9 .......... 123
0014-0018, 2/01/06 letter to Murry A. Gosa, U.S. Equal Employment Opportunity Commission, from Deb Hiott

Plaintiff's Exhibit No. 10 .......... 133
0023, Benny Whitehead's ad for team drivers

Plaintiff's Exhibit No. 11 .......... 134
0025-0029, list of Personnel between 6/01/05 and 12/01/05

Plaintiff's Exhibit No. 12 .......... 140
0031, 12/09/05 letter to Gloria Duniphin from Eddie Whitehead

Defendants' Exhibit No. 1 .......... 147
5/11/05 Certified letter to Mrs. Duniphin

* * * * * * * * *

MR. ROBERSON: This is the videotaped deposition of the Defendant, PeopLease Corporation taken -- today is February 20th, 2007.

This case is Gloria Duniphin versus Benny Whitehead, Inc., and PeopLease Corporation. It's pending in the United States District Court for the Middle District of Alabama, Northern Division, CV No. 06-459-MHT.

My name is Jerry Roberson. I'm the attorney for the Plaintiff, Gloria Duniphin. And I would ask all counsel of Record to state their name and who they're representing.

MRS. POTTHOFF: Courtney Potthoff, attorney for PeopLease.

MR. CALTON: Jim Calton, Jr., attorney for Benny Whitehead, Inc.

MR. ROBERSON: Would you swear our Witness?

DEBORAH HIOTT,

The Witness, having first been duly sworn or affirmed to speak the truth, the whole truth, and nothing but the truth, testified as follows:

MR. ROBERSON: Do we have the usual stipulations?

MRS. POTTHOFF: Yes.

MR. ROBERSON: Is she going to waive signature since we're so close to the summary judgment deadline?

MRS. POTTHOFF: I still would like for her to read and sign. I think we can do that fairly quickly.

Can you get the transcript to us and expedite it?

MR. ROBERSON: Sure. That's okay. I'm going to cite it, her transcript, anyway, so okay.

EXAMINATION

BY MR. ROBERSON:

Q. Ms. Hiott, my name is Jerry Roberson. We've never met, correct?

A. Correct.

Q. Okay. And what is your name?

A. Deborah Hiott.

Q. And what -- what is your residence address?

A. 4731 Arko Lane, Charleston, South Carolina, 29418.

Q. And are you employed, ma'am?

A. Yes, sir.

Q. Where do you work?

A. PeopLease Corporation.

Q. In what capacity?

A. Human Resources and Benefits Manager.

Q. Now, I have noticed the deposition of the Defendant in this case, PeopLease Corporation, and asked them to designate someone who is familiar in certain categories. Are you aware of that?

A. Yes, sir.

Q. And you've been designated, correct?

Page 10

A. Yes, sir.
Q. Okay. Have you ever been to Eufaula before today?
A. No, sir.
Q. You've never been to Benny Whitehead's --
A. No, sir.
Q. -- place of business?
Okay. Well, what is PeopLease Corporation?
A. PeopLease is an employee leasing company, professional employer organization, a PEO. And we do the administrative work for Benny Whitehead so they can focus on their core business of direction and control.
Q. So how many employees does PeopLease have?
A. We are approximately close to 10,000, just under 10,000.
Q. And you lease employees to various businesses, correct?
A. Strictly to the transportation, trucking.
Q. Oh, you --
A. We're specific to transportation and

Page 11

trucking.
Q. PeopLease only represents or leases truckdrivers and other transportation workers?
A. Administrative personnel as designated by the client.
Q. Okay. So of those 10,000 people, approximately, about how many are truckdrivers?
A. I would guess -- this is strictly a guess, approximately 80 percent.
Q. Okay. And just for my purposes, who is your largest client?
A. I -- I don't know.
Q. Where do you have offices?
A. We have offices in Mount Pleasant, South Carolina.
Q. Is that where you work?
A. Yes.
Q. Do you have any other offices?
A. Avon, Indiana. There's near Indianapolis.
Q. So I represent Gloria Duniphin. She was previously employed with Benny Whitehead, Inc., in Eufaula, Alabama. Do you understand

Page 12

that?
A. Yes, sir.
Q. And when she began working there, she had to sign some paperwork with your company, correct?
A. Correct.
Q. Was she an employee of PeopLease, Inc.?
A. Yes, sir.
Q. Did you -- did PeopLease withhold payroll taxes on her?
A. Yes, sir.
Q. Did she get a W-2 from PeopLease, Inc.?
A. Yes, sir.
Q. Did you provide any benefits, employment-related benefits to Gloria Duniphin?
A. We have benefits in terms of FMLA -- all benefits. She elected not to take the group insurance which was available to her if she wanted it.
Q. The group health insurance?
A. Yes, sir.
Q. And really, ma'am, these PEOs are

Page 13

set up so that small businesses can offer their employees the same benefits packages that large businesses do, correct?
A. Correct.
Q. Okay. And so if you just have a few employees, like five or six, they can have a cafeteria plan, correct?
A. What do you mean by cafeteria plan?
Q. Well, they can pick and choose what benefits they want, correct?
A. Correct.
Q. Do you offer vision coverage?
A. We do -- we did as of November 1st of 2006.
Q. Do you offer a 401(k) plan?
A. Yes, sir.
Q. Do you offer any other type of employment-related benefits to any of your employees?
A. Other than group insurance and 401(k), no, sir.
Q. Okay. And you administer not only the payroll information, but you administer all the benefits, like FMLA, correct?
A. Yes, sir.

Page 14

Q. And do you have any insurance that covers PeopLease when someone makes a claim against them?
A. Not to my knowledge.
MRS. POTTHOFF: What -- I'm -- what kind of claim?
MR. ROBERSON: An employment-related claim.
A. Not to my knowledge.
Q. All right. Well, do you advise the people that you -- that employ you, do you advise them to obtain insurance for employment-related claims?
A. No, sir.
Q. Do you consider yourself to be familiar with employment-related requirements such as Title VII and FMLA?
A. Yes, sir.
Q. Have you had any training in those two areas?
A. Yes, sir.
Q. What training have you had, ma'am?
A. Through the Society of Human Resources, management courses, as well as some conferences.

