# Condensed Transcript

# Deposition of
# Deborah Hiott

### taken on
### February 20, 2007

### Gloria Duniphin
### v.
### Benny Whitehead, Inc., and PeopLease Corporation, et al.

### Case No. 2:06-cv-00459-WKW



**Certified Court Reporters and Certified Legal Video Specialists**
334.262.3332  1.888.253.DEPS
Email: depo@baker-baker.com
www.baker-baker.com

Page 74

1  leased, are they employees of PLC as well?
2      A. No, sir.
3      Q. Okay.
4      A. The employees of Benny Whitehead are
5  under PeopLease Corporation.
6      Q. Well, are you familiar with this
7  agreement marked Exhibit 4?
8      A. Yes, sir.
9      Q. Is there any indemnification of
10  either Benny Whitehead or PeopLease in that
11  agreement?
12      A. Yes, sir.
13      Q. Does Benny Whitehead indemnify you
14  for this lawsuit?
15      A. I can't answer that question. I
16  don't know the answer to that question.
17      Q. Okay. Well, how does it work when
18  PeopLease and Benny Whitehead get sued? Do
19  you know?
20      A. No, sir.
21      Q. Do you know who's responsible if
22  there's a violation of Title VII or the FMLA?
23      A. It's my understanding that we're
24  jointly responsible.
25      Q. Okay. Where does your understanding

Page 75

1  come from?
2      A. Because we're coemployers.
3      Q. Okay. Has your CEO told you that?
4      A. I don't recall that. I don't know.
5      Q. Well, do you provide any Human
6  Resources advice to Benny Whitehead, Inc.?
7      A. Yes, sir, if they ask for it.
8      Q. Okay. And do you instruct them on
9  how to comply with the FMLA?
10      A. Yes, sir.
11      Q. Did you ever instruct Benny
12  Whitehead, Inc., about how to comply with the
13  FMLA?
14      A. Did I personally?
15      Q. Yes.
16      A. No.
17      Q. All right. Well, do you provide
18  them written materials?
19      A. Yes, sir.
20      Q. What did you provide them in this
21  case?
22      A. There's information in the employee
23  handbook. We provide the original
24  documentation when someone wants to go out on
25  FMLA leave using the Department of Labor

Page 76

1  forms. They are notified that an employee
2  has contacted us regarding FMLA. And we
3  communicate via telephone what the status is.
4      Q. Okay. FMLA is pretty common, isn't
5  it?
6      A. Yes.
7      Q. I mean, this wasn't the first
8  employee to go out on the FMLA leave at Benny
9  Whitehead, was it?
10      A. No, sir.
11      Q. Well, do you know if in the past
12  they had provided you with the authorization
13  when the employee was released to return to
14  work?
15      A. Would you repeat that, please?
16      Q. Yeah. When employees are released
17  to return to work and they take that
18  authorization to Benny Whitehead, in the past
19  has Benny Whitehead provided that to
20  PeopLease?
21      A. I can't answer that question.
22      Q. You don't know?
23      A. I don't know.
24      Q. Okay. Well, are you aware of any
25  problem you've had getting documents from

Page 77

1  Benny Whitehead?
2      A. I don't recall anything off the top
3  of my head.
4      Q. Do you know of any reason why they
5  couldn't, Benny Whitehead couldn't have
6  provided you with Mrs. Duniphin's return to
7  work authorization before December of '05?
8      A. No, sir.
9      Q. I mean, did you ever talk to anybody
10  at Benny Whitehead about why that wasn't
11  done?
12      A. I personally did not.
13      Q. Has anyone at PeopLease?
14      A. I can't answer that. It's the
15  benefits administrator who handles the
16  administration of FMLA.
17      Q. And that's Ms. Ozmore or --
18      A. Star Ross and Pam Ozmore, uh-huh.
19      Q. Okay. And you've never talked to
20  them about that, correct?
21      A. No, sir.
22      Q. Now, do you know how many women work
23  at Benny Whitehead, Inc.?
24      A. Not off the top of my head, no.
25      Q. They hire women as truckdrivers,

Page 78

1  don't they?
2      A.  Yes, sir.
3      Q.  And it's -- my experience is that a
4  lot of women who are married to truckdrivers
5  try -- or become truckdrivers.  Are you aware
6  of that?
7      A.  I know that there are some.  I don't
8  know who's trying to do it.
9      Q.  Well, team drivers -- a husband and
10  wife can be a team, correct?
11      A.  Yes, sir.
12      Q.  And that makes a lot of sense,
13  because you spend a lot of time with your
14  partner, correct?
15      A.  Yes, sir.
16      Q.  And you travel the United States
17  with your partner, right?
18      A.  Yes, sir.
19      Q.  And you sleep in the same small
20  space as your partner, correct?
21      A.  Yes, sir.
22      Q.  Okay.  Well, have you noticed that
23  that trend has developed in the trucking
24  industry?
25      A.  I can't answer that.  I don't know.

Page 79

1      Q.  Okay.  Well, Ms. Hiott, after
2  December of 2005, has PeopLease sent any
3  correspondence to Gloria Duniphin?
4      A.  Not to my knowledge.
5      Q.  Why not?
6      A.  I can't answer that.  I don't know.
7      Q.  Well, certainly she made you aware
8  that she wasn't working, hasn't worked in
9  some time in December, correct?
10      A.  That's correct.
11      Q.  And you read the note.  It sounded
12  like she was complaining, didn't it?
13      A.  Yes, sir.
14      Q.  Well, you're the joint employer of
15  her, correct?
16      A.  Yes, sir.
17      Q.  You told her that as far as your
18  records were concerned, she had voluntarily
19  quit, correct?
20      A.  Someone at PeopLease did.  I did
21  not.
22      Q.  When I say you, I'm really referring
23  to PeopLease.  I apologize.  But she was told
24  by PeopLease that she had voluntarily quit,
25  correct?

Page 80

1      A.  Correct.
2      Q.  That wasn't true, was it?  She
3  didn't voluntarily quit, did she?
4          MRS. POTTHOFF:  Object to the form.
5      A.  When someone does not return to work
6  within a certain period of time, we consider
7  that a voluntary quit.
8      Q.  Do you have a letter of resignation
9  from Mrs. Duniphin?
10      A.  No, sir.  We rarely get letters of
11  resignation from any employee.
12      Q.  Did you contact Benny Whitehead,
13  Inc., to see what her status was in June when
14  she voluntarily quit?
15      A.  There is some correspondence in
16  June, yes.
17      Q.  Well, as of June 28th, did you
18  contact Benny Whitehead, Inc., to find -- to
19  determine Mrs. Duniphin's status?
20      A.  We could have done it by telephone,
21  but there's nothing in writing.
22      Q.  Okay.  Is this voluntary quit
23  status, is that in writing in any PeopLease
24  policy?
25      A.  I'm not certain.

Page 81

1      Q.  Well, how would an employee like
2  Mrs. Duniphin know that if she didn't get a
3  check, she was going to be considered a
4  voluntary quit?
5      A.  There is a place in the employee
6  handbook that says if you do not contact your
7  supervisor within a certain period of time,
8  you'll be considered voluntary quit.
9      Q.  Is anybody at PeopLease
10  Mrs. Duniphin's supervisor?
11      A.  No, sir.
12      Q.  So if she returned the authorization
13  to Benny Whitehead, Inc., had she complied
14  with that requirement?
15      A.  Yes, sir.  But we had no knowledge
16  of that.
17      Q.  So she had complied, but you didn't
18  know it, correct?
19          MRS. POTTHOFF:  I mean, she doesn't
20          know when, the date it was
21          turned in, but . . .
22      A.  We don't have a -- we don't know the
23  date it was turned in to Benny Whitehead.
24  There's no date.
25      Q.  Does Benny Whitehead not know?

Page 82

1      A. I can't answer for them. I don't
2  know.
3      Q. Well, have you talked to them about
4  that?
5      A. No, sir.
6      Q. Well, you know, have you talked to
7  anybody at Benny Whitehead since y'all have
8  been sued?
9      A. Our benefits administrator may have.
10 She does the administration of FMLA. I have
11 not.
12     Q. Well, you know, I asked for someone
13 who was knowledgeable about the status of
14 Mrs. Duniphin. And you're telling me there
15 may be other people at PeopLease who are more
16 knowledgeable than you, correct?
17     A. The benefits administrator handles
18 the administration of FMLA. I don't do the
19 direct administration of FMLA personally.
20     Q. Do you supervise her?
21     A. I supervise her.
22     Q. Have you had an opportunity in the
23 last, oh, twelve months to talk to her?
24     A. Yes, sir.
25     Q. Have you talked to her about this?

