**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 1

1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE MIDDLE DISTRICT OF ALABAMA
3   NORTHERN DIVISION
4
5   CASE NUMBER:  2:06cv459-MHT
6
7   GLORIA DUNIPHIN,
8       Plaintiff,
9   vs.
10  BENNY WHITEHEAD, INC., and
11  PeopLease CORPORATION,
12      Defendants.
13
14
15  BEFORE:
16    Cynthia M. Noakes, Commissioner
17    and Court Reporter
18
19
20  DEPOSITION TESTIMONY OF GLORIA DUNIPHIN
21
22
23    *****************************

## Page 2

1       S T I P U L A T I O N
2
3       IT IS STIPULATED AND AGREED by and
4   between the parties through their respective
5   counsel, that the deposition of GLORIA DUNIPHIN
6   may be taken before Cynthia M. Noakes, Court
7   Reporter, at the Law Offices of WILLIAMS,
8   POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9   Avenue, Eufaula, Alabama 36027, on the 11th day
10  of January, 2007.
11      IT IS FURTHER STIPULATED AND AGREED
12  that the signature to and the reading of the
13  deposition by the witness is waived, the
14  deposition to have the same force and effect as
15  if full compliance had been had with all laws and
16  rules of Court relating to the taking of
17  depositions.
18      IT IS FURTHER STIPULATED AND AGREED
19  that it shall not be necessary for any objections
20  to be made by counsel to any questions except as
21  to the form or leading questions, and that
22  counsel for the parties may make objections and
23  assign grounds at the time of the trial, or at

## Page 3

1   the time said deposition is offered in evidence,
2   or prior thereto.
3       IT IS FURTHER STIPULATED AND AGREED
4   that the notice of filing of the deposition by
5   the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17  ****************************************
18
19
20
21
22
23

## Page 4

1           INDEX
2   EXAMINATION BY:              PAGE NUMBER:
3   MS. POTTHOFF        7-158, 185-189
4   MR. CALTON         158-176, 189-190
5   MR. ROBERSON           176-185
6
7   EXHIBITS:
8   Defendants' Exhibit No. 1         80
9   Defendants' Exhibit No. 2        104
10  Defendants' Exhibit No. 3        126
11  Defendants' Exhibit No. 4        142
12  Defendants' Exhibit No. 5        143
13  Defendants' Exhibit No. 6        144
14  Defendants' Exhibit No. 7        145
15  Defendants' Exhibit No. 8        147
16  Defendants' Exhibit No. 9        148
17  Defendants' Exhibit No. 10       149
18  Defendants' Exhibit No. 11       150
19  Defendants' Exhibit No. 12       151
20  Reporter's Certificate           191
21
22
23  *******************************************

1 (Pages 1 to 4)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 5

```
1              APPEARANCES
2
3   ON BEHALF OF THE PLAINTIFF:
4       JERRY ROBERSON, Esquire
5       ROBERSON & ROBERSON
6       3765 Kinross Drive
7       Birmingham, Alabama  35242
8       205-981-3906
9
10      ALBERT H. ADAMS, JR., Esquire
11      RUSSELL IRBY LAW FIRM
12      257 West Broad Street
13      Eufaula, Alabama  36027
14      334-687-6672
15
16  ON BEHALF OF THE DEFENDANTS:
17      COURTNEY R. POTTHOFF, Esquire
18      WILLIAMS, POTTHOFF, WILLIAMS & SMITH
19      125 South Orange Avenue
20      Eufaula, Alabama  36027
21      334-687-5834
22
23  **************************************
```

---

Page 6

```
1       APPEARANCES (continued)
2
3   ON BEHALF OF THE DEFENDANTS:
4       JIM S. CALTON, JR., Esquire
5       CALTON & CALTON
6       226 East Broad Street
7       Eufaula, Alabama  36027
8       334-687-3563
9
10  ALSO PRESENT:
11      BENNY PAUL WHITEHEAD,
12      Benny Whitehead, Inc.,
13      Corporate Representative
14
15  **************************************
16
17      I, CYNTHIA M. NOAKES, a Court Reporter
18  of Eufaula, Alabama, acting as Commissioner,
19  certify that on this date, as provided by the
20  Alabama Rules of Civil Procedure and the
21  foregoing stipulation of counsel, there came
22  before me at the Law Offices of WILLIAMS,
23  POTTHOFF, WILLIAMS & SMITH, 125 South Orange
```

---

Page 7

```
1   Avenue, Eufaula, Alabama 36027, beginning at 9:30
2   a.m., GLORIA DUNIPHIN, witness in the above
3   cause, for oral examination, whereupon the
4   following proceedings were had:
5
6           GLORIA DUNIPHIN,
7   being first duly sworn, was examined and
8       testified as follows:
9
10      THE COURT REPORTER:  Usual
11  stipulations?
12      MS. POTTHOFF:  Yeah.
13      MR. ROBERSON:  Yes.
14
15          EXAMINATION
16  BY MS. POTTHOFF:
17  Q.   Ms. Duniphin, my name is Courtney Potthoff.
18  We met before, I think, during your unemployment
19  hearing.
20      As you know, I represent PeopLease
21  Corporation and also Benny Whitehead, Inc., in a
22  case that -- another case that you filed, which I
23  think is in state court.  It's a fraud case.
```

---

Page 8

```
1       And as I understand -- I've spoken with your
2   attorney yesterday -- and we have agreed that the
3   issues in regard to your lawsuit over the Drivers'
4   Fund, that we'll do our best not to discuss those
5   today, and limit this deposition to your federal
6   claims.  Is that your understanding?
7   A.   Yes.
8   Q.   Okay.  Now, understand -- I kind of want to
9   describe my interpretation of that limitation:  If
10  I ask you a question and I ask you, "Was that
11  everything that was said during a particular
12  conversation," if something else was said about
13  the Drivers' Fund during that conversation, I
14  would like for you to tell me, so that I have from
15  you everything that was said in that conversation,
16  if that's what I ask.
17      But I won't follow up on things that are
18  isolated toward the Drivers' Fund.  Is that all
19  right with you and your attorneys?
20      MR. ROBERSON:  Well, yeah.
21      MS. POTTHOFF:  Yeah.  We'll just -- I
22  mean, you know, I'm going to do the best I can.
23  Q.   I think it's going to be clear.  It's going
```

2 (Pages 5 to 8)

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 9

1  to be kind of a situation where there's a line
2  between one claim and the other. Okay?
3  A.  Okay.
4  Q.  But if we get to the point where it's just
5  too muddled up, then that's where we are.
6      All right. Have you ever had your
7  deposition taken before?
8  A.  No.
9  Q.  Okay. Let me just explain to you a little
10  bit about the procedures. First of all, if you
11  need something, I'll be happy to get it for you,
12  like something to drink.
13     Or if you need to take a break for any
14  reason, just let me know; I'll be happy to
15  accommodate you when I can. My only request is
16  that when there is a question on the table that
17  you have not answered, then I will not allow a
18  break until the question is answered. Okay?
19  A.  Okay.
20  Q.  All right. Then, if at any time you don't
21  understand my question, just stop me and I'll be
22  glad to rephrase the question. Okay?
23  A.  Okay.

Page 10

1  Q.  If you don't, then I will assume that you
2  understood the question. Is that fair?
3  A.  Yes.
4  Q.  Okay. Tell me your full name.
5  A.  Gloria Whitley Duniphin.
6  Q.  All right. And, Ms. Duniphin, where are you
7  living now?
8  A.  LaGrange, Georgia.
9  Q.  All right. Are you originally from
10  LaGrange?
11  A.  Yes.
12  Q.  And when did you move back?
13  A.  In June of 2006.
14  Q.  All right. And are you employed there in
15  LaGrange?
16  A.  I'm working part time as a hairdresser.
17  Q.  All right. And that is something that you
18  did before you got your CDL; is that right?
19  A.  Yes.
20  Q.  All right. If you would, go through your
21  employment history for me.
22  A.  How far back?
23  Q.  Well, actually, what I'd like for you to do

Page 11

1  is, you know, start even with your first job. I
2  know it's a long time. But what you can remember
3  from your first job, so I kind of have an idea of
4  your experience. Okay?
5  A.  I've worked in the sewing plant; I have
6  managed a restaurant, two restaurants; I been
7  a hairdresser for about 12 years.
8  Q.  Okay.
9  A.  And driving a truck.
10  Q.  Okay. You were a hairdresser for 12 years?
11  A.  Uh-huh.
12     MR. ROBERSON: Was that a yes?
13     THE WITNESS: Yes.
14  Q.  Right. And that's another good point to
15  say. We all say uh-huh and huh-uh, and we all nod
16  our head, in regular conversation. But as you can
17  tell, this isn't regular. And so we need for the
18  court reporter to be able to make sure she gets
19  the correct response. And it's hard to tell an
20  uh-huh from an huh-uh. So if you will, answer
21  either yes or no when it's appropriate. Okay?
22  A.  Okay.
23  Q.  And I might remind you. And I'm not doing

Page 12

1  it to be offensive, but I'm just trying to make
2  sure the record's clear. Okay?
3     All right. So your first job, was your
4  first job at the sewing plant?
5  A.  No. I worked in a cotton mill.
6  Q.  All right. And was all this in LaGrange?
7  A.  Yes.
8  Q.  Okay. And what was the name of the cotton
9  mill?
10  A.  Dixie Mill.
11  Q.  And is that cotton mill still open?
12  A.  No.
13  Q.  And how long did you work there?
14  A.  About a year, I think.
15  Q.  And what were you doing for them?
16  A.  Weaving.
17  Q.  All right. And why did you leave?
18  A.  I had a little baby and a husband that
19  didn't want me working there.
20  Q.  All right. And then where did you go after
21  you left Dixie Mills? Apparently you stopped
22  working for a period of time; is that right?
23  A.  A period of time.

3 (Pages 9 to 12)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

### Page 13

1  Q.  All right.  When did you go back to work?
2  A.  After my next child was born, I worked in
3  another mill, weaving:  General Fibers.
4  Q.  All right.  And how long were you at General
5  Fibers?
6  A.  For about two years.
7  Q.  Is that also in LaGrange, Georgia?
8  A.  Yes.
9  Q.  And is it still open?
10  A.  Yes.
11  Q.  Okay.  And you were also weaving there; is
12  that correct?
13  A.  Yes.
14  Q.  Okay.  And why did you leave?
15  A.  I was still married to the same husband that
16  didn't want me working.
17  Q.  Okay.  So where did you go after that?
18  A.  Playtex.
19  Q.  Okay.
20  A.  And that was a sewing plant.
21  Q.  And what did you do at Playtex?
22  A.  Top stitched elastic on girdles.
23  Q.  Okay.  How long were you there?

