**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3         NORTHERN DIVISION
4
5    CASE NUMBER:  2:06cv459-MHT
6
7    GLORIA DUNIPHIN,
8         Plaintiff,
9    vs.
10   BENNY WHITEHEAD, INC., and
11   PeopLease CORPORATION,
12        Defendants.
13
14
15   BEFORE:
16      Cynthia M. Noakes, Commissioner
17      and Court Reporter
18
19
20   DEPOSITION TESTIMONY OF GLORIA DUNIPHIN
21
22
23      ******************************

Page 2

1       S T I P U L A T I O N
2
3         IT IS STIPULATED AND AGREED by and
4    between the parties through their respective
5    counsel, that the deposition of GLORIA DUNIPHIN
6    may be taken before Cynthia M. Noakes, Court
7    Reporter, at the Law Offices of WILLIAMS,
8    POTTHOFF, WILLIAMS & SMITH, 125 South Orange
9    Avenue, Eufaula, Alabama 36027, on the 11th day
10   of January, 2007.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the signature to and the reading of the
13   deposition by the witness is waived, the
14   deposition to have the same force and effect as
15   if full compliance had been had with all laws and
16   rules of Court relating to the taking of
17   depositions.
18        IT IS FURTHER STIPULATED AND AGREED
19   that it shall not be necessary for any objections
20   to be made by counsel to any questions except as
21   to the form or leading questions, and that
22   counsel for the parties may make objections and
23   assign grounds at the time of the trial, or at

Page 3

1    the time said deposition is offered in evidence,
2    or prior thereto.
3         IT IS FURTHER STIPULATED AND AGREED
4    that the notice of filing of the deposition by
5    the Court Reporter is waived.
6
7
8
9
10
11
12
13
14
15
16
17   ****************************************
18
19
20
21
22
23

Page 4

1            INDEX
2    EXAMINATION BY:              PAGE NUMBER:
3    MS. POTTHOFF            7-158, 185-189
4    MR. CALTON           158-176, 189-190
5    MR. ROBERSON              176-185
6
7    EXHIBITS:
8    Defendants' Exhibit No. 1        80
9    Defendants' Exhibit No. 2       104
10   Defendants' Exhibit No. 3       126
11   Defendants' Exhibit No. 4       142
12   Defendants' Exhibit No. 5       143
13   Defendants' Exhibit No. 6       144
14   Defendants' Exhibit No. 7       145
15   Defendants' Exhibit No. 8       147
16   Defendants' Exhibit No. 9       148
17   Defendants' Exhibit No. 10      149
18   Defendants' Exhibit No. 11      150
19   Defendants' Exhibit No. 12      151
20   Reporter's Certificate      191
21
22
23   ******************************************

1 (Pages 1 to 4)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 97

1  of hand." What was he talking about? I mean, did
2  he say anything else other than, "Things got out
3  of hand"?
4  A.   He got mad because I filed an insurance
5  claim.
6  Q.   Mad because you filed what insurance claim?
7  Talking about the uninsured motorist claim?
8  A.   Yes.
9  Q.   Did he ever say that he was upset with you
10 because you filed the FMLA?
11 A.   No.
12 Q.   All right. And what did he say to you that
13 leads you to believe that he was upset about the
14 uninsured motorist claim?
15 A.   Amy told me that Benny said I couldn't get
16 anything from the Drivers' Fund because I filed
17 that suit with the insurance. And I said, "That's
18 got nothing to do with the Drivers' Fund."
19 Q.   Okay. And then they asked you if you would
20 ride with another man; is that right?
21 A.   Yes.
22 Q.   And did you shortly -- had you already had
23 the conversation with Stacy about Robert?

Page 98

1  A.   About?
2  Q.   Because you said earlier that Stacy called
3  you, and you called; and she said, "What, Robert
4  didn't call you? Because he won't partner. His
5  wife wouldn't let him partner."
6  A.   That happened after we got back from Texas.
7  Q.   Okay. So did you ever get a call from
8  anybody out at Whitehead that they had a load for
9  you to take, and it was apparently during this
10 time that you were going to Texas?
11 A.   No.
12 Q.   During that conversation with Eddie and
13 Benny, did they tell you that they had a load
14 available for you?
15 A.   No.
16 Q.   When was the first time that you learned
17 that they had offered you a load to go during the
18 time that you were at this birthday party in
19 Texas?
20 A.   When was the first time I learned that?
21 Q.   Uh-huh.
22 A.   When it was said when I was in here for the
23 hearing for my unemployment.

Page 99

1  Q.   Okay. So you're saying that nobody ever
2  requested for you to go on a load and you refused
3  a load?
4  A.   I never refused a load.
5  Q.   Okay. And if anybody said that they talked
6  to you and asked you to go out on a load and you
7  said, No, I'm going to Texas for a birthday party,
8  then they are not telling the truth; is that
9  right? Is that what you're saying?
10 A.   Yes.
11 Q.   Okay.
12     MR. ROBERSON: Are you saying that it
13 might be a genuine issue of material fact about
14 that?
15     MS. POTTHOFF: No, I am not.
16 Q.   Tell me, what happened next in regard -- you
17 go to the birthday party. You have the
18 conversation with Benny and Eddie. Did Eddie say
19 anything during that conversation?
20 A.   Not a whole lot.
21 Q.   Well, what can you recall that he said at
22 all?
23 A.   Benny did most of the talking.

Page 100

1  Q.   Can you recall anything that Eddie said?
2  A.   Eddie would answer questions.
3  Q.   Whose questions?
4  A.   Usually Benny's.
5  Q.   What questions?
6  A.   About my release, or did he have my release;
7  and Eddie told him yes.
8  Q.   Okay. What else?
9  A.   He told him that he didn't have anybody to
10 put me with right now.
11 Q.   Eddie said that?
12 A.   Yes.
13 Q.   Did Benny say anything in response to that?
14 A.   I don't remember him saying anything.
15 Q.   Okay. Can you recall anything else that
16 Eddie said?
17 A.   No.
18 Q.   No?
19 A.   No.
20 Q.   Okay. Have you told me everything that you
21 can recall that Benny said during that meeting
22 that you had?
23 A.   I can't think of anything else.

25 (Pages 97 to 100)

Page 101

1   Q.   Okay. All right. Did you have any other
2   conversations with anybody else, after that
3   conversation with Benny and Eddie, from Benny
4   Whitehead?
5   A.   Just the same thing: calling or checking to
6   see if they had anybody.
7   Q.   Do you know of anybody that you think you
8   should have been assigned to or teamed with during
9   this time period?
10  A.   No.
11  Q.   Do you have any reason to dispute the fact
12  that there was not anybody available that met your
13  criteria?
14  A.   I have no idea who they've hired or what
15  they've, you know... I just don't know.
16  Q.   All right. You write the letter to Eddie,
17  the typed letter. And that was after you had
18  filed the EEOC charge, right?
19  A.   I don't remember.
20  Q.   But when you typed the letter to Eddie, had
21  you already consulted a lawyer over your EEOC
22  charge?
23  A.   Yes.

Page 102

1   Q.   So you typed the letter to Eddie. Had you
2   talked to anybody at Benny Whitehead about your
3   employment status, before you wrote the letter to
4   Eddie?
5   A.   No. I talked to PeopLease.
6   Q.   What made you call PeopLease?
7   A.   I got a letter from them, I think. I don't
8   remember why I called them.
9   Q.   Okay. What letter did you get from
10  PeopLease?
11  A.   I don't remember why I called PeopLease.
12  Q.   Okay. So you called PeopLease, and who did
13  you talk to?
14  A.   Pam. I think Pam.
15  Q.   What did Pam tell you?
16  A.   She looked it up and said I had abandoned my
17  job.
18  Q.   When was it that you called PeopLease?
19  A.   It was right before I wrote Eddie the
20  letter. I can't tell you the date.
21  Q.   Okay. Like -- all right. The letter that
22  you wrote to Eddie is dated December 5, 2005.
23  Does that sound like about the time that you wrote

Page 103

1   the letter to Eddie?
2   A.   Probably.
3   Q.   All right. And so when would you have
4   called PeopLease?
5   A.   A couple of days before, somewhere around in
6   there. Within a week before I wrote the letter.
7   Q.   Okay. Did you type this letter? Did you
8   type the December 5, 2005, letter to Eddie?
9         THE WITNESS: Did I type it or did
10  Holly type it?
11  A.   I don't remember.
12  Q.   I don't want to get into conversations that
13  you've had with your lawyers or anything that's
14  attorney-client privilege. But do you know did
15  you type this letter?
16  A.   I hand wrote it. I don't think I typed it.
17  Q.   Okay. What was the purpose of writing the
18  letter on December 5, 2005?
19  A.   Because if I didn't have a job, they had
20  $500 in holdback money that I needed.
21  Q.   Okay. Did you get your holdback money?
22  A.   Yes.
23  Q.   Did you get it with a cover letter from

Page 104

1   Eddie?
2   A.   Yes.
3   Q.   Okay. And the letter that you got from
4   Eddie, did it explain that, if you had a partner,
5   that you had work available?
6   A.   I don't think it did.
7   Q.   Okay. Did it tell you you hadn't been
8   fired?
9         MR. ROBERSON: Why don't you show her
10  the letter instead of testing her memory?
11        MS. POTTHOFF: Okay.
12        (Defendants' Exhibit No. 2 was
13        marked for identification and a
14        copy of the same is attached
15        hereto.)
16  Q.   I'm going to show you what I've marked as
17  Defendants' Exhibit 2 which is a copy of the
18  letter that Eddie wrote to you on December 9,
19  2005, apparently in response to your letter.
20        Do you recognize Defendants' Exhibit 2?
21  A.   Yes.
22  Q.   Is it the letter that you received from
23  Eddie Whitehead?