Page 15

Q. Do you have a college degree?
A. I have an Associate's Degree, yes.
Q. From where?
A. Winthrop University.
Q. And what is that in?
A. Business Administration.
Q. Is that a two-year degree?
A. Yes, sir.
Q. Okay. How long have you been employed with PeopLease, ma'am?
A. About five-and-a-half years.
Q. Have you ever given a deposition before?
A. No, sir.
Q. Okay. Well, there are some rules today, and I'll try to explain them. You understand that you're under oath?
A. Yes, sir.
Q. This is just like you're giving testimony in a court of law, okay?
A. Yes, sir.
Q. Except there's no judge here to rule if any of these people object to my question, okay?
A. Yes, sir.

Page 16

Q. And you have to answer out audibly today, because the Court Reporter is taking everything down; is that fair?
A. Yes, sir.
Q. Okay. And so you can't nod your head or say uh-huh or huh-uh, because we don't want to argue about what you said. Fair enough?
A. Yes, sir.
Q. All right. And if you don't understand my question, what I'm asking you, please tell me and I'll try to rephrase it, okay?
A. Yes, sir.
Q. If you answer it, I'm going to assume you understood it, okay?
A. Yes, sir.
Q. Who is your boss, Ms. Hiott, ma'am?
A. I have -- our CEOs, two CEOs.
Q. Who are they?
A. Charles Schellenger. And that's spelled S-C-H-E-L-L-E-N-G-E-R.
Q. Okay.
A. And D.W. Speer, S-P-E-E-R.
Q. Are their offices in South Carolina?

Page 17

A. Yes, sir.
Q. Now, just explain to me how this works when you have someone -- a client, Benny Whitehead, that's in Eufaula, and your office is located in South Carolina. How do they transmit information to you? Is it by fax?
A. There's several methods, by telephone, by fax, by e-mail.
Q. Okay. Well, every time they hire someone, do they have to complete a package of your information?
A. Yes, sir.
Q. Okay. And all of the withholding forms and what group benefits they want, that kind of information?
A. Yes, sir.
Q. And you have to have their Social Security number, right?
A. Yes, sir.
Q. Now, when you -- when someone is leased through your company, who makes the decision about hiring them? Does anybody at PeopLease?
A. As long as they fill out our packet

Page 18

of employee information in its entirety and it's been approved by the client company to hire them, we hire them.

Q. Well, you don't interview truck-drivers, do you?

A. No, sir.

Q. So somebody at Benny Whitehead hires them?

A. Yes, sir.

Q. Who is that? Who is that person?

A. I'm not sure.

Q. Okay. Well, who -- do they -- if they hire someone, do they have to transmit information to you?

A. Yes, they do.

Q. Who does that?

A. That is -- that is disseminated to our payroll department. So I am not sure. It would be whoever their payroll technician is.

Q. Okay. Now, you represent a number of employees, correct?

A. Correct.

Q. I mean, other trucking companies besides Benny Whitehead, correct?

Page 19

A. Yes, sir.

Q. And each client -- I'm going to use the term "client" to be the trucking companies.

A. Uh-huh (affirmative response).

Q. Each client has their own set of work rules and regulations, correct?

A. Yes, sir.

Q. I mean, they can have whatever rules they want, can't they?

A. Not necessarily. There are certain guidelines that they have to follow as far as the law is concerned.

Q. Well, they have to comply with federal law?

A. Uh-huh (affirmative response).

Q. Which does regulate trucking, correct?

A. That's correct.

Q. But what I'm saying is, if they want to have a policy where if you are late with a load one time, they can fire you, they can do that, can't they?

A. I'm not certain of that.

Q. Okay. Well, now, I asked that

Page 20

someone from PeopLease testify today about the current employment including the terms of any separation of the Plaintiff, Gloria Duniphin. Do you have information about that?

A. Repeat that again, please.

Q. I want to know the status of Gloria Duniphin. Is she an employee currently of PeopLease?

A. No, sir.

Q. When did -- when did she cease to be an employee of PeopLease?

A. She was inactivated June 28th of 2005, I believe, by us, solely. Because she had not received a paycheck in quite -- since she was released to return to work in June.

Q. Now, help me with this, "inactivated"?

A. Uh-huh (affirmative response).

Q. Is that a word?

A. Yes.

Q. Well, I just use simple words like she's currently an employee or she's been discharged or things like that. So she is not currently an employee of PeopLease, correct?

Page 21

A. Correct.

Q. Has she been discharged? Did she get anything that discharged her from employment?

A. No, sir.

Q. Well, has she been discharged?

A. She's in our system as a voluntary quit for not returning to work from FMLA.

Q. Voluntary quit for not returning to work after an approved FMLA leave; is that correct?

A. That's correct.

Q. Okay. Well, was she until June 28th, 2005, a PeopLease employee?

A. Yes, sir.

Q. Was she until June 28th, 2005, a Benny Whitehead, Inc., employee?

A. Yes, sir.

Q. So y'all -- is it fair to say y'all are joint employers?

A. It is fair to say that.

Q. Okay. Who of the two employers has responsibility for administering the FMLA leave?

A. PeopLease.
Q. Okay. And did Ms. Duniphin, did she go out on an approved FMLA leave?
A. Yes, sir.
Q. When was that?
MRS. POTTHOFF: If you need to look at the documents, you can.
Q. Yeah, please feel free to look at the documents. It's not a memory test.
MR. ROBERSON: I'm sorry.
MRS. POTTHOFF: It's okay. All right. Now, I'm going to tell you when you start getting loud, your voice starts to get loud.
MR. ROBERSON: 'kay.
MRS. POTTHOFF: Just so you don't take it all the way to shouting.
MR. ROBERSON: I'll try not to.
A. Okay. On the U.S. Department of Labor, Family and Medical Leave form, it is indicated that she was to begin FMLA on 4/8/05 to cease on 6/20/05.
MRS. POTTHOFF: And, Deb, just for

everybody's convenience, can you see what Bates label number the document you're referring to has on it.
THE WITNESS: 000089.
MRS. POTTHOFF: Okay.
BY MR. ROBERSON:
Q. 89? Because mine's blank. My 089 is blank.
A. I was going by this number.
MRS. POTTHOFF: Yeah, you're looking through that. But which page are you looking at?
THE WITNESS: Oh, okay. I'm sorry. There's not a page number.
MR. ROBERSON: It's not --
MRS. POTTHOFF: Yeah, it is down there. It's 107.
THE WITNESS: Oh, okay. I'm sorry. Okay. 107.
MR. ROBERSON: Where is it on here, Courtney?
MRS. POTTHOFF: It looks like this right here. And it should be right down there. Some of them