Page 83

1      A. Yes, sir.
2      Q. What has she told you with respect
3  to when Benny Whitehead received the
4  authorization?
5      A. She has not.
6      Q. Did it ever come up in your
7  conversation?
8      A. No, sir.
9      Q. Okay. Well, do you have any
10 information at all, from any source
11 whatsoever, that would lead you to believe
12 that Gloria Duniphin didn't provide her
13 authorization in June of 2005?
14     A. No, sir.
15     Q. Okay. Let me ask you something:
16 Benny Whitehead, Inc., where do you
17 correspond with them?
18     A. Mostly by telephone.
19     Q. Okay. Do you know what number
20 they're calling you from?
21     A. No, sir.
22     Q. Well, is it -- is it -- do you talk
23 to people at their Eufaula location?
24     A. Yes, sir.
25     Q. Have you ever talked to anybody in

Page 84

1  Georgia?
2      A. Not to my knowledge.
3      Q. Did Gloria Duniphin work out of the
4  Eufaula location?
5      A. As far as I know, yes, sir.
6      Q. Do you know why she would have to
7  file for unemployment benefits in Georgia?
8      A. Unless she's dispatched out of
9  Georgia. I don't have that knowledge.
10     Q. Okay. Well, assuming she's
11 dispatched out of Eufaula, do you know any
12 reason why she would have to file for
13 unemployment benefits in Georgia?
14     A. No, sir.
15     Q. Do you know if Benny Whitehead,
16 Inc., is qualified to do business in Georgia?
17     A. I don't know.
18     Q. You signed an affidavit in this
19 case, correct?
20     A. Yes, sir.
21     Q. And it says in Paragraph 6 on page 2
22 that as part of its routine practice,
23 PeopLease makes inquiries about inactive
24 employees. And it says prior to
25 December 2005, PeopLease inquired about

Page 85

1  Plaintiff's status, and Whitehead informed
2  PeopLease that she had refused to load in
3  September of 2005 and had been unable to find
4  a qualified partner and was inactive,
5  correct?
6      A. Correct.
7      Q. Well, that's not what you've told me
8  here today, is it?
9          MRS. POTHOFF: Object to form.
10     Q. You told me you don't know when
11 PeopLease inquired -- you don't know of any
12 contact PeopLease had with Benny Whitehead
13 between June 13th, 2005, and December 1st,
14 2005, correct?
15         MRS. POTHOFF: You asked about
16         correspondence.
17     Q. Is there some contact that PeopLease
18 had?
19     A. I can't answer that. I didn't.
20         MR. ROBERSON: Well, let me mark
21         this.
22         MRS. POTTHOFF: Jerry, there's
23         telephone notes in there with
24         all of the contacts and
25         communications there.

Page 86

```
 1          (Whereupon Plaintiff's Exhibit
 2          No. 5 was marked for
 3          identification and attached
 4          hereto.)
 5      MR. ROBERSON:  Look, I can only take
 6          one person at a time as the
 7          corporate rep, so . . .
 8  BY MR. ROBERSON:
 9      Q.  Let me ask you what I -- show you
10  what I've marked as Exhibit 5 and ask you if
11  that's your affidavit that you signed in this
12  case?
13      A.  Yes, sir.
14      Q.  And you signed that affidavit in
15  support of PeopLease's motion for summary
16  judgment, correct?
17      A.  That's correct.
18      Q.  Okay.  Turn to page 2, Paragraph 6,
19  and read that paragraph into the Record,
20  please, ma'am.
21      A.  As part of its routine practice,
22  PeopLease makes inquiries about inactive
23  employees.  Prior to December 2005, PeopLease
24  inquired about Plaintiff's status.  And
25  Whitehead informed PeopLease that she had
```

Page 87

```
 1  refused a load in September 2005 and had been
 2  unable to find a qualified partner and was
 3  inactive.  In order to reflect her inactive
 4  status, she was considered a voluntary quit.
 5      Q.  Okay.  So who at PeopLease inquired
 6  into Gloria Duniphin's status prior to
 7  December 1st, 2005?
 8      A.  I'm not certain who it was.
 9      Q.  Are you certain that anyone did?
10      A.  Yes, sir.
11      Q.  Who?  How are you certain?
12      A.  I would say Star Ross, who's the
13  benefits administrator, contacted them to
14  find out the status, because that is her
15  responsibility.  There's nothing in writing.
16  It would have been strictly on the telephone.
17  When you asked me the prior question, you
18  were asking if there was anything in writing.
19  I did not have anything in writing.  Our
20  correspondence is primarily on the telephone.
21      Q.  Well, Ms. Hiott, have you talked to
22  Star and asked her if she contacted Benny
23  Whitehead?
24      A.  No, sir.
25      Q.  So you don't know whether she did,
```

Page 88

```
 1  do you?
 2      A.  I don't have anything in writing
 3  that she did.
 4      Q.  You don't know whether she did, do
 5  you?
 6      A.  Not to my knowledge, no.
 7      Q.  Okay.  Well, you signed that
 8  affidavit and indicated that someone had,
 9  didn't you?
10      A.  That's true.
11      Q.  That affidavit is not correct, is
12  it?
13      A.  It says someone did.
14      Q.  But you can't name me who did?
15      A.  I'm saying that it had to be Star
16  Ross, who was the benefits administrator.
17      Q.  I will agree with you that Star Ross
18  had the responsibility for contacting Benny
19  Whitehead, Inc.  Is that what you're saying?
20      A.  Yes, sir.
21      Q.  But you don't know, as you sit here
22  today, whether she did contact them of your
23  own personal knowledge, do you?
24      A.  I don't have the notes in front of
25  me.  No, I don't.  But someone at PeopLease
```

Page 89

```
 1  did or we would not have this knowledge at
 2  all.
 3      Q.  What knowledge?
 4      A.  The knowledge that they had been
 5  looking for her -- that she has refused a
 6  load in September because of going to Texas
 7  for a birthday party.  This was communicated
 8  over the telephone to our benefits
 9  administrator.
10      Q.  In the undated document, correct?
11      A.  I don't know if that's exclusive or
12  not.  I don't know.
13      Q.  Well, do you have any document that
14  has a date on it that indicates that Benny
15  Whitehead did contact PeopLease and inform
16  them as to Mrs. Duniphin's status?
17      MRS. POTHOFF:  Can I show her the
18          personnel file?
19      MR. ROBERSON:  You can show her
20          whatever you want.
21      MRS. POTHOFF:  Her personnel file
22          has got this about the -- all
23          of that.
24          (Witness reviewed document.)
25      A.  Okay.  I've got a personnel status
```

1  change form that was sent to our payroll
2  tech, Crystal.
3      Q.  When?
4      A.  There's no date on it.
5      Q.  Oh.
6      A.  But it says on or about 9/18/2005,
7  employee informed Stacey and Eddie that his
8  or her last day of employment -- there was
9  nothing -- it was left blank.  But they
10 handwrote in, Was unable to leave going out
11 on load because of personal reasons.  She was
12 going out of town.
13     Q.  So what you have, please, ma'am, is
14 an undated document from Benny Whitehead,
15 correct?
16     A.  That is correct.
17     Q.  Does it have a transmittal date,
18 that is, when it was received by PeopLease?
19     A.  No, sir.
20     Q.  Well, that's a little unusual, isn't
21 it?
22          (Witness reviewed document.)
23     A.  Yes, it is.
24     Q.  Hmm.  Do you, in HR, teach your
25 clients that written documentation is

1  important?  Do you do that?
2      A.  Constantly.
3      Q.  In fact, do you tell them that they
4  will not be believed if they do not have
5  written documentation?
6          MRS. POTHOFF:  Object to form.
7      Q.  You can answer.  Do you tell them
8  that?
9      A.  No, sir.
10     Q.  Okay.  Well, do y'all have any
11 disciplinary forms there at PeopLease?
12     A.  Yes, sir.
13     Q.  Do you provide them to your
14 employers?
15     A.  Yes, sir.
16     Q.  And do you instruct them that they
17 should get the employee to sign those
18 documents to acknowledge that they've been
19 disciplined?
20     A.  Yes, sir.
21     Q.  Okay.  Why do you do that, ma'am?
22 Why do you tell them to do that?
23     A.  So that we know that the employee
24 has been counseled and acknowledges the
25 counseling report.