### Page 14

1  A.  About three months.
2  Q.  And why did you leave that job?
3  A.  Couldn't stand it.
4  Q.  All right.  And after Playtex, where did you
5  go?
6  A.  To Signal sewing plant.
7  Q.  What did you do for them?
8  A.  Sewed pockets on T-shirts.
9  Q.  Are they also in LaGrange?
10  A.  Yes.
11  Q.  Are they still open?
12  A.  No.
13  Q.  Okay.  How long did you sew pockets on
14  T-shirts?
15  A.  About a year, I think.  It's been so long
16  ago.
17  Q.  Right.  I understand.  And why did you leave
18  there?
19  A.  The same reason as Playtex.  I just couldn't
20  stand the monotony.
21  Q.  Right.  Okay.  Tell me, after Signal, where
22  did you go?
23  A.  Nowhere for a while.

### Page 15

1  Q.  Okay.  How long were you unemployed or
2  working at home?
3  A.  For about three or four years.
4  Q.  All right.  Tell me, now this Signal sewing,
5  what year are we at, about?  What time period?
6  A.  Around '73.
7  Q.  Okay.  '73 is when you left or when you
8  started?
9  A.  That's around the time it was.  Because
10  that's around the time my second child was born,
11  and I was working there then.
12  Q.  Okay.  So if we go three or four years, then
13  '76; is that about right?
14  A.  Something like that.  It's somewhere around
15  there.
16  Q.  Where did you go?
17  A.  To NOK.
18  Q.  Okay.  What did you do there?
19  A.  I run the presses for a while, and then I
20  was in setup.
21  Q.  Okay.  How long did you stay there?
22  A.  About two and a half years.
23  Q.  They're in LaGrange as well?

### Page 16

1  A.  Yes.
2  Q.  Are they still there?
3  A.  Yes.
4  Q.  So you were there about two and a half
5  years.  Why did you leave?
6  A.  They laid me off.
7  Q.  Okay.  Where did you go after that layoff?
8  What did you do?
9  A.  I went to work at the Moose Lodge.
10  Q.  What did you do at the Moose Lodge?
11  A.  I was the manager of the restaurant and bar.
12  Q.  Okay.  And that's also in LaGrange?
13  A.  Yes.
14  Q.  All right.  And why did you leave the Moose
15  bar or the Moose Lodge?
16  A.  I moved to Newnan.
17  Q.  Why did you move to Newnan?
18  A.  To get my daughter out of LaGrange.
19  Q.  All right.  So what did you start doing in
20  Newnan when you moved?
21  A.  I worked at the Moose Lodge in Newnan as a
22  bartender.
23  Q.  Okay.  How long were you there?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 17

1  A.  I worked for them twice.  About four years
2  all together.
3  Q.  Okay.  You didn't work anywhere in between
4  them?
5  A.  Huh-uh.
6  Q.  And the move to Newnan was when? what year?
7  Best you can recall.
8  A.  Around '79 or '80, I think.
9  Q.  Okay.  And so your four years at the Moose
10  Lodge, on and off, so we're about to '84; is that
11  right?
12  A.  Well, I worked five and a half years at the
13  Moose in LaGrange.
14  Q.  Right.  Okay.  So you leave the Moose Lodge
15  either at LaGrange or Newnan.  When was it that
16  you stopped working at either location of the
17  Moose Lodge?
18  A.  I can't remember.
19  Q.  I mean, I'm just trying to get kind of a --
20  what was the next job that you had after the Moose
21  Lodge in Newnan?
22  A.  I moved back to LaGrange and went to beauty
23  school.

---

Page 18

1  Q.  All right.  Where did you get your
2  cosmetology training?
3  A.  West Georgia Technical College.
4  Q.  And prior to that, did you graduate high
5  school?
6  A.  I got my GED.
7  Q.  And when did you leave high school?  I mean,
8  what grade did you complete in high school?
9  A.  Tenth.
10  Q.  And what year was that that you --
11  A.  '70.
12  Q.  And then what year did you get your GED?
13  A.  The same year I started to cosmetology
14  school.  It was in '92, something like that.
15  Q.  Okay.  And I assume that you left high
16  school in LaGrange.  What was the name of the high
17  school?
18  A.  Troup High.
19  Q.  All right.  In between 1970 and 1992, had
20  you had any other technical training?
21  A.  No.
22  Q.  Other than just on-the-job training that you
23  had had at the various jobs that you had worked;

---

Page 19

1  is that right?
2  A.  Yes.
3  Q.  Then you went to West Georgia Tech.  What
4  did you obtain there?  Did you obtain an
5  associate's degree or a certificate?
6  A.  A certificate.
7  Q.  Okay.
8  A.  I had to go and take the state boards.
9  Q.  All right.  So you took the state boards in
10  cosmetology; is that right?
11  A.  Yes.
12  Q.  Okay.  So in between '80 and 92, was that
13  employment all at the Moose Lodge, at the one or
14  two locations?
15  A.  Yes.
16  Q.  Okay.  And then did you -- between '80 and
17  '92, you didn't work anywhere else, other than the
18  Moose Lodge; is that right?
19  A.  No.
20  Q.  That's not right?  You worked somewhere
21  else?
22  A.  No.  That is right.
23  Q.  Okay.  That's fine.  That's one of those

---

Page 20

1  weird questions.
2  Anyway, so in '92, you got your certificate
3  and passed your state boards; is that right?
4  A.  Yes.
5  Q.  Did you pass it the first time?
6  A.  Yes.
7  Q.  Then what beauty shop did you start working
8  at?
9  A.  La Snippe.
10  Q.  Is that the same one that you worked at
11  until you got your CDL, or did you work at other
12  ones?
13  A.  I opened two of my own.
14  Q.  Okay.  Tell me, from '92, the places -- the
15  beauty shops that you worked at?
16  A.  La Snippe.
17  Q.  Okay.  What was the time period?
18  A.  It was two and a half years.
19  Q.  Okay.  So that's 94, 95?
20  A.  I opened three of my own.  I'm sorry.  I
21  opened one on Main Street.
22  Q.  What was the name of it?
23  A.  It was Main Street Beauty Shop.

---

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 21

1  Q.  Okay.
2  A.  And I was in the back of the business there.
3  And the business changed hands, so I moved to
4  Sunny Point.
5  Q.  And I'm not as familiar with LaGrange.  Is
6  Sunny Point a community or is that a street?
7  A.  That was the name of the beauty shop.  It
8  was Sunny Point Salon.
9  Q.  Okay.  What time period did you have the
10  Sunny Point Salon?
11  A.  I was there for about a year and a half, and
12  the partner that was with me quit.
13  Q.  All right.  And then after that?
14  A.  I moved to open one in Hogansville.  And the
15  name of it was Magic Clippers.
16  Q.  All right.  And then how long did you have
17  the shop in Hogansville?
18  A.  About two years.
19  Q.  And then after that, what did you do?
20  A.  I went back to La Snippe.
21  Q.  And why did you leave a shop that you had
22  owned and operated yourself to go back to La
23  Snippe?

---

Page 22

1  A.  Because of the headache of owning it
2  yourself.
3  Q.  Okay.
4  A.  My husband had just passed away.
5  Q.  Was this your first husband?
6  A.  My second.
7  Q.  Okay.  I'll ask you about your marriages in
8  just a minute.
9     All right.  So you're back at La Snippe?
10  A.  Yes.
11  Q.  And what year did you go back?
12  A.  '01.
13  Q.  Okay.
14  A.  No, '02.
15  Q.  Okay.  So '02.  Then when do you leave La
16  Snippe?
17  A.  After I got hired with Benny Whitehead.
18  Q.  All right.  We'll get to Benny Whitehead.
19  But tell me, after -- before you started work at
20  Benny Whitehead, had you ever been terminated from
21  a job?
22  A.  No.  I've quit them.
23  Q.  Right.  So no terminations; is that right?

---

Page 23

1  A.  Yeah.  No.  Yes, that's right.
2  Q.  Okay.  And had you ever filed a complaint
3  for harassment?
4  A.  No.
5  Q.  Had you ever filed a complaint for
6  discrimination?
7  A.  No.
8  Q.  Had you ever filed a lawsuit?
9  A.  No.
10  Q.  Okay.  Other than the -- now let's talk
11  about just in general.
12     Other than the lawsuit that you filed in
13  state court and the other lawsuit that you filed
14  in federal court against Benny Whitehead and
15  PeopLease, have you ever sued anybody else?
16  A.  No.
17  Q.  Okay.  Have you ever been a witness in a
18  court proceeding?
19  A.  No.
20  Q.  Have you ever been arrested?
21  A.  No.
22  Q.  All right.  Have you ever been denied
23  employment somewhere that you applied for a job?

---

Page 24

1  A.  I don't remember if I have.
2  Q.  Okay.  And that's even since Benny
3  Whitehead; is that right?
4  A.  Yes.
5  Q.  Okay.  Tell me about your marriages.  What
6  was your first husband's name?
7  A.  John Browning.
8  Q.  All right.  And did you have children with
9  Mr. Browning?
10  A.  Three.
11  Q.  Okay.  And your children's names and ages,
12  please?
13  A.  Nancy, 36.
14  Q.  All right.
15  A.  April, 34.
16  Q.  Okay.
17  A.  And Joseph, 28.
18  Q.  Okay.  And do they all live in the LaGrange
19  area?
20  A.  My son and oldest daughter does.  The middle
21  one lives in Alabama.
22  Q.  Where does she live in Alabama?
23  A.  Smiths Station.

---

6 (Pages 21 to 24)

Page 25

1  Q.   Okay.  And while we're on the subject of
2  relatives, I want to ask you -- and I'm going to
3  list off some counties.  And if you don't know
4  where the counties are and you're not familiar
5  with the counties, then more than likely you don't
6  have any relatives there that you know of.
7        But these are the counties that are in the
8  middle district of Alabama:  Barbour County,
9  Autauga County, Bullock County, Butler County,
10 Chilton, Coosa, Covington, Crenshaw, Elmore,
11 Lowndes, Montgomery, and Pike.  I'll be glad to
12 repeat those.
13       But do you have any relatives that live in
14 any of those counties in Alabama?
15 A.   I don't know what county my daughter lives
16 in.
17 Q.   Okay.  Well, that's Russell County, and
18 that's not in the middle district.  I will tell
19 you that.
20 A.   That's the only relative I have in Alabama
21 that I know of.
22 Q.   Right.  What about your late husband, Mr.
23 Duniphin?  Did he have relatives in Alabama?