26 (Pages 101 to 104)

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 105

1    A.    Yes.
2    Q.    Okay.  Do you see in it where it says, "Due
3    to your experience level, our insurance company
4    won't allow you to run in a solo position"?
5    A.    Yes.
6    Q.    Is that something that you agree with or
7    disagree with?
8    A.    That's -- I don't see where I can agree or
9    disagree; that's what they said.
10   Q.    Okay.  But you said earlier that Robert is
11   somebody that you know of that drove with less
12   than two years' over-the-road experience; is that
13   right?
14   A.    Yeah.
15   Q.    Okay.  And here he says, "We did call you on
16   or about September 8th to go out, and you were
17   going out of town and wouldn't be back until the
18   following week."  Is that right?
19   A.    That's what it says here.
20   Q.    Do you agree with that statement?
21   A.    September the 8th I was in Texas.  He
22   couldn't have called me.
23   Q.    Okay.  But it says, "On or about..."  So on

Page 106

1    or about means maybe that day, maybe the day
2    before.
3        But he never called you; is that what you're
4    saying?
5    A.    Yes.
6    Q.    And it also says that you haven't been
7    fired; is that right?
8    A.    Yes.
9    Q.    Have you ever been told that you were fired
10   from your position at Benny Whitehead?
11   A.    Benny Whitehead has never told me that.
12   PeopLease told me I abandoned my job.
13   Q.    Right.  But you weren't fired, right?
14   A.    Right.
15   Q.    And then it says, "We haven't been able to
16   meet your criteria as far as a partner you can run
17   with."  Do you see that?
18   A.    Yes.
19   Q.    Is that something that you disagree with?
20   You think they could have found you a partner?
21   A.    I don't know.
22   Q.    Okay.  The next sentence says, "If you can
23   find someone that is qualified to work here, we

Page 107

1    will be more than happy to put you back to work."
2    Do you see that?
3    A.    Yeah.
4    Q.    Has anyone ever told you that if you came
5    with somebody that was qualified to be your
6    partner, that met your criteria as somebody that
7    you wanted to be your partner, and if they could
8    qualify under the insurance requirements and the
9    qualification process, that they would not put you
10   back to work?
11   A.    Has anybody told me that?
12   Q.    Right.
13   A.    No.
14   Q.    Okay.  Has anybody told you -- I mean,
15   during the time period that you were calling Benny
16   Whitehead, you knew that you had a position
17   available there, right?
18   A.    I thought I did.
19   Q.    And you were calling to see if there was
20   somebody to ride with; is that right?
21   A.    Yes.
22   Q.    And so you never thought that you were
23   terminated, did you?

Page 108

1    A.    No.  Not until I heard it from PeopLease.
2    Q.    And PeopLease didn't tell you you were
3    terminated, did they?
4    A.    No.  They told me I abandoned it.
5    Q.    Right.  And they considered it a voluntary
6    quit; is that right?
7    A.    That's the way I took it.
8    Q.    Okay.  Did Pam tell you anything else during
9    that telephone conversation?
10   A.    That she didn't receive my release forms.
11   Q.    Talking about your FMLA release?
12   A.    To go back to work.
13   Q.    All right.  What else did she say?
14   A.    That was about it.
15   Q.    Okay.  But that didn't have anything to do
16   with whether or not you were a voluntary quit or
17   what your status was at PeopLease or Whitehead,
18   did it?
19       MR. ROBERSON:  Object to the form.  You
20   can answer.
21   A.    All right.  But what I'm saying is, she did
22   not tell you, "I haven't received your return to
23   work slip.  I've work available for you.  Had I

27 (Pages 105 to 108)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

## Page 109

1  had that slip, you would be driving a truck." She
2  didn't say that, did she?
3  A.  No.
4  Q.  She didn't tell you anything that would
5  indicate to you that the fact that she may or may
6  not have had your release form affected your job
7  status in any way?
8         MR. ROBERSON:  Object to the form.  You
9  can answer.
10  Q.  She didn't tell you anything like that, did
11  she?
12  A.  No.
13  Q.  Is that just something that she just
14  mentioned while she was on the phone, that she
15  didn't have your FMLA release form?
16  A.  Yes.
17  Q.  Okay.  Did she ask you to get it to her or
18  anything like that?
19  A.  No.
20  Q.  Did you tape record the conversation that
21  you had with PeopLease?
22  A.  No.
23  Q.  Okay.  Where were you when you called them?

## Page 110

1  A.  At home.
2  Q.  All right.  Did Pam tell you anything else
3  during that conversation that you haven't told me?
4  A.  No.
5  Q.  Okay.  What did you say in response when she
6  told you that they had you down as a voluntary
7  quit?
8  A.  That I hadn't quit.
9  Q.  Okay.  And what did she say in response to
10  your statement?
11  A.  "That's what I've got on record."
12  Q.  Okay.  Then you write the letter to Eddie;
13  is that right?
14  A.  Yes.
15  Q.  Okay.  And then he responds back to tell you
16  what your status is; is that right?
17  A.  Yes.
18  Q.  And he tells you that you are not
19  terminated; and that if you have a partner, bring
20  them, and that if they are qualified, you can run
21  loads; is that right?
22  A.  That's what the letter says.
23  Q.  Did you ever make an effort to find a

## Page 111

1  partner that you could team with?
2  A.  I didn't have anybody to -- anywhere to find
3  a partner.
4  Q.  Okay.  But answer my question.  Did you ever
5  make an effort to find somebody?
6  A.  No.
7  Q.  Okay.  And he told you that at this time he
8  didn't have anybody that he could put you with, so
9  he enclosed your check for your holdback money; is
10  that right?
11  A.  Yes.
12  Q.  Okay.  Have you had any other conversations
13  with Eddie Whitehead that you haven't told me
14  about?
15  A.  No.
16  Q.  Have you had any other conversations with
17  Stacy that you haven't told me about?
18  A.  Nothing pertaining to my job.
19  Q.  Okay.  Have you had any conversations with
20  Benny Whitehead that you've not told me about?
21  A.  No.
22  Q.  Have you had any conversations with Benny
23  Paul?

## Page 112

1  A.  Other than just speaking.
2  Q.  Okay.  And your conversations with Amy, have
3  they all been related to your request for money
4  from the Drivers' Fund?
5  A.  Yes.
6  Q.  Okay.  So none of the conversations with Amy
7  have anything to do with your leave status or your
8  request to return back to work; is that right?
9  A.  Right.
10  Q.  Okay.  After you received the letter to
11  Eddie -- I mean, from Eddie -- did you make any
12  attempt to contact anybody at Whitehead at that
13  point?
14  A.  No.  Because when he sent the $500 back to
15  me, you don't get it back unless you don't have a
16  job anymore.
17  Q.  Well, he explained to you in the letter why
18  you were getting the $500, and he explained to you
19  what your status was; isn't that right?
20  A.  He explained why I was getting the $500?
21  Q.  Uh-huh.
22  A.  Yeah.  He just says he's sending it to me.
23  Q.  Okay.  Well, tell me -- well, he says right

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

| Page 113 | Page 115 |
|---|---|

Page 113

1  here, I mean, "At this time, I still don't have
2  anyone that I can put with you, so I have enclosed
3  a check for your holdback. As soon as I come up
4  with something, I will give you a call." Is that
5  right?
6  A.  Yes.
7  Q.  All right. Do you know if, at the time this
8  letter was written, whether or not Eddie knew of
9  your EEOC charge?
10  A.  I don't think so. I don't think it had been
11  filed.
12  Q.  Okay. Tell me, have you had any
13  communication with Benny Whitehead, Inc., since
14  the letter -- since you received this letter from
15  Eddie?
16  A.  No.
17  Q.  Okay. Then you filed your claim for
18  unemployment; is that right?
19  A.  Yes.
20  Q.  Okay. And where did you file your claim for
21  unemployment?
22  A.  I tried filing it in Alabama, and they told
23  me I didn't have anything where I worked in

Page 115

1  A.  Yes.
2  Q.  Then you appealed that decision; is that
3  right?
4  A.  Yes.
5  Q.  And then you were denied benefits from that
6  appeal; is that right?
7  A.  Yes.
8  Q.  And then you had the opportunity for another
9  appeal?
10  A.  I didn't know anything about another appeal.
11  Q.  Okay. Did you ever file any other appeal?
12  A.  I didn't know I could.
13      MR. ROBERSON:  No. Because she'd be
14  nullified. She's got a lawyer that knows the
15  deal.
16      MS. POTTHOFF: I understand. Gotcha.
17  Q.  Anyway, you never filed another appeal from
18  the unemployment decision in Georgia; is that
19  right?
20  A.  That's correct.
21  Q.  And you testified during the unemployment
22  hearing that was here in my office; is that right?
23  A.  Yes.

Page 114

1  Alabama.
2  Q.  Okay.
3  A.  That I had to file it in Georgia.
4  Q.  All right. So you tried to file it at the
5  unemployment office here in Eufaula?
6  A.  On the phone. Because you can file on the
7  phone in Alabama.
8  Q.  All right. And then they told you that you
9  weren't shown as an employee in the state of
10  Alabama, so you couldn't apply for unemployment
11  benefits; is that right?
12  A.  Correct.
13  Q.  Did they tell you where to go to file?
14  A.  Told me I had to file in Georgia.
15  Q.  Okay. And did they know that from looking
16  at some particular thing, or do you have any idea
17  why they told you that you could go to Georgia?
18  A.  They pulled up my work file.
19  Q.  Okay. So then you filed your unemployment
20  claim in Georgia; is that right?
21  A.  Yes.
22  Q.  All right. And you were denied benefits; is
23  that right?

Page 116

1  Q.  And do you believe that if you -- you don't
2  have any reason to dispute the fact that work is
3  available for you at Benny Whitehead if you come
4  to them with a qualified partner?
5  A.  That's what they say.
6  Q.  Right. But you don't have any reason to
7  dispute that, do you?
8  A.  No.
9  Q.  Okay. And you don't know of anybody that's
10  been hired, from the time that you submitted your
11  return to work slip in June of '05 up until today,
12  that could have been your partner?
13  A.  I have no idea.
14  Q.  Okay. And you don't know specifically of
15  anybody that was hired, that was hired as a single
16  driver without two years' over-the-road
17  experience, do you?
18  A.  I have no idea.
19  Q.  Tell me this: The employees in general at
20  Benny Whitehead, do you know whether or not the
21  people out there are typically younger than you
22  are or older than you are, or about the same age?
23  A.  The ones I've seen, there's more younger.