--
MR. ROBERSON: Some of them aren't Bates- stamped?
MRS. POTTHOFF: Right -- well, no. They're all Bates-labeled. It's just that it might not be in the exact spot, same spot, just to keep them from being on top of something.
BY MR. ROBERSON:
Q. Okay. All right. Let's, if we can, Ms. -- is it Hiott?
A. Hiott, right.
Q. I'm sorry.
A. Uh-huh (affirmative response).
Q. Let me mark this as Plaintiff's Exhibit 1 to your deposition so that we -- and is this the FMLA leave document?
A. Yes, sir.
Q. Okay. And can you look on that, your copy of this?
(Whereupon Plaintiff's Exhibit No. 1 was marked for identification and attached hereto.)

Q. And this is dated June the 6th of 2005, correct, at the top?
(Witness reviewed document.)
A. Oh, yes, sir. Yes, sir.
Q. This form is dated then?
A. Yes, sir.
Q. And it's regarding Gloria Duniphin. And who is Pam Ozmore?
A. She was the benefits administrator at the time who administers the FMLA.
Q. Does she still work for y'all?
A. No, sir.
Q. Where is she now?
A. I'm not sure.
Q. All right. And this document says, On 5/11/05, you notified us of your need to take family leave due to a serious health condition. Do you know what that health condition was? I know it's not indicated on here, but do you know?
A. No, sir.
Q. Okay. You notified that you needed this leave beginning on 4/8/05 and that you expect to continue to have the leave until 6/20/05. Now, where does that information

come from? Do you know?
A. That would have come from Ms. Duniphin.
Q. All right. Well, would she be required to provide you with proof of medical information?
A. Proof of a serious health condition, yes, sir.
Q. Okay. And if she had congestive heart failure, would that be a serious health condition?
A. Yes, sir.
Q. It would qualify under FMLA?
A. Yes, sir.
Q. And then if she received treatment and was released from -- for that illness, what was she -- what would she have to do to comply with her responsibilities under the FMLA?
A. She would need to provide a medical release from her doctor.
Q. To you?
A. Yes, sir.
Q. Or could she provide it to Benny Whitehead?

A. Typically, it goes through the client, Benny Whitehead, and then is transferred to us. But sometimes it comes directly to us. It just depends on the employee.
Q. Okay. And I see on the bottom of this exhibit it shows a cc, Benny Whitehead?
A. Uh-huh (affirmative response).
Q. Now, is that something that is handwritten?
A. It is handwritten, yes.
Q. Why is that?
A. To let Benny Whitehead know that they have an employee that is going out on FMLA leave.
Q. Okay. And would this document also, should be, in a copy of their file?
A. Yes, sir.
Q. Do you maintain a copy of a personnel file for each employee?
A. Yes, sir.
Q. Who is the custodian of that file?
A. Our payroll department.
Q. For Benny Whitehead, Inc., who is the person? Is there one person or are there

many people involved?
A. There is one person that handles their payroll.
Q. Do you know who that is?
A. Crystal Tiect, T-I-E-C-T.
Q. Okay. Does she still work with y'all?
A. Yes, sir.
Q. Okay. All right. Well, did you ever receive -- that is, did PeopLease ever receive any medical release provided by Ms. Duniphin?
A. Yes, sir.
Q. All right. Is that in these papers? Will you find it for me?
A. Yes, sir. We received it in December of 2005.
Q. You received it in December?
A. Uh-huh (affirmative response).
Q. Is that yes?
A. Yes, sir.
Q. Okay. Can you --
A. I'll try to find it in here.
Q. And if you will, call out the Bates number.

(Witness reviewed documents.)
MRS. POTTHOFF: It's No. 106.
MR. ROBERSON: And I don't mind any help from the studio audience. I'm just --
MRS. POTTHOFF: Yeah, we're just looking for the number.
MR. ROBERSON: Sure.
BY MR. ROBERSON:
Q. Do you have that?
A. Yes, sir. 106.
Q. All right. Let me mark this as Exhibit 2 to your deposition. And if you'll look on your copy.
(Whereupon Plaintiff's Exhibit No. 2 was marked for identification and attached hereto.)
(Witness reviewed document.)
Q. Is this document on Northside Cardiology's letterhead?
A. Yes, sir.
Q. And is it dated June the 8th, 2005?
A. Yes, sir.
Q. And it says Gloria Duniphin may

return to work as of 6/13/05, correct?
A. Yes, sir.
Q. And it's initialed by Michael Balk, M.D., correct?
A. Yes, sir.
Q. Do you consider this to be an adequate medical release for FMLA purposes?
A. Yes, sir.
Q. Okay. And when did PeopLease receive this document?
A. December 10th of '05.
Q. December 10th of 2005. Now, you told --
MRS. POTTHOFF: It says December 01.
A. I'm sorry. I was looking at it wrong. I'm sorry.
Q. That's all right.
Now, I thought I understood you to tell me that Ms. Duniphin was released by PeopLease on June 28th, 2005?
MRS. POTTHOFF: Object to the form.
Q. Is that correct, inactivated June 28th, 2005?
A. That's correct.
Q. Well, who did you receive the

document from?
A. I don't know. It came from Benny Whitehead. The person at Benny Whitehead, I don't know.
Q. Okay. Well, that's -- that's all I'm trying to get at.
A. Okay.
Q. Was it faxed to you from Benny Whitehead, Inc.?
A. Yes, sir.
Q. Okay. Do you know when they received it?
A. No, sir.
Q. Well, do you -- had there been any correspondence between PeopLease and Benny Whitehead, Inc., about Ms. Duniphin in the six months between June of '05 and December of '05?
A. There was regular correspondence between June and September of '05.
Q. Is that in here?
(Witness reviewed document.)
A. This would be page 117.
Q. Okay. Let me --
A. That's one. That's one.