1      Q.  Do you think that's important?
2      A.  It is important.
3      Q.  Does it communicate expectations?
4      A.  I don't understand that question.
5      Q.  Well, an employee can't know
6  something until they're told it, correct?
7      A.  I'm not certain what you mean.
8      Q.  If an employee has a performance
9  issue, that needs to be documented and
10 acknowledged by the employee, correct?
11     A.  Yes, sir.
12     Q.  Because you're communicating
13 expectations, that is, the employer's
14 expectations, for future performance,
15 correct?
16     A.  Yes, sir.
17     Q.  And you're documenting that if the
18 employee does not meet those expectations,
19 that there will be further disciplinary
20 action, correct?
21     A.  Yes, sir.
22     Q.  So there's no misunderstanding,
23 correct?
24     A.  Yes, sir.
25     Q.  It's only fair to advise the

1  employee in writing that further instances of
2  this deficiency will result in their further
3  discipline, correct?
4      A.  Yes, sir.
5      Q.  So you're communicating
6  expectations, right?
7      A.  Yes, sir.
8      Q.  And that's just good employment
9  practice, correct?
10     A.  Yes, sir.
11     Q.  And you, as a professional employer
12 organization, want to have good employment
13 practices, correct?
14     A.  Yes, sir.
15     Q.  Is there any document that's
16 actually dated that shows that Gloria
17 Duniphin was ever told that she had
18 responsibility for providing a team driver
19 between June 13th and December 1st, 2005?
20     A.  I have no knowledge of any.
21     Q.  Well, that's a deficiency, isn't it?
22          MRS. POTHOFF:  Object to form.
23     Q.  She can't work if she doesn't have a
24 team driver, right?
25     A.  That is my understanding, yes.

Page 94

1    Q. Well, why isn't that documented,
2  ma'am?
3    A. I can't answer that.
4    Q. Well, that's not a good employment
5  practice, is it?
6    A. (No immediate response.)
7    Q. Is it?
8    A. What -- is what not a good
9  employment practice?
10    Q. The failure to document that, to
11  advise the employee of that, and let them
12  know that they have to get a team driver?
13    A. It's my understanding that employees
14  at Benny Whitehead are told that.
15    Q. No. I don't care what they say they
16  tell them. Is it in writing, and does the
17  employee acknowledge it?
18    A. I can't answer that.
19    Q. Okay. Can I see -- I want to make
20  this an exhibit. Let me see that document.
21  Well, is this the document you're referring
22  to, on the top?
23    A. Yes.
24    Q. Okay. Will you pull it out, and
25  I'll mark it as an exhibit?

Page 95

1        (Witness complied.)
2        MRS. POTTHOFF: If you're talking
3        about the fax up at the top,
4        that's when it was sent to me.
5        MR. ROBERSON: I just want to mark
6        it as an exhibit if you don't
7        object to that.
8        MRS. POTTHOFF: Okay. Let me look
9        at that. Okay.
10        (Whereupon Plaintiff's Exhibit
11        No. 6 was marked for
12        identification and attached
13        hereto.)
14  BY MR. ROBERSON:
15    Q. Now I'll show you what I've marked
16  as Exhibit 6, and it's a two-page PeopLease
17  document, correct?
18    A. Yes, sir.
19    Q. And there is a fax header at the top
20  that's dated when?
21    A. November 2nd, 2006.
22    Q. Okay. And there's also some
23  information. Says, Job information, first
24  date worked, 12/10/03, correct?
25    A. Yes, sir.

Page 96

1    Q. Okay. Then we go to the second
2  page. Now, you see in this first category,
3  Termination layoff, rehire FMLA, there's
4  nothing checked on that, is there?
5    A. No, sir.
6    Q. All right. Then it's got
7  voluntarily quit on or about. And then look
8  at that. Why would the date be below that
9  line?
10    A. I don't know.
11    Q. Oh. Stacey and Eddie. Stacey and
12  Eddie, the name and title that his/her last
13  date of employment would be, and then that's
14  blank, isn't it, that date?
15    A. The last date of employment they
16  have up above is 9/18/05.
17    Q. Was unable to leave going out on a
18  load because of personal reasons. She was
19  going out of town. Okay. And this is by
20  S. Lawson. And the signature is Stacey
21  Lawson, correct?
22    A. Yes, sir.
23    Q. Is that a Benny Whitehead employee?
24    A. Yes, sir.
25    Q. Have you ever talked to Stacey?

Page 97

1    A. I believe I have a few times.
2    Q. Well, did she ever explain why
3  this -- when they sent this document?
4    A. Not to me. This document goes to my
5  payroll technician, who, in turn, puts it in
6  the personnel file. They're in control of
7  the personnel files.
8    Q. Well, this says termination, doesn't
9  it? It's got that checked?
10    A. Yes, sir.
11    Q. Well, is it a Benny Whitehead
12  document or a PeopLease document?
13    A. It's a PeopLease document that is
14  filled out by an employee at Benny Whitehead.
15    Q. Well, did you know that Benny
16  Whitehead testified at Mrs. Duniphin's
17  unemployment compensation hearing that she
18  was still employed there? Did you know that?
19    A. No, sir.
20    Q. That's not what this document says,
21  is it?
22    A. No, sir.
23    Q. But we don't know the date on this
24  document, do we?
25    A. No, sir.

Page 98

1  Q. Do you know what that note is right
2  there?
3      (Witness reviewed document.)
4  A. I have no idea. Well, I could --
5  no, I don't know. I'm not certain. It looks
6  like it could be last check.
7  Q. Last check, what the date is?
8  A. Perhaps 8/05.
9  Q. Do you know what that references?
10 A. No, sir.
11 Q. Okay. But it's your testimony that
12 PeopLease did receive this document, correct,
13 from Benny Whitehead, Inc.?
14 A. As far as I know, yes.
15 Q. You just don't know when they
16 received it, correct?
17 A. No, sir.
18 Q. Okay. Why wouldn't it be dated down
19 here where it says date?
20 A. I can't answer that. It should have
21 been, but it wasn't.
22 Q. Oh. Now, when y'all have an
23 agreement like you have with Benny Whitehead,
24 do they -- do you review their personnel
25 policies to make sure they comply with the

Page 99

1  FMLA and Title VII and everything like that?
2  A. Do we review their personnel
3  policies?
4  Q. Yeah.
5  A. No.
6  Q. Ma'am?
7  A. When they come on with us, their
8  FMLA falls through PeopLease. I don't know
9  what their policies would have been previous
10 to that.
11 Q. Okay. Well, what I'm asking you --
12 and I apologize for the clumsy nature of my
13 question: Each trucking company has their
14 own rules, work rules, correct?
15 A. Yes, sir.
16 Q. Do they provide those work rules to
17 PeopLease?
18 A. No, sir.
19 Q. Okay.
20 A. Not to my knowledge anyway.
21 Q. All right. Well, how do you know
22 that they don't have work rules that violate
23 some statute?
24 A. We would not know unless they told
25 us.

Page 100

1  Q. Well, see, I thought the whole idea
2  of getting the professional employer
3  organization involved was so you didn't have
4  to worry about complying with all of these
5  laws like FMLA and Title VII, somebody else
6  would do that for you; is that true?
7  A. We do the administration, yes.
8  Q. Well, Mrs. Duniphin didn't get much
9  administration from her FMLA leave, did she?
10     MRS. POTTHOFF: Object to form.
11 Q. Did she?
12 A. I'm sorry, I . . .
13     MRS. POTTHOFF: Yeah. Object to
14         form. I mean --
15 Q. You can answer.
16     MRS. POTTHOFF: Administration of
17         her paperwork was sent out.
18 A. Well, she received the full twelve
19 weeks of entitlement of FMLA.
20 Q. Did she received comparable
21 employment when she was released to return to
22 work?
23 A. They were attempting to do that, but
24 she didn't meet the criteria of having the
25 team driver.

Page 101

1  Q. Do you have any information from any
2  source, other than Benny Whitehead, Inc.,
3  that Mrs. Duniphin didn't meet the criteria?
4  A. No, sir.
5  Q. So you're relying on your client,
6  correct?
7  A. Yes, sir.
8  Q. And I trust that you would like to
9  keep Benny Whitehead, Inc., as a client?
10 A. Yes, sir.
11 Q. So you've got a financial incentive
12 to believe them, correct?
13     MRS. POTTHOFF: Object to form.
14 Q. You can answer.
15 A. We have a loyalty to them to make
16 sure that they are in compliance as far as
17 the administration is concerned.
18 Q. Okay. Well, do y'all ever audit
19 their personnel files?
20 A. It has not been done to my
21 knowledge.
22 Q. Do you ever audit anybody's files?
23 A. We audit our own files.
24 Q. Well, do you audit any client files?
25 A. Not to my knowledge.

Page 102

1 Q. Will you give me back your
2 affidavit? Exhibit 4, I think it was. It
3 may be 5. I'm sorry, Exhibit 5.
4     (Witness complied.)
5 Q. And in this Paragraph 6, you say
6 PeopLease makes inquiries about inactive
7 employees, but it's true that there is no
8 written documentation of any inquiry as to
9 Mrs. Duniphin's status between June 13th,
10 '05, and December 1st, '05, correct?
11 A. Well, there was the personnel status
12 change form.
13 Q. Okay. It's undated, correct?
14 A. Yes, sir.
15 Q. So there is no dated document?
16 A. Dated document, not to my knowledge.
17 Q. Okay. And y'all don't assign
18 drivers, correct?
19 A. That's correct.
20 Q. I mean, Benny Whitehead has to do
21 that, right?
22 A. Yes, sir.
23 Q. And you don't dispatch loads,
24 correct?
25 A. No, sir.