Page 26

1  A.   No.
2  Q.   All right.  So Mr. Browning.  Were y'all
3  divorced, or how did that --
4  A.   Yes.
5  Q.   And he is where?
6  A.   LaGrange.
7  Q.   Okay.  And then your next marriage?
8  A.   Was David Smith.
9  Q.   All right.  Is he deceased?
10 A.   Yes.
11 Q.   And when did he pass away?
12 A.   January 2, 2002.
13 Q.   And were y'all still married whenever he
14 passed away?
15 A.   Yes.
16 Q.   Okay.  And then, of course, there's Michael
17 Duniphin, correct?
18 A.   Yes.
19 Q.   And when did y'all get married?
20 A.   June 5, '04.
21 Q.   And I understand that he's passed away.
22 A.   Yes.
23 Q.   And when did he pass?

Page 27

1  A.   April 23, '06.
2  Q.   Okay.  And tell me, what was his health
3  condition for the reason that he passed away?
4  A.   They put on the death certificate it was
5  from sepsis.
6  Q.   Okay.  I mean, was he in the hospital?
7  A.   Yes.
8  Q.   Okay.  What had led to him being
9  hospitalized?
10 A.   His appendix had ruptured a few months
11 earlier, and he just got real sick.
12 Q.   Okay.  Where was he whenever he passed away?
13 A.   Columbus Medical Center.
14 Q.   Okay.  And I understand that you obtained
15 your CDL in order to apply for a job as a truck
16 driver; is that right?
17 A.   Yes.
18 Q.   And where did you get training to get
19 your --
20 A.   West Georgia Technical College.
21 Q.   And how long did that course last?
22 A.   I took a night course, so it was like four
23 months, something like that.

Page 28

1  Q.   Okay.  And then you passed the test that you
2  needed in order to get your CDL; is that right?
3  A.   Yes.
4  Q.   Did you have any particular employer in mind
5  when you went to West Georgia Tech to get your --
6  A.   Not when I first started.
7  Q.   Okay.  And tell me, how did you come to
8  apply for a job with Benny Whitehead?
9  A.   I have a friend that is a truck driver.  And
10 when she went to school, she left right out of
11 school and went to work with Benny Whitehead, and
12 told me to go talk to them.
13 Q.   Okay.  And your friend's name is?
14 A.   Linda Barnes.
15 Q.   All right.  And she's the one that told you
16 about Benny Whitehead?
17 A.   Yes.
18 Q.   And was she working at Benny Whitehead at
19 the time that she told you about a job there?
20 A.   No.
21 Q.   Okay.  But had she already applied and been
22 accepted for an application?
23 A.   She worked there when she first graduated.

7 (Pages 25 to 28)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 29

1   Q.   All right.  I asked you just a minute ago --
2   and you might have been confused -- whenever she
3   told you about Benny Whitehead, was she working
4   there?
5   A.   No.  She had worked there previously.
6   Q.   All right.  How long did she work at Benny
7   Whitehead?
8   A.   I don't know.
9   Q.   Okay.  And how are y'all friends?  How do
10  you know each other?
11  A.   We met when we were teenagers.
12  Q.   And is she originally from LaGrange?
13  A.   Yes.
14  Q.   Where was she living, at the time that you
15  talked to her about Benny Whitehead?
16  A.   In LaGrange.
17  Q.   And what did she tell you about Benny
18  Whitehead that made you decide to apply for a job
19  there?
20       And when I say, "Benny Whitehead," I'm
21  talking about Benny Whitehead, Inc., not the
22  individual.
23  A.   Uh-huh.

## Page 30

1   Q.   All right.  Go ahead.
2   A.   That she liked it; they didn't run the east
3   coast; and that they would put me with a partner;
4   and that she thought I would like it there.
5   Q.   All right.  And they would put you with a
6   partner, what did she specifically tell you about
7   that?
8   A.   That's all she told me.
9   Q.   All right.  And just so we're clear, when
10  she told you this, she wasn't working at Benny
11  Whitehead?
12  A.   No.
13  Q.   All right.  And how long ago had she worked
14  there?
15  A.   I really can't say.  I don't know for sure.
16  Q.   Okay.  Where was she working when y'all had
17  this conversation?
18  A.   At Smith Logistics.
19  Q.   Okay.  Which is what?
20  A.   A trucking company.
21  Q.   Okay.  And she was doing truck driving for
22  them?
23  A.   Yes.

## Page 31

1   Q.   All right.  And how long -- do you know how
2   long she worked at Benny Whitehead, Inc.?
3   A.   No.
4   Q.   All right.  Tell me, how did -- what was the
5   next thing that happened, in relation to your
6   applying for a job at Benny Whitehead?
7   A.   I don't understand what you mean.
8   Q.   Okay.  I mean, as I understand it, the first
9   you knew of Benny Whitehead was this conversation
10  with your friend; is that right?
11  A.   Yes.
12  Q.   What was the next thing you did in order to
13  secure employment as a truck driver with them?
14  A.   I went and got a book with their number,
15  called, and got them to send me an application.
16  Q.   All right.  And the book with their number,
17  what kind of book are you talking about?  Are you
18  talking about a telephone book or --
19  A.   Truckers' Guide.  I picked it up at the
20  truck stop.
21  Q.   All right.  The Truckers' Guide, is that
22  just a listing of --
23  A.   Truck companies.

## Page 32

1   Q.   -- truck companies and their names and
2   telephone numbers?
3   A.   It's like an advertisement.
4   Q.   Okay.  Do you still have a copy of that
5   guide that you used in order to obtain their
6   telephone number?
7   A.   I don't think so.  It was just a little
8   magazine.
9   Q.   Yeah.  Do you remember anything else, other
10  than their telephone number, being in there?
11  A.   No.
12  Q.   Did it tell you anything about the job or
13  anything like that?
14  A.   I don't remember.
15  Q.   Okay.  So you call the number; is that
16  right?
17  A.   Yes.
18  Q.   All right.  And who do you talk to?
19  A.   I cannot remember her name.  She was the
20  secretary/recruiter before Stacy came.  I can't
21  think of her name.
22  Q.   Okay.  So it was the recruiter before Stacy
23  that you spoke with.  And tell me what you can

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

## Page 33

1  recall from that conversation.
2  A.   I had just -- the first time I called, I
3  told her that I had just finished school and I
4  wanted to get an application, and just gave her my
5  address.
6  Q.   All right.  And then the next thing that
7  happened is the application comes in the mail; is
8  that right?
9  A.   It came.  And I carried it down to the
10  school, and my instructor put on -- I don't
11  remember what he added, but he faxed it back for
12  me.
13  Q.   Okay.  So your instructor faxed it back?
14  A.   Yes.
15  Q.   All right.  And then what was the next thing
16  that happened after the application was faxed?
17  A.   She called me back and told me that they
18  were interested.
19  Q.   Okay.  So the recruiter calls you back and
20  tells you that they are interested.  Did she tell
21  you anything else?
22  A.   That she was looking for a trainer to put me
23  with.

## Page 34

1  Q.   And, at this point, they had gotten your
2  application, so they knew that you didn't have any
3  truck driving experience over the road; is that
4  right?
5  A.   Yes.
6  Q.   You didn't, right?
7  A.   No, I didn't.
8  Q.   Okay.  And did they tell you that in order
9  -- that you needed two years' over-the-road truck
10  driving experience; otherwise, you would have to
11  be with a trainer?
12  A.   No.
13  Q.   Okay.  At any time, did anybody ever tell
14  you that you needed two years' over-the-road truck
15  driving experience in order to qualify for a
16  single load?
17  A.   Not until I was in that hearing for my
18  unemployment.
19  Q.   Okay.  So you never knew that two years'
20  over-the-road truck driving experience was a
21  requirement from their insurance?
22  A.   No.
23  Q.   Okay.  Did you know that Benny Whitehead

## Page 35

1  hires team drivers? drivers as teams?
2  A.   I wasn't a team.
3  Q.   Right.  But were you aware that they hire
4  team drivers?
5  A.   Yes.
6  Q.   And I understand when you were hired, you
7  did not have another team member; is that right?
8  A.   That's right.
9  Q.   Tell me, what did the recruiter tell you
10  about your training?
11  A.   That I would go through a training period
12  with the trainer, and they would put me in a truck
13  with somebody.
14  Q.   All right.  And did they tell you that they
15  would always put you in a truck with somebody?
16  A.   We didn't go into that.
17  Q.   All right.  Tell me, so you talked to this
18  recruiter.  She says that she's going to put you
19  with a trainer; is that right?
20  A.   Yes.
21  Q.   When did you actually start driving with
22  Benny Whitehead?
23  A.   December 3rd, I believe it was, was the day

## Page 36

1  we went out.
2  Q.   Prior to that, had you ever visited any
3  location, in person, of Benny Whitehead?
4  A.   As their office?
5  Q.   Right.
6  A.   The one down in Eufaula, yes.
7  Q.   All right.  Tell me, I understand at this
8  point what we've got, as far as contact and
9  communication with Benny Whitehead, Inc., is a
10  telephone call to the recruiter to get the
11  application; application is faxed back in.  Then
12  there's another -- was it a telephone call where
13  she said that she's going to put you with a
14  trainer and that they're interested?
15  A.   I had to come in for an interview.  She
16  called me and told me that they were interested,
17  and she wanted me to come in for an interview.
18  Q.   Okay.  So you come for an interview.  Where
19  do you go?
20  A.   To the place in Eufaula.
21  Q.   Okay.  The location on 431?
22  A.   Yes.
23  Q.   And who do you interview with when you go?