29 (Pages 113 to 116)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 117

```
1   Q.   Okay.
2   A.   I don't know the drivers, but that's just
3   looking.
4   Q.   Okay.  When you were driving, were you
5   assigned a particular route?
6   A.   A particular route?
7   Q.   Right.  When you were driving, did you have
8   a particular assignment that was yours and nobody
9   else's, but you and Mike drove this route?
10  A.   No.  We went to California but we went to
11  different places.
12  Q.   Right.  So the dispatcher would assign -- as
13  loads came available, they would assign loads to
14  whoever was available; is that right?
15  A.   Yes.
16  Q.   So you don't know of anybody that has
17  replaced you?
18  A.   No.
19  Q.   Okay.  And you have no reason to dispute
20  that there is a position still available for you
21  out at Benny Whitehead as we sit here today?
22  A.   No.
23  Q.   Would you go back to work at Benny Whitehead
```

Page 118

```
1   today?
2   A.   Yeah.
3   Q.   Tell me, on what basis do you feel like you
4   were discriminated against because of your age?
5        I'm going to try to isolate, because you
6   have several claims.  Let's just talk about age
7   first.
8   A.   Most of the people that I've seen are young.
9   Q.   Okay.  And when you talk about most of the
10  people you've seen are younger, are you talking
11  about drivers?
12  A.   Yes.
13  Q.   Okay.  Younger male and female?
14  A.   Yes.
15  Q.   And so that's the evidence that, at least,
16  you know about that you believe supports your
17  allegation that you were discriminated against
18  because of your age, is because you've seen other
19  people out there that are younger than you; is
20  that right?
21  A.   Yeah.
22  Q.   Okay.  Has anybody ever said anything to you
23  that you believe was discrimination on the basis
```

Page 119

```
1   of your age?
2   A.   No.
3   Q.   Nobody's ever said, You're too old to drive
4   here?
5   A.   No.
6   Q.   "We don't want people your age here"?
7   A.   No.
8   Q.   Or, "You're cycling out," or something like
9   that?
10  A.   No.
11  Q.   Or, "You don't have much time left to
12  drive"?
13  A.   No.
14  Q.   Or anything like that?
15  A.   No.
16  Q.   You've also sued on the basis of your gender
17  that you are a female.
18       Tell me, what evidence do you have or know
19  of to support your allegation that you were
20  discriminated against because you are a female?
21  A.   Well, for one, not being able to take the
22  loads that Mike could take.
23  Q.   Okay.  Now, Mike, as I understand it, had
```

Page 120

```
1   well over two years' over-the-road driving
2   experience when you started to ride with him; is
3   that right?
4   A.   Yes.
5   Q.   And so the fact that he could drive loads,
6   do you have any reason to dispute the fact that he
7   was able to drive some of those loads because he
8   had two years' over-the-road experience, and it
9   had nothing to do with the fact that he was a
10  male?
11  A.   That's possible.  But two years' experience
12  didn't come up until later.
13  Q.   Okay.  And when was the first time -- you
14  told me earlier the first time you heard about the
15  two years' experience was here at the employment
16  hearing; is that right?
17  A.   Yeah.
18  Q.   So you never knew that that was a
19  requirement there for you to be able to be
20  assigned a single load; is that what you're
21  saying?
22  A.   I wasn't told that.
23  Q.   Okay.  When you filled out your job
```

30 (Pages 117 to 120)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 121

1  application, were you ever given an employee
2  handbook?
3  A.  Yes.
4  Q.  All right.  So if the reason why people --
5  other people, other than you -- were assigned
6  single loads, if it's related to the fact that
7  they have two years' over-the-road driving
8  experience, do you have any reason to dispute the
9  fact that that doesn't anything to do with your
10  gender?
11  A.  I don't understand what you're asking me.
12  Q.  Okay.  You don't believe that there's some
13  pretext reason why they have a two-year
14  over-the-road driving requirement, and that it's
15  really because they don't want women driving; and
16  they put this two-year requirement because more
17  women don't have two years' experience?  Do you
18  understand what I'm saying?
19  A.  (No response.)
20  Q.  You don't have any reason to dispute that
21  that is a requirement from their insurance?
22  A.  I don't know if it's from their insurance or
23  not.

Page 122

1  Q.  Okay.  You also filed a claim for
2  discrimination on the basis of your race, because
3  you're white.
4     Tell me, what evidence do you have that
5  people that are not white are treated differently
6  than you are?
7  A.  I don't know.
8  Q.  Okay.  Do you know of anybody that's treated
9  better than you were at Benny Whitehead because
10  they were not white?
11  A.  I don't know.
12  Q.  Okay.  You don't know of anything; is that
13  right?
14  A.  Yes.
15  Q.  Okay.  Do you know of anyone that was
16  treated better than you were or differently than
17  you were because of their age?
18  A.  I don't know.
19  Q.  You don't know of anybody?
20  A.  No.
21  Q.  Okay.
22  A.  I don't know anybody down there, except
23  the --

Page 123

1  Q.  Yeah.  Except for the one situation that you
2  told me about with Robert, where he was driving;
3  right?  And he's the same age you are, so that
4  doesn't have anything to do with his age; is that
5  right?  Or he's about the same age.
6  A.  Right.
7  Q.  Okay.  Do you know anybody else that had
8  ever been on FMLA?
9  A.  No.
10  Q.  Do you know of anybody else that you feel
11  like that was retaliated against because they
12  filed for leave under FMLA?
13  A.  No.
14  Q.  Did anybody ever say anything negative to
15  you about your FMLA leave?
16  A.  No.
17  Q.  All right.  Did anyone ever say anything
18  negative to you about women?
19  A.  No.
20  Q.  Did anybody ever -- or did you ever hear
21  anybody say anything to anybody else negative
22  about women?
23  A.  No.

Page 124

1  Q.  Did you ever hear anybody else say anything
2  negative about people that take FMLA leave?
3  A.  No.
4  Q.  Okay.  What about older people?
5  A.  No.
6  Q.  Okay.  Did you ever complain to anybody out
7  at Benny Whitehead that you had been discriminated
8  against?
9  A.  No.
10  Q.  Why not?
11  A.  I can't answer that; I just didn't.
12  Q.  Okay.  And you never complained to anybody
13  that you had been retaliated against because you
14  filed for FMLA, did you?
15  A.  Say that again.
16  Q.  You never complained to anybody out at Benny
17  Whitehead that you had been retaliated against
18  because you filed for FMLA; is that right?
19  A.  Right.
20  Q.  Okay.  And you never complained to anybody
21  at PeopLease about that you were discriminated
22  against?
23  A.  No.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 125

1    MR. ROBERSON:  You're talking about
2  other than her EEOC charge?
3    MS. POTTHOFF:  Right.
4    MR. ROBERSON:  Okay.  Until that, she
5  never did.
6    MS. POTTHOFF:  Right.
7    MR. ROBERSON:  Okay.  Well, we agree
8  with that.
9    MS. POTTHOFF:  Okay.
10  Q.   Do you have --
11    MS. POTTHOFF:  Well, let me -- why
12  don't I do this:  I'm going to go through these
13  documents and go through my notes and see kind of
14  where we go from here.  I mean, I've got several
15  documents to go through, so we're not close to
16  leaving; but we will just kind of take a break so
17  I can see where I am so we can use our time
18  wisely.
19    MR. ROBERSON:  Okay.
20    (A brief recess was taken.)
21  (BY MS. POTTHOFF)
22  Q.   I'm looking at your complaint.  And if you'd
23  like a copy of it to look at, you're welcome to

Page 126

1  it.  I'll go ahead and just mark one.  I'm going
2  to mark it as Defendants' Exhibit 3.
3    (Defendants' Exhibit No. 3 was
4    marked for identification and a
5    copy of the same is attached
6    hereto.)
7  Q.   Did you read a copy of the complaint that
8  was filed in federal court, before it was filed?
9  Did you ever read that?
10  A.   Yes.
11  Q.   Let's go to paragraph 10 on page 3.  Well,
12  before we go to that, tell me this:  Mike was
13  fired for the marijuana test.  Did you ever have
14  any of those brownies with the marijuana in them?
15  A.   No.  I'm a diabetic.
16  Q.   Okay.  So you don't eat brownies.  Good for
17  you.  All right.  Let's go to paragraph 10.
18    In here, you make the allegation that Benny
19  Whitehead, Inc., routinely hires truck drivers who
20  are not a part of a team.
21    What evidence do you have to support that,
22  that you know of?
23  A.   He hired me.

Page 127

1  Q.   Okay.  Anybody else that you know of that he
2  hired that was not part of a team?
3  A.   When they were hired?
4  Q.   Yeah.
5  A.   The Kirkhams were hired individually.
6  Q.   Okay.  Anybody else that you know of?
7  A.   I don't know anybody else.
8  Q.   Okay.  What about Linda Barnes.
9  A.   She was hired single.
10  Q.   All right.  Anybody else?
11  A.   Not that I know of.  I don't know anybody
12  else.
13  Q.   What about Ms. Barnes?  Did she ever have
14  any negative experience during her employment with
15  Benny Whitehead that she told you about?
16  A.   Nothing she told me about.
17  Q.   I mean, she doesn't have any complaint that
18  she was discriminated against or anything like
19  that; does she?
20  A.   No.
21  Q.   Did she ever file for FMLA leave while she
22  was working with Benny Whitehead?
23  A.   No.

Page 128

1  Q.   Okay.  What about Robert and his wife?  I
2  mean, do they still work at Benny Whitehead?
3  A.   As far as I know.
4  Q.   Do you know of any complaints that they had
5  about their employment with Benny Whitehead, Inc.?
6  A.   I don't know.
7  Q.   Okay.  Do you know of any former employee
8  that has told you about any complaints that they
9  had while they were working out there?
10  A.   I don't know anybody else that has worked
11  there or works there.
12  Q.   Okay.  So the answer is:  No, nobody's told
13  you -- any former employee has told you about any
14  problems that they had or complaints that they had
15  about their employment at Benny Whitehead; is that
16  right?
17  A.   That's right.
18  Q.   Okay.  Now, tell me, what evidence do you
19  have that not only do they routinely hire truck
20  drivers who are not part of a team, but that they
21  also provide them with team drivers to work with?
22  A.   They did me.
23  Q.   Right.  And they provided you with Mike

32 (Pages 125 to 128)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 129

1    Duniphin, right?
2    A.    Right.
3    Q.    And then D.A. Bryant, right?
4    A.    Right.
5    Q.    And then attempted to provide you with
6    Robert, right?  Stacy called you and said that
7    Robert's wife said no, right?
8    A.    No.
9    Q.    Okay.
10    A.    I don't even know the man's name.
11    Q.    Okay.  Well, didn't she tell you -- I
12    thought you told me earlier, and I thought I wrote
13    it down, that she said, "What do you mean?  Robert
14    didn't call you?"
15    A.    Robert in dispatch.
16    Q.    Okay.  Robert, the dispatcher.  I've got you
17    now.  That straightens that out.  Okay.
18        But she said that they had tried to find
19    somebody, but that their wife would not permit
20    them to ride with a female?
21    A.    No.  The driver said he would not go out
22    with a married woman.
23    Q.    Okay.  Is it difficult to, in your

Page 130

1    experience as a driver, to ride with somebody that
2    you don't like?
3    A.    I don't know if it would be or not because
4    I've liked the people I've rode with.
5    Q.    Well, what about --
6    A.    And I'm sure it would be.
7    Q.    Do you think it's reasonable for somebody
8    not to want to ride with a married woman?
9    A.    Yes.
10    Q.    And that wouldn't have anything to do with
11    your age, right, or the fact that you're white,
12    right?
13    A.    No.
14    Q.    I mean, you understand that that's pretty
15    close quarters that you spend together; is that
16    right?
17    A.    Oh, yes.
18    Q.    And do y'all sleep in the truck?
19    A.    Yes.
20    Q.    And when you sleep in the truck, is there a
21    separate place for you to sleep where the other
22    driver is -- I mean, do y'all have to sleep in the
23    same bed area?