Q. Okay. Let me mark this first as Exhibit 3 to your deposition.
(Whereupon Plaintiff's Exhibit No. 3 was marked for identification and attached hereto.)
Q. Now, do you see Bates Stamp No. 117, which I've marked as Exhibit 3?
A. Yes, sir.
Q. Is that a PeopLease document?
A. Yes, sir.
Q. Is that generated on your computer at PeopLease?
A. Yes, sir.
Q. Okay. Well, it says created, last modified 12/1/05 at 11:36 a.m. Do you see that?
(Witness reviewed document.)
A. Yes, sir.
Q. So is that when this document was created?
A. That's when the last comment was made. On 12/1/05, that was put into the computer.
Q. Okay. Well, I'm looking at below

that it says 10/14/04, worker's comp claim. Are y'all the employer for workers' comp purposes?
A. Yes, sir.
Q. Do you administer workers' comp through PeopLease?
A. Yes, sir.
Q. Do you have workers' comp insurance for those employees?
A. Yes, sir.
Q. Is Benny Whitehead a named insured?
A. Yes, sir.
Q. And it says employee off work since 10/05/04 and KW. Who is that?
A. Karen Wolf (phonetic).
Q. Does she work in the workers' comp section?
A. She did. She no longer works there.
Q. Okay. Changed to office, 11/8/04. What does that mean?
A. That she was put on light duty to do office work while she was on work comp. She was released to light duty.
Q. Okay. 2/15/05, returned to work from workers' comp 1/15/05, KP. Who is that?

A. I don't know.
Q. Are these initials of people who work at PeopLease?
A. Yes, sir.
Q. You just don't know who that person is?
A. I don't recall who KP is.
Q. Okay. And then it says, Changed back to driver, off light duty 2/16/05, CT. Is that correct?
A. Correct.
Q. Okay. Now, do you -- do you have any information that after Ms. Duniphin had a work-related injury, she was released back to work as a truckdriver? Do you have anything that shows that?
A. I don't recollect anything, no, sir.
Q. Okay. Do you know whether she was provided a partner in February of '05?
A. No, sir.
Q. Do you have any responsibility at PeopLease for providing her with a truckdriving partner?
A. No, sir.
Q. Who does that?

A. That is done at the client level.
Q. Benny Whitehead, Inc.?
A. (Nodded head.)
Q. Is that yes?
A. Yes, sir.
Q. Okay. When Ms. Duniphin was hired initially, do you have any document that shows when she started at Benny Whitehead?
A. Yes, sir. I believe her personnel file is in here.
MRS. POTTHOFF: And, Jerry, just so that you know, her workers' comp file is also in front of Deb. And it might have some return to work information from her workers' comp, but we would have to go through it to see.
A. Okay. This would be page 26, is the beginning of her personnel file with PeopLease.
MRS. POTTHOFF: That's her initial disclosures. I didn't bring you another copy.
MR. ROBERSON: Oh, okay. Hold on.
MRS. POTTHOFF: Or it could be in

response to the Request for Production, too.
MR. ROBERSON: Well, I tell you what, just pull it out of there, and we will mark it as an exhibit.
MRS. POTTHOFF: Hey, Deb.
THE WITNESS: Uh-huh (affirmative response).
MRS. POTTHOFF: 26 is out of Mike Duniphin's personnel file.
THE WITNESS: Oh, I'm sorry.
MRS. POTTHOFF: Her personnel file really starts on PeopLease 33.
THE WITNESS: That's correct. Page 33.
BY MR. ROBERSON:
Q. Okay. What is her start date at PeopLease and Benny Whitehead?
A. 12/10/03.
Q. '03, 12/10/03. Then we have this workers' comp claim in 10/14/04, correct? Well, it's right here on Exhibit 3.
A. Oh, okay. We're still on that.
Q. I don't mind showing you this.

We've got that workers' comp claim, correct?
A. Yes, sir.
Q. So from '03 to the workers' comp claim, she worked as a truckdriver, correct?
A. That's correct.
Q. And you paid her, "you" being PeopLease, correct?
A. Yes, sir.
Q. And how do y'all -- how does the payroll information get to PeopLease? Because I'm sure employers have different pay rates, right?
A. It is sent to us on a worksheet from Benny Whitehead.
Q. Okay. So every -- is it weekly or biweekly or how do employees at Benny Whitehead get paid?
A. I believe they're weekly.
Q. And so they send you the figures and you write the check, correct?
A. Yes, sir.
Q. Okay. And is it a PeopLease check?
A. Yes, sir.
Q. Okay. Now, what if an employee thinks they were underpaid, who do they

contact?
A. They would contact their payroll technician.
Q. At Benny Whitehead or at PeopLease?
A. Initially -- I don't know the answer to that.
Q. Okay. Well, in fact, on December 1st of '05, did Gloria Duniphin call PeopLease?
(Witness reviewed document.)
A. December 1st of '05?
Q. Uh-huh (affirmative response).
A. Yes, sir. According to the payroll notes, yes, sir.
Q. Okay. Now, is it fair to say that from June of '05 until December of '05, you had received no information from Benny Whitehead, Inc., about the work status of Gloria Duniphin?
A. Yes, sir, that's correct.
Q. But you knew that Mrs. Duniphin had an approved FMLA leave that ended -- expired in June of '05, correct?
A. Yes, sir.
Q. Did you get any additional

information about that leave from any source?
A. There was communication regarding the fact that she did not have a partner driver, which is a requirement of the job. And that is what they were waiting on, to see if she could provide a partner to drive with her.
Q. Well, was that communication received in writing?
A. No, sir, not to my knowledge.
Q. Just so I'm certain that I understand your response: From June till December, there is no writing at PeopLease that reflects Gloria Duniphin's status except that note, Exhibit 3?
A. I would have to go through and look. There were other notes in here. I can't say that this is exclusive.
Q. Okay. Well, that's a pretty important question to me. So you want to take a break and look?
A. Sure.
MR. ROBERSON: Okay. And we'll go off the Record. It's a quarter till ten. Let's go off the