Page 103

1 Q. Now, do you know what holdback money
2 is?
3 A. I've heard the term.
4 Q. Yeah. Well, what is it, your
5 understanding?
6 A. That Benny Whitehead held -- holds
7 back $50 when someone is employed, out of
8 their paycheck, until they reach a certain --
9 I'm not really certain the amount. I believe
10 it's 500 -- for purposes of covering any
11 liability that may be incurred upon
12 termination.
13 Q. Okay. Do you know any employee of
14 Benny Whitehead, other than Gloria Duniphin,
15 who is a current employee who has received
16 their holdback money?
17 A. I have no knowledge of that.
18 Q. But that's a practice that's
19 administered by Benny Whitehead, Inc.,
20 correct?
21 A. Yes, sir.
22 Q. PeopLease doesn't have any
23 involvement in that, correct?
24 A. No, sir. Except for the directive
25 of taking a deduction. But we don't know

Page 104

1 what that -- you know, most of the time, it's
2 miscellaneous deductions. And we don't have
3 any idea what that is.
4 Q. Do y'all also administer the driver
5 fund?
6 A. No, sir.
7 Q. Okay. That's a deduction that's
8 separate that y'all don't have any control
9 over?
10 A. I don't know anything about that.
11 Q. Okay.
12     MRS. POTTHOFF: It's a deduction on
13       her paycheck. I mean, if you
14       want to look at -- show her one
15       of her paychecks.
16     MR. ROBERSON: Yeah. I'm about out
17       of tape. Let's go off the
18       Record. I'm almost through.
19     MRS. POTTHOFF: Well, you can get
20       through.
21     MR. ROBERSON: No, I can't. I've
22       got eight minutes. Let's go
23       off the Record.
24     MRS. POTTHOFF: Okay.
25     MR. ROBERSON: It's 11:17.

Page 105

1     (Whereupon an off-the-Record
2       discussion was held.)
3     MR. ROBERSON: Back on the Record.
4       This is tape three. It's
5       11:22. Tape three of the
6       deposition of PeopLease, Inc.
7 BY MR. ROBERSON:
8 Q. Ms. Hiott, let me show you what I've
9 marked as Plaintiff's Exhibit 7. It's a
10 payroll check for Gloria Duniphin. Do you
11 see that, ma'am?
12     (Whereupon Plaintiff's Exhibit
13       No. 7 was marked for
14       identification and attached
15       hereto.)
16 A. Yes, sir.
17 Q. And does it show a donation of one
18 dollar deducted from her paycheck?
19 A. Yes, sir.
20 Q. This check is -- I guess, if she was
21 hired December the 10th, this is probably --
22 probably her first check, correct? If she
23 was hired December 10, 2003, this is probably
24 her first check?
25 A. This is dated August 20th, 2004.

Page 106

1    MRS. POTTHOFF:  You're looking at
2 another one.
3    Q.  I'm looking at another one.  Excuse
4 me.  I'm sorry.  I'm sorry.  I'm looking at
5 another document.
6    What's the amount of that check?
7    A.  The deposit amount is 53.03.
8    Q.  Okay.  Let me show you -- let me
9 mark this as Exhibit 8.  It's a payroll check
10 dated December 19th, 2003.  And I misspoke
11 earlier.  I was looking at this check.  Is
12 that from Mrs. Duniphin?
13        (Whereupon Plaintiff's Exhibit
14         No. 8 was marked for
15         identification and attached
16         hereto.)
17        (Witness reviewed document.)
18    A.  Gloria W. Smith.
19    Q.  Okay.  Well, was she, Ms. Smith --
20 Gloria Duniphin was Gloria Smith when she was
21 hired, correct?
22    A.  Yes, sir.
23    Q.  And she married Michael Duniphin,
24 correct?
25    A.  Yes, sir.  That's my understanding.

Page 107

1    Q.  Yeah.  And he was her trainer, team
2 driver that she was assigned to.  Do you
3 understand that?
4    A.  That's my understanding.
5    Q.  Okay.  And does this show a
6 miscellaneous deduction of $50, Exhibit 8?
7    A.  Yes, sir.
8    Q.  And is that part of the holdback
9 money that you were referring to earlier?
10    A.  Yes, sir.
11    Q.  Okay.  And it also shows a donation
12 of one dollar, correct?
13    A.  Yes, sir.
14    Q.  Do you know what that donation is to
15 or for?
16    A.  No, sir.
17    Q.  Okay.  It's just a payroll
18 deduction; is that fair?
19    A.  Yes, sir.
20    Q.  Okay.  Now, do you have any
21 information, like the W-2s, for Gloria
22 Duniphin?
23    A.  Not with me, no, sir.
24    MRS. POTTHOFF:  You asked for her
25        payroll checks.  I got her

Page 108

1        payroll checks.  You haven't
2        asked for her W-2s.  Do you
3        want them?
4    Q.  Do you have the year-to-date
5 earnings of Gloria Duniphin for '03, '04, and
6 '05?  Would that be reflected on the payroll
7 checks?
8    A.  It should be reflected on the
9 payroll checks, the year to date.
10    Q.  All right.  Would --
11        MR. ROBERSON:  We could stipulate to
12        that, can't we?
13        MRS. POTTHOFF:  Yeah.
14        MR. ROBERSON:  Okay.
15        MRS. POTTHOFF:  I mean, we can get
16        to that.  I'm not going -- I
17        mean, that's going to be --
18        whatever the number is, is what
19        the number is.
20        MR. ROBERSON:  Okay.  I'm just
21        trying to --
22        MRS. POTTHOFF:  You don't have to
23        cover that base here today.
24        MR. ROBERSON:  All right.  I don't
25        want to have to bring somebody

Page 109

1        back from South Carolina.
2        MRS. POTTHOFF:  No.  I can stipulate
3        to whatever her payroll
4        records -- whatever the W-2s
5        show.
6        MR. ROBERSON:  Okay.
7 BY MR. ROBERSON:
8    Q.  Now, have you made available to me
9 all of the documents that PeopLease has that
10 relate to Gloria Duniphin?
11    A.  As far as I know, yes, sir.
12    Q.  Okay.  And of those documents, have
13 we identified all that are dated between
14 June 13th and December 1st, 2005?
15    A.  As far as I know, yes, sir.
16    Q.  Okay.  Well, you don't know any
17 reason that PeopLease would hide documents
18 from you, do you?
19    A.  No, sir.
20    Q.  I mean, they've designated you as
21 the corporate rep, surely they would give you
22 the documents, wouldn't they?
23    A.  Yes, sir.
24    Q.  Okay.  So is it fair to say, ma'am,
25 that from June 13th, 2005, until

Page 110

1 December 1st, 2005, PeopLease, as a
2 corporation, did not know that Gloria
3 Duniphin had been released to return to work
4 by her physician? Is that fair to say?
5    A. We have nothing in writing.
6    Q. Okay. And you have nothing in
7 writing to show that there was any inquiry
8 into her status during that time period,
9 correct?
10    A. Other than what I've identified.
11    Q. Okay. Can PeopLease fire Gloria
12 Duniphin?
13    A. Not without -- not without the
14 consent of Benny Whitehead or consulting
15 them.
16    Q. Okay. Well, did they consult Benny
17 Whitehead in June of 2005 when they
18 considered her a voluntary quit?
19    A. Yes, sir. We've got the
20 documentation of that.
21    Q. Where?
22    A. Go back through the notes. There's
23 a phone slip and -- of June 6th?
24    Q. Okay. But you considered her a
25 voluntary quit on what date?

Page 111

1    A. PeopLease?
2    Q. Yeah.
3    A. On June 28th. Because she had not
4 returned to work. She had missed a number of
5 paychecks.
6    Q. Did you ever communicate that fact,
7 did PeopLease, to Benny Whitehead anytime
8 after June 28th, 2005, before December 1st?
9    A. I am not certain of that.
10    Q. Did you ever communicate it to
11 Gloria Duniphin?
12    A. The only knowledge I have of it
13 being communicated to Gloria Duniphin was in
14 December of '05.
15    Q. You know, just out of curiosity, I
16 know Mrs. Duniphin didn't have insurance
17 benefits, correct?
18    A. Yes, sir.
19    Q. Health insurance. They are offered
20 by Benny Whitehead, right?
21    A. Yes, sir.
22    Q. But she had health and access to
23 health insurance through her husband's
24 military service, correct?
25    A. I don't know.