Page 37

1  A.  The recruiter. I cannot remember her name.
2  Q.  Okay. So it's just the recruiter before
3  Stacy, whoever that is; is that right?
4  A.  Yes.
5  Q.  And you interviewed just with her, or did
6  you interview with anyone else?
7  A.  Just with her.
8  Q.  Did you meet anybody else while you were
9  there?
10  A.  No.
11  Q.  Okay. And during the interview, what did
12  she tell you about your job?
13  A.  What do you mean? She explained --
14  Q.  I mean, did she tell you what the job duties
15  would be? How often you would just -- those kind
16  of things.
17      What did she tell you about what the job
18  available at Benny Whitehead was and what you were
19  going to be doing?
20  A.  She explained the way the pay was on
21  percentage; she went over part of the handbook;
22  she told me that I would have to sign the papers
23  about PeopLease; she told me about the Drivers'

Page 38

1  Fund; she told me that I'd have to go have the
2  physical and the drug test, and that she was
3  working on -- or that she had already contacted
4  Mike and that he was out with somebody else; he'd
5  be coming back in, and I would be going to work
6  when he got back.
7  Q.  All right. Did she ask you anything about
8  your preferences of who you might want to ride
9  with, as a trainer?
10  A.  I told her I'd prefer to be put with
11  somebody white and somebody that smoked or didn't
12  mind smoking.
13  Q.  Right. Because you smoke; is that right?
14  A.  Yes.
15  Q.  And I understand, you know, you go on long
16  drives whenever you're together, so sometimes
17  personality preferences come into play; is that
18  right?
19  A.  Yes.
20  Q.  Because you spend a lot of time together as
21  a team driver; is that right?
22  A.  Yes.
23  Q.  All right. And so Mr. Duniphin was the

Page 39

1  person that you were teamed with?
2  A.  Yes.
3  Q.  And what do you remember that she went over
4  in the employee handbook?
5  A.  She just flipped through the book and
6  pointed out things in it. Nothing specific.
7  Q.  Okay. Can you recall anything that she went
8  over with you that was in the employee handbook?
9  A.  No.
10  Q.  Okay. And you, at some point, were made
11  aware of PeopLease; is that right?
12  A.  Yes.
13  Q.  What were you told about PeopLease's role in
14  your employment?
15  A.  We were employed through Benny but we were
16  leased to PeopLease, and they would be paying us,
17  or something.
18  Q.  Or was it something kind of like that?
19  A.  Basically.
20  Q.  And so were you given documents that day,
21  during the interview process, from PeopLease?
22  A.  I don't remember getting any. I don't know.
23  Q.  All right. But, at some point, you would

Page 40

1  have gotten an employee handbook for Benny
2  Whitehead; is that right?
3  A.  Yes.
4  Q.  And then you would have gotten an employee
5  handbook for PeopLease; is that right?
6  A.  I don't think I ever got anything from
7  PeopLease.
8  Q.  All right. Did you ever sign any documents
9  acknowledging that you had received certain
10  documents from PeopLease? I mean, do you remember
11  being presented with anything that said
12  "PeopLease" on it?
13  A.  I had to sign something for PeopLease.
14  Q.  Right.
15  A.  I couldn't tell you what it is. Some kind
16  of document I had to sign.
17  Q.  All right. I've got documents here, and
18  we'll go through them specifically. I'm just
19  trying to get from you exactly when you were told
20  and what you were told about PeopLease.
21      But, at this point, your communication was
22  with only the recruiter at Benny Whitehead; is
23  that right?

10 (Pages 37 to 40)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 41

1  A.  Yes.
2  Q.  Did you talk to anybody at PeopLease that
3  day?
4  A.  No.  I never did.
5  Q.  Okay.  You had to give them your driver's
6  license, and they had to pull and make sure that
7  your driving record was okay; is that right?
8  A.  Yes.
9  Q.  And did they do all that while you were
10  there during the interview, or is that something
11  you were made aware of later?
12  A.  They didn't do it while I was there.
13  Q.  Okay.  Did they offer you the job that day
14  that you were there for that interview with the
15  recruiter?
16  A.  Yes.
17  Q.  Okay.  And then about what day was that?  Do
18  you remember?
19  A.  No, I don't remember.
20  Q.  Was it in June or was it in May -- I'm sorry
21  -- in December?
22  A.  I waited about three weeks before I went to
23  work.

Page 42

1  Q.  Okay.  Before you actually started doing
2  anything?
3  A.  Yes.
4  Q.  So this would have been sometime three weeks
5  before your first load was, whatever date that
6  was; is that right?
7  A.  Yes.
8  Q.  Okay.  And so your first load is with Mr.
9  Duniphin?
10  A.  Yes.
11  Q.  Okay.  Tell me, what was his role as your
12  trainer?  Do you know?
13  A.  What was his role as my trainer?
14  Q.  Yeah.  Okay.  I mean, you understood he was
15  your trainer; is that right?
16  A.  Yes.
17  Q.  And so his responsibility was to train you.
18  Did you understand that?
19  A.  To basically make sure I knew what I was
20  doing.
21  Q.  Right.  So tell me, day-to-day, whenever you
22  first started work, what did y'all do?
23  A.  Well, driving as a team driver, we both had

Page 43

1  to drive.  But he would watch what I was doing, as
2  far as driving, turning, passing; just basically
3  make sure I knew what I was doing.
4  Q.  Right.  But did he go ahead and start
5  letting you drive some, you know, that first load?
6  A.  Yes.
7  Q.  And then would he evaluate you and your
8  driving techniques?
9  A.  I guess he did.  I don't know.
10  Q.  Would he explain to you, like, safety rules
11  and things like that?
12  A.  He went over all kind of things about
13  checking the trucks, just basically what we had to
14  know driving.
15  Q.  Okay.  When you were working with or driving
16  with Mr. Duniphin, what was your understanding of
17  the person that you reported to?
18  A.  The person I reported to?
19  Q.  That supervised you.
20  A.  He did, as far as I knew.
21  Q.  All right.  And then what was your
22  understanding of who supervised Mr. Duniphin?
23  A.  I don't know.

Page 44

1  Q.  Okay.  And so you don't know where the
2  supervision chain goes past Mr. Duniphin; is that
3  right?
4  A.  I don't know who he reported to.
5  Q.  Okay.  Who would give y'all instructions
6  about where to go, what to do?
7  A.  Dispatch.
8  Q.  All right.  And who was your dispatcher when
9  you first started working?  Were you assigned a
10  dispatcher?
11  A.  Stacy and Robert.
12  Q.  Okay.  So were you satisfied with your
13  employment at Benny Whitehead during this time
14  period?
15  A.  I loved it.
16  Q.  Okay.  And also with PeopLease, you were
17  satisfied with PeopLease at this point?
18  A.  Yeah.
19  Q.  Okay.  And then I understand you and Mr.
20  Duniphin got married; is that right?
21  A.  Yes.
22  Q.  And then Mr. Duniphin tested positive for
23  marijuana during a random drug screen; is that

11 (Pages 41 to 44)

Page 45

1  right?
2  A.    Yes.
3  Q.    And then his job was terminated as a result?
4  A.    Yes.
5  Q.    Did either you or Mr. Duniphin ever dispute
6  the findings of that drug screen?
7  A.    He did.
8  Q.    Did he ever get a second test or anything
9  like that?
10  A.    No.
11  Q.    And then dispute it, what did he do to
12  dispute it?  He just didn't agree with it?
13  A.    Well, he didn't smoke.  I mean, he ate some
14  brownies with it in there.
15  Q.    Okay.
16  A.    And asked Robert, the morning he told him,
17  could he go take it again.  Robert told him there
18  was nothing he could do.
19  Q.    All right.  He ate some brownies with
20  marijuana in them?
21  A.    Yes.
22  Q.    Where did that happen?
23  A.    At a Christmas party.

Page 46

1  Q.    Whose Christmas party?
2  A.    Some friends we had in LaGrange.
3  Q.    It's kind of unusual to have brownies with
4  marijuana in them at a Christmas party.  Was that
5  something that he knew about?
6  A.    He didn't know until afterwards.
7  Q.    All right.  Well, how did he know that
8  that's what happened?  I mean, what made him aware
9  that he had eaten brownies with marijuana in them?
10  A.    We knew the people at the house we were at
11  smoked.  We contacted them later, and they said it
12  was in the brownies.  We were trying to backtrack
13  to find out where he got it.
14  Q.    Was that just their idea of a joke?
15  A.    They smoke.
16  Q.    So was there marijuana being smoked at the
17  party?
18  A.    If they did, it was when they went outside.
19  Q.    Okay.  Did Mr. Duniphin ever -- other than
20  ask to have another test, did he ever do anything
21  to dispute the findings of the positive drug test?
22  A.    He just asked to have another test.
23  Q.    Okay.  And as I understand it, y'all were

Page 47

1  involved in a motor vehicle accident before he was
2  terminated; is that right?
3  A.    Yes.
4  Q.    And where was that motor vehicle accident?
5  A.    El Paso.
6  Q.    And who was driving at the time that it
7  happened?
8  A.    I was.
9  Q.    Okay.  Tell me what you can remember about
10  that accident.
11  A.    I was pulling out into an access road, and a
12  woman came off the interstate and hit me.
13  Q.    All right.  You were pulling out of an
14  access road from what? like a grocery store?
15  A.    It was a Western store.
16  Q.    Okay.  Were you injured as a result of that
17  automobile accident?
18  A.    Yes.
19  Q.    And the lady, what was she driving?
20  A.    An SUV.
21  Q.    All right.  And she hit on the driver's side
22  where you were?
23  A.    Yes.

Page 48

1  Q.    And you reported that accident; is that
2  right?
3  A.    Yes.
4  Q.    And then you reported that you were injured
5  during that accident; is that right?
6  A.    Yes.
7  Q.    And then you received worker's compensation
8  benefits as a result; is that right?
9  A.    Yes.
10  Q.    And the accident occurred when?
11  A.    September the 30th.
12  Q.    Of?
13       MR. ROBERSON:  '04.  You hadn't worked
14  a year.  It was '04.
15  Q.    And did you have to go see the company
16  doctor?
17  A.    Yes.
18  Q.    And that's Trudy Nixon, right?
19  A.    Yeah.
20  Q.    Dr. Nixon.  And then she put you on
21  restrictions; is that right?
22  A.    Yes.
23  Q.    So for a time period, you could not drive,

12 (Pages 45 to 48)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 49

1  correct?
2  A.  I couldn't drive.
3  Q.  Tell me, what were your injuries that you
4  had in that accident?
5  A.  I pinched a nerve in my elbow.
6  Q.  Okay.  Tell me just briefly, what kind of
7  treatment did you have as a result of that?
8  A.  Dr. Nixon couldn't find what was wrong with
9  it.  She kept it immobilized and I couldn't lift
10  anything.  I couldn't hardly move my arm.
11      And she finally sent me to Dr. Nessouli, and
12  he found it and did surgery and corrected it.
13  Q.  Okay.  Do you have any complaints about the
14  way your claim for worker's compensation was
15  handled?
16  A.  No.
17  Q.  Okay.  And then when you were released to
18  return back to work, were you returned?
19  A.  I was released in December, and I was put
20  with D.A. Bryant in either around the end of
21  February, first of March.
22  Q.  Okay.  Because when you came back to work
23  and were released from worker's comp, was your

Page 50

1  husband terminated?  Had he been terminated
2  already?
3  A.  Yes.
4  Q.  And during the time period that you were not
5  available to ride with him, was somebody else
6  riding with him?
7  A.  He had somebody go with him once, I think.
8  But he made mostly single runs.
9  Q.  Okay.  Did he make single runs to the same
10  locations that y'all were driving?
11  A.  Some of them.
12  Q.  Okay.  And then when he had somebody go with
13  him, you believe that only occurred one time?
14  A.  I think it was once.
15  Q.  Who was it that went with him that one time?
16  A.  I couldn't tell you his name.  I didn't meet
17  him.
18  Q.  It was a guy?
19  A.  Yes.
20  Q.  And do you know anything about him, like
21  what race or what his age was, or anything about
22  the guy that went with him?
23  A.  I know he was white.