Page 131

1    A.    Yes.
2    Q.    Okay.  And so if both of you want to sleep,
3    you've got to sleep right there together, right?
4    A.    No.  There's two bunks.
5    Q.    Okay.  Are they on top of each other or side
6    by side?
7    A.    On top of each other.
8    Q.    Okay.  But, otherwise, you're still in
9    pretty close quarters with each other, is that
10    right?
11    A.    Yes.
12    Q.    Can you see why some wives would not permit
13    their husband to ride with another female?
14    A.    I can see that.  But that had nothing to do
15    with it.  He was single.
16    Q.    Right.  I understand that.  But I'm just
17    asking you in general.
18        Can you see why that might be a problem for
19    other people?
20    A.    Yes.
21    Q.    Can you see why it might be a problem for
22    somebody that doesn't smoke to ride with somebody
23    that does?

Page 132

1    A.    Yes.
2    Q.    Okay.  Can you see why -- and you don't know
3    how many times you inquired about work, from June
4    until the date you wrote this letter in December?
5    A.    No, I can't tell you how many times.
6    Q.    Okay.  You have no judgment whatsoever?
7    A.    No.
8    Q.    You can't say it's more than five times?
9        MR. ROBERSON:  I object to the form.  I
10    think she said that she checked about every week.
11    I think her testimony is that.
12    Q.    Okay.  But it was always -- so it was just
13    once a week.  So however many weeks there were
14    between June 13th of 2005 and December 9, 2005,
15    that's how many times that you inquired?
16    A.    I checked at least once a week.
17    Q.    Okay.  Did you ever check more than once a
18    week?
19    A.    I can't say; I don't know.
20    Q.    But every week you checked at least once?
21    A.    Yes.
22    Q.    Okay.
23        MR. ROBERSON:  That's about 25.

33 (Pages 129 to 132)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

| Page 133 | Page 135 |
|---|---|

**Page 133**

1 Q. All right. You also state in your complaint
2 that you've suffered embarrassment, humiliation,
3 mental distress, emotional pain, anxiety, or
4 anguish; is that right?
5 A. Yes.
6 Q. All right. Describe the embarrassment that
7 you contend that you've suffered.
8 A. Embarrassment.
9 Q. Yeah.
10 A. When you can't make your bills, you can't
11 pay what's owed, having to borrow money from your
12 children or your parents or your friends to live
13 off of.
14 Q. Okay. What efforts have you made in order
15 to rectify that situation?
16 A. Trying to work at doing hair.
17 Q. And that's not something that you did until
18 June of '06, right?
19 A. Right.
20 Q. Okay. And then the humiliation, is that the
21 same as the embarrassment?
22 A. Yes.
23 Q. Is there any more that you would say in

**Page 135**

1 get one, you just haven't gotten one yet.
2 A. I haven't got one yet.
3 Q. Okay. So you believe that you would get a
4 negative reference from Benny Whitehead, Inc., if
5 somebody called to inquire?
6 A. More than likely.
7 Q. On what basis do you believe that?
8 A. The basis that we're here right now, because
9 I filed a lawsuit.
10 Q. So you think that because you filed this
11 lawsuit that they would give a negative reference?
12 A. Yes.
13 Q. But other than your thoughts, you have no
14 evidence to support that, do you?
15 A. No.
16 Q. Okay. And then mental distress. Tell me
17 about the mental distress that you've suffered.
18 A. Worrying about the bills; worrying about
19 being sick; not having the money to do what needs
20 to be done.
21 Q. Okay. And being sick, are you talking about
22 your congestive heart failure or are you talking
23 about some other illness?

**Page 134**

1 order to describe the humiliation?
2 A. I've had to move. You know, it's just been
3 one thing after another.
4 Q. Okay. But nobody has denied you employment
5 based on the fact that you are no longer working
6 at -- or that you state that you are no longer
7 working at Benny Whitehead, Inc.; is that right?
8 A. No.
9 Q. I mean, nobody said, Hey, you abandoned your
10 job at Benny Whitehead or PeopLease, so therefore
11 I can't hire you; is that right?
12 A. Not yet.
13 Q. Okay. Well, what makes you think that they
14 will say that?
15 A. I don't know what kind of reference I'd get.
16 Q. Okay. But you've never been given a
17 negative reference that you know of?
18 A. Not yet.
19 Q. Why do you think you will get a negative
20 reference?
21 A. I'm just saying I haven't yet.
22 Q. Okay. But by saying "not yet," that
23 basically states that you believe that you will

**Page 136**

1 A. I'm talking about my being diabetic,
2 congestive heart failure, Mike's sickness and
3 losing him, having to borrow money to bury him
4 with.
5 Q. All right. Other than the fact that you are
6 diabetic, are you still -- how long have you been
7 diagnosed as being diabetic?
8 A. Five years.
9 Q. And is it maintained through diet?
10 A. Yes.
11 Q. So you don't have to take insulin or
12 anything like that?
13 A. No, I don't take insulin; I take a pill.
14 Q. What pill do you take?
15 A. Glucophage.
16 Q. Okay. What other physical ailments do you
17 have? medical conditions?
18 A. The congestive heart failure.
19 Q. Right.
20 A. I've had three heart attacks.
21 Q. When did you have the heart attacks?
22 A. October.
23 Q. October of what year?

34 (Pages 133 to 136)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 137

1  A.   '05. When they found the blockages.
2  Q.   Okay.
3  A.   And one was -- I've had two definite heart
4  attacks; not three, two. I'm sorry. The other
5  one was probably two years before that.
6  Q.   Two years before October?
7  A.   Uh-huh.
8  Q.   So sometime in 2003?
9  A.   Yeah.
10 Q.   Was that before you were hired?
11 A.   Yes.
12 Q.   Did you tell them during your medical
13 physical exam that you had had a heart attack?
14 A.   They told me I did no damage. I was never
15 put on any kind of medicine. They got it stopped
16 in time.
17 Q.   Okay. Well, tell me about it though. Where
18 were you treated?
19 A.   LaGrange.
20 Q.   Okay. Did you have to go to the hospital?
21 A.   Yes.
22 Q.   And were you hospitalized?
23 A.   Overnight.

Page 138

1  Q.   Okay. And they just told you they had
2  stopped it and there was no damage?
3  A.   They said they got it stopped in time and
4  there was no damage.
5  Q.   Okay. Were you on any kind of medication to
6  prevent it from happening again?
7  A.   No.
8  Q.   Did you have any other follow-up treatment
9  after that?
10 A.   No.
11 Q.   All right. Any other medical condition?
12 A.   I found out recently that I've got
13 emphysema.
14 Q.   When were you diagnosed with emphysema?
15 A.   Last month.
16 Q.   Who diagnosed you with that?
17 A.   Dr. Haggerty.
18 Q.   Are you receiving any kind of Social
19 Security Disability benefits?
20 A.   No.
21 Q.   Have you applied for any Social Security
22 Disability benefits?
23 A.   No.

Page 139

1  Q.   You applied for the job at West Georgia, so
2  you believe you're able to return back to work?
3  A.   Yes.
4  Q.   And do you believe you're able to drive a
5  truck?
6  A.   Yes.
7  Q.   Do you believe -- have you gotten any -- you
8  talked about your automobile accidents. And those
9  are the only two automobile accidents that you've
10 ever had in your entire life; is that right?
11 A.   Yes.
12 Q.   Have you ever had any tickets?
13 A.   One -- two.
14 Q.   What tickets were those?
15 A.   I had one about 20 years ago for speeding.
16 Q.   Okay.
17 A.   And I got one for no seat belt.
18 Q.   When did you get the no seat belt?
19 A.   While I was in the truck.
20 Q.   You're talking about with the Benny
21 Whitehead truck?
22 A.   Yes.
23 Q.   Do you remember when that was? Were you

Page 140

1  riding with Mike?
2  A.   Yes.
3  Q.   All right. So have you described for me
4  completely your mental distress?
5  A.   I think so.
6  Q.   Okay. What about the emotional pain? Have
7  you described that?
8  A.   I think so.
9  Q.   What about the anxiety or anguish?
10 A.   I think I have.
11 Q.   Tell me, have you had to have any kind of
12 medication as a result of your embarrassment,
13 humiliation, mental distress, or anxiety?
14 A.   I'm on Cymbalta.
15 Q.   Okay. Who prescribed the Cymbalta?
16 A.   Dr. Haggerty.
17 Q.   And does he relate it to your employment
18 with Benny Whitehead?
19 A.   He relates it to everything that's been
20 going on in my life.
21 Q.   Including the fact that your husband has
22 passed away; is that right?
23 A.   Yes.

35 (Pages 137 to 140)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 141

1  Q.  Including the fact that you've got some
2  physical --
3  A.  Financial problems.
4  Q.  Right.  And that you've got some physical
5  ailments too; is that right?
6  A.  Yes.
7        MR. ROBERSON:  Courtney, we'll
8  stipulate that she's not making any claim for
9  medication, if that will help you, or that she
10  hasn't had any treatment for mental anguish for
11  discrimination.  Okay?
12        MS. POTTHOFF:  Okay.
13  Q.  And you confirm what your lawyer has just
14  said?  You have not had to have specific treatment
15  that you claim has related to your claims of
16  mental distress, embarrassment, humiliation, or
17  anxiety, as a result of the claims that you are
18  making in this lawsuit?
19  A.  Yes.
20  Q.  All right.  Do you have any evidence that
21  substantially younger employees have been found
22  team partners?
23  A.  No.

Page 142

1  Q.  Okay.  I'm going to go through and mark some
2  documents.  I want you to identify, first, whether
3  or not you've ever seen them or are familiar with
4  them or anything like that.  Okay?
5  A.  Okay.
6  Q.  All right.  The first one I'll mark for you
7  is a copy of the Driver's Handbook & Safety
8  Manual.  I'll mark it as Defendants' Exhibit 4.
9        (Defendants' Exhibit No. 4 was
10        marked for identification and a
11        copy of the same is attached
12        hereto.)
13  Q.  Did you ever receive a Driver's Handbook &
14  Safety Manual?
15  A.  Yes.
16  Q.  Did you ever go through any kind of safety
17  training before you were put on the road?
18  A.  No.
19  Q.  But you would have received some training
20  while you were on the road with Mike; is that
21  right?
22  A.  Yes.
23  Q.  Okay.  I'm sorry.  You said you've seen

Page 143

1  this, right?
2  A.  Yes.
3  Q.  And you received a copy?
4        MR. ROBERSON:  Courtney, just for the
5  record, she didn't make any claim in this lawsuit
6  for race discrimination.  She did in the EEOC
7  charge.
8        MS. POTTHOFF:  That's right.  Okay.
9  Q.  Did you ever read anything in the Driver's
10  Handbook & Safety Manual that stated that the
11  drivers were required to have 24 months of
12  over-the-road driving experience?
13  A.  I didn't read the whole handbook.
14  Q.  Okay.  Did you read any part of the handbook
15  or the safety manual?
16  A.  Parts of it.
17  Q.  What parts did you look at?
18  A.  Just really glanced through it.
19  Q.  Okay.
20        (Defendants' Exhibit No. 5 was
21        marked for identification and a
22        copy of the same is attached
23        hereto.)