Record. Is that all right with everybody?
MRS. POTTHOFF: Uh-huh (affirmative response).
(Whereupon an off-the-Record discussion was held.)
MR. ROBERSON: We're back on the Record at ten till ten.
BY MR. ROBERSON:
Q. Yes, ma'am. Have you had a chance to locate the documents?
A. Yes, sir.
Q. Okay. Tell me what documents you're referring to, the Bates number.
A. Page 90, nine zero.
Q. And what is that document?
A. This is a sequence of events relating to Gloria Duniphin that was sent to our benefits administrator, Star, from Stacey.
Q. All right. And when was that document sent?
A. December 8th, 2005.
Q. Okay. And what does it say, ma'am?
A. The hire date of Gloria Smith, at

the time.
Q. Okay.
A. And when she had the accident.
Q. The workers' comp accident?
A. Yes, sir.
Q. Okay.
A. That's my understanding.
Q. All right.
A. Do you want me to go through each line?
Q. I would appreciate that, yes, ma'am.
A. The accident was on 9/30/04 in El Paso, Texas. She went to Dr. G. Nixon in Eufaula, Alabama, on 10/5/04. Dr. NaFolie (phonetic) released to return to work with no limitations on 1/17/05. She was not able to provide herself a partner. We run teams. We were able to find her a partner, and she left out on 2/14/05.
Q. Okay. Let me stop you right there. Who is this document from?
A. Stacey.
Q. At Benny Whitehead, Inc.?
A. Yes, sir.
Q. And it says we were able to find her

a partner? Is that what it says?
A. Yes, sir.
Q. Okay. So before she went off on FMLA leave, when she was returning from workers' comp leave, Benny Whitehead found a partner for her, correct?
A. Yes, sir.
Q. Okay. All right. Keep going.
A. Worked until 3/4/05, at which time she came off the truck needing to go to the doctor for health reasons.
Q. Okay.
A. FMLA was granted between 4/8/05 to 6/28/05.
Q. Okay.
A. Received return-to-work form effective 6/13/05.
Q. Now, that's what was communicated to you in December, that Mrs. Duniphin had been returned to work in June, correct?
A. Yes, sir.
Q. And does that document indicate that Benny Whitehead received the return-to-work notice in June?
A. I don't know when they received the

notice.
Q. Okay.
A. She was not able to provide herself a partner. We run teams.
Q. Okay.
A. On or around 9/8/05, she was called to ask if she could leave that weekend for a would be -- excuse me -- for a Monday delivery in California. She was unable to, and she was going out of town. She would be back in the middle of the next week. Have not had anyone that we can partner her with since. She has been unable to provide herself a partner. Her requirements, white, smoker, need to know about if a male. That's the end of the information on the document.
Q. Okay. And you received that from Stacey one week after Gloria Duniphin had called PeopLease, correct?
A. Yes, sir.
Q. Is there any document between June and December 1st from Benny Whitehead, Inc.?
A. I don't know off the top of my head.
Q. Okay. Well, please look for it. Let's go through the other documents that

you've suggested.
A. This would be page 100.
Q. And whose notes are those?
A. I don't know.
Q. Well, is that information that was transmitted from Benny Whitehead by fax or was that some note that was taken at PeopLease by someone who was talking to Benny Whitehead, Inc.?
A. I don't know the answer to that.
Q. Well, do you know whose document that is?
A. This was in her personnel file.
Q. The personnel --
A. Excuse me, her FMLA file. Pardon me.
Q. The FMLA file that's maintained at PeopLease in South Carolina?
A. Yes, sir.
Q. Okay. What does it say?
A. Gloria Duniphin, Benny Whitehead, Stacey. 10/1/04, work comp. Date of injury, 9/30/04. Filed report 10/1/04. Kept having problems with elbow and could not work 11/10 through 11/24. Returned to work 1/17/05.

There was no team available. Run two people on a truck. First load she went on was 2/14/05 with a partner Benny Whitehead provided.
Q. Okay.
A. Delivered 3/4/05. Last day of her being on a truck when she returned from FMLA. Benny has the RTW.
Q. Benny has return to work? Is that what that means?
A. That's what the note says.
Q. Okay. So Benny Whitehead was made aware of Mrs. Duniphin's availability for work in June when she was released from her physician, correct?
MRS. POTTHOFF: Object to the form.
MR. ROBERSON: That's what that indicates, doesn't it?
MRS. POTTHOFF: Doesn't have a date.
BY MR. ROBERSON:
Q. You can answer.
A. I don't know.
Q. Okay.
A. Later she wanted to team with son, but MVR over 20-miles-per-hour speeding

ticket. Offered work approximately September -- the end of September, first of October. Called three or four times for work throughout on Wednesday for Friday delivery or Tuesday for Friday delivery. Could not go until the next week. Single male would not want to ride with her.

This is page 101. Continuing, she wanted specific person to ride with Stacey -- she wanted specific person to ride, but Stacey was limited on the work she could offer. Oh, she wanted a specific person to ride with. Stacey was limited on the work she could offer. Gloria does not have two years OTR experience. Smoker needs a smoke truck. Male, female issue. Advertised for team drivers. She does not qualify for delivery drivers, because she lacks experience. Insurance companies require two years.

Q. When did that document -- when was it received by PeopLease?

A. I don't know.

Q. So we have --

A. There are no dates.

Q. So we have an undated document that is in her FMLA file, correct?

A. Yes, sir.

Q. Do you have any other examples of undated files -- of undated documents?

(Witness reviewed document.)

MRS. POTTHOFF: When you say examples of undated documents, any document that doesn't have a date on it?

MR. ROBERSON: Right.

MRS. POTTHOFF: Do you want us to go through all of these documents and find out which ones don't have a date on them?

BY MR. ROBERSON:

Q. Well, do you normally, in HR, date your documents now?

A. Yes, sir.

Q. Do you not have an explanation for why this one is undated?

A. No, sir.

Q. Okay. Keep going.

MR. ROBERSON: Thank you, Courtney.

A. This is page 104.

Q. Okay. And what is that, ma'am?

A. It is a phone message from Jennifer in HR to Star. And it's dated 12/1/05.

Q. Okay. Is Star a PeopLease employee?

A. Yes, sir.

Q. And Jennifer, who is she? Do you know?

A. She's the HR assistant.

Q. Okay. And what does it say, ma'am?

A. Star, I just received a call from Gloria Duniphin, Social Security No. [redacted] She was out on FMLA that was approved until 6/28. And she was released by her doctor to return to work on or about 6/13. But Benny Whitehead has not put her back to work, and she is in the system as a voluntary quit. She stated that she did provide the release paperwork to Benny Whitehead. And she has met with them, but they keep putting her off and telling her that they do not have anyone for her to ride with. Could you look into this for Gloria and give her a call back? Have you run into situations like this in your previous

experience? Thanks, Jennifer.