Page 112

1    Q. Okay. Well, if she had been insured
2 with the insurance carrier -- who is the
3 insurance carrier for Benny Whitehead? Do
4 you know?
5    A. At the moment?
6       MRS. POTTHOFF: The health
7       insurance?
8    Q. Health insurance.
9    A. Health insurance is with Coventry.
10    Q. Okay. Would she have to have made
11 premium payments during this period of time?
12    A. Which period of time?
13    Q. When she was off work in order to
14 keep her insurance.
15    A. Yes. It would continue. Benny
16 Whitehead would continue their share of the
17 premium payment, and she would have continued
18 hers.
19    Q. Okay. So would that mean there
20 would have to be correspondence between
21 PeopLease and her during that period of time
22 if she had had health insurance?
23    A. She would have had to pay her share
24 of the premium to --
25    Q. Who would she pay it to?

Page 113

1    A. She would have paid it directly to
2 us.
3    Q. To PeopLease?
4    A. Uh-huh (affirmative response).
5    Q. So you would have been contacting
6 her to --
7    A. No. Excuse me. I retract that.
8 She would have to pay the insurer, our
9 insurance company. And they, in turn, send
10 the premium payments to us.
11    Q. Well, someone has to notify her what
12 amount is due, correct?
13    A. Yes, sir.
14    Q. Who would that be?
15    A. We do, PeopLease.
16    Q. So you would be in contact with her
17 during this period of time while she was on
18 FMLA leave and afterward to get those
19 insurance payments, correct?
20    A. Right.
21    Q. But since she didn't have health
22 insurance, there was no contact, correct?
23    A. There was no contact relating to the
24 health insurance.
25    Q. Well, there was no contact, period,

Page 114

1 was there?
2    A. I can't answer that. I don't know.
3    Q. Well, you don't have any record of
4 any contact, correct?
5    A. We have the personnel status change
6 form that is -- this is not dated. The
7 telephone calls. I don't know.
8    Q. So you don't have any personal
9 knowledge of any contact, do you?
10    A. I know that there were telephone
11 calls. But that's all I know.
12    Q. Between PeopLease and Gloria
13 Duniphin?
14    A. Yes. There was one in December of
15 '05 when she called.
16    Q. Yeah. Well, other than that, when's
17 the other telephone --
18    A. I don't have any knowledge of that.
19    Q. Okay. Would you look at that
20 agreement again?
21        (Witness reviewed document.)
22    A. Okay.
23    Q. Paragraph 3.12, sharing of
24 information. Customer agrees. Is that Benny
25 Whitehead?

Page 115

1    A. 3.12?
2    Q. Yeah.
3    A. Okay.
4    Q. Customer, is that Benny Whitehead?
5    A. Yes, sir.
6    Q. Customer agrees to assist PLC in
7 establishing light duty, return-to-work
8 programs at customer's location for the
9 purpose of returning assigned employees to
10 work during rehabilitation and in light of
11 restrictions placed upon the assigned
12 employee by treating physician following any
13 work-related injury occurred.
14    A. I don't see that on 3.1.
15    Q. Okay. I'm reading the wrong
16 paragraph. Customer agrees to cooperate with
17 PLC and to share information with PLC as
18 necessary for the performance of this
19 agreement. Would that include this
20 return-to-work authorization?
21    A. Yes, sir.
22    Q. So they promised to tell you about
23 that in a timely fashion, didn't they,
24 according to this agreement?
25    A. They agreed to cooperate with us, to

Page 116

1 share that information.
2    Q. Customer further agrees to cooperate
3 with PLC in defense of any employment-related
4 lawsuit claim, charge, or investigation
5 assigned to assigned employee, including
6 providing reasonable access to PLC and its
7 agents to pertinent information relating to
8 assigned employee and/or customer's work
9 site. So they have to tell you when --
10 according to this agreement, when they sent
11 these documents, don't they?
12    A. They are supposed to communicate
13 with us, yes.
14    Q. Have they told you?
15    A. Have they told us what?
16    Q. When they sent the authorization.
17        MRS. POTTHOFF: The return-to-work
18        slip you're talking about?
19        MR. ROBERSON: Yeah, yeah.
20 BY MR. ROBERSON:
21    Q. Have they told you -- has Benny
22 Whitehead, Inc., told PeopLease when they
23 sent that?
24    A. I don't know. I have no knowledge
25 of that.

Page 117

1    Q. Wouldn't you agree with me that's
2 pretty important?
3    A. It is important, yes.
4    Q. But you don't know. You can't say,
5 correct?
6    A. I only know that we received it in
7 December of 2005.
8    Q. All right. You would have liked to
9 have received it earlier, wouldn't you?
10    A. Yes, sir.
11    Q. This says PLC and customer shall
12 comply with all federal, state, and local
13 employment laws and regulations. Is that the
14 agreement?
15    A. Yes, sir.
16    Q. So both of y'all are on the hook to
17 comply with the FMLA and Title VII and the
18 ADEA, correct?
19    A. Yes, sir.
20    Q. Do y'all get sued when Benny
21 Whitehead's drivers have a wreck?
22    A. A work comp?
23    Q. No.
24    A. Are you talking about the work comp?
25    Q. No. When an employee, a

Page 118

1 truckdriver, runs into somebody, kills them,
2 do y'all get sued?
3    A. Yes, sir.
4    Q. Because you're the employer and
5 you're responsible for the misconduct of your
6 employee, correct?
7       MRS. POTTHOFF: Object to form.
8    Q. Correct? Do you know?
9    A. Do I know what?
10    Q. If your employee is careless, and he
11 or she runs into somebody and injures them,
12 is the employer responsible?
13    A. We are to be notified. But I can't
14 answer who's responsible.
15    Q. Okay. Are you aware of lawsuits
16 like that?
17    A. I've heard of them.
18    Q. This document references Benny
19 Whitehead, Inc., P.O. Box 573, Georgetown,
20 Georgia. Did you know that?
21    A. No, sir.
22    Q. And then it has a Schedule A, and
23 that refers to -- on the last page or before
24 the appendix, is that the amount that Benny
25 Whitehead must pay to you for your services?

Page 119

1    A. I'm not familiar with this. I don't
2 know.
3    Q. Ms. Hiott, what did you do to
4 prepare for your deposition today?
5    A. I pulled together all files that we
6 had on Gloria Duniphin, our FMLA files, work
7 comp files, personnel file. I was not aware
8 that we needed a work comp file -- because we
9 keep, of course, that information separately
10 -- until yesterday, and had that sent in this
11 morning.
12    Q. Okay. Did you have anything to do
13 with the response of PeopLease to the EEOC
14 charge of Mrs. Duniphin?
15    A. Yes, sir.
16    Q. What did you have to do with that?
17    A. I, once the charge was received,
18 investigated it, and then prepared a
19 response.
20    Q. Is your response part of the
21 documents?
22    A. Yes, sir, I think it is.
23       MRS. POTTHOFF: It's in your -- it's
24       in your initial disclosures.
25          (Mr. Adams entered the

Page 120

1          deposition proceedings.)
2       MR. ROBERSON: Is that it?
3       MRS. POTTHOFF: Uh-huh (affirmative
4       response). And that's --
5 THE WITNESS: I don't think I have a
6       copy of that.
7       MRS. POTTHOFF: You don't have a
8       copy in front of you.
9 THE WITNESS: Huh-uh (negative
10       response).
11       MRS. POTTHOFF: I mean, I've got
12       another, so if you want to pull
13       yours.
14       MR. ROBERSON: I don't know that I
15       brought it.
16       MRS. POTTHOFF: Yeah, you did.
17       There it is right there. Do
18       you want to mark the exhibits
19       with it or . . .
20       MR. ROBERSON: What?
21       MRS. POTTHOFF: Those exhibits were
22       attachments to it.
23       MR. ROBERSON: Listen, if you would
24       like to offer anything,
25       Courtney, you will have an

Page 121

1       opportunity to examine this
2       Witness, okay.
3 BY MR. ROBERSON:
4    Q. Let me show you what I've marked as
5 Exhibit 9 and ask you if that is your
6 response to the EEOC?
7       (Whereupon Plaintiff's Exhibit
8       No. 9 was marked for
9       identification and attached
10       hereto.)
11    A. Yes, sir.
12       MRS. POTTHOFF: And that's not
13       complete, because that doesn't
14       contain the exhibits.
15    Q. Did you prepare that response
16 personally?
17    A. Yes, sir.
18    Q. Okay. Can you locate that document
19 so I can look at this one? Do you have it in
20 front of you? No?
21    A. That, no, sir.
22    Q. Okay. Okay, well, do you see -- on
23 page 2, which is Bates-stamped Duniphin 0015,
24 do you see where in this paragraph -- I took
25 my release paperwork to Benny Whitehead,