Page 51

1  Q.  Okay.  Was it somebody that your husband
2  knew?
3  A.  No.  Somebody that they put with him.
4  Q.  Okay.  Before that, had he requested
5  somebody to ride with him?
6  A.  I don't think he ever requested it.
7  Q.  Okay.  He just had somebody that rode with
8  him that particular time?
9  A.  Robert called and asked him about going with
10  this other guy.
11  Q.  Okay.  Was there any particular reason why
12  this guy was assigned with him?
13  A.  I think he had just been hired.  I don't
14  know for sure, but I think he had just been hired.
15  Q.  Okay.  And this was during the time that
16  you're on worker's comp; is that right?
17  A.  Yes.
18  Q.  All right.  When were you released to come
19  back to work as a result of your worker's comp
20  injury?
21  A.  Like I said, I think it was around December.
22  Q.  Okay.  And then you were driving with D.A.
23  Bryant; is that right?

Page 52

1  A.  Yes.
2  Q.  Tell me, how did you -- how were you teamed
3  with D.A. Bryant?
4  A.  They teamed me with him.
5  Q.  Tell me, when you were released from
6  worker's comp, did you notify them that you had
7  been released?
8  A.  Yes, I did.
9  Q.  And what was the conversation about you
10  coming back to work after your worker's comp?
11  A.  I carried the paperwork in and gave it to
12  Stacy, and she said she'd let Eddie know and they
13  would see what they could do.
14  Q.  All right.  How long did it take after you
15  were released from worker's comp for you to
16  start riding with Mr. Bryant?
17  A.  I was released, I think it was in December;
18  and it was around the end of February, the first
19  of March, when I went out for the first time.
20  Q.  All right.  Do you have any complaint about
21  the time period that it took after your worker's
22  comp injury to place you with Mr. Bryant?
23  A.  Not really.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

### Page 53

1  Q.   Okay.  Well, when you say "not really," that
2  means maybe really.
3      I mean, you don't have any complaint about
4  the time period that it took after you were
5  released from your worker's comp to assign you to
6  Mr. Bryant?
7  A.   No.
8  Q.   Okay.  And who notified you that you would
9  be riding with Mr. Bryant?
10 A.   Stacy called me in to meet with Eddie, and
11 Eddie told me about D.A.
12 Q.   Tell me what you can recall, first, from the
13 telephone call where Stacy called you and told you
14 to come.  What did she say to you?
15 A.   That she thought they had me a partner and I
16 needed to come down and talk to Eddie.
17 Q.   Okay.  And did she say anything else on the
18 telephone call?
19 A.   Not that I recall.
20 Q.   And in between the time period for the
21 worker's comp, you brought in your release to
22 return to work form; is that right?
23 A.   Yes, I did.

### Page 54

1  Q.   And who did you take it to?
2  A.   Stacy.
3  Q.   And what did y'all talk about when you took
4  it to her?
5  A.   Nothing in particular.
6  Q.   Okay.  Well, did she tell you anything about
7  what they were going to do in order to get you
8  back to work?
9  A.   No.
10 Q.   Okay.  She just told you that she would just
11 let Eddie know and that you would hear from them?
12 A.   Yes.
13 Q.   All right.  Then you go meet with Eddie; is
14 that right?
15 A.   Yes.
16 Q.   Was anybody else with you other than you and
17 Eddie?
18 A.   No.
19 Q.   Okay.  Tell me what was said during the
20 conversation with Eddie.
21 A.   Eddie asked did I have a problem going out
22 with a man.  He told me that D.A. was a nice guy;
23 told me D.A. had a little dog and that D.A.

### Page 55

1  smoked; and I said that was fine.
2  Q.   Okay.
3  A.   Told me D.A. had worked for them for a long
4  time.
5  Q.   All right.  So then you said okay to riding
6  with D.A. Bryant; is that right?
7  A.   Yes.
8  Q.   Then when was the first time that you
9  actually rode with Mr. Bryant?  I think you said
10 maybe sometime like the end of February?
11 A.   Yeah.  End of February, first of March,
12 somewhere around in there.
13 Q.   Okay.  So how many times do you ride with
14 Mr. Bryant?
15 A.   I made two trips.
16 Q.   Where were those two trips to?
17 A.   California.
18 Q.   And, at this time, you're still married to
19 Mr. Duniphin; is that right?
20 A.   Yes.
21 Q.   And he was fine with you riding with Mr.
22 Bryant?
23 A.   Yes.

### Page 56

1  Q.   What was he doing after his employment was
2  terminated with Benny Whitehead?
3  A.   At the time, he wasn't doing anything.
4  Q.   Did he ever get another job after he was
5  terminated?
6  A.   No.
7  Q.   Did he ever apply for another job?
8  A.   No.
9  Q.   Why not?
10 A.   His health problems.
11 Q.   And that's the health problems with the
12 appendix?
13 A.   He had other health problems too.
14 Q.   What other health problems did he have that
15 prevented him from applying for a job?
16 A.   He had rheumatoid arthritis, for one; he had
17 COPD.
18 Q.   Okay.
19 A.   And he was also getting his retirement from
20 the military, so he just stayed at home.
21 Q.   Okay.  When both of you were not working
22 during this time period that you're waiting to
23 hear about D.A. Bryant, the income that y'all

14 (Pages 53 to 56)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

### Page 57

1  received, was that just the retirement from his
2  military?
3  A.   That was it.
4  Q.   Y'all didn't have any other source of
5  income?
6  A.   No.
7  Q.   Okay. You weren't doing anything since you
8  had been released from worker's comp up until the
9  time you drove with Mr. Bryant; is that right?
10  A.   No, I didn't do anything.
11  Q.   Did you ever cut hair on the side or
12  anything like that?
13  A.   No.
14  Q.   Okay. So you make two trips with Mr. Bryant
15  to California; is that right?
16  A.   Yes.
17  Q.   Then what happened?
18  A.   I had to come out of the truck. I went in
19  the hospital with congestive heart failure.
20  Q.   Right. And that's when you went on FMLA; is
21  that right?
22  A.   Yes.
23  Q.   Tell me, what happened in particular for you

### Page 58

1  to recognize that you had this heart condition?
2  A.   I didn't know I was having heart problems;
3  it was just swelling in my legs is the reason I
4  went to the doctor. And that's when I found out.
5  Q.   Is that something you noticed while you were
6  in the truck?
7  A.   Yes.
8  Q.   And who was the first doctor that you went
9  to go see?
10  A.   Dr. Haggerty.
11  Q.   And so Dr. Haggerty is the one that
12  diagnosed you with the congestive heart failure;
13  is that right?
14  A.   Yes.
15  Q.   And I understand you were hospitalized at
16  some point at Emory; is that right?
17  A.   At St. Joseph's.
18  Q.   Oh, okay. At St. Joseph's. I'm sorry. So
19  when did you go see Dr. Haggerty when you were
20  first diagnosed with congestive heart failure?
21  A.   The very next day after I came back in on
22  the second trip.
23  Q.   Was that sometime in March?

### Page 59

1  A.   Yes.
2  Q.   And what year?
3  A.   '04.
4  Q.   Right.
5      MR. ROBERSON: No, it's 05.
6      MS. POTTHOFF: Yeah, that's right, it
7  would be '05.
8  Q.   All right. So up until March of '05 --
9  we're now at the point where you are diagnosed
10  with your congestive heart failure -- do you have
11  any complaints before March of '05 about anything
12  to do with your job at Benny Whitehead or
13  PeopLease?
14  A.   No.
15  Q.   Okay. And I understand you also had an
16  uninsured motorist claim as a result of your
17  automobile accident; is that right?
18  A.   Yes.
19  Q.   And although that uninsured motorist claim
20  was not handled by Benny Whitehead, it was through
21  their insurer; is that right?
22  A.   Yes.
23  Q.   Tell me -- and Mr. Adams, he represented you

### Page 60

1  in that uninsured motorist claim; is that right?
2  A.   Yes.
3  Q.   Did you have to file a lawsuit for the
4  uninsured motorist claim?
5  A.   Yes.
6  Q.   And that was resolved; is that right?
7  A.   Yes.
8  Q.   Is that settlement confidential?
9      MR. ADAMS: I don't know. I can look
10  and tell. I don't remember. It was during the
11  time that her husband died and so there was a lot
12  going on at that time. So she probably doesn't
13  know a lot about it.
14  Q.   All right. I'm not going to ask you the
15  amount of that claim until we can determine,
16  because that's something that I can find out from
17  Mr. Adams. If it's confidential, we can address
18  that together. Because I don't want you to
19  unknowingly breach a confidentiality clause.
20      MR. ROBERSON: Courtney, we'll look at
21  the release, and if it's not confidential, --
22      MS. POTTHOFF: Yeah, I know.
23  Q.   Okay. Tell me, when was the uninsured

15 (Pages 57 to 60)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 61

1  motorist claim resolved? Do you know when you got
2  the payment?
3      THE WITNESS: It was after Mike died,
4  wasn't it?
5      MR. ADAMS: I think it was before.
6  Because you had another car accident during the
7  time. I think it was right before. It was
8  sometime in the summer there.
9      THE WITNESS: Yeah, it was.
10      MR. ADAMS: It was in the summer before
11  you had got hurt in the Phenix City accident.
12  A.  I can't tell you for sure, but it was --
13  Q.  Okay. I'll find out from Mr. Adams exactly
14  when that case was resolved, okay?
15  A.  Okay.
16  Q.  Tell me this: Do you have, other than the
17  automobile accident that you were in, in El Paso,
18  Texas, have you been involved in any other
19  automobile accidents?
20  A.  Yes.
21  Q.  Okay. What accident was that?
22  A.  A lady pulled out in front of me in Phenix
23  City, and I hit her, run into her.