Page 144

1  Q.  I'm going to show you what I've marked as
2  Defendants' Exhibit 5, which is a copy of your
3  EEOC charge.
4        Do you recognize that?
5  A.  Yes.
6  Q.  Okay.  Is that your signature on the first
7  page, down at the bottom?
8  A.  Yes.
9  Q.  And the information that's provided in the
10  attachment is information that you swore to and
11  provided your lawyers; is that right?
12  A.  Yes, ma'am.
13  Q.  All right.  And you understood at the time
14  that the information that's provided in the
15  Attachment A is sworn under oath; is that right?
16  A.  Yes.
17  Q.  Okay.
18        (Defendants' Exhibit No. 6 was
19        marked for identification and a
20        copy of the same is attached
21        hereto.)
22  Q.  I'm going to show you what I've marked as
23  Defendants' Exhibit 6, which is a letter dated

36 (Pages 141 to 144)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 145

1　December 5, 2005.  There's some markings on the
2　bottom, which is my handwriting, "E-1."  That's
3　where we faxed it during the unemployment hearing.
4　I don't know if you remember that.
5　　　But other than that, this is your letter --
6　what I've marked as Defendants' Exhibit 6 -- that
7　you mailed to Eddie Whitehead; is that right?
8　A.　Yes.
9　Q.　And it's dated December 5, 2005; is that
10　correct?
11　A.　Yes.
12　Q.　And that's about when you would have mailed
13　it?
14　A.　Yes.
15　Q.　Okay.  We've already talked about parts of
16　that letter.  Okay.
17　　　(Defendants' Exhibit No. 7 was
18　　　marked for identification and a
19　　　copy of the same is attached
20　　　hereto.)
21　Q.　I've marked Defendants' Exhibit 7, which is
22　the Decision of the Administrative Hearing Officer
23　from the Georgia Department of Labor Appeals

Page 146

1　Tribunal.
2　　　Did you ever read the decision in your
3　unemployment case?
4　A.　Yes.
5　Q.　Okay.  Did you see where you could have
6　filed another appeal?  It's on the back.
7　A.　The letter that I got said it was denied
8　because of findings was I was still employed.  I
9　didn't think I could appeal it again.
10　Q.　All right.  Here, on page 2, it notifies you
11　of the appeal rights and it tells you when they
12　expire.  Do you see that?
13　A.　Yes.
14　Q.　Did you ever read that or anything like
15　that?
16　A.　This was not the same letter that I got.
17　Q.　Okay.  So you never got Defendants' Exhibit
18　7?  You didn't get the Decision that was rendered
19　in May regarding your employment; is that right?
20　A.　The paperwork I got looked similar to this.
21　Q.　Looked similar to Defendants' Exhibit 5,
22　which is your charge?
23　A.　It was not like this.  It stated that I was

Page 147

1　denied my claim because it said I was still
2　employed.
3　Q.　Okay.  And was that the initial decision
4　that you did file an appeal?
5　A.　That was the second one after the hearing.
6　Q.　Okay.
7　　　MS. POTTHOFF:  Do y'all know what
8　she's --
9　　　MR. ADAMS:  I don't.  Let me look.
10　Q.　All right.  While they look to see if they
11　can find the notification that you're talking
12　about, I'm going to mark Defendants' Exhibit 8,
13　which I believe is your return to work slip from
14　Northside Cardiology; is that right?
15　　　(Defendants' Exhibit No. 8 was
16　　　marked for identification and a
17　　　copy of the same is attached
18　　　hereto.)
19　A.　Yes.
20　Q.　Okay.  Is this what you took to Stacy to say
21　that you could come back to work after your FMLA
22　leave?
23　A.　Yes.

Page 148

1　Q.　Okay.  I'm going to show you what I'm
2　marking as Defendants' Exhibit 9, which is a
3　letter dated April 22, 2005, To Whom It May
4　Concern, regarding your care from Dr. Haggerty.
5　　　(Defendants' Exhibit No. 9 was
6　　　marked for identification and a
7　　　copy of the same is attached
8　　　hereto.)
9　Q.　Do you recognize that?
10　A.　Yes.
11　Q.　Did you request Dr. Haggerty to write a
12　letter to your employer to verify that you were
13　out of work and unable to drive?
14　A.　Yes.
15　Q.　And who requested that you send that letter?
16　A.　I did.
17　Q.　Okay.  Did anybody at Benny Whitehead say
18　that they needed this for any reason, Defendants'
19　Exhibit 9?
20　A.　When he told me I couldn't go back to work,
21　I told him I needed something to take to my
22　employer.
23　Q.　Okay.  And you didn't get that until April

37 (Pages 145 to 148)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 149

1 of '05; is that right?
2 A. (No response.)
3 Q. I mean, you were already on leave. I mean,
4 I'm not saying that there's a problem with that;
5 I'm just trying to establish what days.
6 A. It's when it's dated.
7 Q. Okay.
8 A. Yeah. That was after I went in the hospital
9 in the first of March, yeah.
10 Q. Okay. I'm going to show you what I'm going
11 to mark as Defendants' Exhibit 10, which is an
12 Employer Response to Employee Request for Family
13 or Medical Leave form.
14     (Defendants' Exhibit No. 10 was
15     marked for identification and a
16     copy of the same is attached
17     hereto.)
18 Q. Have you ever seen this?
19 A. Yes.
20 Q. Okay. When did you see Defendants' Exhibit
21 10?
22 A. I got one in the mail.
23 Q. Okay. And did you read over it?

Page 150

1 A. I filled it out and sent it back to them.
2 Q. Did you have any kind of questions about it
3 or anything like that?
4 A. No.
5 Q. Okay. I'm going to show you what I'm going
6 to mark as Defendants' Exhibit 11.
7     (Defendants' Exhibit No. 11 was
8     marked for identification and a
9     copy of the same is attached
10     hereto.)
11 Q. This is the Benny Whitehead, Inc., Employee
12 Handbook.
13     Did you receive a copy of Defendants'
14 Exhibit 11?
15     THE WITNESS: Is that the red one?
16     MR. ROBERSON: I don't know. I'm sure
17 you got one.
18 A. Yes.
19 Q. Okay. Did you ever read it, take a look at
20 it?
21 A. When I was hired, she went over parts of it
22 and gave me a copy of it and told me to read it
23 later.

Page 151

1 Q. Okay.
2 A. I skimmed through it.
3 Q. Okay. Did you ever see anything in it that
4 -- did you see the statement in it where they
5 state that they don't discriminate on the basis of
6 sex, race? Did you look --
7 A. She read that to me that day.
8 Q. Okay. You don't recall anything else that
9 she read to you, do you?
10 A. Not about being employed.
11 Q. Okay. I'm going to mark this as Defendants'
12 Exhibit 12.
13     (Defendants' Exhibit No. 12 was
14     marked for identification and a
15     copy of the same is attached
16     hereto.)
17 Q. Did you receive a copy of PeopLease's
18 Employee Handbook?
19 A. I don't remember ever getting a PeopLease
20 handbook.
21 Q. Okay. Did you ever sign a certification
22 that you had received the PeopLease Employee
23 Handbook?

Page 152

1 A. I don't remember getting it. If I did,
2 y'all have got it.
3 Q. Okay.
4 A. If I signed for it, I've probably got it at
5 home, if I've got it. I'm not saying I did or I
6 didn't.
7 Q. Right.
8 A. I don't remember.
9 Q. Okay. Because I've got a copy of the
10 certification saying that you received the
11 handbook. It's in your personnel file.
12 A. Okay.
13 Q. So you don't have any reason to dispute that
14 you received the handbook from PeopLease? Of
15 course, it doesn't look anything like -- it's
16 folded over. It's in a small booklet form.
17 A. I'm not saying I did or I didn't.
18 Q. It doesn't look like what I've given you
19 today as far as formatwise.
20 A. Yeah.
21 Q. Okay. On Exhibit 12, if you would refer to
22 page 2, please.
23 A. Okay.

38 (Pages 149 to 152)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 153

1  Q.   Do you see where it has a statement about
2  PeopLease does not discriminate on the basis of
3  race, color, religion, sex, age, marital status,
4  sexual orientation, national origin, or any other
5  classification protected?
6  A.   Yes.
7  Q.   Okay. And then it also directs anybody who
8  encounters unacceptable conduct that violates this
9  policy should immediately bring it to the
10  attention of the Human Resources Department.
11      Do you see that?
12  A.   Yes.
13  Q.   And you never brought anything to their
14  attention, did you?
15      MR. ROBERSON: Until your EEOC charge.
16  Q.   Prior to filing your EEOC charge, you never
17  brought any conduct to their attention, did you?
18  A.   No.
19  Q.   And you were never subject to any kind of
20  sexual harassment or anything like that, were you?
21  A.   No.
22  Q.   Okay. Let's go to page 8. Did you ever
23  read the section regarding FMLA?

Page 154

1  A.   I don't remember.
2  Q.   Okay. And you believe you complied with
3  everything necessary -- which I don't have any
4  reason to believe that you didn't -- in order to
5  obtain your FMLA; is that right?
6  A.   Yes.
7  Q.   And your sole complaint regarding your FMLA
8  is that you feel like you were retaliated against
9  because you took it, and that your job was not
10  offered back to you whenever you came back; is
11  that right?
12  A.   Yes.
13  Q.   But no other complaints regarding your FMLA;
14  is that right?
15  A.   Right.
16  Q.   Okay. Do you have any other documents
17  related to your employment with either Benny
18  Whitehead or PeopLease?
19      MR. ROBERSON: Other than the two
20  letters that she wrote?
21      MS. POTTHOFF: Right.
22  Q.   Other than the two letters, did you keep
23  anything from your employment with Benny Whitehead

Page 155

1  or PeopLease?
2      MR. ROBERSON: There's another letter
3  about the Drivers' Fund, but nothing about these
4  claims.
5      MS. POTTHOFF: Okay.
6  Q.   You don't have any other documents at home
7  or that you've given to your lawyers that relate
8  to your employment with PeopLease or Benny
9  Whitehead; is that right?
10  A.   Yes.
11  Q.   All right. Because your lawyer filed
12  initial disclosures in the federal case and
13  provided copies of the EEOC charge, the letter
14  that we've had that was dated in December, and
15  then today I've gotten the other handwritten
16  letter, you don't know of anything else other than
17  that, right?
18  A.   No.
19  Q.   Okay. And I'm going to just list some of
20  these people that they've listed on their initial
21  disclosures that might have discoverable
22  information about your lawsuit. Okay? And we're
23  talking about the federal lawsuit.