Q. Okay. And then there are some handwritten notes on that document. Do you know whose notes those are?

A. Yes, sir. Those are mine.

Q. Well, can you read into the Record your notes?

A. Husband had drug license revoked. He was eliminated from the team and ineligible for employment as a result of failing the drug test.

Q. Okay. When did you make these notes?

A. I don't -- probably the day this slip was received, but I don't know exactly.

Q. Why did you make notes on this document?

A. They had asked me what to do about the situation, with her telephone call. So these notes were probably a result of my having a conversation with Benny Whitehead.

Q. Why did they ask you?

A. Because I'm their supervisor.

Q. Okay. What did you tell them?

A. I don't recall.

Q. Did you give them any instructions about what to do?
A. As it relates to what?
Q. As it relates to Gloria Duniphin getting back to work at Benny Whitehead, Inc.
A. I don't have a recollection of that.
Q. Well, keep reading what you made --
A. Total team drivers. Found partner. Had a wreck. At fault. Out on work comp. Injured elbow. Heart. FMLA. Smoker. Someone to partner. Married. Delivery driver. Doesn't have experience. Team partner. Compatible. Smoke. Female. Don't know what this word is.

Men won't go with married women. Must find a partner. She's insistent on a smoker. Benny Whitehead claim wasn't at fault. Insurance said she was. Attorney needed. Any missed wages.

Q. Okay. Well, is there any information on that document, any handwritten note made by you that relates to giving Ms. Duniphin instructions you gave her or your subordinates about getting back to work?

A. No, sir.
Q. Did you make any such instructions?
A. I don't recall.
Q. Did you understand that Gloria Duniphin was out of work?
A. Yes, sir.
Q. Did you understand that she wished to return to work as a truckdriver?
A. Yes, sir.
Q. Do you normally try to help people if they want to work?
A. If they ask, yes, sir.
Q. Well, Gloria Duniphin never talked to you, did she?
A. No, sir.
Q. Did you interpret that note from December 1st, 2005, to be her request for assistance to return to work?
A. Yes, sir.
Q. Did anyone at PeopLease offer her any instruction on how to get back to work at Benny Whitehead, Inc.?
A. I do not know the answer to that.
Q. Well, did you contact Benny Whitehead, Inc.?

A. The benefits administrator did contact Benny Whitehead, Inc., to find out if they were able to find partners, a partner for her.
Q. Okay. Who is the benefits administrator, Ms. --
A. Well, we've had two in this situation. One was Pam Ozmore. And she was replaced by Star Ross.
Q. Okay. So Star called Benny Whitehead, Inc., correct?
A. I can't answer that.
Q. Well, is the reason you can't answer it because there's no writing that reflects that she did?
A. Yes, sir.
Q. So if she had made a writing to reflect that she did contact them and what she discussed, you would have that available to you, correct?
A. Not necessarily.
Q. Why wouldn't you?
A. She may have it on her own notes. I don't know.
Q. Well, have you talked to Star?

A. Star is out on maternity leave right now.
Q. Oh. Well, in the several months that this case has been pending, have you ever talked to Star?
A. Yes, sir.
Q. In the year that Mrs. Duniphin filed an EEOC charge against PeopLease and Benny Whitehead, have you ever had an opportunity to talk with Star?
A. Yes, sir.
Q. Have you?
A. Yes, sir.
Q. And what did she say?
A. What did she say about what?
Q. Did she contact Benny Whitehead?
A. Star had nothing to do with the EEOC charge. I handled that.
Q. Did you talk to Star to determine whether she ever contacted Benny Whitehead?
A. No, sir.
Q. Okay. Did you ever contact Benny Whitehead regarding Mrs. Duniphin?
A. Yes, sir.
Q. When?

A. I'm not certain.
Q. In December of '05?
A. I am not certain.
Q. Well, do we know when you made the notes that are on that document?
A. No, sir.
Q. Okay. Are there any other documents, correspondence from Benny Whitehead about Mrs. Duniphin?
A. We've already referenced page 117. Page 118.
Q. What is that document, ma'am?
A. It is a memo, internal memo from Crystal, who's the payroll technician.
Q. To whom? Is it just to the file?
A. Pam Ozmore -- actually -- I'm sorry, it's from Pam Ozmore initially with a response from Crystal.
Q. Okay. Can you read that into the Record, please, ma'am?
A. It's dated June 6th, 2005. Have you heard anything from Gloria Duniphin? I just got something in Friday's mail after I left for my half day. It's next in my stack to process, as I got quite a few FMLA things

in Friday. I'll PS you back in a few.
Pam. I've got the FMLA approved now from 4/8 until 6/28. I'm unsure about her last day of work, so I based it on the last check date. If I hear differently from her after she gets the approval form, I will let you know. Pam.
And Crystal responded: Have you heard anything from Gloria Duniphin with Benny Whitehead on her attorney and her FMLA paperwork? The note in the system is still saying you sent the paperwork, not that you got the receipt back or anything. So I was just wondering if you know anything more.
Q. And when is that dated?
A. June the 6th of '05.
Q. Okay. While Mrs. Duniphin was still on her FMLA leave, correct?
A. Yes, sir.
Q. Before she had been released on June 13th, correct?
A. Yes, sir.
Q. Okay. Now, do y'all have at

PeopLease Gloria Duniphin's telephone number?
A. Yes, sir.
Q. Do you have her mailing address?
A. Yes, sir.
Q. Did you, between June and December, ever correspond with Gloria Duniphin?
A. I did not.
Q. Did PeopLease ever correspond with Gloria Duniphin?
MRS. POTTHOFF: Before June or in December?
MR. ROBERSON: Yes.
A. Anytime -- yes, in December.
Q. Okay. Well, you tell me that on June 27th your records indicate she was -- your word, "inactivated" because she voluntarily quit, correct?
MRS. POTTHOFF: Object to the form. I think she said June 28th.
MR. ROBERSON: Okay.
MRS. POTTHOFF: You said 27th.
BY MR. ROBERSON:
Q. Is that correct, ma'am?
A. Repeat the question, please.
MR. ROBERSON: I'll tell you what,

let's go off the Record. I've got -- I'm at the end of my tape. We'll go off the Record at 10:10.
(Whereupon an off-the-Record discussion was held.)
MR. ROBERSON: This is tape two of the deposition of PeopLease, Inc. It's 10:20.
BY MR. ROBERSON:
Q. Ms. Hiott, are there some additional documents that you received at PeopLease during this time period, or have we identified them all?
A. As far as communication?
Q. Right.
A. That's all.
Q. Okay. And to your knowledge, none of those documents was received by PeopLease between June the 13th, when Mrs. Duniphin was released from FMLA leave, until December 1st when she called PeopLease, correct?
A. I can't say that for sure.
Q. You don't know?