Page 122

1  Inc., in Eufaula and returned it to Stacey.
2  And then your response was admitted, correct?
3      A.  Yes, sir.
4      Q.  You don't know when she turned that
5  in?
6      A.  No, sir.
7      Q.  Well, tell me, you had to talk with
8  someone at Benny Whitehead in order to
9  respond to the EEOC charge, correct?
10     A.  Yes, sir.
11     Q.  Who did you talk with?
12     A.  Eddie Whitehead.
13     Q.  And what did he tell you?
14     A.  About . . .
15     Q.  What Benny Whitehead's position was
16  with respect to Mrs. Duniphin.
17     A.  He said that they were attempting to
18  help her get a team driver.  They were unable
19  to locate one, and she's been unable to
20  locate one.
21     Q.  Okay.  Did they send her a list of
22  employees?
23     A.  I don't know.  A list of employees
24  for what?
25     Q.  A list of employees of Benny

Page 123

1  Whitehead?
2      A.  Did Benny Whitehead send Gloria
3  Duniphin a list?
4      Q.  (Nodded head.)
5      A.  I don't know.
6      Q.  Well, wouldn't she be allowed to
7  work with anybody at Benny Whitehead that had
8  over two years of driving experience?
9      A.  I understand that Mrs. Duniphin had
10  certain criteria that they were trying to
11  fulfill in order for her to team with
12  someone.
13     Q.  Do you know of any rule that would
14  prohibit her from working with any driver who
15  had more than two years of work experience?
16     A.  No, sir.
17     Q.  Okay.  And you're unaware of whether
18  Benny Whitehead ever provided her with a list
19  of drivers and how to contact them, correct?
20     A.  I have no knowledge of that.
21     Q.  Oh.  Well, wouldn't she need to
22  contact a current employee of Benny Whitehead
23  in order to get a team driver?
24     A.  I can't answer that either.
25     Q.  Now, where did you get the

Page 124

1  information about the average age of female
2  employees?
3      A.  This was through our computer system
4  based on the age that was reported.  That is
5  one of the exhibits that are attached to the
6  letter.
7      Q.  After investigative interviews.  Who
8  conducted these interviews?
9      A.  I did.
10     Q.  Are there any notes about that?
11     A.  I probably have them back at the
12  office.
13     Q.  You didn't bring them with you?
14     A.  No, sir.
15     Q.  Okay.  Are there recorded
16  statements?
17     A.  Yes, sir.
18     Q.  Were -- did you ask if any of those
19  women were ever asked to work with Gloria
20  Duniphin?
21     A.  No, sir.  I have no recollection of
22  asking that question.
23     Q.  Well, gee, that would be a pretty
24  good question to ask, wouldn't it?
25     A.  I was investigating the EEOC charge

Page 125

1  as to whether these female employees felt
2  that they were treated differently from the
3  male employees.
4      Q.  Well, had any of the women that you
5  interviewed been working for more than two
6  years?
7      A.  I don't recall off the top of my
8  head.
9      Q.  Well, that would be a pretty
10  important question to ask, too, wouldn't it?
11     A.  Ask who?
12     Q.  The women.  If they had been working
13  more than two years, they had two years of
14  experience, correct?
15     A.  That wouldn't have anything to do
16  with the EEOC charge.
17     Q.  Well, Mrs. Duniphin was trying to
18  get back to work, wasn't she?
19     A.  Yes, sir.
20     Q.  And she needed a partner, didn't
21  she?
22     A.  Yes, sir.
23     Q.  What efforts did you make to find
24  her a partner?
25     A.  That is not the responsibility of

Page 126

1 PeopLease. Benny Whitehead assigns the
2 drivers. And the drivers bring their team
3 member with them, is my understanding, when
4 they're hired.
5     Q. Are you the employer of those women?
6     A. We are the coemployer and the
7 employer of record, yes, sir.
8     Q. Okay. And could you obtain that
9 information about suitable partners for
10 Mrs. Duniphin?
11     A. Could I obtain those? Yeah. She
12 would have no reason to tell us that.
13     Q. No. Could you ask those women if
14 they had more than two years of experience?
15     A. I could, yes.
16     Q. And they'd have to tell you,
17 wouldn't they? You actually don't even have
18 to ask, you have their records, right?
19     A. Their employment records, yes, with
20 us.
21     Q. So even though you have all of that
22 information, even though you know Gloria
23 Duniphin wants to return to work, you did
24 nothing to assist her, correct?
25     A. The only recollection or the only

Page 127

1 time Gloria Duniphin contacted us regarding
2 this was December of '05, to my knowledge.
3     Q. Have you ever assisted Gloria
4 Duniphin in returning to work?
5     A. Our hands were tied in assisting
6 her, because she did not have a team driver.
7     Q. Okay.
8     A. And this was according to the
9 requirements of Benny Whitehead, as was told
10 us.
11     Q. So the answer to my question is, no,
12 you did not assist her, correct?
13     A. Did PeopLease try to assist her?
14     Q. Right.
15     A. Not to my knowledge.
16     Q. And you're the employer or
17 coemployer for FMLA purposes, correct?
18     A. Yes, sir.
19     Q. And you have a federal obligation to
20 return her to comparable employment, correct?
21     A. Yes, sir.
22     Q. And you did not return her to
23 comparable employment, did you?
24     A. Because Mrs. Duniphin did not meet
25 the requirements of Benny Whitehead for

Page 128

1 having a team driver.
2     Q. Okay. And you took no action to
3 assist her in locating a team driver, did
4 you?
5     A. That is not part of the
6 responsibilities of PeopLease to do that.
7     Q. Did you have the information
8 available to you, ma'am, about who had two
9 years experience and who was a qualified
10 employee of Benny Whitehead?
11     A. The information I had was the
12 employment dates of the employees of Benny
13 Whitehead with PeopLease.
14     Q. Did you ever provide a list of
15 employees and their contact information to
16 Gloria Duniphin to advise her of who she
17 should contact to obtain a team driver?
18     A. Not to my knowledge.
19     Q. Why not?
20     A. Because we don't provide that
21 information. It's confidential.
22     Q. So she has to get a team driver, but
23 she's not entitled to the information,
24 because it's confidential. Is that your
25 testimony?

Page 129

1     A. We don't provide employee
2 information to another employee, because that
3 is confidential.
4     Q. An employee's name and telephone
5 number and experience is confidential
6 information. Is that your testimony --
7     A. Yes, sir.
8     Q. -- and your position in this case?
9     A. Yes, sir. We don't share
10 information on employees with other
11 employees.
12     Q. What makes it confidential, please,
13 ma'am?
14     A. The personnel records of every
15 employee is confidential.
16     Q. Do you have it?
17     A. Do I have what?
18     Q. The name and their telephone number?
19     A. Yes, sir.
20     Q. Can you contact them and see if they
21 would have any objection to you providing
22 that information?
23     A. They would need to provide a signed
24 release.
25     Q. Did you contact anyone and tell them

Page 130

1  that?
2      A.  No, sir.
3      Q.  So the employees can waive your
4  confidentiality, correct?
5      A.  Employees have to do a signed
6  release to us before we will release any
7  information, yes, sir.
8      Q.  Okay.  Well, did you ever advise
9  Gloria Duniphin that you couldn't help her,
10  she was on her own?
11      A.  No, sir.
12      Q.  What is she supposed do, just go
13  down to Benny Whitehead's and hang out and
14  wait on drivers to come back?
15      A.  No, sir.  There are other
16  opportunities out there.  Companies are
17  begging for drivers.
18      Q.  Oh.  She's supposed to go to work
19  for somebody else?
20      A.  It's up to her.
21      Q.  I see.
22      A.  She has to meet the criteria of the
23  employment requirements of the client
24  company; in this case, Benny Whitehead.  It
25  is my understanding that she didn't have the

Page 131

1  experience to drive solo.
2      Q.  I'm going to show you what I'll mark
3  as Exhibit 10.  And this is an exhibit to
4  your EEOC response and ask you if that is the
5  ad that you referred to earlier?
6          (Whereupon Plaintiff's Exhibit
7              No. 10 was marked for
8              identification and attached
9              hereto.)
10      A.  Yes, sir.
11      Q.  Wanted, good team drivers.  Does
12  that say anywhere that the employees are
13  responsible for providing a team driver?
14          (Witness reviewed document.)
15      A.  No.  But it specifies wanted, good
16  team drivers.
17      Q.  Well, let me show you what I've
18  marked as Exhibit 11.  What is Exhibit 11?
19          (Whereupon Plaintiff's Exhibit
20              No. 11 was marked for
21              identification and attached
22              hereto.)
23          (Witness reviewed document.)
24      A.  It's a list of employees, personnel
25  between 6/1/05 and 12/1/05, with their last