## Page 62

1  Q.  All right. Was that accident charged by the
2  police officer investigating as being your fault?
3  A.  No.
4  Q.  Okay. And did you receive any kind of
5  compensation as a result of that automobile
6  accident?
7  A.  Yes.
8  Q.  All right. And what -- did you have to file
9  a lawsuit?
10  A.  No.
11  Q.  You just filed a claim against her carrier?
12  A.  Yes.
13  Q.  Okay. Do you know if the settlement of that
14  claim was confidential?
15  A.  I don't know.
16  Q.  All right. Tell me, when did this second
17  accident occur?
18  A.  December 11, '05.
19  Q.  Okay. And what kind of injuries did you
20  receive as a result of that December 11, '05,
21  accident?
22  A.  I had a concussion. just bruised up.
23  Q.  Okay. Did you have to seek medical care?

## Page 63

1  A.  Yes.
2  Q.  Did you -- where did you go?
3  A.  They took me to Columbus Medical Center
4  first. I spent the night in the trauma unit.
5  Q.  And then who treated you after that?
6  A.  Dr. Haggerty.
7  Q.  All right. Any other automobile accidents?
8  A.  No.
9  Q.  And prior to the accident in El Paso, Texas,
10  had you had any other accidents?
11  A.  No.
12  Q.  All right.
13      MR. ROBERSON: Had a pretty good run
14  there, didn't you?
15  Q.  All right. So you applied for FMLA leave;
16  is that right?
17  A.  Yes.
18  Q.  Who did you apply for FMLA leave with?
19  A.  I got the papers in the mail.
20  Q.  Okay.
21  A.  And I just filled them out and sent them
22  back in.
23  Q.  I'm going to show you some papers, and we'll

## Page 64

1  see if we can't identify the papers that you
2  filled out and sent back in.
3      But do you have copies of the papers that
4  you filled out -- your own copies of the papers
5  that you filled out for your FMLA leave?
6  A.  I don't know if I have them or not.
7  Q.  Okay. And when did you fill out those
8  papers for your FMLA leave?
9  A.  When they mailed them to me. I can't tell
10  you a date.
11  Q.  Okay. I mean, what time period were you
12  actually in the hospital?
13  A.  For the wreck?
14  Q.  No, no; I'm sorry. I'm sorry; you're right.
15  For the congestive heart failure.
16  A.  I was in the hospital here for about a week.
17  I think it was about four or five days.
18  Q.  Okay. And then when were you in the
19  hospital in Georgia?
20  A.  For the wreck?
21  Q.  No. I'm sorry. I thought you were admitted
22  to the hospital in Georgia for the congestive
23  heart failure.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

### Page 65

1  A.  I had to go have a heart cath and stints put
2  in. I was up there for two days.
3  Q.  Okay. And when was that?
4  A.  In October.
5  Q.  In October of '05; is that right?
6        MR. ADAMS: '04, I think.
7        MS. POTTHOFF: Got to be '05.
8  A.  Yeah.
9  Q.  And you were at Lakeview when?
10  A.  Before I went to St. Joseph's. It was in
11  March. When I was at Lakeview, it was in March.
12  Because I came out of the truck with D.A. I think
13  it was the first of March.
14  Q.  Okay. Go through -- while you were on FMLA,
15  you had to have stints placed. Go through what
16  your medical condition was and what your treatment
17  was during that time period that you were on FMLA.
18  A.  What do you mean, "go through"?
19  Q.  Well, rather than specifically ask you what
20  the day-to-day medical treatment and what your
21  condition was, I just kind of wanted you to kind
22  of summarize: Well, first I went to Lakeview,
23  then they transferred me here; and then I got

### Page 66

1  these stints placed in, and then I went home to
2  recover. You know, if that's what it was.
3        I just kind of wanted you to summarize sort
4  of what was going on during that time period that
5  you were on medical leave.
6  A.  Basically just what you said. I had
7  congestive heard failure and I went here. They
8  used medicine to draw the fluid off. I had to
9  find a doctor in Atlanta, a cardiologist. They
10  did the heart catheterization, and then -- well, I
11  went to Dothan first to a cardiologist there, and
12  then I went to Atlanta.
13  Q.  Why did you end up in Atlanta versus Dothan?
14  Was that just a preference of yours?
15  A.  It was my preference after the doctor in
16  Dothan poked a hole in the artery in my heart when
17  he did a heart cath and told me I had to have
18  open-heart surgery. I wanted a second opinion.
19  Q.  All right. Did you have any complications
20  as a result of what the doctor did in Dothan?
21  A.  No.
22  Q.  Okay. So you're on the FMLA leave; you get
23  the stints placed in; and then you have to go home

### Page 67

1  to recover; is that right?
2  A.  Yes.
3  Q.  And during this time period, your husband is
4  not working, and so he's able to take care of you;
5  is that right?
6  A.  Yes.
7  Q.  All right. Tell me, what was your
8  compensation initially -- I know you worked on a
9  percentage -- when you were first hired at
10  Whitehead? What was the percentage?
11  A.  10 percent, I think.
12  Q.  Okay. What other benefits did you receive?
13  A.  None.
14  Q.  Okay. Where did your health insurance come
15  from?
16  A.  I didn't have any until we married.
17  Q.  Okay. Did you obtain health insurance
18  through your husband?
19  A.  After we married, yes.
20  Q.  Okay. And during the time period that
21  you're being treated for your congestive heart
22  failure, are you being covered by his insurance?
23  A.  Yes.

### Page 68

1  Q.  And did he have insurance through his
2  employer, Benny Whitehead, or did he have other
3  insurance as a result of being retired?
4  A.  He had insurance through Benny and other
5  insurance.
6  Q.  Okay. When he was terminated, did he
7  maintain that insurance through Benny Whitehead?
8  A.  For the first month.
9  Q.  Okay. And then after he was terminated, he
10  only maintained that insurance for the first
11  month; is that right?
12  A.  Yes.
13  Q.  And then did he decide to drop that
14  insurance?
15  A.  Yes.
16  Q.  And then after that time period, after he's
17  terminated and that one month is expired, what
18  insurance do y'all have?
19  A.  TRICARE.
20  Q.  Okay. And he gets TRICARE through what?
21  A.  Through the military, for retirement.
22  Q.  Right. And he was retired through what
23  branch of the Armed Forces?

17 (Pages 65 to 68)

Page 69

1   A.   Eight years in the Army and 12 in the Navy.
2   Q.   Okay.  So while you're on FMLA, you're not
3   receiving any other benefits, because you weren't
4   receiving benefits before you were placed on FMLA;
5   is that right?
6   A.   Yes.
7   Q.   All right.  Then it's my understanding your
8   doctor releases you to come back to work after
9   your FMLA; is that right?
10  A.   Yes.
11  Q.   And your leave had actually not expired.
12  You still had some time on your 120 days; is that
13  right?
14  A.   Yes.
15  Q.   So before your 120 days is up, your doctor
16  says it's okay for you to go back to work; is that
17  right?
18  A.   Yes.
19  Q.   All right.  During the time period that
20  you're on FMLA, are you talking to anybody out at
21  Whitehead?  I mean, you've on leave.
22  A.   I talked to Stacy.
23  Q.   All right.  What did you and Stacy talk

Page 70

1   about during the time that you were on leave?
2   A.   Different things.  She had a new baby.  We
3   talked, you know.
4   Q.   Was it anything related to your employment
5   status, or was it just friendly conversation
6   between you and Stacy?
7   A.   Just friendly conversation.
8   Q.   Okay.  So then you get the release from your
9   doctor; is that right?
10  A.   Yes.
11  Q.   All right.  And then what do you do whenever
12  you get that release?
13  A.   I take it to Stacy.
14  Q.   And I see that some of it refers to 6/13 as
15  being the date that you come back, and then I've
16  seen 6/16.  We'll see the document in a minute,
17  but I think it says 6/13 is the date that you can
18  come back to work.
19  A.   It's somewhere around there.
20  Q.   Yeah, somewhere around June.  So you take it
21  to Stacy.  And what's the conversation with Stacy
22  when you take it there?
23  A.   I gave her the release, and she said she

Page 71

1   would let Eddie know.  And I told her I needed to
2   go back to work.
3           MR. ROBERSON:  Are you at a place where
4   we can stop so I can use the restroom?
5           MS. POTTHOFF:  Yeah.
6           (A brief recess was taken.)
7   (BY MS. POTTHOFF)
8   Q.   All right.  I think where we left off is
9   that you had turned in your return to work from
10  your FMLA to Stacy, and that she said that she
11  would let Eddie know; is that right?
12  A.   Yes.
13  Q.   What happened next?
14  A.   Well, she turned around and faxed it to
15  PeopLease; and then she said she would let Eddie
16  know.  And she put the paper in my file while I
17  was there.
18  Q.   All right.  Did she say anything else?
19  A.   No.
20  Q.   Okay.  Then what happened?
21  A.   I started calling her and calling Eddie.
22  And I tried to get some help because they wouldn't
23  put me back to work right then.

Page 72

1   Q.   Okay.  And so this is in June, right?
2   A.   Right.
3   Q.   This is in June of 2005, right?
4   A.   Yeah.
5   Q.   So your doctor said that you could go back
6   to work June 13th.  About what time period would
7   it have been before you would have given it to
8   Stacy?
9   A.   It was within a couple of days I gave it to
10  Stacy.
11  Q.   Okay.  And then when did you make your first
12  call to Stacy when you hadn't heard from anybody?
13  A.   I don't remember.
14  Q.   Okay.  Well, did you call again in June?
15  A.   Yes.
16  Q.   What can you remember about that call?
17  A.   Just asking did they have anybody they could
18  put me with yet.
19  Q.   Tell me, why -- there was a time period from
20  when you could be put back in a truck for the
21  worker's comp.
22       And why was there -- was there a different
23  need during this time period in June of 2005?  I

18 (Pages 69 to 72)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

## Page 73

1  mean, was your situation different than what it
2  was when you were trying to go back to work after
3  your worker's comp injury?
4      A.   What do you mean?  Well, before, I was
5  getting workman's comp.
6      Q.   Right.  You were receiving worker's comp
7  benefits; is that right?
8      A.   Yes.
9      Q.   And then --
10     A.   When I was out on FMLA, I received nothing.
11     Q.   Right.
12     A.   Bills were behind and ...
13         MR. ROBERSON:  You were hungry.
14         THE WITNESS:  Basically.
15     Q.   All right.  But your husband was still
16  receiving the same benefits that he was receiving,
17  as far as his retirement; is that right?
18     A.   Yes.
19     Q.   All right.  And I'm just wanting to know
20  what, if anything, was different.
21         Have you told me -- just the fact that you
22  had not received income during that whole time
23  period, that's why you wanted to get back?