Page 156

1      Obviously yourself. And then Benny
2  Whitehead. What would Benny Whitehead know, other
3  than about the conversation that you had with him,
4  what do you believe that he knows about this
5  lawsuit?
6  A.   He knows what he's told me.
7  Q.   Okay. And as far as what's relevant to this
8  lawsuit is the one conversation that you told me
9  about earlier that you had with him and Eddie; is
10  that right?
11  A.   Right.
12  Q.   And then Eddie Whitehead. Do you know of
13  anything that Eddie knows, other than what you've
14  already told me that he said to you during
15  conversations?
16  A.   I can't tell you what Eddie knows, other
17  than what we've discussed.
18  Q.   Okay. What about Deb? Have you ever talked
19  to Deb Hoyt at PeopLease?
20  A.   I don't know anybody. I think the girl that
21  I talked to was named Pam.
22  Q.   Right. So you don't know what she may or
23  may not know; is that right?

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 157

1  A.  No.
2  Q.  And then Amy Culpepper.  She had no dealings
3  with you that relate to the claims that you have
4  in this federal lawsuit; is that right?
5  A.  Right.
6  Q.  Okay.  And then B.W. Allen.  Who is that?
7  A.  B.W. Allen?
8  Q.  Yeah.  It says, "B.W. Allen."
9  A.  I don't know.
10  Q.  Okay.  It might be Mr. Bryant, maybe.  But
11  you don't know a B.W. Allen, do you?
12  A.  No.
13  Q.  Okay.
14      MR. ROBERSON:  I don't know.  I don't
15  know who B.W. Allen is either.
16      MR. BENNY PAUL WHITEHEAD:  There's a
17  Bruce Allen that works for us.
18  Q.  What about Bruce Allen?  Do you know Bruce
19  Allen?
20  A.  (Witness shakes head.)
21  Q.  No?
22  A.  (Witness shakes head.)
23  Q.  Do you know anybody by the last name Allen

---

Page 158

1  that worked at Benny Whitehead that knows anything
2  that might be relevant to this lawsuit?
3  A.  I don't know anybody.
4  Q.  Okay.  That's fine.
5      MR. ROBERSON:  That's my mistake.
6      MS. POTTHOFF:  That's all right.
7  Q.  Okay.  I think right now I'm going to turn
8  it over to Jim to ask his follow-up questions; and
9  then if I've got some more, then I will ask those.
10  Okay?
11      MR. ROBERSON:  Are you going to skip
12  me?
13      MS. POTTHOFF:  Well, I thought you
14  would want to wait until after --
15      MR. ROBERSON:  I'll just do mine.  I
16  won't be long.  Are you going to be as long as
17  Courtney?
18      MR. CALTON:  I've got some follow-up
19  questions.  I just need to find out some
20  information about some of the people that y'all
21  have discussed today.
22  BY MR. CALTON:
23  Q.  Tell me, what was your maiden name before

---

Page 159

1  you got married to Mr. Browning?
2  A.  Whitley.
3  Q.  Whitley?  How do you spell that?
4  A.  W-H-I-T-L-E-Y.
5  Q.  Where were you born?
6  A.  In LaGrange, Georgia.
7  Q.  So LaGrange is where you were born and you
8  were raised; and you lived there until you went to
9  the different places you and Courtney have already
10  talked about?
11  A.  Yes.
12  Q.  Okay.  And when you moved from LaGrange to
13  Eufaula, where did you live when you first moved
14  here?
15  A.  Out on 165.  Mike and I rented a place out
16  there.
17  Q.  Okay.  And I was understanding that you met
18  Mike when you started work at Benny Whitehead.
19  Did you know Mike before?
20  A.  No.
21  Q.  So when your instructor faxed the
22  information over and you spoke with Stacy and you
23  came over here and, I guess, interviewed for the

---

Page 160

1  job and you got the job, did you know Mike at that
2  point?
3  A.  No.  I met Mike the day I got in the truck
4  with him.
5  Q.  All right.  So when you moved over here, you
6  moved over here once you already had the job and
7  the haul that you were about to make?  You weren't
8  living here in Eufaula and then you got the haul?
9  Did you follow my question?
10  A.  No.  I lived in LaGrange.
11  Q.  So that first haul, you came back to
12  Eufaula; and then that's when you changed your
13  residence to Eufaula?
14  A.  No.  It was months later before I moved to
15  Eufaula.
16  Q.  All right.  So you were actually working for
17  Benny Whitehead, Inc., but living in LaGrange?
18  A.  Yes.
19  Q.  And then you met Mike on that first haul.
20  Tell me a little bit about y'all's romance.  How
21  did that start?  Just tell me what you remember
22  about it.
23  A.  We were friends first, and it just worked

---

40 (Pages 157 to 160)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 161

1  out between us.
2  Q.  Do you remember, did either one of y'all
3  initiate the first romantic contact or was it
4  something that was just a mutual feeling between
5  the two of you?
6  A.  It was just a mutual thing.
7  Q.  Was he married?  Were you his first wife?
8  A.  No.  I was his third wife.
9  Q.  Third wife.  Would you happen to know the
10  names of his first two wives?
11  A.  The first one was -- the second one was
12  Carol.
13  Q.  Carol?  Did she keep Duniphin?
14  A.  I have no idea.
15  Q.  You don't know what her last name is now?
16  A.  I don't know where she is or what her last
17  name is now.  Dorothy was his first wife's name.
18  Q.  Okay.  What about her?  Do you know if she
19  still goes by Duniphin?
20  A.  I have no idea.
21  Q.  All right.  Was Mike from Eufaula?
22  A.  No.
23  Q.  Where was he originally from?

Page 162

1  A.  He was born in Oklahoma.
2  Q.  How did he get to Eufaula?
3  A.  I don't know that.  He was living here when
4  I met him.
5  Q.  Okay.
6  A.  I know he moved back here from Florida to go
7  back to work with Benny, because he had worked
8  there before.
9  Q.  I know there's a Eufaula, Oklahoma.  I
10  didn't know if he had ever mentioned that, that he
11  knew about Eufaula, Oklahoma, and he ended up in
12  Eufaula, Alabama.
13  A.  No.
14  Q.  What about his children?  Did he have any
15  children?
16  A.  Two.
17  Q.  Two children?  And what are their names?
18  A.  Rob and Melissa.
19  Q.  Is Rob short for Robert?
20  A.  I think; I don't know.  I've never met them.
21  Q.  Rob and Melissa.  And how old are Rob and
22  Melissa?
23  A.  Rob, I think, is 35, somewhere around there.

Page 163

1  I just found his son about a month ago.
2  Q.  Okay.
3  A.  Because he didn't know his dad was dead.
4  Q.  He didn't know his father had passed away?
5  A.  No.
6  Q.  They did not stay in regular contact?
7  A.  No.
8  Q.  Did he find you?  How did you find him?
9  A.  I found him going through the Internet.
10  Q.  Just looking for Duniphin and calling
11  around?
12  A.  Yeah.  And he's in California.
13  Q.  Did he know that his dad had married?
14  A.  No.
15  Q.  Do you know if there was -- what was the
16  interpersonal relationship between Rob and his
17  dad?
18  A.  They didn't have one for the last ten years.
19  Q.  Why is that?
20  A.  I don't know for sure.
21  Q.  Mike never discussed that with you?
22  A.  He said most of it was because of his wife
23  then and his ex-wife came between them.

Page 164

1  Q.  Do you know if Rob was the child of Carol or
2  Dorothy?
3  A.  Dorothy.  Both of them were the children of
4  Dorothy.
5  Q.  And what about Melissa?  What was his
6  relationship with Melissa?
7  A.  He had no contact with either one of them.
8  Q.  And do you know if Melissa knows that her
9  dad and you were married?
10  A.  She does now.
11  Q.  And Melissa didn't know that Michael had
12  passed away?
13  A.  No.
14  Q.  Do you stay in contact with them now?
15  A.  I speak to Rob occasionally.
16  Q.  Where does he live now?
17  A.  Pleasanton, California.
18  Q.  Okay.
19  A.  I think that's the name of it.
20  Q.  And what about Melissa?  Do you know where
21  she lives?
22  A.  Bakersfield.
23  Q.  Is that in California?

41 (Pages 161 to 164)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 165

1  A.   Uh-huh.
2       MR. ROBERSON:  Yes?
3  A.   Yes.
4  Q.   Who was your instructor at West Georgia
5  Tech?
6  A.   Tommy Ray.
7  Q.   And is he the one that faxed the information
8  over to Benny Whitehead for you?
9  A.   Yes.
10  Q.   And you mentioned that you were going back
11  to West Georgia Tech to be a CDL instructor; is
12  that correct?
13  A.   Yes.
14  Q.   Is Tommy Ray still there?
15  A.   Yes.
16  Q.   Have you had any discussions or contact with
17  Tommy Ray regarding this lawsuit?
18  A.   No.
19  Q.   Either lawsuit, state or federal?
20  A.   No.
21  Q.   Does Tommy Ray know anything about it, to
22  your knowledge?
23  A.   As far as I know, no.

Page 166

1  Q.   Has Tommy Ray ever told you he recalls
2  conversations with the recruiter or anyone at
3  Benny Whitehead regarding your employment?
4  A.   As far as I know, he never had a
5  conversation with them.
6  Q.   He just simply faxed the information; and
7  that's the only contact that you know that he has
8  had with Benny Whitehead regarding your
9  employment?
10  A.   As far as I know.
11  Q.   As far as you know?
12  A.   (Witness nods head.)
13  Q.   Is that yes?
14  A.   Yes.
15  Q.   You were making it a point, it seemed, to
16  indicate that you were not hired as a team driver
17  but as a single driver; is that correct?
18  A.   I wasn't hired on as a team.
19  Q.   You weren't hired on as a team driver?  Is
20  there any document or any kind of handbook or
21  anything that --
22  A.   I didn't bring another partner with me.
23  Q.   Right.  Did you understand though that you

Page 167

1  were going to be part of a team driving?
2  A.   Yes.
3  Q.   Can you point to anything that -- document,
4  literature, advertisement -- that indicated Benny
5  Whitehead was responsible for putting you with a
6  team driver?
7  A.   No, other than word of mouth.
8  Q.   Do you know when you say "word of mouth," is
9  there any specific person you can tell us about
10  that would have told you that?
11  A.   That would have told me what?
12  Q.   That Benny Whitehead was responsible for
13  putting you with another driver to make a team
14  driving.
15  A.   Not that they were responsible, but that
16  they would be putting me with somebody.
17  Q.   Is there anything that you can point to that
18  shows that you were told or not told that it was
19  your responsibility to bring a team driver on
20  board?
21  A.   Not until I got that letter from Eddie, and
22  he mentioned it in my hearing.
23  Q.   All right.  And I believe you've testified

Page 168

1  that you yourself have not done anything to find a
2  team driver; is that correct?
3  A.   That's correct.
4  Q.   Is there any literature or advertisements or
5  anything that you can point to and tell us that
6  says Benny Whitehead will accept drivers with less
7  than two years' over-the-road driving experience?
8  A.   Other than they hired me.
9  Q.   Okay.  With the qualification that you were
10  going to be part of a team driving group; is that
11  correct?
12  A.   Yeah.
13  Q.   Did you understand that you were going to be
14  part of a team?
15  A.   Yes.
16  Q.   All right.  Did you ever -- Mr. Duniphin was
17  your first trainer; is that correct?
18  A.   Yes.
19  Q.   Did you and Mr. Duniphin ever discuss the
20  requirements of employment as a truck driver with
21  Benny Whitehead, Incorporated?
22  A.   No.
23  Q.   He had more experience at driving, correct?