A. There's one document that's not dated.
Q. Okay. Other than that document, you didn't receive anything, though, correct?
A. Not to my knowledge.
Q. Now, who has the responsibility -- first of all, when a person goes out on FMLA leave, is the employer required to hold a position for that person when they return?
A. Yes, sir. During the twelve -- maximum of twelve weeks.
Q. And if they return within twelve weeks, do they have to be returned to comparable employment?
A. Yes.
Q. Is that a federal requirement?
A. Yes, sir.
Q. Okay. And is PeopLease responsible for complying with that federal requirement as relates to Gloria Duniphin?
A. Yes, sir.
Q. Is Benny Whitehead, Inc.?
A. Yes, sir.
Q. Okay. Was Mrs. Duniphin returned to comparable employment?

A. No, sir.
Q. Okay. Did PeopLease or Benny Whitehead, Inc., comply with the FMLA?
A. Yes, sir.
Q. How?
A. She was provided twelve weeks of leave with her position guaranteed at the end of that leave.
Q. Okay. She was a truckdriver, correct?
A. That's correct.
Q. Okay. Did she ever draw a check from June 13th to 12/1/05 for her work as a truckdriver?
A. Between what date in June?
Q. June 13th, '05, and 12/1/05?
A. I would have to -- I can't answer that. I would have to look it up in the notes.
Q. Okay. Well, in fact, Mrs. Duniphin reported to PeopLease that she had not worked during that time period on December 1st, correct?
A. Which time period?
Q. June 13th, '05, the date she was

released to return to work from her FMLA leave, until December 1st, '05.
A. That's correct.
Q. Okay. Was she returned to comparable employment as a truckdriver?
A. They were attempting to try to return her to equivalent employment. But one of the criteria of the position was that she have a partner to drive, because the insurance would not cover her.
Q. Okay. When Gloria Duniphin began her employment with Benny Whitehead, Inc., was she a newly -- a new graduate of truckdriving school?
A. I don't know.
Q. Well, assume for me that she was, when she was hired, she was a recent graduate of truckdriving school, okay? Can you make that assumption? Can you?
A. I don't know. I don't know the answer to that.
Q. Well, I'm asking you to assume for the purposes of my question. You understand that?
A. Okay.

Q. Okay. And that she didn't know anybody that was employed at Benny Whitehead, and that Benny Whitehead found her a -- what they described as a trainer to go with her as a team driver, Mike Duniphin, okay? Can you assume that?
A. I'm not familiar with that.
Q. Okay. Well, on two occasions, Benny Whitehead -- before her FMLA leave, Benny Whitehead, Inc., found a truckdriver partner for her. Were you aware of that?
A. Yes, sir. That's what we were told.
Q. Okay. Were you given any explanation for why Benny Whitehead, Inc., could not find her a partner after she returned from her FMLA leave?
A. They found her a partner, it is my understanding, in February, as an accommodation to her; that it is the driver's responsibility to find a partner to work at Benny Whitehead, because they only do teams.
Q. Okay. Have you seen any Benny Whitehead document that says that it is the driver's responsibility to find a team member?

A. Not to my knowledge.
Q. Okay.
A. There is -- there was an advertisement that Benny Whitehead had put out that specifically states that they hire team drivers. And that was an exhibit in our EEOC response.
Q. Is there any writing that says that Benny Whitehead will not find you a team driver, that you're aware of?
A. Not to my knowledge.
Q. Hmm. Well, so, is it correct that PeopLease did not undertake to do anything between June 13th, 2005, and December 1st, 2005, to see that Gloria Duniphin was returned to comparable employment?
A. There were telephone conversations between the benefits administrator and Benny Whitehead -- and I'm not sure who at Benny Whitehead -- wanting to know the status of finding her a driver so that she could return to work. We were told -- and we were told this in December, that in September she was --
Q. Okay. I want to refer to the time

period. Any communications between June 13th, the day she was released, and December 1st, the day she called PeopLease, is there any correspondence between Benny Whitehead and PeopLease about Gloria Duniphin between those dates?
A. I can't answer that. I don't know.
Q. Okay. You're unaware of any; is that correct?
A. Yes, sir.
Q. Okay. Well, Ms. Hiott, in five or six months, can someone who works as a truckdriver, can they reasonably expect that they no longer have a job if they haven't been put back to work?
A. I think that would be reasonable to assume.
Q. Okay. In fact, PeopLease's own policies, what do they say about not receiving a check for how long when you will be considered no longer an employee?
A. Our payroll technicians are told that they need to contact the client companies after two weeks of not receiving a paycheck to find out the status.

Q. Okay. Well, did anybody contact Benny Whitehead from PeopLease between June 13th, 2005, and December 1st?
A. Yes, sir.
Q. Who?
A. The payroll technician, Crystal, according to the notes that we have here.
Q. Well, when did she contact them?
A. I would have to go back through the notes.
Q. I see where she contacted them on June the 6th, but I don't see anything after that date, ma'am.
A. June the 6th is the last I have.
Q. Okay. Well, did she ever get any explanation as to the status of Mrs. Duniphin on June 6th?
A. I have no knowledge of that.
Q. Because there's nothing in the PeopLease file, is there?
A. No.
Q. So did PeopLease drop the ball with respect to Gloria Duniphin?
A. No, sir.
Q. Is the employer supposed to contact

you?
A. Who do you mean "the employer"?
Q. Benny Whitehead, Inc.
A. To contact us about what?
Q. Well, if Mrs. Duniphin brings a release back to Benny Whitehead, Inc., is Benny Whitehead, Inc., supposed to send that release the you?
A. Yes, sir.
Q. Did they?
A. Yes, sir.
Q. When?
A. In December of '05.
Q. Well, is that a reasonable time to send the release to you, ma'am?
A. No, sir.
Q. And who sent it in December? Do you know?
A. I don't know. I'd have to look -- there's nothing on the document. I wouldn't know.
Q. Does Benny Whitehead, Inc., have any responsibility to send that to you in a timely manner?
A. Yes, sir.