Page 132

1  name, first name, middle.  Their number,
2  their class, meaning what their position is.
3  Inactive status, gender, ethnic origin, birth
4  date, start date, inactive date, and age.
5      Q.  All information that PeopLease
6  tracks and maintains, correct?
7      A.  What do you mean by tracks?
8      Q.  You have -- you keep up with all of
9  that information, right?
10      A.  When we're asked to provide a
11  report, this is the type report we provide.
12      Q.  You can pull it up with your
13  computers, can't you?
14      A.  Yes, sir.
15      Q.  Takes about thirty seconds, doesn't
16  it?
17      A.  I don't know how long it takes.
18      Q.  You could -- you've provided to the
19  EEOC, correct?
20      A.  Correct.
21      Q.  You could have provided it to Gloria
22  Duniphin, correct?
23      A.  Disagree.
24      Q.  Okay.  Well --
25      A.  I would never provide this to an

Page 133

1  employee.
2      Q.  Do you know how many employees Benny
3  Whitehead had in June of 2005?
4      A.  Not off the top of my head, no, sir.
5      Q.  Can you tell from those records,
6  Exhibit 11, how many employee they had?
7      A.  Well, I'd have to count them.  I
8  don't know.
9      Q.  Well, just count on one page and
10  then we'll count the pages.
11      A.  How many were employed in 2005?
12      Q.  Yeah.
13      A.  Looks like there were eight.
14      Q.  Employees?
15      A.  I'm sorry?
16      Q.  Eight employees at Benny Whitehead?
17      A.  That were hired in 2005.
18      Q.  Oh, I'm sorry.  If I stated that, I
19  misspoke.  How many employees did Benny
20  Whitehead have that were employed -- totally
21  were employed during the year 2005?
22      A.  I can't answer that off the top of
23  my head.
24      Q.  Well, look, I'll do it.
25          MRS. POTTHOFF:  And that would be --

Page 134

```
 1        I mean, let me just say that
 2    your question is unfair,
 3    because then you'd have people
 4    going on and off during that
 5    whole time period during 2005.
 6        So you'd probably have to
 7    pick a date certain and say how
 8    many people did they have on
 9    December 1, 2005, to get an
10    accurate number, if that's
11    necessary.  Because probably
12    on -- you know, I'd just assume
13    that they have turnover.  And
14    there would be a time period or
15    a day when they might have more
16    than another day.
17    Q.  Ms. Hiott, there are thirty-six
18 employees listed on the first page of Exhibit
19 11, and there are five sheets to that
20 document.  So over 150 people worked at Benny
21 Whitehead during -- counting during that
22 period of time from June 1st to
23 December 1st, correct?
24    A.  I would have to -- I would have to
25 go through and count them.
```

Page 135

```
 1    Q.  Well --
 2    A.  I can't say off the top --
 3    Q.  And just look on that first page.
 4 Count how many people were hired more than
 5 two years prior to that date.
 6    A.  There are also some inactive
 7 employees listed here.
 8    MRS. POTTHOFF:  Do you want those
 9        included or not?
10    MR. ROBERSON:  Sure.
11    A.  Okay.  Now, repeat the question
12 again.
13    Q.  Look at their hire date, ma'am.
14    A.  Uh-huh (affirmative response).
15    Q.  Is it more than two years?  Is it
16 before '03?  How many people have a hire date
17 before '03 on the first page?
18    A.  Twenty-one.
19    Q.  Twenty-one on the first page, and
20 there are five pages?
21    A.  Uh-huh (affirmative response).
22    Q.  So there are approximately, just
23 ballpark, a hundred employees who have
24 more -- who had more than two years
25 experience and could have worked as a partner
```

Page 136

```
 1 for Gloria Duniphin, correct?
 2    MRS. POTTHOFF:  Object to the form.
 3        There's no way to know if there
 4        are twenty-one people on every
 5        page.
 6    Q.  Correct?
 7    A.  And it does include both active and
 8 inactive.
 9    Q.  Okay.  Do you have any knowledge
10 that anyone was asked to be Gloria Duniphin's
11 partner?
12    A.  No, sir.
13    Q.  Do you have any writing that shows
14 that anyone was directed to be Gloria
15 Duniphin's partner?
16    A.  The only one I knew of that was her
17 partner was her husband.
18    Q.  Well, did you know that she
19 worked -- when she came off of workers' comp
20 leave, that she worked with D.A. Bryant as a
21 partner?
22    A.  I didn't know the name.  I knew that
23 they had found her a driver in February, but
24 I had no knowledge of the name.
25    Q.  Do you have any documents that show
```

Page 137

```
 1 that D.A. Bryant was ever asked to be her
 2 partner again?
 3    A.  Not to my knowledge.
 4    Q.  Do you have any documents that show
 5 that D.A. Bryant objected to being her
 6 partner?
 7    A.  Not to my knowledge.
 8    Q.  Well, you did a very thorough
 9 investigation in responding to the EEOC,
10 didn't you?
11    A.  (No immediate response.)
12    Q.  Ma'am?
13    A.  Yes, I did.
14    Q.  You didn't bother to talk to anybody
15 who had worked as her partner, did you?
16    A.  The only person that I was aware of
17 that was her partner was her husband.
18    Q.  So you didn't even know that D.A.
19 Bryant had been her partner, did you?
20    A.  I have never heard of D.A. Bryant.
21    Q.  Look right here.  What is Exhibit
22 12, please, ma'am?
23        (Whereupon Plaintiff's Exhibit
24        No. 12 was marked for
25        identification and attached
```

Page 138

1        hereto.)
2     A. It's a letter to Gloria Duniphin
3  from Eddie Whitehead.
4     Q. When is it dated?
5     A. December 9th, 2005.
6     Q. Over a week after Gloria Duniphin
7  called PeopLease?
8     A. Yes, sir.
9     Q. Is there any correspondence from
10  Whitehead -- Benny Whitehead, Inc., between
11  June 13th and December 1st?
12     A. Dated?
13     Q. Yeah.
14     A. Not to my knowledge.
15     Q. Well, do you think maybe
16  Mr. Whitehead was prompted to write that
17  letter on December 9th?
18     A. I have no idea.
19     Q. We have been trying to find someone
20  you can ride with since you've been cleared
21  to work since June. This is in December of
22  2005. Can you find somebody in six months, a
23  truckdriver? When you have a hundred people
24  that work for you, can you find somebody,
25  ma'am?

Page 139

1     A. We don't do the hiring of the
2  truckdrivers.
3     Q. We did call you on or about
4  September 8th to go out, and you were going
5  out of town and wouldn't be back until the
6  following week. You haven't been fired. We
7  just haven't been able to meet your criteria
8  as far as a partner you can run with. Is
9  there any document between June 13th and
10  December 2005 that indicates that Gloria
11  Duniphin was ever told to get a partner?
12     MRS. POTTHOFF: Jerry, I object to
13        you yelling and pacing. So if
14        you would, please sit down and
15        ask the questions in a tone
16        that's not . . .
17     Q. Ma'am?
18     A. Not to my knowledge.
19     Q. Well, this document says that
20  Mrs. Duniphin hadn't been fired, correct?
21     A. Yes, sir.
22     Q. You showed me a document that
23  said -- that you claim Benny Whitehead sent
24  you that said she had been fired?
25     MRS. POTTHOFF: Voluntarily quit.

Page 140

1     Q. Voluntarily quit, correct?
2     A. We have a form that said that she
3  voluntarily quit.
4     Q. You just don't know when you got it,
5  right? Correct?
6     A. That's right.
7     Q. Well, those are inconsistent
8  positions, aren't they?
9     MRS. POTTHOFF: Object to form.
10     Q. Aren't they?
11     A. (No immediate response.)
12     Q. He doesn't mention anything in here
13  about voluntarily quitting, does he?
14     A. No, sir.
15     Q. Those are inconsistent positions,
16  aren't they, ma'am?
17     MRS. POTTHOFF: Object to form.
18     Q. You can answer.
19     A. What are you saying is inconsistent.
20     Q. To say that she hasn't been fired
21  and to say that she voluntarily quit. He
22  doesn't advise her that she voluntarily quit
23  in this letter of December 9th, does he?
24     A. No, sir.
25     Q. But that's what the documents you

Page 141

1  showed me that Stacey Lawson, an employee of
2  Benny Whitehead, Inc., indicated to you,
3  correct?
4     A. That's correct.
5     Q. Do you have an explanation for why
6  they wouldn't tell her she voluntarily quit
7  in December of '05?
8     A. No, sir. The only explanation I
9  have is that they -- based on what they told
10  us, they were trying to find someone to
11  partner with her, because she had not been
12  able to find someone herself.
13     Q. At this time, I still don't have
14  anyone I can put you with, so I have enclosed
15  a check for your holdback. So in December of
16  2005, Mrs. Duniphin received her holdback
17  money, right?
18     A. According to the letter.
19     MR. ROBERSON: Let's go off the
20        Record just a second. And I
21        think I'm through.
22     MRS. POTTHOFF: Okay.
23     MR. ROBERSON: We're off the Record
24        at 12:08.
25        (A brief recess was taken.)