## Page 74

1      A.   Well, I needed to get back to work because I
2  was on all this other extra medicines, and we had
3  more expenses because of my sickness.  And I
4  wasn't receiving anything, so his pension didn't
5  go that far.
6      Q.   Okay.  What did you communicate to Stacy
7  when you called that first time?
8      A.   That I needed to go to work.
9      Q.   What did she say in response?
10     A.   "I don't have anybody right now."
11     Q.   Okay.
12     A.   And she would let Eddie know.
13     Q.   All right.  And this was in June?
14     A.   Every time I called.
15     Q.   Okay.  So how many times did you call after
16  you were released to go back on FMLA -- I mean,
17  you were released from FMLA?
18     A.   I talked to her or Eddie just about every
19  week.  I also wrote letters.
20     Q.   Right.  I have one letter that you've
21  written.  Did you write another letter?  Is there
22  another letter?
23     A.   I wrote one to Eddie; I wrote one to their

## Page 75

1  sister.
2      Q.   Amy?
3      A.   Amy.  But it wasn't about my job.
4      Q.   Okay.  The information in the letter with
5  Amy, that was related to your claim from the
6  Drivers' Fund; is that right?
7      A.   Uh-huh.
8      Q.   That didn't have anything to do with the
9  claims that you're making in this case; is that
10  right?
11     A.   No.
12     Q.   And the only letter that you've written to
13  Benny Whitehead about your employment status was
14  the letter that you wrote to Eddie; is that right?
15     A.   I wrote two to Eddie.  One was asking for
16  anything, even the short hauls, that I needed some
17  work.  I was willing to do the short hauls to pick
18  up loads for them.
19     Q.   Okay.
20     A.   And one was after I was told that I had been
21  -- I had abandoned my job.  I wrote him one saying
22  if I didn't have a job anymore, I needed my
23  holdback money.  And he sent it to me.

## Page 76

1      Q.   Tell me, do you still have a copy of the
2  letter where you're asking for short hauls or any
3  work that's available?
4         THE WITNESS:  You've got a copy of it,
5  haven't you?
6         MS. POTTHOFF:  Well, I haven't seen it.
7         MR. ADAMS:  I thought it was in the
8  disclosures.
9         MS. POTTHOFF:  Huh-uh, it's not.
10        MR. ROBERSON:  I don't think I have it.
11        MS. POTTHOFF:  Yeah.  I've never seen
12 it.
13        MR. ADAMS:  I'll have to look and find
14 it.
15        MR. ROBERSON:  We'll get you that if
16 we've got it.
17        MS. POTTHOFF:  Yeah.  And, Albert, if
18 you don't mind, if you could call Holly or
19 whatever and see if she can't --
20        MR. ADAMS:  On the releases?
21        MS. POTTHOFF:  No, no, no, no.  On this
22 letter.  Because if it's something that's in your
23 file and easy to find, and if she could get her

19 (Pages 73 to 76)

Page 77

1  hands on it, then if she could fax it to me, that
2  would be great.  Because I would like to ask her
3  about it.
4  (BY MS. POTTHOFF)
5  Q.    All right.  So after you've given them the
6  release to return back to work in June, did you
7  ever talk to Eddie?
8  A.    Yes.
9  Q.    Okay.  When was the first time that you
10  talked to Eddie?
11  A.    I can't tell you for sure.  I talked to him
12  quite a few times.
13  Q.    Okay.  What was the first conversation
14  about?
15  A.    Finding me a partner.
16  Q.    What did he say to you?
17  A.    That he was trying to find somebody to place
18  me with; he didn't have anybody right now.
19  Q.    All right.  And where did this conversation
20  occur? on the telephone?
21  A.    At the office.
22  Q.    Okay.  Was anybody else there when you
23  talked to Eddie?

Page 78

1  A.    Not always.
2  Q.    No, no, no.  I'm talking about this
3  particular time that you talked to Eddie that he
4  said, I'm trying to find you somebody and I can't
5  find you anybody right now.
6  A.    No.
7  Q.    Okay.  How many times did you talk to Eddie
8  at the office?
9  A.    I don't know for sure.
10  Q.    Well, was it more than once?
11  A.    Yes.
12  Q.    Was it twice?
13  A.    I can't tell you a definite.  I'd go down
14  there and check.
15  Q.    All right.  How many times did you go and
16  check?
17  A.    I don't know.
18  Q.    All right.
19  A.    I can't say because I'm not sure.  I went
20  quite a few times.
21  Q.    Okay.  So do you think it was more than
22  three times?
23  A.    Yes.

Page 79

1  Q.    And more than three times that you actually
2  spoke to Eddie?
3  A.    A lot of times I'd go in and ask Stacy, or
4  I'd stick my head in the door and say, "Eddie have
5  you found anybody?"  It wasn't a sit-down
6  conversation.
7  Q.    Okay.  Was his response to you always the
8  same, that he's looking for somebody?
9  A.    "We're checking.  I don't have anybody right
10  now."
11  Q.    Was he ever rude to you or anything like
12  that?
13  A.    No.
14  Q.    Okay.  And when did you find out that they
15  had actually found somebody for you to ride with,
16  after you had been released to return back to work
17  from your FMLA?
18  A.    Stacy called me once and told me that she
19  had somebody, wanted to know how soon I could be
20  ready.  I said, Give me a day or so to get my
21  stuff together.  Because it had been so long.  And
22  she said, All right.  I'll call you back and let
23  you know when you're leaving.

Page 80

1          And after about three days, I never heard
2  anything.  And I called her.  And she said, "Oh,
3  Robert didn't call you?  This guy said he wouldn't
4  ride with a married woman."
5          That's the only time I've been notified
6  about going back out at all.
7          MR. ROBERSON:  Courtney, do you want to
8  make a copy of this and let us keep the original,
9  if you don't mind?
10          MS. POTTHOFF:  Yeah.
11          MR. ROBERSON:  I mean, you can have a
12  copy, but we'd like to keep the original.
13          MS. POTTHOFF:  Yeah, okay.  I'm going
14  to get a copy real quick.
15          (A brief recess was taken.)
16  (BY MS. POTTHOFF)
17  Q.    Okay.  I'm going to go ahead and mark as
18  Defendants' Exhibit 1 the handwritten letter
19  that's just been provided to me.  It's dated
20  August 29, 2005.
21          (Defendants' Exhibit No. 1 was
22          marked for identification and a
23          copy of the same is attached

20 (Pages 77 to 80)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 81 |
|---|

1         hereto.)
2    Q.   Do you recognize this?
3    A.   Yes.
4    Q.   Is this the letter that you were talking
5    about that you sent about getting some work after
6    you were released?
7    A.   Yes.
8    Q.   Okay.  And tell me, did you mail this
9    letter?
10   A.   Yes.
11   Q.   Okay.  Do you know if they received the
12   letter?  Did you ever get any confirmation that
13   they received the letter?
14   A.   I never got any kind of acknowledgment.
15   Q.   Okay.  Did anybody ever say, "I got your
16   letter," or anything like that?
17   A.   The only one they answered was the one when
18   I asked about my holdback money.
19   Q.   Right, right.  And tell me, whenever you
20   would call to inquire about your status while you
21   were on FMLA -- I mean, off of FMLA -- you talked
22   to Stacy or Eddie.  Did you ever talk to anybody
23   else other than Stacy or Eddie?

| Page 82 |
|---|

1    A.   No.
2    Q.   Okay.  Were they always courteous and
3    helpful?
4    A.   They were always nice to me.
5    Q.   Okay.  And did anybody ever tell you that
6    you were not qualified to run solo, in August of
7    2005?
8    A.   No.
9    Q.   Okay.  Had you, during this time period
10   where you were financially in a bind, did you
11   apply for a job with another trucking company?
12   A.   No.  I thought I was employed at Benny's.
13   Q.   Right.  I understand that.  But even if
14   you're working somewhere, it doesn't mean you
15   don't go out and apply for jobs in other places.
16        At any time, have you ever applied for a job
17   with another trucking company?
18   A.   No.
19   Q.   Are you aware that some other trucking
20   companies don't have the two-year over-the-road
21   requirement for their insurance?
22   A.   I haven't checked.
23   Q.   Okay.  So you've made no effort to check on

| Page 83 |
|---|

1    any other job as a truck driver?
2    A.   Not as a truck driver.  But I interviewed
3    yesterday, and I'm probably going to be teaching
4    CDL.
5    Q.   Okay.  Well, good.  Congratulations.  Where
6    are you going to be doing that?
7    A.   At West Georgia College.
8    Q.   Okay.  Great.  Who did you interview with?
9    A.   Ray Benefield.
10   Q.   Okay.  And was that your first attempt to
11   get another job using your truck driving
12   experience?
13   A.   Yeah.
14   Q.   Okay.  Because I understand that you now,
15   for income, you are cutting hair; is that right?
16   A.   Yes.
17   Q.   And when was the first time that you
18   actually went back to work of any kind?
19   A.   In June, when I moved back to LaGrange.
20   Q.   Okay.  And so while you were here in
21   Eufaula, did anything prevent you from applying
22   for a job here in Eufaula?
23   A.   Other than Mike being sick so long.

| Page 84 |
|---|

1    Q.   Right, right.  But what about after he
2    passed away?
3    A.   I was trying to get things in order, and I
4    knew I had to move.  And I just -- I couldn't do
5    it all right then.
6    Q.   Okay.  When he passed away, did you receive
7    any life insurance benefits?
8    A.   No.  He didn't have any.
9    Q.   All right.  Did you receive any of his
10   military benefits?
11   A.   I can get half of what he drew.
12   Q.   Okay.  Are you doing that?
13   A.   Yes.
14   Q.   Other than half of what he drew -- which is
15   how much?
16   A.   It's a little over $500 is what I get.
17   Q.   And he got how much?
18   A.   He got a thousand and some-odd dollars a
19   month.
20   Q.   Okay.  Do you receive any other benefits
21   from your husband?
22   A.   Just the insurance, the TRICARE insurance.
23   Q.   So you are still covered under his military

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 85

1  insurance?
2  A.   Yes.
3  Q.   Okay.  So did anyone tell you that you
4  needed to be looking for a driver partner too,
5  that they were having trouble finding one?
6  A.   No.
7  Q.   Did you ever bring anybody up there in order
8  to apply to be your partner?
9  A.   No.  I didn't know anybody to bring.
10  Q.   Did you ever bring your son up there for him
11  on to apply for a job there?
12  A.   Before he finished school.
13  Q.   When did you do that?
14  A.   I was still driving.  He came in ...
15  Q.   Were you still --
16  A.   Mike and I were still driving.
17  Q.   Okay.  Mike was still employed?
18  A.   Yes.
19  Q.   Okay.  And your son, what was he doing at
20  the time?  You said he was still in school?
21  A.   Uh-huh.  He was going to driver school and
22  he was working in construction.
23  Q.   All right.  So he was trying to get his CDL?