42 (Pages 165 to 168)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

---

Page 169

1  A.  Yes.
2  Q.  He was your trainer, correct?
3  A.  Yes.
4  Q.  And this is either before or after your
5  relationship and eventual marriage:  Did y'all
6  ever talk about what requirements there would be
7  to be an over-the-road driver for Benny Whitehead,
8  Inc.?
9  A.  No.
10  Q.  Whose house were you at with the brownies?
11  A.  I would rather not give their names.
12      MR. ROBERSON:  You need to tell them.
13  A.  Burt and Cindy Hunter.
14  Q.  And did you say they live in LaGrange?
15  A.  Yes.
16  Q.  Within the city limits of LaGrange?
17  A.  No.  They're in Troup County.
18  Q.  When was the last time you spoke with either
19  Burt or Cindy?
20  A.  I spoke with Burt on the phone in April when
21  Mike died.
22  Q.  Okay.  How do you know Burt or Cindy?
23  A.  They used to be my neighbors.

---

Page 170

1  Q.  And it was their house where these brownies
2  were either served or made?
3  A.  Yes.
4  Q.  And when you called them trying to find out
5  how the marijuana got into Mike's system, who told
6  you, Burt or Cindy, that brownies were served at
7  their Christmas party that had marijuana in them?
8  A.  Burt.
9  Q.  Did he tell you that he made the brownies?
10  A.  He just said, "We had it in the brownies."
11  Q.  Did you ask him what "it" was?
12  A.  I just asked him about pot.
13  Q.  About pot?  And he referred to "it" to your
14  question about pot?
15  A.  Yeah.
16  Q.  Did he apologize or say he was sorry?
17  A.  Yes.
18  Q.  Did he offer to explain, to come show up and
19  explain what he had done?
20  A.  No.
21  Q.  In September of 2005, you had attended
22  Mike's mother's birthday party?
23  A.  Mike's grandmother's.

---

Page 171

1  Q.  Okay.  What's her name?
2  A.  Agnes Ringer.
3  Q.  And where in Texas did y'all go?
4  A.  Lubbock.
5  Q.  Lubbock, Texas.  Is Ms. Ringer still living?
6  A.  Yes.
7  Q.  And she turned 100 in September of 2005, so
8  she just turned 101?
9  A.  101.
10  Q.  Okay.  Have you talked to her since her
11  birthday?
12  A.  Yes.
13  Q.  Did she make the trip for Mike's funeral?
14  A.  She couldn't.
15  Q.  You had mentioned your conversation with
16  Benny Whitehead, and he asked you to get a list
17  together.  What list did he ask you to get
18  together?
19  A.  Of what I owed, what I was behind on.
20  Q.  All right.  Did you ever get that list
21  together?
22  A.  Yes.
23  Q.  And who did you give that list to?

---

Page 172

1  A.  I took it to Stacy.
2  Q.  And you gave it to Stacy?
3  A.  Yes.
4  Q.  And what did Stacy tell you that she was
5  going to do with that list?
6  A.  She would see to it Benny got it.
7  Q.  Okay.  And what did you put on that list
8  that you owed?
9  A.  I've got a copy of it, but I can't tell you
10  exactly.  It was close to $4,000.
11  Q.  And have you turned that copy over to your
12  attorneys?
13  A.  I don't know.  I know I've got a copy of it.
14  Q.  Well, if you haven't, will you, please?
15  A.  Okay.
16  Q.  Thank you.  The letter that -- is the letter
17  that we saw for the first time today, the
18  handwritten letter, is that the first letter that
19  you sent to Eddie?  I believe that's Defendants'
20  Exhibit 1.  Is that the first letter?
21  A.  Yes.
22  Q.  Did you send that by certified mail?
23  A.  No.  I just mailed it.

---

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

---

Page 173

1  Q.  Did you send any correspondence to Benny
2  Whitehead, Inc., by certified mail?
3  A.  I don't think I did. I don't remember if I
4  did.
5  Q.  All right. Let me ask you this: Do you
6  remember receiving a return card saying that Benny
7  Whitehead, Inc., or someone at Benny Whitehead,
8  Inc., had received correspondence from you?
9  A.  Not on this one.
10  Q.  On any of them?
11  A.  I got the letter back with the check.
12  Q.  Right. But did you ever receive a return
13  card? It should be a green card.
14  A.  No.
15  Q.  Okay. And then the second letter that you
16  wrote to Eddie, I believe, was in December of
17  2005; is that correct? the typed letter?
18  A.  Yes.
19  Q.  Had you gotten your settlement from the car
20  accident before or after that letter?
21  A.  I don't remember.
22       MR. ADAMS:  The car accident was in
23  December.

---

Page 174

1  A.  I didn't have the accident from my -- my
2  personal vehicle?
3  Q.  Right.
4  A.  I had the wreck after.
5  Q.  Okay. So your personal accident where you
6  got the concussion, that wasn't until December 11,
7  2005?
8  A.  Six days after the letter.
9  Q.  Okay. And you had made the comment, and I
10  just kind of wanted to explore it a little bit
11  because I want you to tell us now: With the
12  conversation with Benny Whitehead, he was mad.
13      What was said, what was done, to indicate to
14  you that he was mad?
15  A.  To indicate he was mad?
16  Q.  Sure.
17  A.  He said he got pissed because I had filed
18  that insurance claim; and the letter came from
19  Russell Irby's office, and he tried to be sued by
20  that son of a bitch before.
21  Q.  And you believe that's close to his exact
22  words?
23  A.  Yes.

---

Page 175

1  Q.  Anything else?
2  A.  Well, that was --
3  Q.  I just want to know if there is anything
4  else that you recall specifically that he said
5  that you can tell me about that would indicate to
6  you that he was mad. Because mad is a
7  subjective ...
8  A.  He just said he got pissed about the letter.
9  Q.  Okay. And just to put this in the time
10  frame and the context, do you claim that you were
11  discriminated against while you and Michael were
12  team driving?
13  A.  No.
14  Q.  So your discrimination claims only occurred
15  after you and Michael were no longer team drivers;
16  is that correct?
17  A.  Correct.
18  Q.  And I apologize for this; I wasn't here on
19  the EEOC or any of the employment questions, but
20  did you ever apply for unemployment?
21  A.  Yes.
22  Q.  And were you denied?
23  A.  Yes.

---

Page 176

1  Q.  And what was the reason?
2  A.  They said I'm still employed.
3  Q.  Okay. I'm finished.
4       MR. ROBERSON:  I've got some questions.
5       MS. POTTHOFF:  Okay. Go ahead.
6  BY MR. ROBERSON:
7  Q.  Gloria, you were released from your FMLA
8  leave on June 13th, 2005; is that correct?
9  A.  Yes.
10  Q.  And you filed this EEOC charge. It's dated
11  December 1st. Looks like they got it in the EEOC
12  office December 2, 2005. Do you agree with that?
13  A.  Yes.
14  Q.  For the EEOC to hear or investigate your
15  claim, you have to file it within 180 days of the
16  discriminatory act.
17      And what you are complaining about is that
18  you hadn't been put back to work, right?
19  A.  Right.
20  Q.  Well, that was about 170 days later, when
21  you weren't put back to work; so you had to file
22  an EEOC charge in order to bring this claim. Did
23  you know that?

---

44 (Pages 173 to 176)

LEGALINK, A MERRILL COMMUNICATIONS COMPANY
Court Reporting * Legal Videography * Trial Services

Page 177

1    A.    Right.
2    Q.    So you waited as long as you could to file
3    an EEOC charge, right?
4    A.    Yes.
5    Q.    You were trying to go back to work, weren't
6    you?
7    A.    Yes.
8    Q.    And you called every week?
9    A.    Yes.
10   Q.    And you were told essentially the same thing
11   every week, right?
12   A.    Yes.
13   Q.    Is that frustrating?
14   A.    Very.
15   Q.    I mean, when you've got bills to pay, you
16   just wanted to work, didn't you?
17   A.    That's all I wanted.
18   Q.    You didn't want a lawsuit, did you?
19   A.    No. I enjoyed my job.
20   Q.    Well, is it frustrating when they won't put
21   you back to work?
22   A.    Very.
23   Q.    Now, when you were just out of school, did

Page 178

1    you know anybody that worked at Benny Whitehead?
2    A.    No.
3    Q.    You didn't know a soul at Benny Whitehead,
4    did you?
5    A.    No.
6    Q.    And when you were hired, they hired you as a
7    single person, right?
8    A.    Yes.
9    Q.    You weren't part of any team that was being
10   hired, were you?
11   A.    No.
12   Q.    They assigned you to Mike Duniphin, right?
13   A.    Yes.
14   Q.    And you wound up marrying him?
15   A.    Yes.
16   Q.    But that was just a fortuity. Now, when
17   Mike got fired about these brownies, Mike got
18   fired and they put you with another -- they
19   assigned you to another driver, didn't they?
20   A.    Yes.
21   Q.    What's his name?
22   A.    D.A.
23   Q.    D.A. Bryant?