Q. Did they?
A. No, sir.
Q. Did Benny Whitehead, Inc., comply with the FMLA with respect to Mrs. Duniphin's employment?
A. According to our communication with them, they were attempting to try to do that, but they -- she did not have a partner, a team driver.
Q. They never even let you know she was back working -- was released to return to work until December, did they?
A. No, sir.
Q. So how did you know that they were attempting to find her a partner during this period of time? Do you have any personal knowledge of that, ma'am?
A. No, sir.
Q. Okay. You're relaying what you've been told, correct?
A. That's correct.
Q. Okay. Now, all of these efforts made by Benny Whitehead, have you seen any writing that reflects those efforts?
A. Most of our communication is on the

telephone. So, no, there isn't other than what I have here. To my knowledge, writing doesn't exist.
Q. Okay. Have you seen any letter from Benny Whitehead to Gloria Duniphin advising her between June 13th, 2005, and December 1st, 2005, that she has the responsibility of providing a team driver?
A. There was some communication from Eddie Whitehead to Gloria, but I don't recall off the top of my head whether that was in there or not.
Q. Hmm. So is it fair to say that you're unaware of any writing like that?
A. To my knowledge, I am unaware, yes.
Q. Okay. Well, do we agree that Mrs. Duniphin had in every respect complied with her responsibilities as an employee of Benny Whitehead? Do we agree about that? She got an approved FMLA leave; she had been out on documented workers' comp injury. We agree about that?
A. Yes, sir.
Q. She had done everything she was supposed to do to try to get back to work,

correct?
A. With the exception of one thing.
Q. Of finding a driver?
A. Which is a requirement of the job.
Q. Why wasn't it a requirement back when she was hired?
A. I can't answer that question. We don't hire.
Q. Okay. Well, she didn't have a teammate when she was hired, and they found her one. Did you know that?
A. No, sir.
Q. She didn't have a teammate when she came off of workers' comp injury, and they found her one. Did you know that?
A. I did know that per the notes.
Q. Okay. Well, why couldn't they find her one when she came back from FMLA leave?
A. I can't answer that. I don't know.
Q. Does Benny Whitehead have control over his drivers? Can they make assignments for them?
A. Yes, sir.
Q. Could they assign a worker who had more than two years over-the-road experience

to work with her?
MRS. POTTHOFF: Object to the form. I mean --
Q. You can answer. Do you know anything that would prevent them from doing that?
A. The only thing that I know is that they offer this as an accommodation to find a team driver for an employee. But it's ultimately the employee's responsibility to find their own team driver.
Q. When do they offer it as an accommodation, ma'am?
A. I can't answer that.
Q. I see. Well, do you know how many people with less than two years experience as a truckdriver that Benny Whitehead has hired since 2003?
A. Do I know how many people?
Q. Yeah.
A. No, sir.
Q. Well, they'd have to be PeopLease employees, wouldn't they?
A. Benny Whitehead has direction and control. They hire. We don't get involved

Page 70

in the hiring process other than the fact that they do our paperwork and send it in to us.

Q. No, ma'am. For every new employee that's hired, you have to be notified, correct?

A. Correct.

Q. And you would know. You have records that would show you how many people they've hired, don't you?

A. Yes. Specific periods of time, we have information on that.

Q. Do you know how many people they've hired with less than two years of driving experience?

A. No.

Q. Do you know what the turnover is at Benny Whitehead?

A. Not off the top of my head, no.

Q. Okay. How do they pay you, pay PeopLease?

A. They are invoiced each week.

Q. Yeah, but, you know, I know y'all make the payroll check, and you withhold taxes and Social Security and all of that

Page 71

stuff, but do you charge Benny Whitehead an additional amount, premium amount over and above those things?

A. I don't know the specifics of that. I can't answer that.

Q. Well, y'all have to make money off the deal, don't you?

A. We have a service agreement that exists between Benny Whitehead and us.

Q. Okay. You don't know the terms of that agreement?

A. I have a copy of it.

Q. Would you get that for me?

(Witness reviewed document.)

A. Okay.

Q. What Bates number is that, ma'am?

A. 2.

MR. ROBERSON: Okay. Courtney, can we just get a copy of that?

MRS. POTTHOFF: Uh-huh (affirmative response).

MR. ROBERSON: I'm sure you produced it.

MRS. POTTHOFF: Do you need one now or . . .

Page 72

MR. ROBERSON: Yeah. We can -- can we -- I tell you what, can we mark hers and just make a copy later?

MRS. POTTHOFF: Yeah.

MR. ROBERSON: That would be all right?

MRS. POTTHOFF: That would be fine as long as you let her refer back to it.

MR. ROBERSON: Absolutely. Absolutely.

BY MR. ROBERSON:

Q. All right. Ms. Hiott, I'm going to show you what I've marked as Exhibit 4 to your deposition, and ask you what is that document?

(Whereupon Plaintiff's Exhibit No. 4 was marked for identification and attached hereto.)

A. Service agreement.

Q. Between PeopLease and Benny Whitehead?

A. Yes, sir.

Page 73

Q. And is it dated?

A. Yes, sir.

Q. When did that agreement begin?

A. July 29th, 2005.

Q. Okay. And may I see Exhibit 4, please?

MRS. POTTHOFF: All right. Jerry, just a minute. Can you possibly -- would it be too cumbersome to ask you to go ahead and sit down? Because it's hard for her, because she's having to follow you as you walk around. And it's distracting.

Q. Okay. Have you heard of the term "PLC"?

A. Uh-huh (affirmative response).

Q. What is that, ma'am?

A. PLC Services. It's a separate corporation from PeopLease Corporation.

Q. Well, who is PLC?

A. That is a separate corporation of PeopLease.

Q. Well, are these employees that are