Page 142

1    MR. ROBERSON: This is the
2        continuation of tape three of
3        the deposition of PeopLease.
4        It's 12:20.
5        And I don't have any
6        further questions for you,
7        Ms. Hiott.
8        EXAMINATION
9  BY MRS. POTTHOFF:
10    Q. Okay. Deb, I've got a few follow-up
11  questions on some testimony that you gave
12  earlier.
13        Earlier, when Mr. Roberson asked you
14  the question about whether or not it was
15  reasonable for Whitehead not to send the
16  return-to-work slip until December of 2005,
17  you don't know when that return-to-work slip
18  was actually received by Benny Whitehead, do
19  you?
20    A. No, ma'am.
21    Q. Okay. So you don't know how long
22  they had it before they gave it to PeopLease?
23    A. No, ma'am.
24    Q. Okay. So is it fair to say that
25  they unreasonably withheld that information

Page 143

1  from PeopLease or that the delay in providing
2  information was unreasonable?
3    A. Repeat the question, again.
4    Q. You would need to know how long
5  they've had it in order to determine whether
6  or not it was reasonable or not?
7    A. That's correct.
8    Q. The time period it took to get it to
9  you?
10    A. That's correct.
11    Q. All right. In addition,
12  Mrs. Duniphin is required to present the
13  return-to-work certificate to PeopLease; is
14  that right?
15    A. Yes.
16    Q. Whose responsibility is it to get
17  the return-to-work slip to PeopLease?
18    A. It is the employee's responsibility.
19    Q. Okay. And she's actually sent a
20  certified letter notifying her of her
21  responsibilities; is that right?
22    A. Yes.
23    Q. Okay. And I'm going to show you
24  what I'll mark as Defendants' Exhibit -- I'll
25  show you what I'll mark as Defendants'

Page 144

1  Exhibit 1, which is a copy of the certified
2  letter that was sent to Mrs. Duniphin. Do
3  you recognize that?
4        (Whereupon Defendants' Exhibit
5        No. 1 was marked for
6        identification and attached
7        hereto.)
8    A. Yes, ma'am.
9    Q. Okay. What's the date on it?
10    A. May 11th, 2005.
11    Q. All right. And look at page 3 of
12  that letter. Does it indicate what her
13  responsibilities are?
14    A. Yes, it does.
15    Q. Okay. Is she also supposed to
16  communicate every thirty days about her
17  status?
18    A. About her intent to return to work,
19  yes.
20    Q. Okay. All right. Did she
21  communicate directly with PeopLease at any
22  time during this time period that she was on
23  FMLA leave?
24    A. Not to my knowledge.
25        MRS. POTTHOFF: Okay. That's all.

Page 145

1        MR. ROBERSON: Can I see that?
2        MRS. POTTHOFF: Uh-huh (affirmative
3        response).
4        EXAMINATION
5  BY MR. ROBERSON:
6    Q. Ms. Hiott, is Benny Whitehead, Inc.,
7  Mrs. Duniphin's supervisor?
8    A. Yes, sir.
9    Q. And can she rely on her supervisor
10  to provide you with her information?
11    A. It can be done that way, yes.
12    Q. And can -- she relies on them to
13  provide you with her information about pay,
14  correct?
15    A. Say that again.
16    Q. Benny Whitehead gives you the
17  information about pay, her pay, correct?
18    A. How to pay her?
19    Q. Yes.
20    A. Yes.
21    Q. They've got a fax machine down there
22  at Benny Whitehead's office, don't they?
23    A. Yes, sir.
24    Q. They fax PeopLease about every day,
25  don't they?

Page 146

1    A. They fax them. I don't know how
2  often.
3    Q. Yeah. Well, they do it every week
4  if they pay every week, don't they?
5    A. Yes, sir.
6    Q. And is it -- does Mrs. Duniphin have
7  to get two return-to-work slips and send one
8  to Benny Whitehead and one to PeopLease?
9    A. No, sir.
10   Q. She can just give one to Benny
11 Whitehead, can't she?
12   A. Well, the letter instructs her to
13 send it to us.
14   Q. Oh. Well, ma'am, does this letter
15 even have your address on it?
16   A. It's on the bottom. It was cut off.
17 But, yes, our address is on the bottom of the
18 letterhead.
19   Q. Well, the document I was given
20 doesn't have it on there, does it?
21   A. No, sir.
22   Q. Who provided you with the
23 information about Mrs. Duniphin's FMLA leave?
24   A. The benefits administrator, Pam
25 Ozmore.

Page 147

1    Q. No. Who provided the form to her?
2    A. Who provided the FMLA form to Gloria
3  Duniphin? Is that the question?
4    Q. No. How did the completed form get
5  sent to Ms. Ozmore at PeopLease? Did Benny
6  Whitehead send it?
7    A. No, sir.
8    MRS. POTTHOFF: It was sent by
9        certified -- well . . .
10   A. The FMLA paperwork was sent
11 certified, return receipt, to Mrs. Duniphin.
12 It's her responsibility to make sure the
13 forms are complete, along with a doctor's
14 cert, and returned back to us.
15   Q. Ma'am, you showed me a document that
16 was completed where Gloria Duniphin was
17 certified for FMLA leave until 6/28, correct?
18   A. Correct.
19   Q. How did PeopLease get that document?
20   A. That would have been sent by
21 Mrs. Duniphin.
22   Q. It was sent to PeopLease by
23 certified mail from Mrs. Duniphin?
24   A. It wouldn't be sent by certified
25 mail from her, to my knowledge. It would

Page 148

1  have been regular mail.
2    Q. So you're telling me that an
3  employer that employs 10,000 people, correct?
4    A. Approximately, yes.
5    Q. That Gloria Duniphin has her notice
6  that she has been authorized to return to
7  work, is not effective as to you, when she
8  gives it to her employer, Benny Whitehead,
9  Inc.? Are you telling me that?
10   A. What is the question?
11   Q. Assume that Gloria Duniphin went to
12 Benny Whitehead, Inc., in June of 2005, and
13 she gave them her return-to-work slip, okay?
14   A. Uh-huh (affirmative response).
15   Q. Is that effective notice to
16 PeopLease?
17   A. She should have returned it to
18 PeopLease.
19   Q. Does Benny Whitehead have a
20 contractual obligation to share that
21 information with you, ma'am?
22   A. Yes, sir.
23   MR. ROBERSON: Okay. Thank you.
24   MRS. POTTHOFF: That's all.
25   MR. ROBERSON: We'll go off the

Page 149

1    Record at 12:27. Thanks.
2    (The videotaped deposition of
3    DEBORAH HIOTT concluded at
4    approximately 12:27 p.m.)
5
6  * * * * * * * * * *
7    FURTHER DEPONENT SAITH NOT
8  * * * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 150

```
 1        * * * * * * * * * *
 2        REPORTER'S CERTIFICATE
 3        * * * * * * * * * *
 4
 5    STATE OF ALABAMA)
 6    COUNTY OF MONTGOMERY)
 7
 8        I, Cornelia J. Baker, Certified Court
 9    Reporter, Certified Shorthand Reporter,
10    and Notary Public in and for the State of
11    Alabama at Large, do hereby certify that
12    on Tuesday, February 20, 2007, pursuant to
13    notice and stipulation on behalf of the
14    Plaintiff, I reported the deposition of
15    DEBORAH HIOTT, who was first duly sworn by
16    me to speak the truth, the whole truth,
17    and nothing but the truth, in the matter
18    of GLORIA DUNIPHIN, Plaintiff, versus
19    BENNY WHITEHEAD, INC. and PEOPLEASE
20    CORPORATION, et al., Defendants, Case
21    Number 2:06-cv-00459-WKW, now pending in
22    the United States District Court for the
23    Middle District of Alabama, Northern
24    Division; that the foregoing pages contain
25    a true and accurate transcription of the
```

Page 151

```
 1    examination of said witness by counsel for
 2    the parties set out herein; that the
 3    reading and signing of said deposition was
 4    not waived by witness and counsel for the
 5    parties.
 6        I further certify that I am neither of
 7    kin nor of counsel to the parties to said
 8    cause, nor in any manner interested in the
 9    results thereof.
10        This the 21st day of February, 2007.
11
12
13
              Cornelia J. Baker
14            Certified Shorthand Reporter,
              Certified Court Reporter and
15            Notary Public for the
              State of Alabama
16
17        My Commission expires 6/9/08.
18
19
20
21
22
23
```