Page 86

1  A.   Yes.
2  Q.   Did he ever get his CDL?
3  A.   Yes.
4  Q.   Is he driving a truck now?
5  A.   Not at the moment.  He was.
6  Q.   Who did he drive for?
7  A.   Warner.
8  Q.   Has he ever driven for anybody else other
9  than Warner?
10  A.   Hogan.
11  Q.   Okay.  Where is Warner out of?
12  A.   I don't know where they're out of.  They've
13  got one office in Sandy Springs, Georgia.
14  Q.   Okay.  What kind of loads does he haul with
15  Warner?
16  A.   He had a dedicated run with Home Depot,
17  anything Home Depot sells.
18  Q.   Okay.  What about with Hogan?
19  A.   I don't have any idea.
20  Q.   Did you ever inquire with him about possibly
21  working for either one of those trucking
22  companies?
23  A.   For myself?

Page 87

1  Q.   Right.
2  A.   No.
3  Q.   Okay.  So the only contact and communication
4  that you had with Benny Whitehead was the two
5  letters; is that right?
6  A.   And the calls or stopping by.
7  Q.   Okay.  Calls or stopping by.  When were --
8  during this time period, did you know of anybody
9  that was assigned a team partner, during this time
10  period that you were looking for a partner, from
11  June until August.  Let's just say June to August
12  29th, the date of this letter.  Do you know of
13  anybody that was assigned a team partner?
14  A.   No, I don't know.
15  Q.   Do you know of anybody that was hired as a
16  single driver that did not have two years'
17  experience?
18  A.   I don't know.
19  Q.   Did you know of anybody that was hired
20  during the June to August 29th time frame that was
21  younger than you?
22  A.   I don't know who they hired.
23  Q.   Okay.  Tell me, when did you decide to file

Page 88

1  an EEOC charge?
2  A.   After I had tried to get help, I had tried
3  to go back to work.  They let other men take
4  single loads.  And as long as I was working as a
5  team with Mike, I could take a single load.
6  Q.   Okay.
7  A.   And then all of a sudden I couldn't.  I felt
8  like I had been discriminated against.
9  Q.   Okay.  Well, let's go back.  You said that
10  as long as you were driving with Mike, you could
11  take a single load.  What do you mean?
12  A.   We'd come back from California, the teams.
13  If they've got a load going to Florida, one of the
14  driver can get off and the other driver take the
15  load on to Florida.
16  Q.   Okay.  And so would you -- did you ever take
17  a single load to Florida?
18  A.   I didn't, but I could.
19  Q.   How do you know you could have?
20  A.   That's the way the teams do it.
21  Q.   All right.  Well, do you know if the other
22  team member that did it had two years'
23  over-the-road driving experience and was qualified

22 (Pages 85 to 88)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 89

1  to drive the truck under their insurance
2  requirements by themselves?
3  A.    Do I know of any that's not?
4  Q.    Do you know of anybody that did that?
5  A.    Yes.
6  Q.    That did not have two years' over-the-road
7  driving experience?
8  A.    Yes.
9  Q.    Who?
10  A.    Robert Kirkham.
11  Q.    Can you spell his last name?
12  A.    K-I-R-K-A-M or -H-A-M.
13  Q.    So you're saying that he took a single load
14  by himself without two years' over-the-road
15  driving experience; is that right?
16  A.    Him and his wife together didn't have two
17  years.
18  Q.    Okay. And what is his wife's name?
19  A.    Sally. Debra.
20  Q.    Debra or Sally?
21  A.    Debra is how they've got her listed.
22  Q.    Okay. And are you saying that she also
23  drove single loads by herself without two years'

Page 90

1  driving experience?
2  A.    I don't know if she did, but he did.
3  Q.    Okay. When did Robert do that?
4  A.    They drive as a team.
5  Q.    Right. So were they together the whole time
6  or --
7  A.    No. She would get out, just like I would,
8  and he would take the load on to Florida.
9  Q.    Get out where?
10  A.    At the yard.
11  Q.    Okay.
12  A.    And go home.
13  Q.    Get out in the yard and go home. And then
14  he would just drive off?
15  A.    He would take the load on to Florida.
16  Q.    Okay. And how many times did you witness
17  Robert taking a single load to Florida when he
18  didn't have two years' over-the-road driving
19  experience?
20  A.    I couldn't tell you how many times they did
21  it.
22  Q.    Okay. Was it more than one time?
23  A.    I know I've talked to her at home more than

Page 91

1  once when he would be gone to driver loads.
2  Q.    And how do you know that he didn't have two
3  years' over-the-road driving experience?
4  A.    They went to work not long before I did. He
5  was hired and drove with somebody else for about
6  six months, I think; and then they put his wife in
7  there with him as soon as she graduated.
8  Q.    Okay. Anybody else that you believe drove
9  single loads in however method when they had less
10  than two years' over-the-road driving experience?
11  A.    I don't know.
12  Q.    What do you mean you don't know? You don't
13  know of anybody else?
14  A.    I don't know anybody else.
15  Q.    Okay. Robert is the only person that you
16  know; is that right?
17  A.    Yes.
18  Q.    And Robert, how old is he?
19  A.    In his 50s.
20  Q.    Okay. So he's about the same age as you
21  are; is that right?
22  A.    Pretty close, I think.
23  Q.    And he's white?

Page 92

1  A.    Yes.
2  Q.    Obviously, male. And when was he hired?
3  A.    I don't know.
4  Q.    Okay. During the time period that you were
5  coming back from your FMLA leave, do you know of
6  anybody else that was assigned a team partner from
7  then up until today?
8  A.    I don't have any idea.
9  Q.    Okay. Do you know of anybody else, during
10  any time period, that has ever driven a truck for
11  Benny Whitehead as a single load without two
12  years' driving experience, other than Robert?
13  A.    I don't know of anybody.
14  Q.    Okay. And when was it that you decided to
15  file the EEOC charge or pursue an EEOC charge?
16  A.    I can't remember exactly when.
17  Q.    Okay. I mean, was it shortly before the
18  charge was signed and filed?
19  A.    Yes.
20  Q.    Or had it been some time that you had
21  considered filing it?
22  A.    It was shortly before.
23  Q.    Okay. And tell me again why you decided to

23 (Pages 89 to 92)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 93

1  file the charge.
2      Other than you had seen other people take a
3  single load --
4  A.   Other men.
5  Q.   Other men. I'm sorry. You had seen other
6  men take a single load. And the person that
7  you're talking about is Robert, and nobody else;
8  is that right?
9  A.   Yes.
10  Q.   Okay. What else led you to file the EEOC
11  charge?
12  A.   I just felt like I know they had been hiring
13  people, but specifically I can't tell you if they
14  were hiring males, females, whatever. But I just
15  felt like I was being discriminated, pushed aside.
16  Q.   Okay. Did anybody at Benny Whitehead ever
17  say anything to you that you believe was
18  discriminatory?
19  A.   No.
20  Q.   Did anyone at Benny Whitehead tell you that
21  they weren't doing the best they could to try and
22  find you a partner?
23  A.   No.

Page 94

1  Q.   Did anyone at -- did you ever get a call to
2  take a load, and you refused to do it because you
3  were going to a birthday party?
4  A.   No.
5  Q.   So that never happened?
6  A.   No. I told Eddie and Benny, sitting in
7  Eddie's office, that I would be willing to go back
8  to work any time with any partner. But we had a
9  birthday party that we were going to the next
10  morning. I would be back. We were going to be
11  gone about four days. It was my husband's
12  grandmother's hundredth birthday party. As soon
13  as we got back, I would be ready to go.
14  Q.   Why were you having this conversation with
15  Eddie and Benny?
16  A.   Because Benny wanted to meet with me about
17  the Drivers' Fund and going to work.
18  Q.   Okay. Tell me what you can remember about
19  the conversation that you had with Benny and
20  Eddie.
21      So they summoned you? They called you up
22  there?
23  A.   Yes.

Page 95

1  Q.   Who called you?
2  A.   Stacy called me and asked me to come down
3  there.
4  Q.   Okay. When?
5      MR. ROBERSON: It must have been right
6  before her birthday.
7      THE WITNESS: Right.
8  Q.   Well, when was the birthday?
9  A.   In September.
10  Q.   Okay. What was the date of the birthday?
11  A.   We were in Texas on September the 8th, and
12  we got out there two days before; and I met with
13  them two days, so it was around the 4th. 3rd or
14  4th, somewhere in there.
15  Q.   So September 3rd or 4th you received a call
16  from Stacy?
17  A.   Well, the day before. I told her I could
18  come in the next day.
19  Q.   Okay. So sometime, either the 2nd or the
20  3rd, you received a call from Stacy; is that
21  right?
22  A.   That they wanted to talk to me.
23  Q.   Okay. What was said during that

Page 96

1  conversation?
2  A.   Benny asked me if Mike would have a problem
3  with me being a partner with another man, and I
4  told him no.
5  Q.   Okay.
6  A.   He said they would try to find somebody.
7  That's when Benny asked me -- he told me things
8  kind of got out of hand and that he was going to
9  make sure I got money from the Drivers' Fund, to
10  give him a list of what I owed. And he wanted to
11  know when I'd be able to go back to work.
12      And that's when I told him it would be after
13  I got back from the birthday party. It was
14  already planned. I had been out that long anyway,
15  so four days didn't mean that much.
16  Q.   Okay. And did Benny say anything else?
17  A.   That they were going to do what they could.
18  Benny said he would get me the money to get me
19  caught up. And it wouldn't take no two months to
20  do it.
21  Q.   Okay. I'm not going to go into the part of
22  the conversation that's about the Drivers' Fund,
23  but I want to ask you: He said, "Things got out

24 (Pages 93 to 96)