Page 179

1    A.    Yes.
2         MR. ROBERSON: Okay. That may be what
3    that name was supposed to be. That may be an
4    error on my part. And I make many.
5    Q.    And you worked with D.A.?
6    A.    Yes.
7    Q.    All right. Well, did you get along with
8    D.A.?
9    A.    Yes.
10   Q.    To your knowledge, did he get along with
11   you?
12   A.    To my knowledge.
13   Q.    And you said he had a dog?
14   A.    Yes.
15   Q.    That went on trucks with you?
16   A.    Misty.
17   Q.    What kind of dog was it?
18   A.    A miniature poodle.
19   Q.    Well, are you -- and this is not a very good
20   question: Are you difficult to get along with, to
21   your knowledge?
22   A.    I don't think so.
23   Q.    Okay. I mean, I am, but... Well, would you

Page 180

1    work right now with D.A. Bryant, I mean, if they
2    would put you with him?
3    A.    Yeah.
4    Q.    Okay. Now, I know you don't know anybody
5    that works for -- wait a second. From June 13th
6    of 2005 until this letter from, is it Eddie
7    Whitehead on the 9th of December?
8    A.    5th.
9    Q.    No. You wrote a letter to Eddie, and he
10   wrote you back on the 9th, I think.
11   A.    Yeah.
12        MS. POTTHOFF: That's right.
13   Q.    For that six-month period of time, did
14   anybody at Benny Whitehead write you or tell you
15   that you needed to find a driver to team with?
16   A.    No.
17   Q.    For six months they didn't?
18   A.    No.
19   Q.    Did anybody during those six months tell you
20   that you had to have two years' experience to
21   drive?
22   A.    No.
23   Q.    Had you ever heard that from any source?

45 (Pages 177 to 180)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 181

1  A.  If I did, I don't remember it.
2  Q.  Okay.  Well, how many folks does Benny
3  Whitehead -- how many drivers does he have?
4  A.  I don't know for sure.  Probably 100 or
5  more.
6  Q.  Do you think that any of them would be
7  suitable for you to work with?
8  A.  I hope they would.
9  Q.  Okay.  Well, do you think any of them have
10 more than two years of experience?
11 A.  Yeah.
12 Q.  Well, and this criteria about your partner,
13 you never expressed anything other than a
14 preference, correct?
15 A.  Yes.
16 Q.  That you smoked and you would like to ride
17 with somebody that didn't object to your smoking,
18 right?
19 A.  Yes.
20 Q.  Well, if you're going to be gone for four or
21 five days, you're going to have a cigarette,
22 aren't you?
23 A.  Yes.

Page 182

1  Q.  So that needs to be part of the deal.  They
2  need to know going in, right?
3  A.  Right.
4  Q.  And you didn't care if you worked with a man
5  or a woman, did you?
6  A.  No.  I just asked that it be somebody white.
7  That's close quarters.
8  Q.  It is close quarters.  But, now, when you
9  work as a team driver, there's never any occasion
10 when both of you are sleeping in the truck, is
11 there? or is there?
12 A.  Yes.
13 Q.  There is?  Okay.  Well, I thought somebody
14 was driving all the time.
15 A.  No.  Sometimes you get laid over or you have
16 to wait on a load.
17 Q.  Okay.  Well, it's rare that you both would
18 be sleeping, isn't it?
19 A.  It don't happen often, but it does happen.
20 Q.  Okay.  Somebody's supposed to be driving,
21 unless you're waiting on a load?
22 A.  Right.
23 Q.  I mean, you're not making money unless

Page 183

1  you're driving, right?
2  A.  Right.
3  Q.  Okay.  There's nobody from PeopLease that's
4  at the Benny Whitehead location in Eufaula,
5  correct, that you know about?
6  A.  That I know about.
7  Q.  I mean, all your contact with PeopLease was
8  by phone; is that correct?
9  A.  Right.  Or through one of Benny's employees.
10 Q.  Okay.  But you got a check from PeopLease
11 and you got a W-2 from PeopLease?
12 A.  Right.
13     MS. POTTHOFF:  To clarify for you, it's
14 like Benny Whitehead, Inc., PeopLease.
15     MR. ROBERSON:  Whatever.  Okay.
16     MS. POTTHOFF:  So it has both.
17 Q.  But you are dispatched -- that is, your
18 loads are assigned in Eufaula, right, by people
19 you believe work for Benny Whitehead, right?
20 A.  Yes.
21 Q.  It wasn't anybody at PeopLease that says,
22 You've got a load; come on down here?
23 A.  Correct.

Page 184

1  Q.  Okay.  Now, in going through trying to get
2  back to work, did you call PeopLease -- call
3  somebody at the PeopLease in South Carolina?
4  A.  Yes.
5  Q.  And did you ask about your employment
6  status?
7  A.  Yes.
8  Q.  And you were told what?
9  A.  That I abandoned my job.
10 Q.  Okay.  And that they hadn't ever gotten your
11 paperwork for release?
12 A.  That they never got my paperwork for
13 release.
14 Q.  Now, had you abandoned your job?
15 A.  No.
16 Q.  Okay.  And then you wrote Eddie Whitehead
17 and told him that they told you that you had
18 abandoned your job, and either you wanted to go to
19 work or get your holdback money, right?
20 A.  Right.
21 Q.  And what happened?
22 A.  He sent me my holdback money.
23 Q.  Do you know, in the history of Benny

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 185

1  Whitehead, anybody that's ever gotten their
2  holdback money that was still working there?
3  A.   That was part of the stipulation, I thought.
4  That you didn't get it unless you left the
5  company.
6  Q.   Okay.
7  A.   That was my understanding.
8  Q.   Okay.
9       MR. ROBERSON:  Courtney, did you mark
10  as an exhibit that thing about -- that list, that
11  roster?  Or is that just something I was looking
12  at?
13      MS. POTTHOFF:  Are you talking about
14  the driver roster?
15      MR. ROBERSON:  Yeah.
16      MS. POTTHOFF:  Huh-uh.  Since she said
17  she didn't know anybody out there, I wasn't going
18  to mark it and just go through them.
19      MR. ROBERSON:  Well, that's all right.
20  Q.   Thank you, Gloria.
21  BY MS. POTTHOFF:
22  Q.   Okay.  Gloria, I've just got a few
23  questions.

Page 186

1     You said in the history of Benny Whitehead,
2  Inc., you don't know anybody that's ever gotten
3  their holdback money that hadn't left their job or
4  that is still working out there.
5     Tell me, what do you base your opinion about
6  the holdback policy at Benny Whitehead?
7  A.   I don't understand.
8  Q.   Well, did somebody tell you that that was a
9  policy of Benny Whitehead, Inc., not to return
10  holdback money to somebody that might be
11  temporarily out of work, or what their policy
12  regarding the holdback money was?
13  A.   That they held the money back; and when you
14  left the company, if you had any damages on loads
15  or anything like that ...
16      MR. ROBERSON:  It's in the Benny
17  Whitehead manual.
18  Q.   Right.  I mean, they have the rules and
19  regulations about ...
20  A.   But she read that to me that day and went
21  over it.
22  Q.   Okay.  But you understand that the
23  circumstances under which you were returned your

Page 187

1  holdback money were clarified and discussed in the
2  letter that came with the holdback money, right?
3  I mean you can't get any clearer than that.
4     The reasons and the circumstances under
5  which you were getting your holdback money was all
6  discussed in the cover letter that came with it,
7  right?
8       MR. ROBERSON:  They sent her a letter
9  with her holdback money.
10      MS. POTTHOFF:  Right.
11      MR. ROBERSON:  We don't disagree with
12  that.
13  Q.   And the reason for sending the holdback
14  money is discussed in the letter that came with
15  the holdback money, right?
16  A.   No.  It just says, "At this time, I still
17  don't have anyone I can put you to, so I have
18  enclosed a check for your holdback."
19  Q.   Right.
20  A.   "As soon as I come up with something, I'll
21  give you a call."
22  Q.   All right.  I'm not going to argue with you
23  about it.  But the reality is that that letter

Page 188

1  came with your holdback money.
2  A.   Yes.
3  Q.   All right.  And do you have any personal
4  knowledge of anybody's return of their holdback
5  money and the circumstances under which it was
6  returned?
7  A.   Mike got his when they fired him.
8  Q.   All right.  Anybody else?
9  A.   No.
10  Q.   Okay.  If Mike hadn't failed the drug test,
11  do you think you would still be driving a truck
12  today with Mike?
13  A.   Yeah, if he were still here.
14  Q.   Right.  If he were still alive.
15     Now, tell me, D.A. Bryant, do you know what
16  he does right now?
17  A.   He's doing short hauls, last I talked to
18  him.
19  Q.   Okay.  Tell me, why were you talking to D.A.
20  last time you talked to him?
21  A.   We have kept in touch off and on.
22  Q.   Okay.  Did you ever say to D.A., Dude, I'm
23  in a tight; I need a partner.  What's up?  We did

47 (Pages 185 to 188)

**LEGALINK, A MERRILL COMMUNICATIONS COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 189

1  well together for two days.
2  A.   I talked to him, and he said he had a
3  partner at one time; and then he told me last time
4  he's doing short hauls.
5  Q.   Did you ever ask him to be your partner
6  again?
7  A.   No.
8  Q.   Okay.  When was the last time you talked to
9  D.A.?
10  A.   Right after Mike died.
11  Q.   And how many times have you talked to him
12  since June of 2005?
13  A.   I don't know.
14  Q.   I mean, more than once?
15  A.   Yeah.
16  Q.   Okay.  That's all I have.
17        MR. CALTON:  I've got a follow-up.
18  BY MR. CALTON:
19  Q.   For the ten months or so that you were
20  driving for Benny Whitehead, Inc., did you get to
21  know any of the other drivers, other than Mike and
22  D.A.?
23  A.   The Kirkhams.

Page 190

1  Q.   Anyone else?
2  A.   No.
3  Q.   Okay.  Did you ever make an effort to get to
4  know any other drivers?
5  A.   You don't usually see the other drivers
6  unless you're at the Christmas party.
7  Q.   Did you go to the Christmas party.
8  A.   I went to one.
9  Q.   So you don't know or you did not know at the
10  time any other drivers at Benny Whitehead, Inc.,
11  other than D.A., Mike --
12  A.   I didn't know D.A. until they partnered me
13  with him.
14  Q.   Okay.  But my question is:  Did you know
15  anyone other than the Kirkhams, D.A., and Mike?
16  A.   I would see faces.  I couldn't tell you the
17  name of anybody.  I didn't know anybody but the
18  Kirkhams.
19  Q.   All right.  No further questions.
20
21
22        FURTHER THE DEPONENT SAITH NOT
23

Page 191

1              C E R T I F I C A T E
2
3  STATE OF ALABAMA
4  BARBOUR COUNTY
5
6        I hereby certify that the above and
7  foregoing deposition was taken down by me in
8  stenotype and the questions and answers thereto
9  were transcribed by means of computer-aided
10  transcription, and that the foregoing represents
11  a true and correct transcript of the testimony
12  given by said witness upon said hearing.
13        I further certify that I am neither of
14  counsel, nor kin to the parties to the action,
15  nor am I in anywise interested in the result of
16  said cause.
17
18
19
20
21        CYNTHIA M. NOAKES,
22        COURT REPORTER and
23        COMMISSIONER

48 (Pages 189 to 191)